1  ROBERT E. OPERA – State Bar No. 101182
   ropera@wcghlaw.com
2  PETER W. LIANIDES – State Bar No. 160517
   plianide@wcghlaw.com
3  **WINTHROP COUCHOT**
   **GOLUBOW HOLLANDER LLP**
4  1301 Dove Street, Suite 500
   Newport Beach, CA 92660
5  Telephone:   (949) 720-4100
   Facsimile:    (949) 720-4111
6
7  General Insolvency Counsel for Debtor and Debtor-
   in-Possession, Lovejoy's Family Moving, Inc., dba
8  Republic Moving & Storage

9

10                **UNITED STATES BANKRUPTCY COURT**

11                **CENTRAL DISTRICT OF CALIFORNIA**

12                       **RIVERSIDE DIVISION**

13

| | |
|---|---|
| In re | Case No. 6:18-bk-16624-SC |
| LOVEJOY'S FAMILY MOVING, INC., dba REPUBLIC MOVING & STORAGE, | Chapter 11 Proceeding |
| | **DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT ACCOMPANYING DEBTOR'S SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION** |
| Debtor and Debtor-in-Possession. | **Disclosure Statement Hearing** |
| | Date:     April 2, 2019 |
| | Time:     1:30 p.m. |
| | Place:    Court Room 126 |
| | 3420 Twelfth Street |
| | Riverside, CA 92501 |
| | -OR- |
| | Courtroom 5C |
| | 411 W. Fourth Street |
| | Santa Ana, CA 92701 |
| | **Plan Confirmation Hearing** |
| | Date:     June 11, 2019 |
| | Time:     1:30 p.m. |
| | Place:    Court Room 126 |
| | 3420 Twelfth Street |
| | Riverside, CA 92501 |
| | -OR- |
| | Courtroom 5C |
| | 411 W. Fourth Street |
| | Santa Ana, CA 92701 |

| | | |
|---|---|---|
| I. | INTRODUCTION ................................................................................................ | 2 |
| | | |
| II. | DEFINITIONS AND RULES OF CONSTRUCTION ........................................... | 6 |
| | A. Defined Terms. ......................................................................................... | 6 |
| | B. Rules of Interpretation ............................................................................ | 20 |
| | C. Exhibits ................................................................................................... | 21 |
| | | |
| III. | OVERVIEW OF THE CHAPTER 11 PROCESS, THE PLAN AND VOTING ON THE PLAN ................................................................................ | 21 |
| | A. The Chapter 11 Process ........................................................................... | 21 |
| | B. Overview of the Debtor's Proposed Plan. ................................................ | 22 |
| | C. Plan Confirmation and Voting and Objections to the Plan........................ | 23 |
| |     1. Voting on the Plan. ....................................................................... | 23 |
| |     2. Deadline for Voting for or Against the Plan. .................................. | 24 |
| |     3. Time and Place of the Confirmation Hearing. ................................ | 25 |
| |     4. Deadline For Objecting to the Confirmation of the Plan.................. | 25 |
| |     5. Plan Confirmation. ....................................................................... | 26 |
| |     6. Identity of Person to Contact for More Information Regarding this Disclosure Statement or the Plan. ............................................. | 27 |
| | | |
| IV. | BACKGROUND OF THE DEBTOR ................................................................. | 27 |
| | A. Description and History of the Debtor's Business ................................... | 27 |
| |     1. Debtor's Business ......................................................................... | 27 |
| |     2. Debtor's Financial Affairs ............................................................ | 27 |
| |     3. Corporate History......................................................................... | 27 |
| |     4. Events Precipitating the Debtor's Bankruptcy Filing ...................... | 28 |
| | B. Management of the Debtor ....................................................................... | 30 |
| |     1. Officer ........................................................................................... | 30 |
| |     2. Corporate Director. ...................................................................... | 30 |
| | C. Significant Events During the Case........................................................... | 30 |
| |     1. Debtor's Employment of Counsel ................................................. | 30 |
| |     2. Debtor's Employment of Accountants............................................ | 31 |
| |     3. Bar Date ........................................................................................ | 31 |
| |     4. Cash Collateral Stipulations.......................................................... | 31 |
| |     5. Motion to Reject Leases and Contracts .......................................... | 31 |
| |     6. Motion to Extend Time to Assume or Reject Real Property Lease... | 31 |
| |     7. Motion to Extend Debtor's Plan Exclusivity Rights........................ | 32 |
| |     8. Motion for Approval of Compromise and Transaction Outside of the Ordinary Course of the Debtor's Business ......................................... | 32 |
| |     9. Motion to Approve Compromise of Litigation................................. | 32 |
| | | |
| V. | LITIGATION AND OBJECTIONS TO CLAIMS............................................... | 33 |
| | A. Litigation Commenced Prior to the Petition Date........................................ | 33 |
| | B. Litigation Commenced After the Petition Date ......................................... | 33 |
| | | |
| VI. | DESCRIPTION OF THE PLAN ......................................................................... | 34 |
| | A. Basic Structure of the Plan........................................................................ | 34 |
| | B. Classification and Treatment of Claims...................................................... | 34 |
| | C. Unclassified Claims .................................................................................. | 35 |

|  |  | 1. | Allowed Administrative Claims. | 35 |
|  |  | 2. | Priority Tax Claims. | 38 |
|  | D. | Classification of Claims and Interests Under the Plan | 38 |
|  |  | 1. | Overview | 38 |
|  |  | 2. | Designation of Classes. | 39 |
|  |  | 3. | Summary of Classification | 40 |

VII. TREATMENT OF CLASSES UNDER THE PLAN.................................................. 41
- A. Class 1 -- Allowed Secured Claim of BOW ........................................ 41
  1. Allowed Claims of BOW.................................................... 41
  2. Treatment of Allowed Secured Claim of BOW............................ 41
  3. BOW Subordinated Claim ................................................ 43
  4. Allowed General Unsecured Claim of BOW.............................. 46
  5. Modification of the BOW Loan Documents............................... 46
- B. Class 2 -- Treatment of Any Allowed Secured Claims of Creditors Listed in Section 4.2.1.2 of the Plan ................................................. 46
  1. Class 2(a) -- Exchange Bank.............................................. 46
  2. Class 2(b) -- GreatAmerica .............................................. 49
  3. Class 2(c) -- Trans Advantage ........................................... 51
  4. Class 2(d) -- Western Equipment ........................................ 53
  5. Class 2(e) -- Allegiant ................................................... 56
- C. CLASS 3 -- TREATMENT OF ANY ALLOWED SECURED CLAIMS OTHER THAN CLASS 1 AND CLASS 2 CLAIMS ............................... 58
- D. CLASS 4 -- ALLOWED PRIORITY NON-TAX CLAIMS ....................... 59
- E. CLASS 5 -- ALLOWED GENERAL UNSECURED CLAIMS .................. 59
  1. Distributions on Account of Allowed General Unsecured Claims.... 59
  2. No Post-Petition Interest .................................................. 60
  3. Termination of the Reorganized Debtor's Obligations to Holders of Allowed General Unsecured Claims..................................... 60
  4. Insider's Contribution of Distributions Payable to Insider ............ 60
  5. Treatment of Allowed Deficiency Claims ................................ 61
- F. CLASS 6 -- ALLOWED INTERESTS....................................... 61
  1. Retention of Interest....................................................... 61
  2. New Value. ................................................................ 61

VIII. MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN ................. 62
- A. Overview........................................................................ 62
- B. Condition Precedent to Plan Confirmation. ................................ 62
- C. Conditions Precedent to the Effectiveness of the Plan. .................. 62
- D. Implementation of Plan on the Effective Date............................. 63
- E. Corporate Action.............................................................. 63
- F. Reorganized Debtor. .......................................................... 63
- G. Plan Funding and Administration. .......................................... 64
  1. Plan Funding. .............................................................. 64
  2. Reorganized Debtor's Authority for Implementation of Plan. ........ 65
  3. Representative of the Estate. ............................................. 65
  4. No Liability of the Reorganized Debtor. ................................ 66
- H. Powers and Duties of the Reorganized Debtor. ........................... 66
- I. Causes of Action................................................................ 67

| | | | |
|---|---|---|---|
| J. | Post-Effective Date Professional Fees. | | 68 |
| K. | Disposition of Plan Assets. | | 68 |
| L. | Compromise of Controversies. | | 69 |
| M. | Objections to Disputed Claims. | | 69 |
| N. | Bankruptcy Court Approval Relative to Post-Confirmation Matters. | | 69 |
| O. | Resolution of Disputes. | | 69 |
| P. | Reorganized Debtor's Enforcement of Rights and Remedies. | | 69 |
| Q. | Other Rights, Powers and Duties of Reorganized Debtor. | | 69 |
| R. | Final Decree. | | 70 |
| S. | Distributions. | | 70 |
| | 1. | Designation and Role of the Disbursing Agent. | 70 |
| | 2. | Distribution of Property Under the Plan. | 70 |
| T. | OBJECTIONS TO DISPUTED CLAIMS. | | 73 |
| | 1. | Exclusive Right to Object to Claims. | 73 |
| | 2. | Claims Objection Deadline. | 73 |
| | 3. | Investigation Regarding Disputed Claims. | 73 |
| U. | Treatment of Disputed Claims. | | 74 |
| | 1. | No Distribution Pending Allowance. | 74 |
| | 2. | Distribution After Allowance. | 74 |
| | 3. | Reserve for Disputed Claims. | 74 |
| | 4. | No Distribution Until Allowance of Disputed Claim. | 75 |
| | 5. | Bar Date for Filing Avoidance Action Payment Claims. | 75 |
| V. | Litigation. | | 76 |
| | 1. | Reorganized Debtor's Authorization to Assert Causes of Action. | 76 |
| | 2. | Reorganized Debtor's Evaluation of Causes of Action. | 76 |
| | 3. | Retention of Professionals. | 76 |
| | 4. | Preservation of Causes of Action. | 77 |
| | 5. | Subordination of Claims. | 77 |
| W. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES. | | 78 |
| | 1. | Executory Contracts and Unexpired Leases Being Assumed. | 78 |
| | 2. | Executory Contracts and Unexpired Leases Being Rejected. | 79 |
| | 3. | Retention of Property Rights. | 80 |
| | 4. | Bar Date for Rejection Claims. | 80 |
| | 5. | Cure Claims Schedule. | 80 |
| X. | POST-EFFECTIVE DATE NOTICE. | | 81 |
| Y. | MISCELLANEOUS PLAN PROVISIONS. | | 81 |

| | | |
|---|---|---|
| IX. EFFECT OF CONFIRMATION OF THE PLAN | | 82 |
| A. | Discharge. | 82 |
| B. | Injunction/Release. | 82 |
| C. | Distribution of Property Free and Clear of Liens, Claims and Interests. | 82 |
| D. | Binding Effect of Plan. | 82 |
| E. | REVESTING OF ASSETS. | 83 |

| | | |
|---|---|---|
| X. LIMITATION OF LIABILITY | | 83 |
| A. | No Liability for Solicitation or Participation. | 83 |
| B. | Good Faith. | 83 |
| C. | Limitation of Liability Regarding Plan Confirmation. | 83 |

XI. CERTAIN RISK FACTORS TO BE CONSIDERED ......................................    84

    A.    Risk that the Debtor Will Have Insufficient Cash for the Plan to Become
          Effective. ...........................................................................................    84
    B.    Risk Regarding the Distributions to Be Made to Class 5 Creditors. ............    84
    C.    Bankruptcy Risks. ...........................................................................    85

XII. CONFIRMATION OF THE PLAN .................................................................    85

    A.    Introduction. ...................................................................................    85
    B.    Votes Necessary to Confirm the Plan ...............................................    86
    C.    Votes Necessary for a Class to Accept the Plan. ...............................    86
    D.    Treatment of Non-Accepting Classes. .............................................    86
          1.    Secured Claims ..................................................................    87
          2.    General Unsecured Claims ...................................................    87
    E.    Request for Confirmation Despite Non-Acceptance by Impaired Class(es).    87
    F.    Feasibility of the Plan. ....................................................................    88
          1.    Feasibility Analysis. .........................................................    88
          2.    Funding of Distributions Required by the Plan. . .................    95
    G.    LIQUIDATION ANALYSIS ...........................................................    97
          1.    BOW'S Resort to its Remedies ...........................................    100
          2.    Reduced Value of Assets in Liquidation ............................    100
          3.    Increased Amount of Claims in Liquidation .......................    102

XIII. CERTAIN UNITED STATES FEDERAL TAX CONSEQUENCES OF THE PLAN    105

    A.    INTRODUCTION. ..........................................................................    105
    B.    CONSEQUENCES TO THE DEBTOR. ..........................................    105
    C.    WITHHOLDING OF TAXES. ........................................................    106

XIV. RECOMMENDATION ................................................................................    106

# I.

# **INTRODUCTION**

Lovejoy's Family Moving, Inc. dba Republic Moving & Storage, Inc., the Debtor in the Case, provides this Disclosure Statement to Creditors.[1]  This Disclosure Statement is furnished for the purpose of soliciting acceptances to the Plan, which has been filed with the Bankruptcy Court. A copy of the Plan accompanies this Disclosure Statement.

Section 1125 of the Bankruptcy Code requires that, at the time when the Plan is delivered to Creditors, the Plan be accompanied by this Disclosure Statement.[2]  The purpose of this Disclosure Statement is to provide adequate information of a kind, and in sufficient detail, so far as is reasonably practicable, in light of the nature and history of the Debtor and the condition of the Debtor's books and records, to enable a typical Creditor to make an informed judgment about the Plan and to enable such Creditor to determine whether it is in his best interest to vote for (accept) or against (reject) the Plan.

This Disclosure Statement contains a description of the Plan and other information relevant to a Creditor's decision whether to vote to accept or to reject the Plan.  The Debtor urges Creditors to read this Disclosure Statement because it contains important information concerning the Debtor's history, business, assets and liabilities and because it sets forth a summary of the Plan.

This Disclosure Statement does not purport to be a complete description of the Plan, the financial data pertaining to the Debtor, the applicable provisions of the Bankruptcy Code, or any other matters that may be deemed significant by Creditors.  Out of practical necessity, this Disclosure Statement represents an attempt to summarize extensive financial data, legal documents and legal principles, including provisions of the Bankruptcy Code, and set them forth in an understandable, readable form.  Thus, although the Debtor has attempted to describe fairly

---

[1] The definitions of the capitalized terms used in this Disclosure Statement are contained in Article II of this Disclosure Statement.

[2] Section 1125(b) provides, in pertinent part, as follows:

An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

and accurately the matters set forth and discussed in this Disclosure Statement, the Debtor desires to emphasize that the documents referred to or summarized in this Disclosure Statement (including, without limitation, historical financial information for the Debtor's business operations) are available for review by contacting the Debtor's attorneys, Winthrop Couchot Golubow Hollander, LLP ("Winthrop Couchot") (Attn: Jeannie Martinez), at the address set forth at the upper left-hand corner of the first page of this Disclosure Statement.

If a Creditor does not fully understand this Disclosure Statement, or feels that the information provided herein is insufficient to enable him to determine whether to accept or to reject the Plan, he is invited to make written inquiry of the Debtor's attorneys, Winthrop Couchot (Attn: Peter W. Lianides), at its address set forth at the upper left-hand corner of the first page of this Disclosure Statement.

While this Disclosure Statement provides a summary of the provisions of the Plan, if any inconsistency exists between the Plan and the Disclosure Statement, the provisions of the Plan are controlling. Therefore, Creditors are urged to review carefully the provisions of the Plan.

Only holders of Claims allowed under section 502 of the Bankruptcy Code or Claims temporarily allowed for voting purposes under Rule 3018(a) of the Federal Bankruptcy Rules, and whose Claims are in those Classes of Claims that are "impaired" under the Plan, are entitled to vote to accept or reject the Plan.[3] Classes of Claims that are not impaired are conclusively presumed to have voted to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan.

Voting on the Plan, by each holder of a Claim entitled to vote on the Plan, is important. To vote to accept or reject the Plan, a Creditor must indicate his acceptance or rejection thereof on the ballot that accompanies this Disclosure Statement and return it, by mail or by e-mail transmission, to Winthrop Couchot (Attn: Jeannie Martinez) such that the ballot is actually received by Winthrop Couchot by 5:00 p.m. on May 10, 2019. The mailing address for Winthrop Couchot is listed in the upper left-hand corner of the first page of this Disclosure Statement. Each

---

[3] Under section 1124 of the Bankruptcy Code, a Class of Claims is impaired if the legal, equitable, or contractual rights of the Claims in the Class are altered.

Class of Creditors allowed to vote on the Plan will be deemed to have accepted the Plan if the Plan is accepted by valid ballots cast by Creditors in that Class holding at least two-thirds (2/3) in dollar amount and more than one half (1/2) in number of the Allowed Claims of Creditors in that Class actually voting on the Plan. **ONLY PROPERLY EXECUTED BALLOTS TIMELY TENDERED TO COUNSEL FOR THE DEBTOR WILL BE COUNTED AS HAVING VOTED ON THE PLAN.**

Since mail delays may occur, and because time is of the essence, it is important that ballots be returned well in advance of the date specified hereinabove as the deadline for Winthrop Couchot to receive ballots. Unless otherwise allowed by the Bankruptcy Court, any ballots received after such deadline will <u>not</u> be included in any calculation to determine whether the Debtor's Creditors have accepted or rejected the Plan.

At the Confirmation Hearing, the Bankruptcy Court will determine, pursuant to section 1129 of the Bankruptcy Code, whether the Plan has been accepted by the necessary Classes created under the Plan, and, if not, whether the Bankruptcy Court should nevertheless confirm the Plan. If at such hearing the Bankruptcy Court should determine that the Plan meets all of the requirements for confirmation prescribed by the Bankruptcy Code, the Bankruptcy Court will enter a Confirmation Order. Pursuant to section 1141 of the Bankruptcy Code, the effect of the Confirmation Order will be to make the provisions of the Plan binding upon the Debtor, each Creditor, regardless of whether the Creditor voted to accept the Plan, and upon the Interest Holder.

Pursuant to section 1128 of the Bankruptcy Code, any party-in-interest may object to the confirmation of the Plan. The Bankruptcy Court has fixed May 10, 2019, at 5:00 p.m., as the deadline for filing an objection to the Plan and for serving a copy thereof upon the Debtor's attorneys, Winthrop Couchot, at the address set forth hereinabove, and upon the United States Trustee. The branch office of the United States Trustee in which the Case is being administered is located at 3801 University Ave, Suite 720, Riverside, California 92501. Any objections or other written communications to the United States Trustee respecting the Plan or the Case should be mailed to the attention of Abram S. Feuerstein, Esq., at that address.

THIS IS A SOLICITATION BY THE DEBTOR.  NO REPRESENTATIONS CONCERNING THE DEBTOR, INCLUDING, BUT NOT LIMITED TO, REPRESENTATIONS AS TO ITS ASSETS, THE AMOUNT OF CLAIMS AGAINST THE ESTATE, OR ANY TAX EFFECT OF THE TRANSACTIONS PROPOSED UNDER THE PLAN, ARE AUTHORIZED BY THE DEBTOR, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO CERTIFIED AUDIT.  RECORDS KEPT BY THE DEBTOR RELY FOR THEIR ACCURACY ON BOOKKEEPING PERFORMED INTERNALLY BY THE DEBTOR.  THE DEBTOR BELIEVES THAT EVERY REASONABLE EFFORT HAS BEEN MADE TO PRESENT FINANCIAL INFORMATION AS ACCURATE AS IS REASONABLY PRACTICABLE GIVEN THE NATURE AND HISTORY OF THE DEBTOR'S BUSINESS AND THE CONDITION OF THE DEBTOR'S BOOKS AND RECORDS.  HOWEVER, THE RECORDS KEPT BY THE DEBTOR ARE NEITHER WARRANTED NOR REPRESENTED TO BE FREE OF INACCURACY.  NEITHER COUNSEL TO THE DEBTOR, NOR ANY ACCOUNTANT TO THE DEBTOR HAS INDEPENDENTLY VERIFIED THE INFORMATION CONTAINED HEREIN, OR MAKES ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE ACCURACY THEREOF.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR DISPUTED CLAIM OR CAUSE OF ACTION IS NOT IDENTIFIED IN THIS DISCLOSURE STATEMENT.  IN ACCORDANCE WITH THE PROVISIONS OF THE PLAN, THE REORGANIZED DEBTOR MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE OBJECTIONS TO CLAIMS OR CAUSES OF ACTION, WHETHER OR NOT SUCH OBJECTIONS OR CAUSES OF ACTION ARE IDENTIFIED IN THIS DISCLOSURE STATEMENT.

ALL PARTIES ENTITLED TO VOTE ON THE PLAN ARE URGED TO REVIEW CAREFULLY THE PLAN AND THIS DISCLOSURE STATEMENT PRIOR TO VOTING

ON THE PLAN.  THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED IN ANY MANNER TO BE LEGAL, BUSINESS OR TAX ADVICE.  EACH CREDITOR SHOULD CONSULT WITH HIS OWN LEGAL COUNSEL, BUSINESS ADVISOR, CONSULTANT OR ACCOUNTANT PRIOR TO VOTING ON THE PLAN IN ORDER TO ENSURE A COMPLETE UNDERSTANDING OF THE TERMS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF THE CREDITORS OF THE DEBTOR TO ASSIST THEM TO MAKE AN INFORMED DECISION REGARDING THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT INDICATES ONLY THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION FOR THE PURPOSE OF SOLICITATION OF ACCEPTANCES TO THE PLAN BY THE DEBTOR, AND NOT ANY RECOMMENDATION REGARDING WHETHER A CREDITOR SHOULD VOTE TO ACCEPT OR TO REJECT THE PLAN.

ANY DISCUSSION OF TAX MATTERS CONTAINED HEREIN IS NOT INTENDED TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING ANY TAX OR TAX PENALTIES THAT MAY BE IMPOSED ON ANY PERSON.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED OR REFERRED TO IN PROMOTING, MARKETING OR RECOMMENDING A PARTNERSHIP OR OTHER ENTITY, INVESTMENT PLAN, OR OTHER ARRANGEMENT TO ANY PERSON.  ALL CREDITORS SHOULD CONSULT WITH THEIR OWN LEGAL COUNSEL AND/OR ACCOUNTANTS AS TO LEGAL, TAX, AND OTHER MATTERS CONCERNING THEIR CLAIMS.

## II.

## DEFINITIONS AND RULES OF CONSTRUCTION

### A.    Defined Terms.

The following terms (which appear in this Disclosure Statement as capitalized terms), when used in this Disclosure Statement, have the meanings set forth below.

1.      **<u>"Administrative Claim"</u>** means a Claim for costs or expenses that are allowable under sections 503(b) or 507(b) of the Bankruptcy Code or 28 U.S.C. § 1930. These costs or expenses may include: (a) actual, necessary costs and expenses of preserving the Estate after the Petition Date; (b) Ordinary Course Administrative Claims; (c) Pre-Effective Date Professional Fee Claims; (d) Administrative Tax Claims; and (e) United States Trustee Fees.

2.      **<u>"Administrative Claims Bar Date"</u>** has the meaning set forth in Paragraph VI(C)(1)(b) of this Disclosure Statement.

3.      **<u>"Administrative Claims Objection Deadline"</u>** has the meaning set forth in Paragraph VI(C)(1)(c) of this Disclosure Statement.

4.      **<u>"Administrative Tax Claim"</u>** means a Tax Claim, other than a Secured Claim, that a governmental unit asserts against the Debtor for any tax period that, in whole or in part, falls within the period commencing on the Petition Date and ending on the Effective Date.

5.      **<u>"Allegiant"</u>** means Allegiant Partners, Inc.

6.      **<u>"Allowed Administrative Claim"</u>** means an Administrative Claim that is allowed as set forth in Section 3.1 of the Plan or otherwise by a Final Order.

7.      **<u>"Allowed Avoidance Action Payment Claim"</u>** means an Allowed Claim based upon or arising from an entity's payment to the Debtor of a claim asserted against the entity pursuant to an Avoidance Action.  Any Allowed Avoidance Action Payment Claim is treated under the Plan as an Allowed Class 5 Claim.

8.      **<u>"Allowed Claim"</u>** means a Claim (a) that is listed in the Bankruptcy Schedules filed with the Bankruptcy Court by the Debtor and not listed as disputed, contingent, unliquidated or unknown as to amount and as to which no timely objection has been filed; (b) with respect to which a Proof of Claim has been filed by the Bar Date, and as to which no objection is filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or by order of the Bankruptcy Court, or as to which any such objection has been determined in whole or in part in favor of the holder of the Claim

by a Final Order; or (c) that has been resolved pursuant to a settlement agreement approved by Final Order of the Court or otherwise authorized pursuant to the Plan. Pursuant to the Plan, the amount of an Allowed Claim will be as follows: (i) if the Creditor did not file a Proof of Claim with the Bankruptcy Court on or before the Bar Date, the amount of the Creditor's Claim as listed in the Bankruptcy Schedules as neither disputed, contingent, unliquidated or unknown; or (ii) if the Creditor filed a Proof of Claim with the Bankruptcy Court on or before the Bar Date, (1) the amount stated in such Proof of Claim if no objection to such Proof of Claim is filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or by order of the Bankruptcy Court, (2) the amount thereof fixed by a Final Order of the Bankruptcy Court if an objection to such Proof of Claim is filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or by order of the Bankruptcy Court; or (3) the amount fixed pursuant to a settlement agreement approved by Final Order of the Court or otherwise authorized pursuant to the Plan. Any Claim that is not filed by the Bar Date and that is listed in the Bankruptcy Schedules as disputed, unliquidated, contingent or unknown, or that is not allowed under the terms of the Plan, will be disallowed pursuant to the Plan, and no Distribution will be made on account of such Claim.

9.    **"Allowed Class '***' Claim"** means an Allowed Claim classified in the specified Class.

10.    **"Allowed Deficiency Claim"** means that portion of an Allowed Claim that is in excess of the value of any Collateral which is security for the repayment of such Claim, calculated in accordance with the provisions of section 506 of the Bankruptcy Code.

11.    **"Allowed General Unsecured Claim"** means an unsecured Allowed Claim against the Debtor, however arising, not entitled to priority under section 507(a) of the Bankruptcy Code, including, without limitation, an Allowed Deficiency Claim, an Allowed Rejection Claim or an Allowed Avoidance Action Payment Claim.

12.    **"Allowed Priority Non-Tax Claim"** means an unsecured Allowed Claim entitled to priority pursuant to sections 507(a)(4), 507(a)(5), or 507(a)(7) of the Bankruptcy Code.

13.    **"Allowed Priority Tax Claim"** means an Allowed Claim entitled to priority under section 507(a)(8) of the Bankruptcy Code.

14.    **"Allowed Rejection Claim"** means an Allowed General Unsecured Claim based upon or arising from the rejection of an executory contract or unexpired lease pursuant to a Final Order of the Bankruptcy Court or pursuant to the Plan.  Any Allowed Rejection Claim is treated under the Plan as an Allowed Class 5 Claim.

15.    **"Allowed Secured Claim"** means an Allowed Claim secured by a valid and unavoidable Lien against property in which the Estate has an interest, or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value, determined in accordance with section 506(a) of the Bankruptcy Code, of the Secured Creditor's interest in the Estate's interest in the Collateral securing the Claim, or to the extent of the amount subject to setoff, whichever is applicable.  Pursuant to the Plan, unpaid principal and any accrued interest allowable under section 506 of the Bankruptcy Code with respect to an Allowed Secured Claim will be computed as of the Effective Date, and the Allowed Secured Claim will thereafter bear interest as provided in the Plan.

16.    **"Assets"** means all assets and properties of the Debtor's Estate, as set forth in section 541 of the Bankruptcy Code.

17.    **"Avoidance Action"** means an adversary proceeding, lawsuit or other action or proceeding filed pursuant to sections 502(d), 506, 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552, 553 or other sections of the Bankruptcy Code, an adversary proceeding, lawsuit or other action or proceeding based on applicable non-bankruptcy law that may be incorporated or brought under the foregoing sections of the Bankruptcy Code, an adversary proceeding, lawsuit or other action or proceeding arising under, or relating to, any similar state law or federal law, and any other similar action or proceeding filed to recover property for or on behalf of the Estate, or to avoid a Lien or transfer, whether or

not such adversary proceeding, lawsuit, action or proceeding is initiated on or before the Effective Date.

18.     **"Avoidance Action Payment Claim"** means a Claim based upon or arising from an entity's payment to the Debtor of a claim asserted against the entity pursuant to an Avoidance Action.

19.     **"Bankruptcy Code"** means the United States Bankruptcy Code, as set forth in 11 U.S.C. §§ 101-1532, as now in effect and as may be hereafter amended.

20.     **"Bankruptcy Court"** means the United States Bankruptcy Court for the Central District of California, Riverside Division.

21.     **"Bankruptcy Rules"** means, collectively, the Federal Bankruptcy Rules and the Local Bankruptcy Rules.

22.     **"Bankruptcy Schedules"** means the Schedules of Assets and Liabilities and Statement of Financial Affairs filed by the Debtor in the Case, as they may have been amended and as they may be amended hereafter from time to time.

23.     **"Bar Date"** means the last date for Creditors whose Claims are not scheduled, or whose Claims are scheduled in the Bankruptcy Schedules as disputed, contingent, unliquidated or unknown as to amount, to file Proofs of Claim, as set forth in an order of the Bankruptcy Court entered on September 20, 2018.  The Bar Date for filing a Proof of Claim on account of a General Unsecured Claim was December 14, 2018.

24.     **"BOW** means Bank of the West.

25.     **"BOW Loan Documents"** means, collectively, the loan and security agreements among the Debtor, on one hand, and BOW, on the other hand, as such loan and security agreements may have been amended and as they may be amended hereafter from time to time, including, without limitation, the following instruments and agreements:

      a.     Business Loan Agreement, dated March 7, 2016, between the Debtor, as borrower, and BOW, as lender.

b.      Promissory Note, dated March 7, 2016, in the principal amount of $1,500,000, made by the Debtor in favor of BOW

c.      Change in Terms Agreement, dated June 12, 2018, with respect to the Promissory Note dated March 7, 2016.

d.      Commercial Security Agreement, dated March 7, 2016, by and between the Debtor, as grantor, and BOW, as lender.

e.      UCC Financing Statement, filed on March 16, 2016, filing number 16-7514465867.

f.      Promissory Note, dated August 30, 2016, in the principal amount of $100,000, by and between the Debtor, as borrower, and BOW, as lender.

g.      Commercial Security Agreement, dated August 30, 2016, by and between the Debtor, as grantor, and BOW, as lender.

h.      Master Equipment Financing Agreement, dated March 21, 2016, by and between the Debtor, as debtor, and BOW, as creditor.

i.      UCC Financing Statement, filed on March 31, 2016, filing number 16-7517341075.

j.      Sixteen (16) Certificates of Title, for the State of California, attached to Claim No. 38-1.

k.      Commercial Card Agreement.

26.     **"BOW Secured Claim Compromise Motion"** has the meaning set forth in Paragraph VII(A)(3)(c)(ii) of this Disclosure Statement.

27.     **"BOW Subordinated Claim"** has the meaning set forth in Paragraph VII(A)(3) of this Disclosure Statement.

28.     **"Business Day"** means any day other than a Saturday, Sunday or a legal holiday (as defined in Rule 9006(a) of the Federal Bankruptcy Rules).

29.      **"Case"** means the case under Chapter 11 of the Bankruptcy Code commenced by the Debtor on the Petition Date and bearing Case Number 6:18-bk-16624-SC.

30.    **"Case Closing Date"** means the date on which the Bankruptcy Court enters a Final Decree closing the Case, in accordance with section 350 of the Bankruptcy Code.

31.    **"Cash"** means cash or cash equivalents including, but not limited to, bank deposits, checks or other similar forms of payment or exchange.

32.    **"Causes of Action"** means any and all claims, demands, rights, actions, causes of action and suits of the Debtor or the Estate, of any kind or character whatsoever, in contract or in tort, at law or in equity or under any other theory of law, that the Debtor or the Debtor's Estate has or asserts, or may have or assert, against third parties, whether or not the subject of litigation or otherwise asserted as of the Effective Date, and which have not been settled or otherwise resolved by Final Order as of the Effective Date, including but not limited to:  (a) Avoidance Actions; (b) claims for tax refunds; (c) claims to recover accounts receivable; (d) rights of setoff, counterclaim or recoupment; (e) claims on contracts or for breaches of duties; (f) claims or defenses for fraud, mistake, duress or usury; (g) rights to object to claims; and (h) any other claims or demands which may be asserted against third parties.

33.    **"Claim"** means a "claim" against the Debtor, as such term is defined in section 101(5) of the Bankruptcy Code.

34.    **"Claims Objection Deadline"** means the <u>latest</u> of the following dates: (a) the one hundred eightieth (180th) day after the Effective Date; (b) with respect to a specific Claim, the ninetieth (90th) day after a Proof of Claim with respect to such Claim is filed by a Creditor; or (c) with respect to a Claim that is not listed in the Bankruptcy Schedules, the ninetieth (90th) day after the Reorganized Debtor learns of the existence of such Claims; (c) with respect to a specific Claim, such greater period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement of the Creditor asserting such Claim.  Pursuant to the Plan, the Reorganized Debtor is entitled to seek from the Bankruptcy Court an order or orders extending the Claim Objection Deadline, on an <u>ex parte</u> basis, without the need for notice to creditors or a hearing thereon.

35.     "**Class**" means a grouping of Claims or the Interest, as classified in Article IV of the Plan.

36.     "**Collateral**" means any property or interest in property of the Estate subject to a Lien of a Secured Creditor that is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable federal or state law.

37.     "**Confirmation**" means the entry of the Confirmation Order by the Bankruptcy Court.

38.     "**Confirmation Date**" means the date on which the Bankruptcy Court enters the Confirmation Order on its docket.

39.     "**Confirmation Hearing**" means the hearing before the Bankruptcy Court to consider the confirmation of the Plan pursuant to section 1128(a) of the Bankruptcy Code, as such hearing may be continued from time to time.

40.     "**Confirmation Hearing Date**" means the first date on which the Bankruptcy Court holds the Confirmation Hearing.

41.     "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.

42.     "**Corporate Governance Agreements**" means, collectively, the articles of incorporation, by-laws and any and all other agreements, instruments and other documents providing for the governance of the Debtor as a corporation under the laws of the State of California.

43.     "**Creditor**" means the holder of a Claim against the Debtor.

44.     "**Cure Claims**" has the meaning set forth in Paragraph VIII(W)(5) of this Disclosure Statement.

45.     "**Cure Claims Schedule**" has the meaning set forth in Paragraph VIII(W)(5) of this Disclosure Statement.

46.    **"Debtor"** means Lovejoy's Family Moving, Inc. dba Republic Moving & Storage, the debtor and debtor-in-possession in the Case.  For the purpose of this Disclosure Statement, references to the "Debtor" will include the Reorganized Debtor.

47.    **"Deficiency Claim"** means that portion of a Claim that is in excess of the value of the Collateral which is security for the repayment of such Claim, calculated in accordance with the provisions of section 506 of the Bankruptcy Code.

48.    "**Disbursing Agent**" means the entity charged with making Distributions under the Plan.  The Reorganized Debtor will serve as Disbursing Agent under the Plan.

49.    **"Disclosure Statement"** means this Second Amended Disclosure Statement relating to the Plan, including, without limitation, all exhibits and schedules hereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as may be amended, modified or supplemented from time to time in accordance with the provisions of the Bankruptcy Code and Bankruptcy Rules.

50.    **"Disputed Claim"** means any Claim as to which:  (a) a Proof of Claim has been filed and the dollar amount of such Claim is not specified in a fixed amount; (b) a Proof of Claim has been filed, to the extent to which the stated amount of such Claim exceeds the amount of such Claim listed in the Bankruptcy Schedules; (c) a Proof of Claim has been filed and such Claim is not listed in the Bankruptcy Schedules; (d) a Proof of Claim has been filed, or is deemed filed under Rule 3003(b)(1) of the Federal Bankruptcy Rules, and is listed in the Bankruptcy Schedules as contingent, disputed, liquidated, or unknown as to amount; or (e) an objection, or request for estimation, has been filed by the Claims Objection Deadline and such objection or request for estimation has neither been withdrawn nor been denied by a Final Order.

51.    **"Disputed Claims Reserve"** has the meaning set forth in Paragraph VIII(U)(3) of this Disclosure Statement.

52.    **"Disputed Class '***' Claim"** means a Disputed Claim classified in the specified Class.

53.     "**Distribution**" means any transfer of Cash under the Plan to the holder of an Allowed Claim.

54.     "**Distribution Schedule**" has the meaning set forth in Paragraph VIII(S)(6) of this Disclosure Statement.

55.     "**Effective Date**" means the seventh (7th) day following the waiver or satisfaction of the conditions set forth in Section 6.3 of the Plan.

56.     "**Estate**" means the estate created in the Case under section 541 of the Bankruptcy Code.

57.     "**Expenses**" has the meaning set forth in Paragraph II(A)(80) of this Disclosure Statement.

58.     "**Feasibility Analysis**" has the meaning set forth in Paragraph XII(F)(1) of this Disclosure Statement.

59.     "**Feasibility Projections**" has the meaning set forth in Paragraph XII(F)(1)(l) of this Disclosure Statement.

60.     "**Federal Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as now in effect and as may be hereafter amended.

61.     "**Final Decree**" has the meaning set forth in Paragraph VIII(R) of this Disclosure Statement.

62.     "**Final Order**" means an order or judgment of the Bankruptcy Court or other applicable court, as entered on the applicable docket, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or to obtain a rehearing will then be pending or as to which any right to appeal, petition for certiorari, reargue, or obtain a rehearing will have been waived in writing in form and substance satisfactory to the Debtor or to the Reorganized Debtor, as the case may be, or, in the event that an appeal, writ of certiorari, or proceeding for reargument or rehearing of such order or judgment has been sought, such order or judgment will have been affirmed by the highest court to

which such order or judgment was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing will have expired.

63.    "**General Unsecured Claim**" means any Claim that is not an Administrative Claim, a Priority Tax Claim, a Priority Non-Tax Claim or a Secured Claim, including, without limitation, a Rejection Claim, a Deficiency Claim or an Avoidance Action Payment Claim.

64.    "**GreatAmerica**" means GreatAmerica Financial Services Corporation.

65.    "**Interest**" means an "equity security" in the Debtor, as such term is defined in section 101(16) of the Bankruptcy Code, no matter how held, including, without limitation, issued and outstanding shares of stock in the Debtor, and all rights and interests arising thereunder, and all rights to acquire equity securities in the Debtor, including, without limitation, pursuant to options, warrants, employee plans, or similar agreements, contracts or instruments.

66.    "**Interest Holder**" means Mr. Lovejoy, the holder of the Interest.

67.    "**Leed Rancho**" means Leed Rancho California I, a California limited partnership.

68.    "**Lien**" means any lien, security interest, mortgage, deed of trust, encumbrance, pledge or other charge against Assets of the Debtor.

69.    "**Liquidation Analysis**" has the meaning set forth in Paragraph XII(G) of this Disclosure Statement.

70.    "**Loan Documents**" means all loan documents, security documents, Liens, assignments of rent, promissory notes, indemnity agreements, surety agreements, purchase orders, invoices, and other contracts documenting a Creditor's Claims against the Debtor.

71.    "**Local Bankruptcy Rules**" means the Local Bankruptcy Rules applicable to cases pending before the Bankruptcy Court, as now in effect and as may be hereafter amended.

72.    **"Medina"** has the meaning set forth in Paragraph IV(C)(2) of this Disclosure Statement.

73.    **"Mr. Lovejoy"** means Joseph W. Lovejoy, the President of and the sole Interest Holder in the Debtor.

74.    **"Ordinary Course Administrative Claim"** means an Administrative Claim allowable under section 503(b) of the Bankruptcy Code, that is incurred in the ordinary course of the Debtor's operations on administration of the Case, or the payment of which is provided for by an order of the Bankruptcy Court, exclusive of any Pre-Effective Date Professional Fee Claims, Administrative Tax Claims, United States Trustee Fees and any Claims asserted under section 503(b)(9) of the Bankruptcy Code.

75.    **"Petition Date"** means August 6, 2018, the date on which the Debtor filed its voluntary petition commencing the Case.

76.    **"Plan"** means the Second Amended Chapter 11 Plan of Reorganization, including, without limitation, all exhibits, supplements, appendices, and schedules thereto, either in its present form or as it may be altered, amended, or modified from time to time.

77.    **"Post-Effective Date Lender"** has the meaning set forth in Paragraph VII(A)(3)(c) of this Disclosure Statement.

78.    **"Post-Effective Date Loan"** has the meaning set forth in Paragraph VII(A)(3)(c) of this Disclosure Statement.

79.    "**Post-Effective Date Notice Parties**" has the meaning set forth in Paragraph VIII(X) of this Disclosure Statement.

80.    "**Post-Effective Date Plan Expenses**" means all voluntary and involuntary costs, expenses, charges, obligations, or liabilities of any kind or nature, whether matured, unmatured, non-contingent, contingent, liquidated, or unliquidated (collectively, "Expenses") incurred after the Effective Date related to the implementation of the Plan, including, but not limited to:  (a) the Expenses associated with administering the Plan, including any taxes assessed against the Assets; (b) all United States Trustee Fees; (c) the Expenses associated with making the Distributions required by the Plan; (d) any Expenses

-17-

associated with preparing and filing Tax returns and paying Taxes; and (e) the Expenses of independent contractors and Professionals providing services to the Reorganized Debtor.

81.    **"Pre-Effective Date Professional"** means a person employed in the Case prior to the Effective Date pursuant to an order of the Bankruptcy Court in accordance with sections 327 or 1103 of the Bankruptcy Code.

82.    **"Pre-Effective Date Professional Fee Claim"** means: (a) a Claim of a Pre-Effective Date Professional under sections 327, 328, 330, 331 or 1103 of the Bankruptcy Code for compensation for services rendered or expenses incurred prior to the Effective Date on behalf of the Estate; or (b) a Claim, arising prior to the Effective Date, either under section 503(b)(4) of the Bankruptcy Code or under section 503(b)(3)(D) of the Bankruptcy Code.

83.    **"Priority Non-Tax Claim"** means a Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

84.    **"Priority Tax Claim"** means a Claim entitled to priority under section 507(a)(8) of the Bankruptcy Code.

85.    **"Professional"** means any attorney, accountant, appraiser, auctioneer, broker, financial consultant, expert or other professional person.

86.    **"Proof of Claim"** means a statement under oath filed in the Case by a Creditor in which the Creditor sets forth the amount claimed to be owed to it and detail sufficient to identify the basis for the Claim, in accordance with Rule 3001 of the Federal Bankruptcy Rules.

87.    **"Pro Rata"** means proportionately so that the ratio of (a) the amount of consideration distributed on account of an Allowed Claim to (b) the amount of the Allowed Claim is the same as the ratio of (x) the amount of consideration distributed on account of all Claims in the Class in which that Allowed Claim is included to (y) the amount of all Claims in that Class.

The Pro Rata formula is illustrated as follows:

| (a)  Amount of consideration distributed to a holder of an Allowed Claim | | (x)  Total consideration distributed to holders of Allowed Claims in that Class |
|---|---|---|
| ÷ | = | ÷ |
| (b)  Amount of such Allowed Claim | | (y)  Amount of all Allowed Claims in that Class |

For the purpose of the application of this definition, in calculating the Distributions to be made under the Plan, the Reorganized Debtor will establish Reserves, on account of Disputed Class 5 Claims, in accordance with the provisions of Section 8.4.3 of the Plan.

88.    **"Rejection Claim"** means any General Unsecured Claim based upon or arising from the rejection of an executory contract or unexpired lease pursuant to a Final Order of the Bankruptcy Court or pursuant to the Plan.

89.    **"Reorganized Debtor"** means the Debtor, as its financial affairs are reorganized from and after the Effective Date.  For the purpose of this Disclosure Statement, a reference to the "Reorganized Debtor" includes the Debtor.

90.    **"Representatives"** has the meaning set forth in Paragraph VIII(G)(4) of this Disclosure Statement.

91.    **"Reserves"** means, collectively, the Disputed Claims Reserve, the Unclaimed Property Reserve, and any other reserves required to be established pursuant to the Plan.

92.    **"Secured Claim"** means a Claim that is secured by a Lien against property in which the Estate has an interest, or that is subject to setoff under section 553 of the Bankruptcy Code.  Pursuant to the Plan, a Claim is a Secured Claim only to the extent of the value, determined under section 506(a) of the Bankruptcy Code, of the Secured Creditor's interest in the Estate's interest in the Collateral securing the Claim, or to the extent of the amount subject to setoff, whichever is applicable.

93.    **"Secured Creditor"** means the holder of a Secured Claim.

94.    **"Tax"** means any tax, charge, fee, levy, or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income,

excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax.  Pursuant to the Plan, "Tax" includes any interest, penalties or additions attributable to, or imposed on or with respect to, such assessments.

95.    **"Tax Claim"** means any Claim, pre-petition or post-petition, relating to a Tax.

96.    **"Trans Advantage"** means Trans Advantage, Inc.

97.    **"Unclaimed Property"** has the meaning set forth in Section 7.2.7 of the Plan.

98.    **"Unclaimed Property Reserve"** has the meaning set forth in Section 7.2.7 of the Plan.

99.    **"Unencumbered Assets"** has the meaning set forth in Paragraph VII(A)(3)(c)(ii) of this Disclosure Statement.

100.    **"Unencumbered Assets Loan" has the meaning set forth in Paragraph VII(A)(3)(c)(ii) of this Disclosure Statement.**

101.    **"United States Trustee"** means the Office of the United States Trustee for the Central District of California.

102.    **"United States Trustee Fees"** means all fees and charges assessed against the Debtor or the Reorganized Debtor by the United States Trustee and due pursuant to section 1930 of title 28 of the United States Code.

103.    **"Western Equipment"** means Western Equipment Finance, Inc.

B.    **Rules of Interpretation.**

For the purpose of this Disclosure Statement, unless otherwise provided in this Disclosure Statement, (1) the rules of construction set forth in section 102 of the Bankruptcy Code apply to this Disclosure Statement; (2) Rule 9006(a) of the Federal Bankruptcy Rules applies when computing any time period under the Plan referenced in this Disclosure Statement; (3) a term that is used in this Disclosure Statement and that is not defined in this Disclosure Statement has the meaning attributed to that term, if any, in the Bankruptcy Code or in the Bankruptcy Rules;

(4) the definition given to any term or provision in the Plan supersedes any different meaning that may be given to that term or provision in this Disclosure Statement; (5) whenever it is appropriate from the context, each term, whether stated in the singular or the plural, includes both the singular and the plural; (6) each pronoun stated in the masculine, feminine or neuter includes each of the masculine, feminine and neuter; (7) any reference to an exhibit, schedule, instrument or other document means such exhibit, schedule, instrument or other document as it has been, or may be, amended, modified, restated or supplemented as of the Confirmation Date, and any such exhibit, schedule, instrument or other document will be deemed to be included in this Disclosure Statement, regardless of when it is filed; (8) the phrases "under this Disclosure Statement," "hereof," "hereto," "hereunder," and similar words or phrases, refer to this Disclosure Statement in its entirety rather than to only a portion of this Disclosure Statement; (9) unless otherwise indicated, all references in this Disclosure Statement to paragraphs, articles or exhibits are references to paragraphs, articles or exhibits in this Disclosure Statement; (10) paragraph captions and headings are used for convenience only and do not affect the meaning of this Disclosure Statement; and (11) any reference to the holder of a Claim or Interest includes that entity's successor and assigns.

     **C.**     <u>**Exhibits**</u>.

     All exhibits to this Disclosure Statement are incorporated into and are a part of this Disclosure Statement as if set forth in full herein.

**III.**

<u>**OVERVIEW OF THE CHAPTER 11 PROCESS,**</u>

<u>**THE PLAN AND VOTING ON THE PLAN**</u>

     **A.**     <u>**The Chapter 11 Process**</u>.

     Chapter 11 of the Bankruptcy Code provides debtors with a "breathing spell" within which to propose a restructuring of their obligations to third parties. The filing of a Chapter 11 bankruptcy petition creates a bankruptcy "estate" comprising all of the assets and property interests of the debtor. Unless a trustee is appointed by the bankruptcy court for cause (no trustee has been appointed in the Case), a debtor remains in possession and control of all its assets as a

-21-

"debtor-in-possession."  The debtor may continue to operate its business in the ordinary course on a day-to-day basis without bankruptcy court approval.  Bankruptcy court approval is required only for various kinds of transactions as to which the Bankruptcy Code requires approval (such as certain financing transactions) and transactions out of the ordinary course of a debtor's business. The filing of the bankruptcy petition gives rise to what is known as the "automatic stay" which, generally, enjoins creditors from taking any action to collect or recover obligations owed by a debtor prior to the commencement of a Chapter 11 case.  The bankruptcy court can, however, grant relief from the automatic stay, under certain specified conditions or for cause.

A Chapter 11 debtor, as in this case, may propose a plan providing for the reorganization of the debtor.  A plan provides, among other things, for the treatment of the claims of the debtor's creditors and the interests of the debtor's shareholders.

**B.**     **Overview of the Debtor's Proposed Plan.**

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan.  For a more detailed description of the terms and provisions of the Plan, see Articles VI and VII below.

The primary objective of the Plan is for the Debtor to reorganize its financial affairs pursuant to a comprehensive debt restructuring of the Debtor, in accordance with the terms and conditions of the Plan.  Pursuant to the Plan, the Debtor will continue in business after the confirmation of the Plan, and will satisfy Allowed Claims of Creditors in accordance with the terms and conditions of the Plan.

The Plan designates five (5) Classes of Claims and one (1) Class of Interests, which include all Claims against, and Interests in, the Debtor.  These Classes take into account the differing nature and priority under the Bankruptcy Code of the various Classes and Interests.

The following table summarizes the treatment of Claims and Interests under the Plan.

### SUMMARY OF CLAIMS AND INTERESTS UNDER THE PLAN

| Class | Claim/Interest | Summary of Treatment[4] |
|-------|----------------|--------------------------|
| N/A | Allowed Administrative Claims | Payment in full, in Cash, on or about the Effective Date or as an Administrative Claim is allowed by the Bankruptcy Court. |

---

[4] This is only a summary of the treatment of Claims and Interests under the Plan.  Creditors should refer to Articles VI

| Class | Claim/Interest | Summary of Treatment[4] |
|-------|----------------|-------------------------|
| N/A | Allowed Priority Tax Claims | Payment in full, in equal quarterly installments through July 1, 2023, including interest thereon. |
| 1 | Allowed Secured Claim of BOW | Entitled to receive the Distributions of its Allowed Secured Claim and the BOW Subordinated Claim set forth in Section 5.1 of the Plan. |
| 2 | Any Allowed Secured Claims of the Creditors Listed in Section 4.2.1.2 of the Plan | Entitled to receive the Distributions set forth in Section 5.2 of the Plan. |
| 3 | Allowed Secured Claims other than Class 1 or Class 2 Secured Claims. | Entitled to receive one of the payment options, elected by the Reorganized Debtor, set forth in Section 5.3 of the Plan. |
| 4 | Allowed Priority Non-Tax Claims | Payment in full, in Cash, on or about the Effective Date, or as a Priority Non-Tax Claim is allowed by the Bankruptcy Court. |
| 5 | Allowed General Unsecured Claims | Payment of Pro Rata Distributions of the total amount of $450,000 paid in four annual installments over the course of the Plan, as set forth in Section 5.5 of the Plan. |
| 6 | Allowed Interest | The sole Interest Holder, Mr. Lovejoy, will retain, without alteration or modification, his Interest. |

**Set forth in Paragraph XII(F) hereof is a discussion of the projected recoveries by Creditors in the Case.**

C.      **Plan Confirmation and Voting and Objections to the Plan.**

The Bankruptcy Court has not yet confirmed the Plan described in this Disclosure Statement. In other words, the terms of the Plan are not yet binding on the Debtor, Creditors and the Interest Holder.  However, if the Bankruptcy Court confirms the Plan, the Plan will be binding on the Debtor and on all Creditors and the Interest Holder in the Case.

1.      **Voting on the Plan.**  A Creditor may vote to accept or to reject the Plan by filling out and mailing to the Debtor's counsel the form of the ballot that has been provided herewith.  Ballots should be mailed or e-mailed to Winthrop Couchot Golubow Hollander, LLP, located at 1301 Dove Street, Suite 500, Newport Beach, California 92660 (Attn:  Jeannie Martinez).

Any Creditor holding Claims in more than one impaired Class must submit one ballot for each such Class.  If a Creditor has received an incorrect ballot, or believes that

---

and VII of this Disclosure Statement for a more complete discussion of the treatment of Allowed Claims and Allowed Interests under the Plan.

he is entitled to vote in more than one Class, additional ballots may be obtained upon written request made to Winthrop Couchot (Attn:  Jeannie Martinez).

In order to vote for or against the Plan, a Creditor must have filed a Proof of Claim on or before the Bar Date, unless his Claim is listed in the Bankruptcy Schedules filed in the Case by the Debtor as not being disputed, unliquidated, contingent or unknown.  Any such Creditor is, to the extent listed in the Bankruptcy Schedules, deemed to have filed a Claim, and absent a timely objection to the Claim, such Claim is deemed allowed.  In order to determine whether a Creditor is entitled to vote on the Plan notwithstanding any failure to timely file a Proof of Claim, the Creditor should review the Debtor's Bankruptcy Schedules on file with the Bankruptcy Court.  If a Creditor's Claim is not scheduled, or, if it is scheduled as contingent, disputed, unliquidated or unknown and the Creditor did not file a Proof of Claim prior to the Bar Date, the Creditor may not be entitled to vote on the Plan.

The following types of Claims are not entitled to vote on the Plan:  (a) Claims that have been disallowed; (b) Claims in an unimpaired Class; and (c) Administrative Claims and Priority Tax Claims.  Claims in unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan.  Administrative Claims and Priority Tax Claims are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code.  **EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.**

2.     **Deadline for Voting for or Against the Plan**.  The Bankruptcy Court has fixed May 10, 2019, at 5:00 p.m. Pacific Time, as the last date by which ballots must be received by Winthrop Couchot, the Debtor's counsel.  Subject to review and determination by the Bankruptcy Court, votes received by Winthrop Couchot after that date may not be counted.  Whether or not a Creditor votes on the Plan, he will be bound by the terms of the Plan and the treatment of his Claim set forth in the Plan if the Plan is confirmed by the Bankruptcy Court.  Absent some affirmative act constituting a vote, a

Creditor will not be included in the voting tally.  Allowance of a Claim for voting purposes does not necessarily mean that all or a portion of the Claim will be allowed for distribution purposes.

Since, subject only to any order of the Bankruptcy Court to the contrary, only the votes of those Creditors whose ballots are timely received may be counted in determining whether a Class has accepted the Plan, Creditors are urged to fill in, date, sign and promptly mail the enclosed ballot.

3.    **Time and Place of the Confirmation Hearing.**  Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan.  The hearing at which the Bankruptcy Court will determine whether or not to confirm the Plan will take place on June 11, 2019, at 1:30 p.m., in Courtroom 5C, 411 West Fourth Street, Santa Ana, California; a video conference of the Confirmation Hearing also will take place in Video Hearing Room 126, located at 3420 Twelfth Street, Riverside, California.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing.

4.    **Deadline For Objecting to the Confirmation of the Plan.**  Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to the confirmation of the Plan.  Objections to the confirmation of the Plan must be in writing and conform to the requirements of the Bankruptcy Rules and must be filed with the Bankruptcy Court and served upon the following:  counsel to the Debtor, Winthrop Couchot, Attn: Peter W. Lianides, 1301 Dove Street, Suite 500, Newport Beach, CA 92660; and upon the United States Trustee, Attn: Abram S. Feuerstein, Esq., 3801 University Ave, Suite 720, Riverside, CA 92501, so as to be received by 5:00 p.m. (Pacific Time) on May 10, 2019.  Objections to confirmation of the Plan are governed by Rule 9014 of the Federal Bankruptcy Rules.  **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY AND PROPERLY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

5.    **Plan Confirmation**.  The Bankruptcy Court will confirm the Plan if the requirements of section 1129 of the Bankruptcy Code are satisfied.  Section 1129 requires, among other things, that:  (a) with respect to each Class of Claims, each holder of a Claim in that Class has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value that is not less than the amount that such holder would receive if the Debtor were to liquidate its assets under Chapter 7 of the Bankruptcy Code; (b) confirmation of the Plan is not likely to be followed by a liquidation of the Debtor or the need for further reorganization of the Debtor unless liquidation or further reorganization is proposed by the Plan (the Plan does not propose a liquidation of the Debtor); and (c) the Plan be accepted by each Class of Claims that is impaired by the Plan, or the Plan does not discriminate unfairly and is fair and equitable to any impaired Class that has not accepted the Plan.

To confirm the Plan, the Bankruptcy Court must determine whether each "impaired" Class entitled to vote on the Plan has accepted the Plan.  Pursuant to section 1124 of the Bankruptcy Code, Classes "impaired" by the Plan are those Classes whose legal, equitable or contractual rights are altered pursuant to the Plan.  Under section 1126(c) of the Bankruptcy Code, an impaired Class of Claims is deemed to have accepted the Plan if the Plan is accepted by Creditors in that Class holding at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of Creditors in that Class actually voting on the Plan.

The Debtor intends to request that the Bankruptcy Court confirm the Plan pursuant to the provisions of section 1129(a) of the Bankruptcy Code.  However, if any Class of Claims votes against the Plan, or is deemed to have voted against the Plan, the Debtor will seek to confirm the Plan under section 1129(b) of the Bankruptcy Code.  Pursuant to section 1129(b), the Plan may be confirmed despite the failure of an impaired Class of Claims to accept the Plan if the Bankruptcy Court determines that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Claims that is impaired under, and that has not accepted, the Plan, and determines that the Plan otherwise

complies with the requirements of section 1129(b) of the Bankruptcy Code.  The condition that the Plan be fair and equitable with respect to such nonaccepting Classes includes certain legal requirements more fully set forth in section 1129(b).

      **6.**    **Identity of Person to Contact for More Information Regarding this Disclosure Statement or the Plan.**  Any interested party desiring further information about this Disclosure Statement or the Plan should contact counsel for the Debtor, Winthrop Couchot, Attn:  Peter W. Lianides, 1301 Dove Street, Suite 500, Newport Beach, CA 92660; telephone no. (949) 720-4100.

**IV.**

**BACKGROUND OF THE DEBTOR**

**A.**    **Description and History of the Debtor's Business.**

      **1.**    **Debtor's Business.**  The Debtor is a corporation duly organized and existing under the laws of the State of California.  The Debtor is located in Chula Vista, California and Bonsall, California.  The Debtor is engaged in the business of providing moving and storage services.  The President of the Debtor is Mr. Lovejoy.

      **2.**    **Debtor's Financial Affairs.**  Copies of the Debtor's balance sheets, as of December 31, 2016 and December 31, 2017, and the Debtor's profit and loss statements for its 2016 and 2017 fiscal years, will be provided upon written request made to the Debtor's counsel, Winthrop Couchot, Attn:  Peter W. Lianides, Esq. at the address listed in the upper left-hand corner of the first page of this Disclosure Statement.  Also, the Debtor's Bankruptcy Schedules and monthly operating reports submitted by the Debtor to the United States Trustee are available for inspection, during normal business hours, at the Bankruptcy Court Clerk's Office, located at 3420 Twelfth Street, Riverside, CA 92501.  Attached as **Exhibit "A"** hereto is a copy of the most recent (February 2019) monthly operating report filed by the Debtor in the Case.

      **3.**    **Corporate History.**  The Debtor was founded in 2008. The Debtor's principal place of business is located in Chula Vista, California.

4.     **Events Precipitating the Debtor's Bankruptcy Filing**.  The Debtor's
operations historically have been profitable.  The Debtor's operations were very successful
in 2012 and in 2013.  While the Debtor's operations continued to be profitable, the
Debtor's operations began to decline in profitability in or about 2015.  The reasons for the
decline in the Debtor's profitability include the following:

a.     **Increased Rent**.  The rent paid by the Debtor for its facilities
increased substantially from 2013 through 2018.  Rents for the same locations
increased from approximately $467,000 per year in 2013 to approximately
$876,000 per year in 2018.

b.     **Increase in Overhead Expenses**.  The Debtor's overhead expenses
increased from approximately $952,000 in 2015 to approximately $1,357,000 in
2017, due primarily to the Debtor's desire to enhance services to its customer base.

c.     **Expansion of Facilities**.  At the request of a customer of the Debtor,
the Debtor expanded its operations by leasing a facility in Palm Desert, California
in 2016.  The Debtor's Palm Desert operations suffered losses of approximately
$190,000 in 2016 and approximately $182,000 in 2017.  The Debtor closed its
operations in Palm Desert during the end of 2017.

d.     **Cost of Equipment Acquisition**.  From 2014 through 2016, the
Debtor acquired a significant amount of new rolling stock in order to meet
environmental requirements imposed by the State of California, resulting in
significantly increased debt service associated with such acquisitions.

e.     **Business Acquisition Debt**.  In 2017, the Debtor pursued what it
believed to be a promising acquisition of a business located in Virginia ("Virginia
Business Acquisition").  The Debtor incurred, over a period of approximately 12
months, approximately $350,000 in expenses associated with the proposed Virginia
Business Acquisition.  The Debtor had obtained from a funding source a
commitment to provide funding for the proposed Virginia Business Acquisition, to
satisfy the Debtor's obligations to BOW, and to provide working capital for the

-28-

Debtor's operations.  However, in or about May 2018, the Debtor's funding source determined not to provide such funding to the Debtor, leaving the Debtor without any ability to consummate the proposed Virginia Business Acquisition or to satisfy the Debtor's obligations to BOW, and without working capital sufficient for the Debtor's operations.

        **f.**      **<u>High Interest Rate, Short-Term Borrowings</u>.**  In order to address the Debtor's increased overhead, the costs associated with the Debtor's obtaining (and exiting) the Debtor's facility in Palm Desert, California and the costs associated with the proposed Virginia Business Acquisition, the Debtor began obtaining short-term unsecured loans with very high rates of interest.  Certain of such loans had effective rates of interest of more than 100% per annum.  As a result of the obtaining of such loans, the Debtor's debt service increased substantially.

        **g.**      **<u>Guarantee of Affiliated Debt</u>.**  The Debtor guaranteed obligations of an affiliate of the Debtor, JRL Transportation, Inc. ("JRL") with respect to a real property lease of JRL.  JRL failed to pay certain obligations under that lease, and, as a consequence thereof, the Debtor was sued for an amount of approximately $134,000.

As a result of the foregoing, the Debtor's profits declined and the Debtor suffered significant cash flow problems.  The Debtor's debt burdens increased to levels that were not feasible for the Debtor to service.  While the Debtor acted diligently to address these financial difficulties, such as by terminating its Palm Desert, California operations, by terminating the proposed Virginia Business Acquisition, by cutting expenses and acting to enhance revenues, the Debtor was left with a debt structure that was unsustainable for the Debtor.

       Accordingly, in order to restructure the Debtor's debts, on August 6, 2018, the Debtor filed a Chapter 11 petition for relief commencing the Case.  The Debtor acts as debtor-in-possession in the Case pursuant to the provisions of sections 1107 and 1008 of the Bankruptcy Code.

B.      **Management of the Debtor.**

The Debtor was founded in 2007 by Mr. Lovejoy.  The officers and directors of the Debtor are as follows:

1.      **Officer.**

Mr. Lovejoy, President

2.      **Corporate Director.**

Mr. Lovejoy

C.      **Significant Events During the Case.**

Since the Petition Date, the Debtor has continued to operate its business and to manage its assets, as debtor-in-possession, pursuant to Bankruptcy Code sections 1107(a) and 1108.  The Debtor has acted diligently to reorganize its business, and to enhance the profitability of its business.  The following is a list of significant events which have occurred during the Case.

1.      **Debtor's Employment of Counsel.**  On August 20, 2018, the Debtor filed an application to employ Illyssa I. Fogel & Associates as the Debtor's general insolvency counsel.  On September 11, 2018, the Court entered an order granting such application.

On December 6, 2018, the Debtor filed an application to employ Winthrop Couchot as the Debtor's general insolvency counsel in place and stead of Illyssa I. Fogel & Associates.  [Docket No. 96] ("Employment Application").  On December 20, 2018, the United States Trustee filed an objection to the Employment Application, asserting certain objections to the financial terms of the Debtor's proposed employment of Winthrop Couchot, but not to the employment itself.  The United States Trustee and Winthrop Couchot resolved the United States Trustee's concerns.  On February 5, 2019, the Bankruptcy Court authorized the Debtor to employ Winthrop Couchot as the Debtor's general insolvency counsel in the Case.

On January 25, 2019, the Debtor filed an application to employ Clark Hill, PLC ("Clark Hill") as its special litigation counsel in the Case [Docket No. 134].  The fees and costs of Clark Hill will be paid by insurance available to the Debtor.

2.      **Debtor's Employment of Accountants**. On November 29, 2018, the Debtor filed an application to employ Medina, Horning & Kruse, LLP ("Medina") as its accountants in the Case.  [Docket No. 86].  On January 4, 2019, the Bankruptcy Court entered an order granting such application.  [Docket No. 116].

3.      **Bar Date.**  The Bankruptcy Court has set December 14, 2018 as the general Bar Date in the Case.  March 19, 2019 is the Bar Date for governmental units to file Proofs of Claim.

4.      **Cash Collateral Stipulations.**  The Debtor and BOW have entered into, from time to time during the Case, stipulations [Docket Nos. 45, 69, 80, 95, 131] by which BOW has consented to the Debtor's use of any "cash collateral" of BOW, as that term is defined in section 363(a) of the Bankruptcy Code, in accordance with the terms of such stipulations and the operating budgets appended thereto.  The Bankruptcy Court has entered orders approving such stipulations.  As of the date of this Disclosure Statement, the Debtor's right to use any cash collateral of BOW extends through March 5, 2019.  The Debtor anticipates that BOW will consent to the Debtor's further use of any cash collateral through the Effective Date.

5.      **Motion to Reject Leases and Contracts.**  On November 21, 2018, the Debtor filed a motion to obtain from the Bankruptcy Court authority for the Debtor to reject its interest in a vehicle lease with First Foundation Bank, pursuant to 11 U.S.C. § 365 [Docket 82].  On December 18, 2018, the Bankruptcy Court entered an order granting such motion.  [Docket no. 104].

On December 12, 2018, the Debtor filed a motion to obtain from the Bankruptcy Court authority for the Debtor to reject its interest in its lease of its former facility located in Temecula, California, and to reject certain equipment leases and service contracts [Docket No. 101].  On January 8, 2019, the Bankruptcy Court entered an order granting such motion. [Docket No. 122].

6.      **Motion to Extend Time to Assume or Reject Real Property Lease.**  On December 3, 2018, 2018, the Debtor filed a motion to obtain from the Bankruptcy Court an

order extending the time, provided by section 365(d)(4) of the Bankruptcy Code, for the Debtor to determine whether to assume or reject the Debtor's interest, as lessee, under its lease for that real property commonly known as 2311 Boswell Rd., Suites #1, #3 and #5, Chula Vista, California [Docket No. 94]. On January 3, 2019, the Bankruptcy Court entered an order granting such motion, extending through March 4, 2019, the time for the Debtor to determine whether to assume or reject its interest under such real property lease. [Docket no. 114].

7.     **Motion to Extend Debtor's Plan Exclusivity Rights.**  On December 3, 2018, the Debtor filed a motion requesting that the Bankruptcy Court extend the Debtor's exclusive rights, under section 1121 of the Bankruptcy Code, to file a Chapter 11 plan and to seek acceptances of such plan [Docket No. 92].  On January 28, 2019, the Bankruptcy Court entered an order granting such motion, extending through and including February 22, 2019, the Debtor's exclusive right to file a Chapter 11 plan and the Debtor's right to seek acceptance of such a plan. [Docket No. 115].  The Bankruptcy Court thereafter entered an order extending the Debtor's exclusive right to seek to obtain confirmation of the Plan under section 1121 of the Bankruptcy Code.

8.     **Motion for Approval of Compromise and Transaction Outside of the Ordinary Course of the Debtor's Business.**  On December 19, 2018, the Debtor filed a motion requesting that the Bankruptcy Court enter an order authorizing the Debtor to enter into an "Agreement for Assignment of Storage Contracts" with JRL Transportation, Inc., and a "License Agreement" with Harmony Moving, Inc. [Docket No. 106].  On January 8, 2019, the Bankruptcy Court entered an order granting such motion. [Docket no. 123]

9.     **Motion to Approve Compromise of Litigation.**  On January 25, 2019, the Debtor filed a motion requesting that the Bankruptcy Court enter an order approving the Debtor's proposed compromise of a person injury action pending in Riverside County, Daniel Mendez v. Carlos Torres et al.  Case no.  RIC16141712 (the "Riverside Action") [Docket No. 136].  Pursuant to such motion, the settlement payment to the plaintiff is funded by the Debtor's insurance carrier, Vanliner Insurance Company.

## V.

## LITIGATION AND OBJECTIONS TO CLAIMS

### A.    Litigation Commenced Prior to the Petition Date.

As of the Petition Date, the Debtor was a party to only one action, a personal injury action filed against the Debtor as a result of a motor vehicle accident involving one of the Debtor's drivers.  That action now has been settled and the settlement will be funded by insurance.  This litigation therefore should have no material impact on the implementation of the Plan.

### B.    Litigation Commenced After the Petition Date.

From the Petition Date through the date of the filing of this Disclosure Statement, the Debtor commenced no litigation.  The Debtor is evaluating whether to pursue Causes of Action, and, based upon its preliminary evaluation, believes that it is likely that it will assert, pursuant to section 547 of the Bankruptcy Code, claims to recover preferential transfers.  As of the date of this Disclosure Statement, however, the Debtor's evaluation in this regard was not complete. Notwithstanding any otherwise applicable principle of law or equity, including, without limitation, any principle of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, analyze or refer to any Cause of Action, or potential Cause of Action, in the Plan, this Disclosure Statement, or any other document filed with the Bankruptcy Court will in no manner waive, eliminate, modify, release, impair or alter the Debtor's or the Reorganized Debtor's right to commence, prosecute, defend against, settle, and realize upon any Cause of Action that the Debtor or the Estate has or may have as of the Effective Date.  Unless otherwise provided in the Plan or in the Confirmation Order, to the extent that any filed or to-be-filed actions are not resolved as of the Effective Date, the Reorganized Debtor will have the right to prosecute, settle, or otherwise resolve or dispose of Causes of Action in the Case.

The discussion regarding litigation and objections to Disputed Claims contained in this Article is for informational purposes only.  Nothing contained herein is intended, nor should be construed, to be any admission or acknowledgement by the Debtor of any matter pertaining to

Causes of Action in the Case.  The Debtor and the Reorganized Debtor reserve all of their respective rights and remedies with respect to Causes of Action.

The Debtor has not completed its review, analysis and investigation of the Proofs of Claim with regard to determining whether any potential Causes of Action exist to subordinate any Claims.  The Debtor reserves the right to assert Causes of Action to subordinate any Claims in the Case.

Similarly, the Debtor has not completed its review, analysis and investigation of the Proofs of Claim and the preparation of objections to Disputed Claims.  The Debtor expects that it and the Reorganized Debtor will pursue objections to Disputed Claims.

**VI.**

**<u>DESCRIPTION OF THE PLAN</u>**

The following is a brief summary of the Plan and is qualified in its entirety by the full text of the Plan.  The terms of the Plan will be controlling on Creditors in the event that the Plan is confirmed.  Therefore, all Creditors are urged to read the Plan carefully in its entirety rather than relying on this summary.

A.    **<u>Basic Structure of the Plan</u>**.

The Plan proposes to pay the Claims of five (5) Classes of Creditors in accordance with the provisions of the Plan.  The Plan provides for the establishment of one (1) Class consisting of the Interest Holder.

B.    **<u>Classification and Treatment of Claims</u>**.

Section 1123 of the Bankruptcy Code requires that the Debtor, with certain exceptions, classify separately in the Plan all Claims.  Pursuant to section 1122 of the Bankruptcy Code, the Debtor may place all Claims that are substantially the same in the same Class in the Plan. Section 1123(a)(4) of the Bankruptcy Code requires that the Plan provide the same treatment for all Claims in the same Class, unless the holder of a particular Claim agrees to a less favorable treatment of that Claim.

Section 1123(a) of the Bankruptcy Code requires that the Debtor specify in the Plan any Class that is not "impaired" by the Plan and specify the treatment of any Class that is impaired by

the Plan.  Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims is "impaired" by the Plan, unless the Plan (1) leaves unaltered the legal, equitable and contractual rights of holders of the Claims, or (2) cures any defaults with respect to the Claims which occurred before the Petition Date, reinstates the maturity of the Claims, and compensates the holders of the Claims for any damages incurred by them as a result of any reasonable reliance by them on contractual provisions or applicable law entitling them to receive accelerated payment after the occurrence of such defaults, or (3) provides that, on the Effective Date, the holders of such Claims will receive Cash equal to the amount of their Allowed Claims.  Pursuant to section 1126(f) of the Bankruptcy Code, a Class of Claims that is not impaired by the Plan is conclusively presumed to have accepted the Plan, and is not entitled to vote on the Plan.

Classes 3 (Allowed Secured Claims, other than Class 1 or Class 2 Secured Claims), 4 (Allowed Priority Non-Tax Claims) and Class 6 (Interests) are not "impaired" under the Plan and, therefore, are not entitled to vote on the Plan.  Classes 1 (Allowed Secured Claim of BOW), Class 2 (Any Allowed Secured Claims set forth in Section 4.2.1.2 of the Plan) and Class 5 (Allowed General Unsecured Claims) are "impaired" under the Plan.  Classes 1, 2 and 5 are entitled to vote on the Plan.

C.     **Unclassified Claims.**

In accordance with the provisions of section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified under the Plan.  These Claims are not considered impaired, and they do not vote on the Plan, because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  Accordingly, the Debtor has not placed Administrative Claims and Priority Tax Claims in a Class.  The treatment of these unclassified Claims is as provided below.

1.     **Allowed Administrative Claims.**  Administrative Claims generally are Claims for the expenses of administering the Debtor's Case that are allowed under section 503(b) of the Bankruptcy Code.  Administrative Claims also include Claims provided for by section 503(b)(9) of the Bankruptcy Code.  The Bankruptcy Code requires

that all Administrative Claims be paid on the Effective Date of the Plan, unless a particular Creditor agrees to a different treatment of its Claim.

In this case, Administrative Claims are expected to consist primarily of: the Claims of the Professionals employed in the Case; the Claim of Leed Rancho, the landlord of the Debtor's former premises located in Temecula, California, for unpaid post-petition rent; the Claim of Navitas Credit Corp., a lessor of equipment to the Debtor, for unpaid post-petition lease payments; and United States Trustee Fees. The Debtor estimates that Administrative Claims will be asserted in the aggregate amount of approximately $305,468 as of the Effective Date, including approximately $17,468 in United States Trustee Fees.[5] The Debtor believes that it owes no obligations under section 503(b)(9) of the Bankruptcy Code.

The treatment of Administrative Claims under the Plan is as described below.

a.    **Payment.**  Except to the extent that the holder of an Allowed Administrative Claim agrees to a less favorable treatment of its Allowed Administrative Claim, and, subject to the Administrative Claims Bar Date set forth in Section 3.1.2 of the Plan, each holder of an Allowed Administrative Claim will receive, in full satisfaction, discharge, exchange and release of its Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim, on the latest of (i) the Effective Date, (ii) the fifteenth (15th) Business Day after the date upon which such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date upon which such Allowed Administrative Claim becomes due according to its terms; provided, however, that an Ordinary Course Administrative Claim will be paid in full in accordance with the terms and conditions of the agreements giving rise to such Ordinary Course Administrative Claim.

---

[5]  The Debtor intends to update this Claims information in connection with pleadings that the Debtor will file in support of the Confirmation of the Plan.  By order of the Bankruptcy Court, the Debtor must file and serve such pleadings by May 24, 2019.

b.      **Administrative Claims Bar Date**.  Except for Pre-Effective Date Professional Fee Claims, United States Trustee Fees and Ordinary Course Administrative Claims, and, except as set forth in section 503(b)(1)(D) of the Bankruptcy Code, all requests for payment of Administrative Claims (including, without limitation, Administrative Claims asserted under section 503(b)(9) of the Bankruptcy Code) must be filed with the Bankruptcy Court and served on the Reorganized Debtor and the Post-Effective Date Notice Parties, no later than thirty (30) days after the Effective Date (the "Administrative Claims Bar Date"). Any holder of an Administrative Claim that is required to file a request for payment of its Administrative Claim by the Administrative Claims Bar Date and that does not file by the Administrative Claims Bar Date such a request for payment of its Administrative Claim will be forever barred from asserting such Administrative Claim against the Debtor, the Reorganized Debtor, the Estate or any of the property or assets of the Debtor or the Reorganized Debtor.

c.      **Deadline for Objections**.  All objections to allowance of Administrative Claims that are subject to the Administrative Claims Bar Date must be filed by the Reorganized Debtor no later than sixty (60) days after the Administrative Claims Bar Date (the "Administrative Claims Objection Deadline").  The Administrative Claims Objection Deadline may be extended by an order of the Bankruptcy Court.  If the Reorganized Debtor fails to file, by the Administrative Claims Objection Deadline, an objection to an Administrative Claim that must be filed, and is filed, by the Administrative Claims Bar Date, such Administrative Claim will be deemed allowed as of the Administrative Claims Objection Deadline.

d.      **United States Trustee Fees**.  United States Trustee Fees will be paid prior to the Effective Date by the Debtor, and, after the Effective Date by the Reorganized Debtor, in each case, when due in accordance with applicable law until the entry of a Final Decree.

e.      **Pre-Effective Date Professional Fee Claims.**  Each Pre-Effective

Date Professional seeking from the Bankruptcy Court an award with respect to a

Pre-Effective Date Professional Fee Claim must file its final application for

allowance of compensation for services rendered and reimbursement of expenses

incurred through the Effective Date by no later than the sixtieth (60th) day after

the Effective Date or such later date as may be fixed by the Bankruptcy Court.

Such Pre-Effective Date Professional will receive, in full satisfaction, exchange

and release of its Pre-Effective Date Professional Fee Claim, Cash in such

amounts as are allowed by the Bankruptcy Court.  All objections to allowance of

Pre-Effective Date Professional Fee Claims must be filed and served timely in

accordance with the requirements of the Bankruptcy Rules.

2.      **Priority Tax Claims.**  The Debtor estimates that approximately

$4,685 in Priority Tax Claims have been asserted against the Debtor.  The

Debtor disputes all of such Claims.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a

less favorable treatment of its Allowed Priority Tax Claim, each holder of an Allowed

Priority Tax Claim will receive, in full satisfaction, discharge, exchange and release of its

Allowed Priority Tax Claim, equal quarterly Cash payments, commencing on the first

Business Day of the first full calendar quarter after the Effective Date and continuing on

the first Business Day of each full calendar quarter thereafter through July 1, 2023, in an

aggregate amount equivalent  to such Allowed Priority Tax Claim, plus simple interest

thereon calculated at the interest rate available on ninety (90) day United States Treasuries

on the Effective Date.

D.      **Classification of Claims and Interests Under the Plan.**

1.      **Overview.**  As required by the Bankruptcy Code, the Plan places Claims

and Interests into Classes according to their respective legal rights and interests, including

their respective rights to priority.  In Section 4.2 of the Plan, the Debtor lists each Class of

Claims and Interests established under the Plan and states whether each Class is impaired

or is unimpaired by the Plan.  A Class is "unimpaired" by the Plan if the Plan leaves unaltered the legal, equitable and contractual rights to which the holders of Claims or Interests in the Class are entitled, as provided in section 1124 of the Bankruptcy Code. Article V of the Plan sets forth the treatment that each Class will receive under the Plan.

      **2.**      **Designation of Classes.**  The Plan designates the following Classes of Claims and Interests:

      a.      **Allowed Claims.**

      i.      **Class 1**:  The Allowed Secured Claim of BOW.  This Class is impaired by the Plan.

      ii.      **Class 2**:  Any Allowed Secured Claims of the Creditors listed below.  Pursuant to the Plan, any Allowed Secured Claim of each such Creditor is deemed to be classified in a separate sub-class of Class 2, and each sub-class of Class 2 is deemed to be a separate Class under the Plan.  This Class is impaired by the Plan.

      A.      Class 2(a) -- Exchange Bank.

      B.      Class 2(b) – GreatAmerica.

      C.      Class 2(c) -- Trans Advantage.

      D.      Class 2(d) -- Western Equipment.

      E.      Class 2(e) -- Allegiant.

      iii.      **Class 3**:  Any Allowed Secured Claims, other than Class 1 or Class 2 Allowed Secured Claims.  This Class is unimpaired by the Plan.

      iv.      **Class 4**: Any Allowed Priority Non-Tax Claims.  This Class is unimpaired by the Plan.

      v.      **Class 5**:  Allowed General Unsecured Claims.  This Class is impaired by the Plan.

      b.      **Interests.**

       **i.**      **Class 6**:  The Interest of the Interest Holder.  This Class is unimpaired by the Plan.

    **3.**    **Summary of Classification**.

The following table summarizes the Classes of Claims and Interests established by the Plan:

| CLASS | DESCRIPTION | IMPAIRED/ UNIMPAIRED | VOTING STATUS |
|---|---|---|---|
| Class 1 | Allowed Secured Claim of BOW | Impaired | Entitled to Vote on the Plan |
| Class 2 | Any Allowed Secured Claims of the Creditors listed in Section 4.2.1.2 of the Plan | Impaired | Entitled to Vote on the Plan |
| Class 3 | Any Allowed Secured Claims Other than Class 1 or Class 2 Secured Claims under the Plan | Unimpaired | Deemed to Accept the Plan |
| Class 4 | Allowed Priority Non-Tax Claims | Unimpaired | Deemed to Accept the Plan |
| Class 5 | Allowed General Unsecured Claims | Impaired | Entitled to Vote on the Plan |
| Class 6 | Interests | Unimpaired | Deemed to Accept Plan |

As set forth above, Classes 3 and 4 are unimpaired by the Plan; holders of Claims in these Classes are conclusively presumed to have accepted the Plan and, hence, are not entitled to vote with respect to the Plan.  Classes 1, 2 and 5 are impaired by the Plan, and holders of Claims in these Classes are entitled to vote to accept or reject the Plan. Interests in Class 6 are unimpaired; the Interest Holder is conclusively presumed to have accepted the Plan and, hence, is not entitled to vote with respect to the Plan.

The treatment of Claims and Interests under the Plan is in full and complete satisfaction of the legal, contractual, and equitable rights that each Creditor or Interest Holder may have in or against the Debtor or its property.  This treatment supersedes and replaces any agreements or rights which those entities have in or against the Debtor or its property.  **NO DISTRIBUTIONS**

**WILL BE MADE, AND NO RIGHTS WILL BE RETAINED, ON ACCOUNT OF ANY
CLAIM THAT IS NOT AN ALLOWED CLAIM.**

### VII.

### TREATMENT OF CLASSES UNDER THE PLAN

The following sets forth the treatment of Classes established by the Plan.

**A.      Class 1 -- Allowed Secured Claim of BOW.**

Class 1 consists of the Allowed Secured Claim of BOW.  Class 1 is impaired by the Plan.

      **1.      Allowed Claims of BOW.**  Pursuant to the Plan, BOW has the following
Allowed Claims against the Reorganized Debtor:  (a) an Allowed Secured Claim in the
amount of $1,852,950, subject to adjustment as set forth by Section 5.1.2.1 of the Plan,
with the treatment thereof set forth by Section 5.1.2 of the Plan; (b) an Allowed Claim in
the amount of $500,000, with the treatment thereof set forth by Section 5.1.3 of the Plan;
and (c) an Allowed General Unsecured Claim in the amount of $1,143,027, with the
treatment thereof set forth by Section 5.5 of the Plan.

      **2.      Treatment of Allowed Secured Claim of BOW.**  The treatment of BOW's
Allowed Secured Claim under the Plan is as follows:

          **a.      Amount of Allowed Secured Claim of BOW.**  BOW will have
under the Plan an Allowed Secured Claim, as of the Effective Date, in the amount
of $1,852,950, plus interest thereon, calculated at the non-default rate provided by
the BOW Loan Documents between the Debtor and BOW, from February 1, 2019
through the Effective Date.  Pursuant to the Plan, BOW's Allowed Secured Claim
will be reduced by any payments that may be made by the Debtor to BOW from
February 1, 2019 through the Effective Date.

          **b.      Interest Rate on BOW's Allowed Secured Claim.**  Pursuant to
Section 5.1.2.2 of the Plan, commencing on the Effective Date, and continuing until
such time as BOW's Allowed Secured Claim is fully paid, BOW's Allowed Secured
Claim will bear interest at the rate of six percent (6.0%) per annum.

          **c.      Payment of BOW's Allowed Secured Claim.**  Pursuant to

Section 5.1.2.3 of the Plan, the Reorganized Debtor will pay to BOW, in full satisfaction, settlement, release and discharge of BOW's Allowed Secured Claim, the following payments:  (i) commencing on the first day of the first full month following the Effective Date and continuing on the first day of each month thereafter through and including the fifty-ninth (59th) month after the Effective Date, the Reorganized Debtor will pay to BOW equal monthly payments of principal and interest in the amount of $35,822.71; provided, however, that during the months of June, July and August during the 60-month term of the payment of BOW's Allowed Secured Claim under the Plan, the Reorganized Debtor will not be required to pay to BOW principal reduction payments, (i.e., during such months, the Reorganized Debtor will pay interest only payments to BOW); and (ii) on the sixtieth (60th) month following the Effective Date, the Reorganized Debtor will pay to BOW the balance of BOW's Allowed Secured Claim, plus all unpaid and accrued interest thereon.

      **d.**    **Liens of BOW**.  Except as provided expressly to the contrary in the Plan, BOW will retain, without alteration or modification and with the same scope, extent and priority, BOW's existing Liens encumbering BOW's Collateral in order to secure the repayment of BOW's Allowed Secured Claim.

      **e.**    **Reconveyance of BOW's Liens**.  BOW will reconvey all Liens held by BOW encumbering the Reorganized Debtor's Assets as soon as practicable after the Reorganized Debtor pays in full BOW's Allowed Secured Claim under the Plan.

      **f.**    **Sale of BOW's Collateral**.  In the event that the Reorganized Debtor sells any Collateral of BOW, secured as set forth by Section 5.1.2.4 of the Plan, the Reorganized Debtor will pay to BOW the amount of BOW's Allowed Secured Claim with respect to such Collateral as soon as practicable after the sale of such Collateral.

g.  **No Prepayment Penalty Regarding Payment of BOW's Allowed Secured Claim.**  Notwithstanding any provision to the contrary that may be contained in the BOW Loan Documents between the Debtor and BOW, the Reorganized Debtor may prepay, at any time, without any penalty or charge of any nature whatsoever, any or all of the amount of BOW's Allowed Secured Claim.

h.  **Cure of Defaults.**  Pursuant to section 5.1.2.8 of the Plan, any and all arrearages owed by the Debtor to BOW as of the Effective Date under the BOW Loan Documents will be included in the principal amount of BOW's Allowed Secured Claim, fixed as of the Effective Date in the amount set forth by Section 5.1.2.1 of the Plan.  Notwithstanding any provision to the contrary that may be contained in the BOW Loan Documents, as of the Effective Date, any and all defaults under the BOW Loan Documents will be deemed to be fully and completely cured, the maturity of BOW's Allowed Secured Claim will be reinstated as such maturity existed before any such defaults, and the Reorganized Debtor will be deemed to be in full compliance with its obligations under the BOW Loan Documents.

3.  **BOW Subordinated Claim.**

In addition to the Allowed Secured Claim of BOW set forth in Section 5.1.2 of the Plan, and the Allowed General Unsecured Claim of BOW set forth in Section 5.1.4 of the Plan, BOW will have under the Plan an Allowed Claim in the amount of $500,000, which will be subject to subordination on the terms and conditions set forth in Section 5.1.3.3 of the Plan ("BOW Subordinated Claim").

a.  **No Interest on BOW Subordinated Claim.**  The BOW Subordinated Claim will not accrue interest under the Plan.

b.  **Payment of BOW Subordinated Claim.**  Pursuant to Section 5.1.3.2 of the Plan, in full satisfaction, settlement, release and discharge of the BOW Subordinated Claim, the Reorganized Debtor will pay to BOW, on account of the BOW Subordinated Claim, the following Distributions: (i) $50,000,

which will be paid on or before October 31, 2019; (ii) $250,000, which will be paid

on or before September 30, 2020; and (iii) $200,000 which will be paid on or

before September 30, 2021.

        c.    **Subordination of BOW Subordinated Claim.**  The repayment of

the BOW Subordinated Claim will be secured as follows:

        i.  **BOW's Existing Collateral.**  The BOW Subordinated Claim will

be secured by BOW's Liens encumbering BOW's Collateral as of the

Effective Date; provided, however, that BOW will subordinate the BOW

Subordinated Claim in favor of, and the BOW Subordinated Claim will be

junior in priority to, any secured loan that may be obtained by the

Reorganized Debtor on or after the Effective Date ("Post-Effective Date

Loan"), so long as the amount of BOW's Allowed Secured Claim set forth

in Section 5.1.2 of the Plan, including any unpaid and accrued post-

Effective Date interest thereon, is paid from the proceeds of the Post-

Effective Date Loan.  Notwithstanding the foregoing, if the maker of the

Post-Effective Date Loan ("Post-Effective Date Lender") prohibits BOW

from retaining a Lien encumbering Assets of the Reorganized Debtor to

secure the repayment of the BOW Subordinated Claim, the BOW

Subordinated Claim will not be secured by Assets of the Reorganized

Debtor but will be an Allowed General Unsecured Claim payable pursuant

to the provisions of Section 5.5 of the Plan.  BOW will execute and deliver

to a Post-Effective Date Lender any instruments and other documents to

evidence and implement the subordination or termination, as the case may

be, of the Liens securing the BOW Subordinated Claim as may be

reasonably requested by the Post-Effective Date Lender.

        ii.    **Unencumbered Assets.**  The Debtor intends to file a motion

("BOW Secured Claim Compromise Motion"), to be heard concurrently

with the Confirmation Hearing, pursuant to which the Debtor will request

that, in consideration of BOW's agreeing to the restructuring of BOW's Secured Claim as provided for by Section 5.1 of the Plan and as described in Paragraph VII(A) hereof, the Bankruptcy Court authorize the Debtor to provide to BOW additional Collateral to secure the payment of the BOW Secured Claim, on terms comparable to the following:

- In addition to the Collateral described in Paragraph VII(A)(3)(c)(i) herein, on the Effective Date, BOW will obtain a Lien ("Unencumbered Assets Lien") encumbering all otherwise unencumbered Assets of the Reorganized Debtor as of the Effective Date ("Unencumbered Assets") in order to secure the payment of the BOW Subordinated Claim; provided, however, that the Unencumbered Assets Lien will be reconveyed and released by BOW if BOW's Allowed Secured Claim is paid in full within one hundred eighty (180) days after the Effective Date.

- BOW will subordinate the Unencumbered Assets Lien in favor of, and the Unencumbered Assets Lien will be junior in priority to, any loan, to the extent of $300,000, that may be obtained by the Reorganized Debtor on or after the Effective Date secured by the Unencumbered Assets ("Unencumbered Assets Loan").

- Notwithstanding the foregoing, if the maker of the Unencumbered Assets Loan ("Unencumbered Assets Lender") prohibits BOW from retaining a Lien encumbering the Unencumbered Assets, the BOW Subordinated Claim will not be secured by the Unencumbered Assets.

- BOW will execute and deliver to an Unencumbered Assets Lender any instruments and other documents to evidence and

-45-

implement the subordination or termination, as the case may

be, of the Unencumbered Assets Lien encumbering the

Unencumbered Assets as may be requested by the

Unencumbered Assets Lender.

As set forth by Section 6.2 of the Plan, the Bankruptcy Court's entering an

order granting the BOW Secured Claim Compromise Motion on terms and

conditions approved by BOW is a condition to the Confirmation of the Plan.  BOW

may determine to waive such condition to the Confirmation of the Plan.

4.      **Allowed General Unsecured Claim of BOW.**  In addition to BOW's

Allowed Secured Claim and the BOW Subordinated Claim, BOW will have under the

Plan an Allowed General Unsecured Claim in the amount of $1,143,027, including an

Allowed Deficiency Claim in the amount of $1,010,559.  BOW's Allowed General

Unsecured Claim will be treated as an Allowed Class 5 Claim under the Plan.

5.      **Modification of the BOW Loan Documents.**  The BOW Loan Documents

will be deemed modified as of the Effective Date, automatically and with no need for any

further act of the Debtor or the Reorganized Debtor or order of the Bankruptcy Court, to

the extent that any provisions of the BOW Loan Documents are inconsistent with the

provisions of the Plan.

B.      **Class 2 -- Treatment of Any Allowed Secured Claims of Creditors Listed in
        Section 4.2.1.2 of the Plan.**

1.      **Class 2(a) -- Exchange Bank.**  The treatment of Exchange Bank's Allowed

Secured Claim under the Plan is set forth hereinbelow.  Exchange Bank's Allowed Secured

Claim is impaired by the Plan.

a.      **Allowed Secured Claim of Exchange Bank.**  Pursuant to Section

5.2.1.1 of the Plan, Exchange Bank will have an Allowed Secured Claim, as of the

Effective Date, in the amount of $12,243, plus (i) interest thereon, calculated at the

non-default rate provided by the Loan Documents between the Debtor and

Exchange Bank, from February 1, 2019 through the Effective Date, and (ii) any

reasonable fees, costs and other charges to which Exchange Bank is entitled under such Loan Documents and under section 506 of the Bankruptcy Code. Exchange Bank's Allowed Secured Claim will be reduced by any payments that may be made by the Debtor to Exchange Bank from February 1, 2019 through the Effective Date. Any Claim asserted by Exchange Bank in excess of the Allowed Secured Claim of Exchange Bank fixed by the Plan will be fully and forever released and extinguished as of the Effective Date.

      **b.**     **Interest Rate on Exchange Bank's Allowed Secured Claim.** Pursuant to Section 5.2.1.2 of the Plan, commencing on the Effective Date, and continuing until such time as Exchange Bank's Allowed Secured Claim is fully paid, Exchange Bank's Allowed Secured Claim will bear interest at the non-default rate of interest provided by the Loan Documents between the Debtor and Exchange Bank.

      **c.**     **Payment of Exchange Bank's Allowed Secured Claim.** Pursuant to Section 5.2.1.3 of the Plan, in full satisfaction, settlement, release and discharge of Exchange Bank's Allowed Secured Claim, commencing on the first day of the first full month following the Effective Date and continuing on the first day of each month thereafter for a total of sixty (60) consecutive months, the Reorganized Debtor will pay to Exchange Bank monthly payments in the amount of $261.34.

      **d.**     **Liens of Exchange Bank.** Exchange Bank will retain, without alteration or modification and in the same order of priority as of the Effective Date, Exchange Bank's Liens encumbering Exchange Bank's Collateral in order to secure the repayment of Exchange Bank's Allowed Secured Claim.

      **e.**     **Modification of Exchange Bank's Loan Documents.** Pursuant to the Plan, Exchange Bank's Loan Documents will be deemed modified as of the Effective Date, automatically and with no need for any further act of the Debtor or the Reorganized Debtor or order of the Bankruptcy Court, to the extent that any provisions of such Loan Documents are inconsistent with the provisions of the

Plan.

      **f.**      **<u>Reconveyance of Exchange Bank's Liens</u>.**  Pursuant to the Plan, Exchange Bank is required to reconvey all Liens held by Exchange Bank encumbering the Reorganized Debtor's Assets as soon as practicable after the Reorganized Debtor pays in full Exchange Bank's Allowed Secured Claim.

      **g.**      **<u>Sale of Exchange Bank's Collateral</u>.**  In the event that the Reorganized Debtor sells any Collateral of Exchange Bank, the Reorganized Debtor will pay to Exchange Bank the amount of Exchange Bank's Allowed Secured Claim with respect to such Collateral as soon as practicable after the sale of such Collateral.

      **h.**      **<u>No Prepayment Penalty Regarding Payment of Exchange Bank's Allowed Secured Claim</u>.**  Notwithstanding any provision to the contrary that may be contained in the Loan Documents between the Debtor and Exchange Bank, the Reorganized Debtor may prepay, at any time, without any penalty or charge of any nature whatsoever, any or all of the amount of Exchange Bank's Allowed Secured Claim.

      **i.**      **<u>Cure of Defaults</u>.**  Pursuant to Section 5.1.2.9 of the Plan, any and all arrearages owed by the Debtor to Exchange Bank as of the Effective Date under the Debtor's Loan Documents with Exchange Bank will be included in the principal amount of Exchange Bank's Allowed Secured Claim, fixed as of the Effective Date in the amount set forth by Section 5.2.1.1 of the Plan. Notwithstanding any provision to the contrary that may be contained in such Loan Documents, as of the Effective Date, any and all defaults under such Loan Documents will be deemed to be fully and completely cured, the maturity of Exchange Bank's Allowed Secured Claim will be reinstated as such maturity existed before any such defaults, and the Reorganized Debtor will be deemed to be in full compliance with its obligations under such Loan Documents.

      **j.**      **<u>No Deficiency Claim of Exchange Bank</u>.**  Exchange Bank will

have no Allowed General Unsecured Claim or any other Allowed Claim, except for the Allowed Secured Claim fixed in the amount set forth by Section 5.2.1.1 of the Plan.

2.      **Class 2(b) -- GreatAmerica.**  The treatment of GreatAmerica's Allowed Secured Claim under the Plan is set forth hereinbelow.  GreatAmerica's Allowed Secured Claim is impaired by the Plan.

a.      **Allowed Secured Claim of GreatAmerica.**  The Debtor believes that GreatAmerica has no Allowed Secured Claim because the Debtor paid in full the amount of GreatAmerica's Allowed Secured Claim during the Case.  Pursuant to Section 5.2.2.1 of the Plan, if the Debtor and GreatAmerica do not reach agreement by the Effective Date regarding the amount, if any, of GreatAmerica's Allowed Secured Claim, the Reorganized Debtor will request that the Bankruptcy Court determine the amount of GreatAmerica's Allowed Secured Claim, after notice to GreatAmerica and a hearing thereon.  Any Secured Claim asserted by GreatAmerica in excess of any amount of an Allowed Secured Claim of GreatAmerica determined by the Bankruptcy Court will be fully and forever released and extinguished.

b.      **Interest Rate on GreatAmerica's Allowed Secured Claim.** Pursuant to Section 5.2.2.2 of the Plan, commencing on the Effective Date, and continuing until such time as any Allowed Secured Claim of GreatAmerica is fully paid, any Allowed Secured Claim of GreatAmerica will bear interest at the non-default rate of interest provided by the Loan Documents between the Debtor and GreatAmerica.

c.      **Payment of GreatAmerica's Allowed Secured Claim.**  Pursuant to Section 5.2.2.3 of the Plan, in full satisfaction, settlement, release and discharge of any Allowed Secured Claim of GreatAmerica, commencing on the first day of the first full month following the Effective Date and continuing on the first day of each month thereafter for a total of sixty (60) consecutive months, the Reorganized

Debtor will pay to GreatAmerica equal monthly payments of principal and interest in an amount sufficient to satisfy the amount, if any, of GreatAmerica's Allowed Secured Claim, plus the interest accruing thereon.

        **d.**      **Liens of GreatAmerica.**  GreatAmerica will retain, without alteration or modification and in the same order of priority as of the Effective Date, any Liens of GreatAmerica encumbering any Collateral of GreatAmerica in order to secure the repayment of any Allowed Secured Claim of GreatAmerica.

        **e.**      **Modification of GreatAmerica's Loan Documents.**  Pursuant to the Plan, GreatAmerica's Loan Documents will be deemed modified as of the Effective Date, automatically and with no need for any further act of the Debtor or the Reorganized Debtor or order of the Bankruptcy Court, to the extent that any provisions of such Loan Documents are inconsistent with the provisions of the Plan.

        **f.**      **Reconveyance of GreatAmerica's Liens.**  Pursuant to the Plan, GreatAmerica will reconvey all Liens held by GreatAmerica encumbering the Reorganized Debtor's Assets as soon as practicable after (i) it is determined by the Bankruptcy Court that the Debtor has paid in full, or (ii) the Reorganized Debtor pays in full, any Allowed Secured Claim of GreatAmerica.

        **g.**      **Sale of GreatAmerica's Collateral.**  In the event that the Reorganized Debtor sells any Collateral of GreatAmerica, the Reorganized Debtor will pay to GreatAmerica the amount of any Allowed Secured Claim of GreatAmerica with respect to such Collateral as soon as practicable after the sale of such Collateral.

        **h.**      **No Prepayment Penalty Regarding Payment of GreatAmerica's Allowed Secured Claim.**  Notwithstanding any provision to the contrary that may be contained in the Loan Documents between the Debtor and GreatAmerica, the Reorganized Debtor may prepay, at any time, without any penalty or charge of any

nature whatsoever, any or all of the amount of any Allowed Secured Claim of GreatAmerica.

**i.** **Cure of Defaults.** Pursuant to Section 5.2.2.9 of the Plan, notwithstanding any provision to the contrary that may be contained in the Debtor's Loan Documents with GreatAmerica, as of the Effective Date, any and all defaults under such Loan Documents will be deemed to be fully and completely cured, the maturity of GreatAmerica's Allowed Secured Claim, if any, will be reinstated as such maturity existed before any such defaults, and the Reorganized Debtor will be deemed to be in full compliance with its obligations under such Loan Documents.

**j.** **Deficiency Claim of GreatAmerica.** Any Deficiency Claim of GreatAmerica will be treated as a Class 5 Claim under the Plan.

**3.** **Class 2(c) -- Trans Advantage.** The treatment of Trans Advantage's Allowed Secured Claim under the Plan is set forth hereinbelow. Trans Advantage's Allowed Secured Claim is impaired by the Plan.

**a.** **Allowed Secured Claim of Trans Advantage.** Pursuant to Section 5.2.3.1 of the Plan, Trans Advantage will have an Allowed Secured Claim, as of the Effective Date, in the amount of $396,855, plus (i) interest thereon, calculated at the non-default rate provided by the Loan Documents between the Debtor and Trans Advantage, from February 1, 2019 through the Effective Date, and (ii) any reasonable fees, costs and other charges to which Trans Advantage is entitled under such Loan Documents and under section 506 of the Bankruptcy Code. Trans Advantage's Allowed Secured Claim will be reduced by any payments that may be made by the Debtor to Trans Advantage from February 1, 2019 through the Effective Date. Any Secured Claim asserted by Trans Advantage in excess of the Allowed Secured Claim of Trans Advantage fixed by the Plan will be fully and forever released and extinguished as of the Effective Date.

**b.** **Interest Rate on Trans Advantage's Allowed Secured Claim.** Pursuant to Section 5.2.3.2 of the Plan, commencing on the Effective Date, and

continuing until such time as Trans Advantage's Allowed Secured Claim is fully paid, Trans Advantage's Allowed Secured Claim will bear interest at the non-default rate of interest provided by the Loan Documents between the Debtor and Trans Advantage.

        c.      **Payment of Trans Advantage's Allowed Secured Claim**.

Pursuant to Section 5.2.3.3 of the Plan, in full satisfaction, settlement, release and discharge of Trans Advantage's Allowed Secured Claim, commencing on the first day of the first full month following the Effective Date and continuing on the first day of each month thereafter for a total of forty-eight (48) consecutive months, the Reorganized Debtor will pay to Trans Advantage monthly payments in the amount of $7,696.76. On the first day of forty-eighth (48th) month following the Effective Date, the Reorganized Debtor shall pay to Trans Advantage a balloon payment in the amount of $82,025 in full satisfaction of the balance of Trans Advantage's Allowed Secured Claim.

        d.      **Liens of Trans Advantage**. Trans Advantage will retain, without alteration or modification and in the same order of priority as of the Effective Date, Trans Advantage's Liens encumbering Trans Advantage's Collateral in order to secure the repayment of Trans Advantage's Allowed Secured Claim.

        e.      **Modification of Trans Advantage's Loan Documents**. Pursuant to the Plan, Trans Advantage's Loan Documents will be deemed modified as of the Effective Date, automatically and with no need for any further act of the Debtor or the Reorganized Debtor or order of the Bankruptcy Court, to the extent that any provisions of such Loan Documents are inconsistent with the provisions of the Plan.

        f.      **Reconveyance of Trans Advantage's Liens**. Pursuant to the Plan, Trans Advantage will reconvey all Liens held by Trans Advantage encumbering the Reorganized Debtor's Assets as soon as practicable after the Reorganized Debtor pays in full Trans Advantage's Allowed Secured Claim.

g. **Sale of Trans Advantage's Collateral.**  In the event that the Reorganized Debtor sells any Collateral of Trans Advantage, the Reorganized Debtor will pay to Trans Advantage the net amount of the proceeds from any such sale of the Collateral to reduce the outstanding amount of Trans Advantage's Allowed Secured Claim as soon as practicable after the sale of such Collateral.

h. **No Prepayment Penalty Regarding Payment of Trans Advantage's Allowed Secured Claim.**  Notwithstanding any provision to the contrary that may be contained in the Loan Documents between the Debtor and Trans Advantage, the Reorganized Debtor may prepay, at any time, without any penalty or charge of any nature whatsoever, any or all of the amount of Trans Advantage's Allowed Secured Claim.

i. **Cure of Defaults.**  Pursuant to Section 5.2.3.9 of the Plan, any and all arrearages owed by the Debtor to Trans Advantage as of the Effective Date under the Debtor's Loan Documents with Trans Advantage will be included in the principal amount of Trans Advantage's Allowed Secured Claim, fixed as of the Effective Date in the amount set forth by Section 5.2.3.1 of the Plan. Notwithstanding any provision to the contrary that may be contained in such Loan Documents, as of the Effective Date, any and all defaults under such Loan Documents will be deemed to be fully and completely cured, the maturity of Trans Advantage's Allowed Secured Claim will be reinstated as such maturity existed before any such defaults, and the Reorganized Debtor will be deemed to be in full compliance with its obligations under such Loan Documents.

j. **Deficiency Claim of Trans Advantage.**  Any Deficiency Claim of Trans Advantage will be treated as a Class 5 Claim under the Plan.

4. **Class 2(d) -- Western Equipment.**  The treatment of Western Equipment's Allowed Secured Claim under the Plan is set forth hereinbelow.  Western Equipment's Allowed Secured Claim is impaired by the Plan.

a.    **Allowed Secured Claim of Western Equipment**.  Pursuant to Section 5.2.4.1 of the Plan, Western Equipment will have an Allowed Secured Claim, as of the Effective Date, in the amount of $45,811, plus (i) interest thereon, calculated at the non-default rate provided by the Loan Documents between the Debtor and Western Equipment, from February 1, 2019 through the Effective Date, and (ii) any reasonable fees, costs and other charges to which Western Equipment is entitled under such Loan Documents and under section 506 of the Bankruptcy Code.  Western Equipment's Allowed Secured Claim will be reduced by any payments that may be made by the Debtor to Western Equipment from February 1, 2019 through the Effective Date.  Any Secured Claim asserted by Western Equipment in excess of the Allowed Secured Claim of Western Equipment fixed by the Plan will be fully and forever released and extinguished as of the Effective Date.

b.    **Interest Rate on Western Equipment's Allowed Secured Claim**. Pursuant to Section 5.2.4.2 of the Plan, commencing on the Effective Date, and continuing until such time as Western Equipment's Allowed Secured Claim is fully paid, Western Equipment's Allowed Secured Claim will bear interest at the non-default rate of interest provided by the Loan Documents between the Debtor and Western Equipment.

c.    **Payment of Western Equipment's Allowed Secured Claim**. Pursuant to Section 5.2.4.3 of the Plan, in full satisfaction, settlement, release and discharge of Western Equipment's Allowed Secured Claim, commencing on the first day of the first full month following the Effective Date and continuing on the first day of each month thereafter for a total of sixty (60) consecutive months, the Reorganized Debtor will pay to Western Equipment monthly payments in the amount of $911.73.

d.    **Liens of Western Equipment**.  Western Equipment will retain, without alteration or modification and in the same order of priority as of the

Effective Date, Western Equipment's Liens encumbering Western Equipment's Collateral in order to secure the repayment of Western Equipment's Allowed Secured Claim.

e.     **Modification of Western Equipment's Loan Documents**. Pursuant to the Plan, Western Equipment's Loan Documents will be deemed modified as of the Effective Date, automatically and with no need for any further act of the Debtor or the Reorganized Debtor or order of the Bankruptcy Court, to the extent that any provisions of such Loan Documents are inconsistent with the provisions of the Plan.

f.     **Reconveyance of Western Equipment's Liens**.  Pursuant to the Plan, Western Equipment will reconvey all Liens held by Western Equipment encumbering the Reorganized Debtor's Assets as soon as practicable after the Reorganized Debtor pays in full Western Equipment's Allowed Secured Claim.

g.     **Sale of Western Equipment's Collateral**.  In the event that the Reorganized Debtor sells any Collateral of Western Equipment, the Reorganized Debtor will pay to Exchange Bank the amount of Western Equipment's Allowed Secured Claim with respect to such Collateral as soon as practicable after the sale of such Collateral.

h.     **No Prepayment Penalty Regarding Payment of Western Equipment's Allowed Secured Claim**.  Notwithstanding any provision to the contrary that may be contained in the Loan Documents between the Debtor and Western Equipment, the Reorganized Debtor may prepay, at any time, without any penalty or charge of any nature whatsoever, any or all of the amount of Western Equipment's Allowed Secured Claim.

i.     **Cure of Defaults**.  Pursuant to Section 5.2.4.9 of the Plan, any and all arrearages owed by the Debtor to Western Equipment as of the Effective Date under the Debtor's Loan Documents with Western Equipment will be included in the principal amount of Western Equipment's Allowed Secured Claim, fixed as of

the Effective Date in the amount set forth by Section 5.2.4.1 of the Plan. Notwithstanding any provision to the contrary that may be contained in such Loan Documents, as of the Effective Date, any and all defaults under such Loan Documents will be deemed to be fully and completely cured, the maturity of Western Equipment's Allowed Secured Claim will be reinstated as such maturity existed before any such defaults, and the Reorganized Debtor will be deemed to be in full compliance with its obligations under such Loan Documents.

      **j.**    **Deficiency Claim of Western Equipment.**  Any Deficiency Claim of Western Equipment will be treated as a Class 5 Claim under the Plan.

    **5.**    **Class 2(e) -- Allegiant.**  The treatment of Allegiant's Allowed Secured Claim under the Plan is set forth hereinbelow.  Allegiant's Allowed Secured Claim is impaired by the Plan.

      **a.**    **Allowed Secured Claim of Allegiant.**  Pursuant to Section 5.2.5.1 of the Plan, Allegiant will have an Allowed Secured Claim, as of the Effective Date, in the amount of $23,049, plus (i) interest thereon, calculated at the non-default rate provided by the Loan Documents between the Debtor and Allegiant, from February 1, 2019 through the Effective Date, and (ii) any reasonable fees, costs and other charges to which Allegiant is entitled under such Loan Documents and under section 506 of the Bankruptcy Code.  Allegiant's Allowed Secured Claim will be reduced by any payments that may be made by the Debtor to Allegiant from February 1, 2019 through the Effective Date.  Any Secured Claim asserted by Allegiant in excess of the Allowed Secured Claim of Allegiant fixed by the Plan will be fully and forever released and extinguished as of the Effective Date.

      **b.**    **Interest Rate on Allegiant's Allowed Secured Claim.**  Pursuant to Section 5.2.5.2 of the Plan, commencing on the Effective Date, and continuing until such time as Allegiant's Allowed Secured Claim is fully paid, Allegiant's

Allowed Secured Claim will bear interest at the non-default rate of interest provided by the Loan Documents between the Debtor and Allegiant.

      **c.**      **Payment of Allegiant's Allowed Secured Claim.**  Pursuant to Section 5.2.5.3 of the Plan, in full satisfaction, settlement, release and discharge of Allegiant's Allowed Secured Claim, commencing on the first day of the first full month following the Effective Date and continuing on the first day of each month thereafter for a total period of sixty (60) consecutive months, the Reorganized Debtor will pay to Allegiant monthly payments in the amount of $515.70.

      **d.**      **Liens of Allegiant.**  Allegiant will retain, without alteration or modification and in the same order of priority as of the Effective Date, Allegiant's Liens encumbering Allegiant's Collateral in order to secure the repayment of Allegiant's Allowed Secured Claim.

      **e.**      **Modification of Allegiant's Loan Documents.**  Under the Plan, Allegiant's Loan Documents will be deemed modified as of the Effective Date, automatically and with no need for any further act of the Debtor or the Reorganized Debtor or order of the Bankruptcy Court, to the extent that any provisions of such Loan Documents are inconsistent with the provisions of the Plan.

      **f.**      **Reconveyance of Allegiant's Liens.**  Allegiant will reconvey all Liens held by Allegiant encumbering the Reorganized Debtor's Assets as soon as practicable after the Reorganized Debtor pays in full Allegiant's Allowed Secured Claim.

      **g.**      **Sale of Allegiant's Collateral.**  In the event that the Reorganized Debtor sells any Collateral of Allegiant, the Reorganized Debtor will pay to Allegiant the amount of Allegiant's Allowed Secured Claim with respect to such Collateral as soon as practicable after the sale of such Collateral.

      **h.**      **No Prepayment Penalty Regarding Payment of Allegiant's Allowed Secured Claim.**  Notwithstanding any provision to the contrary that may

be contained in the Loan Documents between the Debtor and Allegiant, the Reorganized Debtor may prepay, at any time, without any penalty or charge of any nature whatsoever, any or all of the amount of Allegiant's Allowed Secured Claim.

   **i.** **Cure of Defaults.** Pursuant to Section 5.2.5.9 of the Plan, any and all arrearages owed by the Debtor to Allegiant as of the Effective Date under the Debtor's Loan Documents with Allegiant will be included in the principal amount of Allegiant's Allowed Secured Claim, fixed as of the Effective Date in the amount set forth by Section 5.2.5.1 of the Plan.  Notwithstanding any provision to the contrary that may be contained in such Loan Documents, as of the Effective Date, any and all defaults under such Loan Documents will be deemed to be fully and completely cured, the maturity of Allegiant's Allowed Secured Claim will be reinstated as such maturity existed before any such defaults, and the Reorganized Debtor will be deemed to be in full compliance with its obligations under such Loan Documents.

   **j.** **Deficiency Claim of Allegiant.** Any Deficiency Claim of Allegiant will be treated as a Class 5 Claim under the Plan.

  **C.** **Class 3 -- Treatment of Any Allowed Secured Claims Other Than Class 1 and Class 2 Claims.**

Class 3 consists of any Allowed Secured Claims other than Class 1 or Class Claims. Pursuant to Section 5.3 of the Plan, in the event that there is more than one holder of an Allowed Class 3 Claim, the Allowed Secured Claim of each such Secured Creditor will be deemed to be classified in a separate sub-class of Class 3, and each such sub-class of Class 3 will be deemed to be a separate Class under the Plan.

The Debtor believes that there are <u>no</u> Allowed Class 3 Secured Claims.  In the event that there is any Allowed Class 3 Secured Claim, such Allowed Class 3 Secured Claim will be <u>not</u> be impaired by the Plan.  The treatment of any Allowed Class 3 Secured Claim is set forth in Section 5.3 of the Plan.

In accordance with Section 5.3.2 of the Plan, Confirmation of the Plan will be deemed to constitute a finding, for all purposes, that no Class 3 Secured Creditor asserting a Lien junior in priority to the Liens of BOW has any Allowed Secured Claim under the Plan, as determined by section 506 of the Bankruptcy Code.  Upon the Effective Date of the Plan, any and all such junior-priority Liens will be automatically voided. Accordingly, for the purposes of the Plan, all such junior-priority Secured Claims will be treated under the Plan as Class 5 Deficiency Claims, or, in the case of an Allowed Priority Tax Claim, will be treated in accordance with the provisions of Section 3.2 of the Plan.

    **D.**    **Class 4 -- Allowed Priority Non-Tax Claims.**

Class 4 consists of all Allowed Priority Non-Tax Claims.  Approximately $24,799 in Priority Non-Tax Claims have been asserted against the Debtor.  The Debtor disputes all of such Claims.  Class 4 is not impaired by the Plan.

Pursuant to Section 5.4 of the Plan, except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment of its Allowed Priority Non-Tax Claim, each holder of an Allowed Priority Non-Tax Claim will receive, in full satisfaction, exchange and release of its Allowed Priority Non-Tax Claim, Cash in the full amount of the Allowed Priority Non-Tax Claim on the later of (i) the Effective Date, and (ii) the tenth (10th) Business Day after such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim.

    **E.**    **Class 5 -- Allowed General Unsecured Claims.**

Class 5 consists of all Allowed General Unsecured Claims.  The Debtor estimates that approximately $2,704,720 in General Unsecured Claims have been asserted against the Debtor (including Deficiency Claims).  The Debtor disputes approximately $294,000 of such Claims. Class 5 is impaired by the Plan.  The treatment of Class 5 Allowed General Unsecured Claims under the Plan is as follows:

    **1.**    **Distributions on Account of Allowed General Unsecured Claims.**

Pursuant to Section 5.5.1 of the Plan, the Reorganized Debtor will pay, in full satisfaction, settlement, release and discharge of Allowed General Unsecured Claims, a total amount of $450,000, payable by the following Distributions.

a.      **December 15, 2020** -- Each holder of an Allowed General Unsecured Claim will receive its Pro Rata share of a Distribution in the amount of One Hundred Thousand Dollars ($100,000).

b.      **December 15, 2021** -- Each holder of an Allowed General Unsecured Claim will receive its Pro Rata share of a Distribution in the amount of One Hundred Thousand Dollars ($100,000).

c.      **December 15, 2022** -- Each holder of an Allowed General Unsecured Claim will receive its Pro Rata share of a Distribution in the amount of One Hundred Thousand Dollars ($100,000).

d.      **December 15, 2023** -- Each holder of an Allowed General Unsecured Claim will receive its Pro Rata share of a Distribution in the amount of One Hundred Fifty Thousand Dollars ($150,000).

2.      **No Post-Petition Interest.**  An Allowed General Unsecured Claim will not include any interest from the Petition Date through the Effective Date, and except as provided expressly to the contrary in Section 8.4.3 of the Plan, will not accrue interest after the Effective Date.

3.      **Termination of the Reorganized Debtor's Obligations to Holders of Allowed General Unsecured Claims.**  The Reorganized Debtor's obligations on account of Allowed General Unsecured Claims asserted against the Reorganized Debtor will terminate, and Allowed General Unsecured Claims will be deemed to be fully and completely satisfied and released, upon the Reorganized Debtor's payment of all Distributions on account of Allowed General Unsecured Claims required by Section 5.5.1 of the Plan.

4.      **Insider's Contribution of Distributions Payable to Insider.**  Mr. Lovejoy will receive no Distributions on account of any Allowed General Unsecured Claim that he may have against the Debtor, and, instead, will contribute to the Reorganized Debtor all Distributions otherwise payable to him in order to facilitate the Reorganized Debtor's making of the Distributions required by the Plan.

**5.** **Treatment of Allowed Deficiency Claims.** The Allowed Deficiency Claim of BOW, and any other Allowed Deficiency Claims, will be treated under the Plan as an Allowed Class 5 Claim, and the holder of an Allowed Deficiency Claim will receive its Pro Rata share of the Distributions to holders of Allowed Class 5 Claims set forth by Section 5.5.1 of the Plan.

**F.** **Class 6 -- Allowed Interests.**

Class 6 consists of all Allowed Interests. Mr. Lovejoy is the only Interest Holder in the Case. Class 6 is unimpaired by the Plan.

**1.** **Retention of Interest.** Pursuant to Section 5.6.1 of the Plan, the Interest Holder will retain, without modification or alteration, all of his rights, remedies and interests pursuant to the Interest.

**2.** **New Value.** The Interest Holder will transfer to the Reorganized Debtor, as and for contributions of "new value" in order to facilitate the retention of his Interest: (a) the Distributions otherwise payable to him on account of any Allowed General Unsecured Claim that he may have against the Debtor, in accordance with the provisions of Section 5.5.4 hereof, and (b) the Interest Holder's right, title and interest in and to all capital stock and other equity interests in Harmony Moving Inc., a California corporation, to be transferred to the Reorganized Debtor on or as soon as practicable after the Effective Date.

Mr. Lovejoy asserts that his new value contribution is substantial and adequate under the circumstances of this case. Mr. Lovejoy asserts that he holds a valid General Unsecured Claim against the Debtor in the amount of approximately $220,000, and that his interest in Harmony Moving, Inc. has a value of not less than $515,000. The value of Mr. Lovejoy's Interest in the Reorganized Debtor as of the Effective Date is uncertain, but Mr. Lovejoy asserts that the value of such Interest is not greater than the amount of his new value contribution. Any issues with respect to Mr. Lovejoy's new value contribution, including the adequacy thereof, will be meaningful only if the Class of Allowed General Unsecured Claims established by the Plan (Class 5) votes against the confirmation of the

Plan, and, accordingly, such issues will be addressed, if at all, at the time of the

Confirmation Hearing.

## VIII.

## MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN

### A.      Overview.

The Plan provides for a reorganization of the Debtor's financial affairs in accordance with

the terms and conditions of the Plan.  This article is intended to address the means by which the

Debtor intends to effectuate the reorganization provided for by the Plan and to fund the

obligations to Creditors undertaken in the Plan.  This article provides information regarding the

conditions precedent to Confirmation and the effectiveness of the Plan, sources of funds from

which Distributions to holders of Allowed Claims will be made, corporate governance of the

Reorganized Debtor, and other material issues bearing upon the performance of the Plan.

### B.      Conditions Precedent to Plan Confirmation.

The only conditions precedent to the confirmation of the Plan are that:  the Bankruptcy

Court will have entered the Confirmation Order on terms and conditions satisfactory to the

Debtor; and the Bankruptcy Court will have entered an order granting the BOW Secured Claim

Compromise Motion on terms and conditions approved by BOW and the Debtor.

### C.      Conditions Precedent to the Effectiveness of the Plan.

The only conditions precedent to the effectiveness of the Plan and the occurrence of the

Effective Date are that:  (1) the Bankruptcy Court will have entered the Confirmation Order on

terms and conditions satisfactory to the Debtor; (2) the Bankruptcy Court will have entered an

order granting the BOW Secured Claim Compromise Motion on terms and conditions approved

by BOW and the Debtor; and (3) the Confirmation Order will have become a Final Order.

The Debtor may, in the exercise of its sole and absolute discretion, waive the condition to

the effectiveness of the Plan and to the occurrence of the Effective Date set forth in

subparagraph (3) of this Paragraph VIII(C), without the need for any prior notice or hearing with

respect thereto.  Without limiting the generality of the foregoing, in the event that an appeal,

petition for certiorari or motion for reargument or rehearing or comparable post-confirmation

relief is filed with respect to the Confirmation Order, and no stay of the effectiveness of the Confirmation Order is obtained, the Debtor may, in the exercise of its sole and absolute discretion, elect to waive such condition and to proceed with the Effective Date of the Plan, and the Reorganized Debtor may proceed to commence to consummate the Plan, by filing and serving notice of such election upon the United States Trustee and the party seeking such post-confirmation relief.

### D. __Implementation of Plan on the Effective Date__.

On or soon as practicable after the Effective Date, the following will occur with respect to the implementation of the Plan: (1) all acts, documents and agreements appropriate to implement the Plan will be effected or executed; and (2) the Reorganized Debtor, as Disbursing Agent under the Plan, will make all Distributions required to be made on or about the Effective Date of the Plan.

### E. __Corporate Action__.

Upon the Effective Date, all transactions and matters provided for under the Plan will be deemed to have been authorized and approved by the Debtor without any requirement of further action by the Debtor, the Debtor's Interest Holder, or by the Debtor's Board of Directors.

### F. __Reorganized Debtor__.

On the Effective Date, the Reorganized Debtor will have the rights, powers and duties provided for by the Plan, the Confirmation Order, the Corporate Governance Agreements and applicable law.  On the Effective Date, pursuant to sections 1123, 1141 and 1142 of the Bankruptcy Code, the Reorganized Debtor will have the right to operate the Debtor's business and to manage, administer, use, assign, convey, encumber, liquidate, dispose of or otherwise transfer, all of the Debtor's and the Estate's right, title and interest in and to the Assets, including Causes of Action, and to take all acts appropriate to effectuate the Plan, in each case free of any restrictions or limitations imposed by the Bankruptcy Code or Bankruptcy Rules, except as otherwise stated expressly to the contrary in the Plan.

G.    **Plan Funding and Administration.**

1.    **Plan Funding.**  The funding for the Distributions to be made by the

Reorganized Debtor under the Plan will be derived, in part, from the following:  (a) the

Debtor's Cash as of the Effective Date; (b) Cash that will be generated from the

Reorganized Debtor's operations after the Effective Date; (c) new funding that the Debtor

anticipates will be obtained by the Reorganized Debtor after the Effective Date (i.e., the

Post-Effective Date Loan); (d) proceeds from the assertion of Causes of Action, including

Avoidance Actions; and (e) possible sales of Assets of the Reorganized Debtor.

The Debtor currently is engaged in discussions with several prospective lenders

with respect to the funding of a Post-Effective Date Loan.  Based upon such discussions,

the Debtor's assessment of the value of the Debtor's Assets that would serve as Collateral

for the Post-Effective Date Loan, and the preliminary agreement that the Debtor has

reached with BOW regarding BOW's discounting its Secured Claim and subordinating a

portion of its Secured Claim in order to facilitate the Reorganized Debtor's obtaining the

Post-Effective Date Loan, the Debtor is very optimistic that the Reorganized Debtor will

be able to obtain the Post-Effective Date Loan at or promptly after the Effective Date of

the Plan.  The Debtor anticipates that the Post-Effective Date Loan will be comprised of a

new term loan and a new line of credit with terms comparable to the following:

Term Loan

- Amount -- approximately $1,214,000 to approximately $1,600,000.  For the
  purpose of this Disclosure statement, the Debtor projects that the term loan
  will be in the amount of approximately $1,237,740.

- Closing Fee -- 2.5%

- Interest Rate -- prime, plus 11%

- Term -- 12 months

- Principal Amortization -- 48 months, after 3 months of interest-only
  payments

<u>Line of Credit</u>

- <u>Amount -- Maximum line of $2.0 million.  For the purpose of this Disclosure Statement, the Debtor projects that, at the time of the funding of the line of credit, the Debtor will have drawn down about $975,760 on the line of credit.</u>

- Origination Fee – 1.0%

- <u>Advance Rate</u> -- 80% on eligible accounts receivable.

- <u>Interest Rate</u> -- Wall Street Journal prime rate, plus 3.25% on funds advanced.

- <u>Term</u> -- 24 months.

The Reorganized Debtor projects that it may need the Post-Effective Date Loan, or the Unencumbered Assets Loan, in order to meet its obligations at or about the Effective Date of the Plan.

       **2.**      **<u>Reorganized Debtor's Authority for Implementation of Plan</u>.**  The Reorganized Debtor will be authorized to, and will, take all acts appropriate to implement the provisions of the Plan as are contemplated to be taken by the Reorganized Debtor under the Plan, including, without limitation, making Distributions to holders of Allowed Claims, objecting to Disputed Claims, and prosecuting or settling Causes of Action.  The Reorganized Debtor will be entitled to pay any Post-Effective Date Plan Expenses, in the ordinary course, and without any need to give notice to creditors or other parties-in-interest or to obtain any approval of the Bankruptcy Court.

       **3.**      **<u>Representative of the Estate</u>.**  The Reorganized Debtor will be, and under the Plan is, appointed as the representative of the Estate pursuant to sections 1123(a)(5), 1123(a)(7) and 1123(b)(3)(B) of the Bankruptcy Code and, as such, will be vested with the authority and power, subject to the provisions of the Plan, to take, among others, the following acts: (a) manage, administer and consummate the Plan; (b) file, litigate, prosecute, settle, adjust, retain, enforce, collect and abandon Causes of Action; (c) address and, if appropriate, object to Disputed Claims; (d) make all Distributions provided for by

the Plan; and (e) such other acts as may be appropriate to administer and consummate the Plan and close the Case. As the representative of the Estate, the Reorganized Debtor will succeed to all of the rights and powers of the Debtor and the Estate with respect to all Causes of Action.

       **4.**     **No Liability of the Reorganized Debtor.** Pursuant to Section 6.7.4 of the Plan, to the maximum extent permitted by law, the Reorganized Debtor, and its employees, officers, directors, shareholders, agents, members, representatives, and Professionals (collectively, "Representatives"), will not have or incur liability to any Creditor, Interest Holder, party-in-interest or to any other entity for an act taken or omission made in good faith in connection with or related to the Reorganized Debtor's administration of the Assets, the implementation of the Plan and the making of Distributions under the Plan. The Reorganized Debtor and its Representatives will in all respects be entitled to reasonably rely on the advice of counsel with respect to their duties and responsibilities under the Plan. Entry of the Confirmation Order will constitute a judicial determination that these exculpation provisions are necessary to, inter alia, facilitate Confirmation and to minimize potential claims arising after the Effective Date for indemnity, reimbursement or contribution from the Reorganized Debtor's Assets. Notwithstanding the foregoing, nothing contained in Section 6.7.4 of the Plan will absolve the Reorganized Debtor of any potential liability that it may have to any Creditor on account of any failure by the Reorganized Debtor to make any Distribution required by the Plan or on account of any acts or omissions by it constituting willful misconduct or negligence.

**H.**     **Powers and Duties of the Reorganized Debtor.**

       **1.**     **Corporate Powers.** The Reorganized Debtor will have all of the powers and rights accorded to it under the Corporate Governance Agreements and applicable law.

       **2.**     **Board of Directors of the Reorganized Debtor.** As of the Effective Date, Mr. Lovejoy will be the sole member of the Board of Directors of the Reorganized Debtor. Mr. Lovejoy will receive no compensation for serving in such capacity prior to the Case Closing Date.

3.        **Officers of the Reorganized Debtor.**  As of the Effective Date, Mr. Lovejoy will serve as President of the Reorganized Debtor.  Mr. Lovejoy and the senior management of the Reorganized Debtor will be responsible for operating the Reorganized Debtor's business, and will have all powers, duties, rights and responsibilities with respect to the Reorganized Debtor as provided by the Corporate Governance Agreements and applicable law.  The Board of Directors of the Reorganized Debtor may appoint other officers, as it deems appropriate in the exercise of its business judgment.  Mr. Lovejoy's post-confirmation compensation will be as follows:  $3,846.15 per week, for the first 2 years following plan confirmation, and an anticipated 2% increase annually thereafter.

I.        **Causes of Action.**

The right to enforce, file, litigate, prosecute, settle, adjust, retain, enforce, collect and abandon on behalf of the Estate any and all Causes of Action, including, but not limited to, any Avoidance Actions, will be vested on the Effective Date in the Reorganized Debtor, and, from and after the Effective Date, only the Reorganized Debtor will have the right to enforce, file, litigate, prosecute, settle, collect and abandon any Cause of Action.

The Debtor is evaluating potential Causes of Action.  The Debtor has determined preliminarily that preferential payments were made to a number of entities.  The Debtor or the Reorganized Debtor will pursue any Avoidance Actions or other Causes of Action, as may be appropriate.

Notwithstanding the rights of the Reorganized Debtor with respect to Causes of Action, nothing in the Plan will require the Reorganized Debtor to file or to prosecute any Cause of Action, both of which may be determined by the Reorganized Debtor, in the exercise of its business judgment.

**THE DEBTOR HAS NOT COMPLETED ITS INVESTIGATION REGARDING THE EXISTENCE OF CAUSES OF ACTION.  THE INVESTIGATION IN THIS REGARD IS ONGOING.  AS A RESULT, ALL PARTIES-IN-INTEREST ARE HEREBY ADVISED THAT, NOTWITHSTANDING THE FACT THAT THE EXISTENCE OF ANY PARTICULAR CAUSE OF ACTION MAY NOT BE LISTED, DISCLOSED OR SET**

**FORTH IN THE PLAN OR IN THIS DISCLOSURE STATEMENT, A CAUSE OF
ACTION MAY BE FILED AGAINST ANY CREDITOR OR OTHER PARTY AS THE
REORGANIZED DEBTOR MAY DETERMINE, IN THE EXERCISE OF ITS SOLE
AND ABSOLUTE DISCRETION.**

**J.      Post-Effective Date Professional Fees.**

The Reorganized Debtor may employ, without any need to give notice to Creditors or other
parties-in-interest or obtain any approval of the Bankruptcy Court, any Professional to aid the
Reorganized Debtor in performing the Reorganized Debtor's duties and exercising the
Reorganized Debtor's rights and remedies under the Plan, as the Reorganized Debtor deems
appropriate in the exercise of its sole and absolute discretion, including Professionals who were
employed by the Debtor in the Case. Any Professional employed by the Reorganized Debtor after
the Effective Date will be entitled to obtain payment of the Professional's fees and costs as a Post-
Effective Date Plan Expense, in the ordinary course, without any need to give notice to Creditors
or other parties-in-interest or to obtain any approval of the Bankruptcy Court. Notwithstanding
the foregoing, if the Reorganized Debtor should fail to pay any post-Effective Date fees and costs
of a Professional entitled to such payment within thirty (30) days after the Professional's rendering
of its billing statement to the Reorganized Debtor, the Professional will be entitled to seek, by
application filed in accordance with the Bankruptcy Rules, an order of the Bankruptcy Court
requiring the Reorganized Debtor to forthwith pay to the Professional its fees and costs.

**K.      Disposition of Plan Assets.**

From and after the Effective Date, the Reorganized Debtor will be entitled to sell, transfer,
assign, encumber or otherwise dispose of any interest in any of the Reorganized Debtor's Assets,
without any need to give notice to Creditors or parties-in-interest or to obtain any approval of the
Bankruptcy Court, provided that such action is for the benefit of Creditors. Notwithstanding the
foregoing, the Reorganized Debtor will be entitled to seek, from the Bankruptcy Court, an order
authorizing the sale of any Asset free and clear of Liens pursuant to the provisions of
section 363(f) of the Bankruptcy Code.

**L.    Compromise of Controversies**.

From and after the Effective Date, the Reorganized Debtor will be entitled to compromise any objections to Disputed Claims, or any controversies relating to Causes of Action or other litigation pending after the Effective Date, without any need to give notice to Creditors or parties-in-interest or to obtain any approval of the Bankruptcy Court.

**M.    Objections to Disputed Claims**.

From and after the Effective Date, the Reorganized Debtor will have the sole and exclusive right to object to Disputed Claims in accordance with the terms and conditions of Section 8.1 of the Plan.

**N.    Bankruptcy Court Approval Relative to Post-Confirmation Matters**.

Nothing contained in the Plan will be deemed to impair in any manner the right of the Reorganized Debtor to seek at any time after the Effective Date orders of the Bankruptcy Court approving actions to be taken, or granting relief, consistent with the Plan as may be necessary or desirable to effectuate the provisions of the Plan.

**O.    Resolution of Disputes**.

In the event that a dispute should arise between the Reorganized Debtor and any party-in-interest in the Case regarding any matters pertaining to the Plan or pertaining to the Reorganized Debtor's performance of its duties and exercise of its rights, powers and remedies under the Plan, either of them may request, pursuant to the provisions of the Bankruptcy Rules, that the Bankruptcy Court resolve the merits of such dispute.

**P.    Reorganized Debtor's Enforcement of Rights and Remedies**.

The Reorganized Debtor will have the right to enforce any and all rights and remedies that it may have under the Plan, the Bankruptcy Code, the Bankruptcy Rules, any order of the Bankruptcy Code or other court of competent jurisdiction or under applicable law.  The Reorganized Debtor will be vested exclusively with the rights, powers, and authority to carry out and to implement the Plan.

**Q.    Other Rights, Powers and Duties of Reorganized Debtor**.

In addition to the rights, powers and duties granted expressly to the Reorganized Debtor

pursuant to the Plan, the Reorganized Debtor will have such other rights, powers and duties that are appropriate to implement and to carry out the provisions of the Plan for the benefit of Creditors that are not inconsistent with the provisions of the Plan.

      **R.**    **Final Decree.**

Pursuant to Section 6.19 of the Plan, the Reorganized Debtor will file, in accordance with Rule 3022 of the Federal Bankruptcy Rules, an application with the Bankruptcy Court to obtain a final decree to close the Case ("Final Decree"). The Reorganized Debtor will have the right to seek the entry of a Final Decree on the earliest date after the Effective Date when it is appropriate to do so.

      **S.**    **Distributions.**

      **1.**    **Designation and Role of the Disbursing Agent.**

      **a.**    **Reorganized Debtor to Serve as Disbursing Agent.** The Reorganized Debtor will serve as the Disbursing Agent under the Plan. The Disbursing Agent will be responsible for making all Distributions on account of Allowed Claims under the Plan.

      **b.**    **No Bond.** The Reorganized Debtor will not be required to be bonded in connection with the performance of its duties as Disbursing Agent under the Plan.

      **c.**    **Employment of Agents.** The Reorganized Debtor, as Disbursing Agent under the Plan, will be authorized to implement such procedures as it deems appropriate in order to make, as efficiently and economically as practicable, prompt and accurate Distributions, including employing agents to assist it in that regard.

      **2.**    **Distribution of Property Under the Plan.**

      **1.**    **Cash Distributions.** All Distributions under the Plan will be in Cash. Cash Distributions made pursuant to the Plan will be in United States funds, by checks drawn on a domestic bank, or, if the Reorganized Debtor so elects, in the exercise of its sole and absolute discretion, by wire transfers from a domestic bank.

2.      **Setoffs and Recoupment**.  Pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, the Reorganized Debtor, as Disbursing Agent under the Plan, may set off, recoup or withhold against any Allowed Claim and Distribution to be made pursuant to the Plan on account of such Allowed Claim (before any Distribution is made on account of such Allowed Claim), any pre-Petition Date or post-Petition Date account stated, claim, right, or cause of action which the Debtor, the Estate or the Reorganized Debtor may possess against the holder of such Allowed Claim.  Neither the failure to effect such a setoff or recoupment nor the allowance of any Claim will constitute a waiver or release by the Debtor, the Estate or the Reorganized Debtor of any such account, claim, right, or cause of action that the Debtor, the Estate or the Reorganized Debtor may possess against the holder of such Allowed Claim.  To the extent that the Reorganized Debtor in allowing a Claim fails to effect a setoff with a Creditor and seeks to collect a claim from such Creditor after a Distribution is made to such Creditor pursuant to the Plan, the Reorganized Debtor will be entitled to full recovery on that claim against such Creditor, notwithstanding any payment of the Creditor's Allowed Claim pursuant to the Plan.

3.      **Timeliness of Distributions**.  Any Distribution required to be made under the Plan will be deemed timely if made as soon as practicable after the due date thereof but, in any event, within fourteen (14) days after such date.  Any Distribution required to be made upon a Disputed Claim becoming an Allowed Claim and no longer being a Disputed Claim will be deemed timely if made as soon as practicable thereafter but, in any event, within fourteen (14) days thereafter.

4.      **[Intentionally Omitted.]**

5.      **Delivery of Distributions**.

i.      **Distributions Only to Holders of an Allowed Claim**.  All Distributions under the Plan on account of an Allowed Claim will be

tendered only to the holder of such Allowed Claim, as set forth in Section 7.2.6.2 of the Plan.

    **ii.**    **Addresses to Which Distributions Will be Sent.**  Except as provided in Section 7.2.8 of the Plan with respect to Unclaimed Property, Distributions to holders of Allowed Claims and Allowed Administrative Claims will be distributed by mail as follows:  (1) with respect to each holder of an Allowed Claim that has filed a Proof of Claim, at the address for such Creditor reflected in such Proof of Claim; (2) with respect to each holder of an Allowed Claim that has not filed a Proof of Claim, at the address reflected in the Bankruptcy Schedules filed by the Debtor; provided, however, that, if the Reorganized Debtor receives a written notice of a change of address for such Creditor, the address set forth in such notice will be used; or (3) with respect to each holder of an Allowed Administrative Claim, at such address as the holder thereof may specify in writing.

    **6.**    **Approval for Schedule of Proposed Distributions.**  In the discretion of the Reorganized Debtor, the Reorganized Debtor will be entitled to prepare a preliminary schedule of proposed Distributions to Creditors ("Distribution Schedule"), and to apply, on an expedited basis, for an order of the Bankruptcy Court approving the making of such Distributions pursuant to the Distribution Schedule.  Notice of any such application will be served on the Post-Effective Date Notice Parties or as otherwise determined by the Bankruptcy Court.

    **7.**    **Further Assurances Regarding Distributions.**  In accordance with the provisions of Section 13.22 of the Plan, as a condition to obtaining Distributions under the Plan, each Creditor must execute and deliver to the Reorganized Debtor, or join in the execution and delivery of, any agreement or instrument appropriate for the consummation of the Plan.

**8.      Creditor's Payment of Obligations or Turn Over of Property to the Reorganized Debtor.**  As a condition to obtaining Distributions under the Plan, any Creditor from which property is recoverable pursuant to a Final Order of the Bankruptcy Court under sections 542, 543, 550 or 553 of the Bankruptcy Code, or otherwise, or that is a transferee of a transfer avoidable pursuant to a Final Order of the Bankruptcy Court under sections 522, 544, 545, 547, 548 or 549 of the Bankruptcy Code or otherwise, must pay to the Reorganized Debtor the amount, or turn over to the Reorganized Debtor any such property, for which such Creditor is liable to the Debtor.

**T.      Objections to Disputed Claims.**

**1.      Exclusive Right to Object to Claims.**  From and after the Effective Date, the Reorganized Debtor will have the sole and exclusive right to file, litigate and settle objections to Disputed Claims.  As the representative of the Estate, the Reorganized Debtor will succeed to all of the rights and powers of the Debtor and the Estate with respect to all objections to Disputed Claims.

**2.      Claims Objection Deadline.**  Unless another date is established by order of the Bankruptcy Court, an objection to a Claim must be filed with the Bankruptcy Court and served on the Creditor holding such Claim on or before the Claims Objection Deadline.  Pursuant to the Plan, the Reorganized Debtor will have the right to request that the Bankruptcy Court extend the Claims Objection Deadline.

**3.      Investigation Regarding Disputed Claims.**  Nothing contained in the Plan will be deemed to obligate the Reorganized Debtor to file any objection to a Claim, which action will be determined by the Reorganized Debtor in the exercise of its sole and absolute discretion.

A list of certain Disputed Class 5 Claims is set forth in Paragraph XII(F)(1)(j) hereof.  This list is preliminary in nature and is not intended to be a complete list of all Disputed Class 5 Claims.

**THE DEBTOR HAS NOT COMPLETED ITS INVESTIGATION REGARDING THE CLAIMS IN THE CASE AND THE FILING OF OBJECTIONS TO DISPUTED CLAIMS. THIS INVESTIGATION IS ONGOING AND, SUBJECT ONLY TO THE CLAIMS OBJECTION DEADLINE, MAY OCCUR AFTER THE CONFIRMATION DATE. AS A RESULT, CREDITORS AND OTHER PARTIES-IN-INTEREST ARE HEREBY ADVISED THAT AN OBJECTION TO A DISPUTED CLAIM MAY BE FILED AT ANY TIME, SUBJECT ONLY TO THE CLAIMS OBJECTION DEADLINE. THE REORGANIZED DEBTOR WILL HAVE THE RIGHT TO OBJECT TO AMOUNTS THAT HAVE BEEN SCHEDULED BY THE DEBTOR, OR THAT ARE REFLECTED IN THE DEBTOR'S BOOKS AND RECORDS, AND WHICH ARE FOUND TO BE OBJECTIONABLE IN ANY RESPECT.**

U.    **Treatment of Disputed Claims.**

1.    **No Distribution Pending Allowance.** All Distributions under the Plan will be made only on account of Allowed Claims. If any portion of a Claim is a Disputed Claim, <u>no</u> Distribution provided for under the Plan will be made on account of such Claim unless and until such Claim becomes an Allowed Claim and is no longer a Disputed Claim.

2.    **Distribution After Allowance.** Within fourteen (14) days following the date on which a Disputed Claim becomes an Allowed Claim and is no longer a Disputed Claim, the Reorganized Debtor, as Disbursing Agent under the Plan, will distribute to the Creditor holding such Allowed Claim any Cash or other property that would have been distributable to such Creditor as if, at the time of the making of any Distribution to the Class of which such Creditor is a member, such Claim had been an Allowed Claim and not a Disputed Claim. No interest will be paid on such Claim, except as provided in Section 8.4.3 of the Plan.

3.    **Reserve for Disputed Claims.** On or as soon as practicable after the Effective Date, the Reorganized Debtor, as Disbursing Agent under the Plan, will establish, in a segregated, interest-bearing account, a reserve for any Disputed Claim ("Disputed Claims Reserve") in an amount equal to 100% of the Distribution to which the

holder of the Disputed Claim would be entitled under the Plan based upon the liquidated, face amount of its non-duplicative Disputed Claim unless such Claim is estimated by Final Order of the Bankruptcy Court, in which case the Reorganized Debtor will reserve an amount equal to 100% of the Distribution to which the holder of the Disputed Claim would be entitled based upon the estimated amount of the Disputed Claim.  If the Disputed Claim does not set forth a liquidated amount of such Claim, no Reserve need be established on account of such Disputed Claim unless the Bankruptcy Court orders otherwise.  If the Disputed Claim is estimated, the amount of the Reserve to be established on account of such Disputed Claim will be the Distribution with respect to the estimated amount of such Disputed Claim as determined by Final Order of the Bankruptcy Court, and such estimated amount will set forth the maximum amount of the Distribution on account of such Disputed Claim.

4.     **No Distribution Until Allowance of Disputed Claim.**  No disbursement of funds from a Disputed Claims Reserve will be made on account of a Disputed Claim until such Disputed Claim has been determined by a Final Order of the Bankruptcy Court.  Any amount of a Claim which is disallowed pursuant to a Final Order of the Bankruptcy Court will be deemed to be extinguished and no Distribution of any amount will be paid on account thereof.  The amount reserved for any Disputed Claim (plus any interest thereon) which has been disallowed by the Bankruptcy Court will be released to the Reorganized Debtor, and in the case of a Disputed Class 5 Claim, for the purpose of funding further Distributions to holders of Allowed Class 5 Claims under the Plan.

5.     **Bar Date for Filing Avoidance Action Payment Claims.**  Any Avoidance Action Payment Claim will be forever barred, will not be enforceable against the Debtor, the Estate or the Reorganized Debtor and the holder of such Avoidance Action Payment Claim will not be entitled to any Distribution under the Plan, unless a Proof of Claim for such Avoidance Action Payment Claim is filed and served on the Reorganized Debtor within thirty (30) days after the later of (a) the date of entry of the order of the Bankruptcy

Court adjudging the Creditor's liability to the Debtor or to the Reorganized Debtor on account of such Avoidance Action, or (b) the Effective Date.

## V.    **Litigation.**

1.    **Reorganized Debtor's Authorization to Assert Causes of Action.**  As of the Effective Date, the Reorganized Debtor will be authorized to exercise and to perform the rights, powers and duties held by the Estate with respect to the Causes of Action. From and after the Effective Date, the Reorganized Debtor, will have the sole and exclusive right, to file, litigate, prosecute, settle, adjust, retain, enforce, collect and abandon claims and interests of the Estate with respect to the Causes of Action, without the consent or approval of any third party, and without any further order of the Bankruptcy Court.

2.    **Reorganized Debtor's Evaluation of Causes of Action.**  The Reorganized Debtor will make the decision, in the exercise of its business judgment, whether to prosecute or to continue to prosecute any Cause of Action.  This decision will be based, in part, upon the Reorganized Debtor's evaluation of the merits of the Cause of Action as well as the costs required to prosecute such Cause of Action taking into account the resources available to the Reorganized Debtor to operate the Reorganized Debtor's business and to make Distributions to Creditors.  The Reorganized Debtor will be entitled to determine, in the exercise of its business judgment, not to prosecute, or to abandon, any Cause of Action.

3.    **Retention of Professionals.**  The Reorganized Debtor may retain Professionals to represent it in prosecuting Causes of Action, including Professionals who were employed by the Debtor in the Case.  The Reorganized Debtor will determine the terms of the retention of Professionals, in the exercise of its business judgment, and will be entitled to retain counsel on a contingency fee basis to prosecute some or all of the Causes of Action, and may seek to finance any costs relating to the prosecution of Causes of Action.

4. **Preservation of Causes of Action.** Unless a Cause of Action is expressly waived, relinquished, released, compromised, or settled in the Plan or in any Final Order, such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor (including, without limitation, Causes of Action of which the Debtor presently may be unaware, or which may arise or exist by reason of facts or circumstances unknown to the Debtor at this time, or facts or circumstances which may change or be different from those which the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches will apply to the Reorganized Debtor's prosecution of Causes of Action based on this Disclosure Statement, the Plan, or the Confirmation Order. Without limiting the generality of the foregoing, any entity with respect to which the Debtor has incurred an obligation (whether on account of services, purchase or sale of property, or otherwise), or who has received services from the Debtor or a transfer of money or property of the Debtor, or who has transacted business with the Debtor, should assume that such obligation, transfer, or transaction may be evaluated by the Reorganized Debtor subsequent to the Effective Date and may be the subject of an Avoidance Action or other action or proceeding filed after the Effective Date.

5. **Subordination of Claims.** If the Bankruptcy Court enters a Final Order subordinating a Claim, or any part of a Claim, such that such subordinated Claim is junior to an Allowed General Unsecured Claim in the Case, no Distribution will be paid on account of such subordinated Claim under the Plan and such subordinated Claim will be extinguished and discharged fully as of the later of the Effective Date or the date of such Final Order. After the Effective Date, only the Reorganized Debtor will have the right to file an action to subordinate a Claim.

As of the date of this Disclosure Statement, no Claim had been subordinated in the Case.

W.    **Executory Contracts and Unexpired Leases**.

1.    **Executory Contracts and Unexpired Leases Being Assumed**.  Effective as of, and conditioned on, the occurrence of the Effective Date, the Reorganized Debtor will assume under the Plan all of the executory contracts and unexpired leases of the Debtor listed on Exhibit "1" to the Plan.  The Debtor may amend, through and including the Confirmation Hearing Date, Exhibit "1" to add thereto any executory contract or unexpired lease, or to delete therefrom any executory contract or unexpired lease. However, if any amendments are made to Exhibit "1" less than thirty (30) days before the Confirmation Hearing Date, the affected contract or lease parties will have fifteen (15) days from the date of service of notice of such amendments within which to serve on the Debtor a written objection to the same.  Upon receipt of any such objection, the Debtor will promptly set a hearing on the same, and the assumption or rejection of the affected contract or lease will be delayed until the Bankruptcy Court makes a determination on such issue (such determination may be made after the Confirmation Date, without delaying the confirmation of the Plan).  To the extent that an executory contract or unexpired lease has been assumed by the Debtor prior to the Confirmation Date pursuant to an order of the Bankruptcy Court, such assumption will not be affected by the Plan.  The assumption of any contract or lease pursuant to the provisions of the Plan will be only to the extent that such assumed contract or lease constitutes an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code.  Inclusion of an agreement in Exhibit "1" does not constitute an admission by the Debtor that (a) such agreement is an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code, (b) the Debtor must assume such agreement in order to continue to receive or retain rights, benefits, or performance thereunder or that any Claim under such agreement must be paid or any default thereunder must be cured, or (c) such agreement is a valid contract or lease.  Any contract or lease assumed pursuant to the Plan will be assumed as previously amended or otherwise modified by the parties thereto, whether before or after the Petition Date.

-78-

2.    <u>**Executory Contracts and Unexpired Leases Being Rejected.**</u>  Effective

as of, and conditioned on, the occurrence of the Effective Date, the Reorganized Debtor

will reject under the Plan all of the executory contracts and unexpired leases of the Debtor

not listed on Exhibit "1" to the Plan, including, without limitation, those executory

contracts and unexpired leases listed on Exhibit "2" to the Plan.  The Debtor reserves the

right to amend, through and including the Confirmation Hearing Date, Exhibit "2" to add

thereto any executory contract or unexpired lease, or to delete therefrom any executory

contract or unexpired lease.  However, if any amendments are made to Exhibit "2" less

than thirty (30) days before the Confirmation Hearing Date, the affected contract or lease

parties will have fifteen (15) days from the date of service of notice of such amendments

within which to serve on the Debtor a written objection to the same.  Upon receipt of any

such objection, the Debtor will promptly set a hearing on the same, and the rejection of the

affected contract or unexpired lease will be delayed until the Bankruptcy Court makes a

determination on such issue (such determination may be made after the Confirmation Date,

without delaying the confirmation of the Plan).  To the extent that an executory contract or

unexpired lease has been rejected by the Debtor prior to the Confirmation Date pursuant to

an order of the Bankruptcy Court, such rejection will not be affected by the Plan.  The

rejection of any contract or lease pursuant to the provisions of the Plan will be only to the

extent that such rejected contract or lease constitutes an executory contract or unexpired

lease within the meaning of section 365 of the Bankruptcy Code.  Inclusion of an

agreement in Exhibit "2" does not constitute an admission by the Debtor that (a) such

agreement is an executory contract or unexpired lease within the meaning of section 365 of

the Bankruptcy Code, or (b) such agreement is a valid contract or lease.  Any contract or

lease rejected pursuant to the Plan will be rejected as previously amended or otherwise

modified by the parties thereto, whether before or after the Petition Date.  Any executory

contract or unexpired lease not listed in Exhibit "1" or in Exhibit "2" will be deemed to be

rejected by the Reorganized Debtor on the Effective Date.

3.    **Retention of Property Rights.**  To the extent that the Debtor has obtained property rights under an executed portion of an executory contract or unexpired lease, rejection of such agreement will not constitute an abandonment by the Debtor of any such property rights.

4.    **Bar Date for Rejection Claims.**

a.    **Pre-Confirmation Rejection of an Executory Contract or Unexpired Lease.**  Any Rejection Claim asserted as a result of the rejection of an executory contract or unexpired lease pursuant to order of the Bankruptcy Court entered prior to the Confirmation of the Plan will be forever barred, will not be enforceable against the Debtor, the Estate or the Reorganized Debtor, and will not be entitled to any Distribution under the Plan, unless a Proof of Claim for such Rejection Claim has been or is filed and served timely pursuant to applicable order of the Bankruptcy Court.

b.    **Post-Confirmation Rejection of an Executory Contract or Unexpired Lease.**  Any Rejection Claim asserted as a result of the rejection of an executory contract or unexpired lease pursuant to the Plan will be forever barred, will not be enforceable against the Reorganized Debtor, and will not be entitled to any Distribution under the Plan, unless a Proof of Claim for such Rejection Claim is filed and served on the Reorganized Debtor within thirty (30) days after the <u>later</u> of (a) the date of the entry of the order of the Bankruptcy Court approving the rejection of the executory contract or unexpired lease, or (b) the Effective Date.

5.    **Cure Claims Schedule.**  A schedule of the amounts necessary to cure any defaults under each executory contract and unexpired lease assumed under the Plan ("Cure Claims") is set forth in Exhibit "1" to the Plan ("Cure Claims Schedule").  Any objection to the amount of any Cure Claim set forth in the Cure Claims Schedule must be filed and served upon counsel for the Debtor on or before the fourteenth (14th) day prior to the Confirmation Hearing Date.  In the event that any such objection to the amount stated for a Cure Claim in the Cure Claims Schedule is not filed and served as set forth herein, the

amount of the Creditor's Cure Claim will be deemed forever to be the amount set forth in the Cure Claims Schedule, and any Cure Claim in excess of the amount set forth in the Cure Claims Schedule will be extinguished and will be forever barred in the Bankruptcy Case, without further notice.  If the Debtor cannot resolve any such objection with the Creditor, the Debtor may either (a) elect to reject the executory contract or unexpired lease at the Confirmation Hearing, or (b) have the Bankruptcy Court determine the merits of the objection on or after the Confirmation Hearing (without delaying the confirmation of the Plan).  Any amount of a Cure Claim payable upon the assumption of an executory contract or unexpired lease will be due and payable promptly in accordance with the requirements of section 365 of the Bankruptcy Code after the <u>later</u> of the Effective Date, or the entry of a Final Order fixing the amount of the Cure Claim, and then only in the amount fixed by such Final Order.

## X.     <u>Post-Effective Date Notice</u>.

From and after the Effective Date, any entities that desire to obtain notice of any pleading or document filed in the Case, or of any hearing in the Bankruptcy Court, or of any matter as to which notice is to be provided under the Plan ("Post-Effective Date Notice Parties"), must file a request for post-Effective Date notice and serve such request on the Reorganized Debtor and any counsel for the Reorganized Debtor; provided, however, that the  United States Trustee, BOW and the Reorganized Debtor each will be deemed to have requested such post-Effective Date notice.

## Y.     <u>Miscellaneous Plan Provisions</u>.

Other provisions of the Plan, including provisions pertaining to the Reorganized Debtor's duty to file after the Effective Date reports regarding the status of implementation of the Plan, the Debtor's right to revoke the Plan prior to the Confirmation Date, the governing law relating to the Plan, the Bankruptcy Court's retention of jurisdiction over the Case and the Plan after the Effective Date, and the Debtor's right to seek to modify the Plan are set forth in Article XIII of the Plan.

## IX.

## EFFECT OF CONFIRMATION OF THE PLAN

### A.    Discharge.

Confirmation of the Plan will have all of the effects provided by section 1141 of the Bankruptcy Code which are not inconsistent with the terms of the Plan.  Except as provided expressly to the contrary in the Plan or in the Confirmation Order, the Distributions and rights that are provided in the Plan will be in complete satisfaction, settlement, release and discharge effective as of the Effective Date of all known or unknown Claims and Administrative Claims against, rights against, liabilities of, obligations of, and any Liens encumbering the Debtor's assets and properties, including but not limited to, Claims of the kind specified in sections 502(g), 502(h) and 502(i) of the Bankruptcy Code, in each case whether or not (1) a Proof of Claim based upon such Claim is filed or deemed filed under section 501 of the Bankruptcy Code, (2) such Claim is allowed under section 502 of the Bankruptcy Code, or (3) the holder of such Claim accepted the Plan.  The Confirmation Order will constitute a determination of the discharge of all Claims and Administrative Claims against the Debtor, subject only to the occurrence of the Effective Date, to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Any obligations of the Debtor to Creditors imposed by the Plan will be compensable only from Distributions made pursuant to the Plan.

### B.    Injunction/Release.

On the Effective Date, an injunction against Creditors' acts will be issued in accordance with the provisions of Section 11.2 of the Plan, and Claims will be released in accordance with the provisions of Section 11.3 of the Plan.

### C.    Distribution of Property Free and Clear of Liens, Claims and Interests.

The Distributions to be made under the Plan will be distributed free and clear of all Liens and other Claims of Creditors and the Interest of the Interest Holder.

### D.  Binding Effect of Plan.

Upon the Effective Date, the provisions of the Plan will be binding upon the Debtor, the Reorganized Debtor, each Creditor and the Interest Holder.

### E.  **Revesting of Assets.**

Upon the Effective Date, all assets, properties and interests of the Estate will vest in, and will be property of, the Reorganized Debtor, to be administered by the Reorganized Debtor in accordance with the terms and conditions of the Plan.  In the event that the Reorganized Debtor's Chapter 11 Case is converted after the Effective Date to one under Chapter 7 of the Bankruptcy Code, the assets, properties and interests then held by the Reorganized Debtor will be property of the Chapter 7 estate.

### X.

### **LIMITATION OF LIABILITY**

### A.    **No Liability for Solicitation or Participation**.

As specified in section 1125(e) of the Bankruptcy Code, entities that solicit acceptances or rejections of the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, will not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

### B.    **Good Faith**.

Confirmation of the Plan will constitute a finding that the Plan was proposed, and that acceptances of the Plan were solicited, in good faith and in compliance with applicable provisions of the Bankruptcy Code.

### C.    **Limitation of Liability Regarding Plan Confirmation**.

Effective as of the Effective Date, neither the Debtor, the Reorganized Debtor, nor any of their respective Representatives (including, without limitation, any Professionals) will have or incur any liability to any Creditor, the Interest Holder or to any other party-in-interest or entity for any good faith act or omission in connection with or arising out of the negotiation, preparation and pursuit of confirmation of the Plan, the approval of this Disclosure Statement, the consummation of the Plan, the administration of the Plan, the Case or the property to be distributed under the Plan or the making of Distributions under the Plan, to the fullest extent permitted by applicable

statutory and case law, except only that the Reorganized Debtor will be responsible for making the Distributions provided for by the Plan.

Notwithstanding the foregoing, the Reorganized Debtor and the Debtor will not be absolved of any potential liability that either of them may have to any Creditor on account of any acts or omissions by it constituting willful misconduct or gross negligence.

**XI.**

**<u>CERTAIN RISK FACTORS TO BE CONSIDERED</u>**

Holders of Claims and Interests entitled to vote on the Plan should read and consider carefully the factors set forth below, as well as other information set forth in this Disclosure Statement and the documents delivered together herewith and/or incorporated by reference herein, prior to voting to accept or reject the Plan.

**A.    <u>Risk that the Debtor Will Have Insufficient Cash for the Plan to Become Effective</u>.**

The Plan cannot be confirmed by the Bankruptcy Court unless the Debtor has Cash sufficient by the Effective Date to pay, or to reserve for the payment of, all Allowed Administrative Claims and Allowed Priority Non-Tax Claims, unless Creditors holding such Claims agree to a deferred payment of their Claims. The Reorganized Debtor also will need to pay promptly after the Effective Date all Cure Claims. The Debtor is confident that, as of the Effective Date, the Reorganized Debtor will have in place funding (<u>i.e.</u>, the Post-Effective Date Loan) in an amount sufficient to pay the Allowed Secured Claim of BOW and to make the Distributions required to be made on or about the Effective Date. The Debtor believes that, as of the Effective Date, the Reorganized Debtor will have Cash sufficient to pay, or to reserve for the payment of, all such Claims. For a further discussion of this issue, please refer to Paragraph XII(F) hereof.

**B.    <u>Risk Regarding the Distributions to Be Made to Class 5 Creditors</u>.**

While the Debtor has endeavored to project pursuant to Paragraph XII(F) of this Disclosure Statement what it believes are likely to be the Distributions to be made to Class 5 Creditors, there can be no certainty that those projections will be accurate and that Class 5

Creditors will receive the Distributions projected in this Disclosure Statement.  The projections contained in this Disclosure Statement will be affected by, among other things, the outcome of objections to Disputed Class 5 Claims and, hence, the amount of Allowed Class 5 Claims.

      C.      **Bankruptcy Risks**.

      If a Class of Claims that is entitled to vote with respect to the Plan votes not to accept the Plan, the Debtor will need to "cram down" on that Class pursuant to section 1129(b) of the Bankruptcy Code in order to obtain confirmation of the Plan.  The cram down provisions of section 1129(b) of the Bankruptcy Code are fairly complex, and require, among other things, that the Plan and the Debtor comply with the provisions of sections 1129(a)(1)-(7), and (9)-(16) of the Bankruptcy Code as applicable, and that the Plan not discriminate unfairly and be fair and equitable with respect to each Class of Claims that is impaired under and that has not accepted the Plan.  While the Debtor believes that the Plan satisfies all of the requirements for confirmation of a plan under section 1129(b), there is no assurance that the Bankruptcy Court will make such a determination.

      In addition, the Bankruptcy Court's entering an order granting the BOW Secured Claim Compromise Motion on terms and conditions approved by BOW is a condition to the Confirmation of the Plan.  BOW may waive such condition.  If the Bankruptcy Court declines to enter such an order and BOW declines to waive such condition, Confirmation of the Plan may not occur.

XII.

**CONFIRMATION OF THE PLAN**

      A.      **Introduction**.

      CREDITORS CONCERNED WITH CONFIRMATION OF THE PLAN OR THE PROVISIONS OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW WITH RESPECT TO CONFIRMING A PLAN IS COMPLEX.  The following discussion is intended solely for the purpose of alerting Creditors about basic confirmation issues which they may desire to consider. The Debtor CANNOT and DOES NOT

-85-

represent that the discussion contained below is a complete summary of the law on this topic and is not providing any legal opinions with respect thereto.

Many requirements must be met before a bankruptcy court can confirm a Chapter 11 plan. Such requirements include that the plan must be accepted by at least one impaired class established by the plan, that the plan be feasible and that the distributions to non-accepting creditors in impaired classes must be at least as much as such creditors would receive in a Chapter 7 liquidation.  These requirements are not the only requirements for confirmation.

**B.**      **Votes Necessary to Confirm the Plan.**

A bankruptcy court cannot confirm a Chapter 11 plan unless (1) all impaired classes under the plan have voted to accept the plan, or (2) at least one impaired class has accepted the plan without counting the votes of any insiders within that class, and the plan is eligible to be confirmed by "cramdown" on non-accepting classes pursuant to section 1129(b) of the Bankruptcy Code.

**C.**      **Votes Necessary for a Class to Accept the Plan.**

A class of claims is deemed to have accepted a Chapter 11 plan where more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the claims that actually vote, vote in favor of the plan.

**D.**      **Treatment of Non-Accepting Classes.**

As noted above, even if there are impaired classes that do not accept a Chapter 11 plan, a bankruptcy court may nonetheless confirm the plan if the non-accepting classes are treated in the manner required by the Bankruptcy Code and there is at least one impaired class that accepts the plan.  The process by which a plan can be confirmed and become binding on non-accepting classes is commonly referred to as "cramdown."  The Bankruptcy Code allows a plan to be "crammed down" on non-accepting classes of claims or interests if the plan meets all of the requirements for confirmation, except the voting requirements of section 1129(a)(8) of the Bankruptcy Code, and if the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each impaired class that has not voted to accept the plan, as provided in section 1129(b) of the Bankruptcy Code and applicable case law.

In this case, the Debtor will seek to have the Plan confirmed notwithstanding any rejection of the Plan by any impaired Class of Creditors.  To obtain such confirmation, the Debtor must demonstrate to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each such dissenting impaired Class.  A Chapter 11 plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class, and if no class receives more than that to which it is entitled for its claims or interests.  The Debtor believes that the Plan satisfies this requirement.

The Bankruptcy Code establishes different "fair and equitable" tests for Secured Claims and General Unsecured Claims.

**1.**    **Secured Claims.**  In order to meet the "fair and equitable" requirements of section 1129(b) related to the treatment of a Class of Secured Claims (Class 1 or Class 2), the Plan generally must provide that the holder of a secured claim retain its Lien, to the extent of the allowed amount of such Secured Claim, and that the holder of the Secured Claim receive on account of its Secured Claim deferred cash payments totaling at least the allowed amount of such Secured Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in the Estate's interest in its Collateral.

**2.**    **General Unsecured Claims.**  In order to meet the "fair and equitable" requirements of section 1129(b) related to the treatment of the Class of General Unsecured Claims (Class 5), either (a) each Holder of a General Unsecured Claim must receive or retain under the Plan property of a value, as of the Effective Date, equal to the amount of its Allowed Claim, or (b) the holders of Claims and Interests that are junior in priority to the General Unsecured Claims must not receive any property under the Plan.

**E.**    **Request for Confirmation Despite Non-Acceptance by Impaired Class(es).**

The Debtor will ask the Bankruptcy Court to confirm the Plan by cramdown on any impaired Class if such Class does not vote to accept the Plan.  In this regard, it is important to note that the Debtor has established under the Plan a Class of Allowed Secured Claims (Class 3) which may not exist in the Case.  The Debtor has done so in an abundance of caution.  Pursuant to

Section 13.16 of the Plan, any Class of Claims that does not have a holder of an Allowed Claim or a Claim temporarily allowed under Rule 3018 of the Federal Bankruptcy Rules as of the date of the Confirmation Hearing will be deemed to be eliminated from the Plan for the purpose of voting with respect to the Plan and for the purpose of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code; accordingly, the Bankruptcy Court may confirm the Plan pursuant to the provisions of section 1129(a) of the Bankruptcy Code notwithstanding any otherwise deemed non-acceptance of the Plan by such Class of Claims.  The Debtor will seek confirmation of the Plan under section 1129(a) of the Bankruptcy Code notwithstanding (as is expected) a failure by such Class to cast any affirmative vote with respect to the Plan.

     **F.**     <u>**Feasibility of the Plan.**</u>

     **1.**     <u>**Feasibility Analysis.**</u>  Section 1129(a)(11) of the Bankruptcy Code requires that, for the Plan to be confirmed, the Bankruptcy Court find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor, unless such liquidation or further reorganization is proposed in the Plan.  In effect, section 1129(a)(11) requires that the Bankruptcy Court find that the Plan is "feasible."

     The Debtor has prepared an analysis, set forth hereinbelow, of the feasibility of the Plan in order to demonstrate that the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code ("Feasibility Analysis").  The Feasibility Analysis sets forth, among other things, the Debtor's estimate of the resources available to fund the Distributions required by the Plan.

     THE FEASIBILITY ANALYSIS REPRESENTS A PREDICTION OF FUTURE EVENTS BASED UPON CERTAIN ASSUMPTIONS MADE BY THE DEBTOR, AS SET FORTH HEREINBELOW.  WHILE THE DEBTOR IS CONFIDENT THAT IT WILL BE FEASIBLE TO MAKE THE DISTRIBUTIONS TO CREDITORS PROVIDED BY THE PLAN, THERE IS NO ABSOLUTE GUARANTY OR OTHER ASSURANCE THAT THE FEASIBILITY ANALYSIS WILL PROVE TO BE ACCURATE.  BY

REASON OF THE UNCERTAINTIES INHERENT IN THE PREDICTION OF FUTURE EVENTS, THE FINANCIAL RESULTS MAY WELL BE DIFFERENT FROM THOSE PREDICTED, AND SUCH A DIFFERENCE MAY BE MATERIAL AND ADVERSE TO THE INTERESTS OF CREDITORS.

Significant assumptions underlying the Feasibility Analysis include the following:[6]

a. **Effective Date of the Plan.** For the purpose of the Feasibility Analysis, the Debtor projects that the Confirmation Date will occur in June 2019 and that the Effective Date will occur in or about June 2019. Payments to Creditors, then, will commence to be funded in or about June 2019.

b. **Debtor's Cash Resources as of the Effective Date ($454,000).** As of February 1, 2019, the Debtor had approximately $535,000 in Cash. The Debtor's business is seasonal; generally, the Debtor consumes cash in the summer months, its busy season, and, then, in the fall and winter months, it builds up cash after it collects its receivables generated during the summer months. The Debtor projects that, by about the Effective Date, the Debtor will have about $200,000 in cash from operations to fund Distributions which must be made by about the Effective Date (i.e., the Debtor projects that, of the $454,000 in Cash that the Debtor projects that it will have on the Effective Date, about $200,000 will derive from its operations).

To be conservative, the Debtor projects that the Debtor will not obtain, from February 1, 2019 through the Effective Date, any recoveries from the filing of Avoidance Actions.

The Debtor has acted diligently to obtain additional funding to address its working capital needs during its busy summer season and to fund the Distributions which must be paid on or about the Effective Date. The Debtor is seeking to obtain

---

[6] The Debtor intends to file, in support of the Confirmation of the Plan, pleadings providing updated information regarding Administrative Claims asserted against the Debtor and other financial information in order to demonstrate the feasibility of the Plan. Pursuant to an order of the Bankruptcy Court, the Debtor is required to file such pleadings by May 24, 2019.

a commitment for such additional funding (i.e., the Post-Effective Date Loan), to be extended to the Reorganized Debtor on or about the Effective Date. The Debtor believes that it has reached with BOW a preliminary agreement by which BOW (i) will reduce its $3,363,509 Secured Claim by the amount of $1,010,559 and to have such amount be treated as an Allowed General Unsecured Claim under the Plan, and (ii) will subordinate an additional $500,000 of its Secured Claim, in order to facilitate the Reorganized Debtor's obtaining the Post-Effective Date Loan (such agreement with BOW is reflected in the treatment of BOW's Allowed Claims provided by Section 5.1 of the Plan). The Debtor projects that, pursuant to the Post-Effective Date Loan, the Reorganized Debtor will obtain proceeds in an amount sufficient to pay in full the Class 1 Allowed Secured Claim of BOW ($1,852,950) and to enable the Debtor to have approximately $454,000 in working capital for the Reorganized Debtor.

The Debtor projects that, by reason of the new funding to be obtained by the Reorganized Debtor pursuant to the Post-Effective Date Loan, the Reorganized Debtor will have cash sufficient to pay the Distributions which the Reorganized Debtor will be required to pay on or about the Effective Date.

**c.** **Administrative Claims** ($305,468). The Debtor projects that, on or about the Effective Date, the following Administrative Claims will be asserted against the Reorganized Debtor:

| | **Administrative Claimant** | **Administrative Claim (est.)**[7] |
|---|---|---|
| i. | **Winthrop Couchot** (the Debtor's general insolvency counsel) | $215,000 |
| ii. | **Medina** (the Debtor's accountants) | $0 |
| iii. | **Leed Rancho** (the landlord of the Debtor's former business premises located in Temecula, California) | $62,588 |

---

[7] This projection of the Administrative Claims for Winthrop Couchot and for Illyssa I. Fogel & Associates assumes that they have resorted to, or will resort to, their respective retainer payments prior to the Effective Date.

| **Administrative Claimant** | **Administrative Claim (est.)**[7] |
|---|---|
| iv.  **Illyssa I. Fogel & Associates** (the Debtor's former general insolvency counsel) | $23,000 |
| v.  **Navitas Credit Corp.** (lessor of equipment to the Debtor) | $4,880 |

The Debtor's projection of the Administrative Claims which will have to be paid on or about the Effective Date derives, in large part, from information provided to the Debtor by the Debtor's Professionals with respect to their accrued and accruing fees, the Debtor's review of Leed Rancho's Claim for unpaid post-petition rent and Navitas Credit Corp.'s Claim for unpaid post-petition lease payments.  The Debtor's projection of Administrative Claims of Professionals employed in the Case is only an estimate for the purpose of this Disclosure Statement, and should not be construed as any agreement by the Debtor as to the amount or reasonableness of such claims, or any agreement by the Professionals to limit their fees to such amount.  The actual fees of the Professionals which may be allowed by the Bankruptcy Court and which will have to be paid on or soon after the Effective Date may be higher or lower than the amount estimated by the Debtor.

d.    **United States Trustee Fees ($17,468).**  The Debtor projects that the Reorganized Debtor will have to pay, on or about the Effective Date, approximately $17,468 in United States Trustee Fees.  This projection is based upon the Debtor's estimate of the disbursements that it will make through the Effective Date.  The Reorganized Debtor will pay timely the entire amount of its obligations for United States Trustee Fees.

e.    **Cure Claims ($31,828).**  As set forth in Exhibit "1" of the Plan, the Debtor projects that the Reorganized Debtor will be required to pay approximately $31,828 in Cure Claims promptly after the Effective Date.  Such projection derives

from the Debtor's analysis of the pre-petition arrearages under the Debtor's executory contracts and unexpired leases and its present determination that it will assume no executory contracts or unexpired leases other than those set forth in Exhibit "1" to the Plan.

       **f.**      <u>**Priority Non-Tax Claims ($24,799)**</u>**.**  The Debtor estimates that approximately $24,799 in Priority Non-Tax Claims have been asserted against the Debtor.  The Debtor disputes all of such Claims, and believes that none of such Claims will need to be paid by the Reorganized Debtor.  The Debtor's estimate of the amount of the Priority Non-Tax Claims derives from the Debtor's accounting of the pre-petition obligations owed to its employees, including for vacation time, sick leave time and personal time.

       **g.**      <u>**Secured Claims ($2,330,908)**</u>**.**  The Debtor estimates that the following Secured Claims will be asserted against the Reorganized Debtor:

          **i**      <u>**Class 1 -- BOW ($1,852,950)**</u>**.**  The Debtor acknowledges that BOW has an Allowed Secured Claim in the amount of $1,852,950.

          **ii**      <u>**Class 2(a) -- Exchange Bank ($12,243)**</u>**.**  The Debtor acknowledges that Exchange Bank has an Allowed Secured Claim in the amount of $12,243, and believes that Exchange Bank has no Deficiency Claim.

          **iii.**      <u>**Class 2(b) -- GreatAmerica ($14,971)**</u>**.**  GreatAmerica asserts a Secured Claim in the amount of $14,971.  The Debtor believes that GreatAmerica has no Allowed Secured Claim, and that GreatAmerica has a Deficiency Claim in the amount of $14,971.

          **iv.**      <u>**Class 2(c) -- Trans Advantage ($396,855)**</u>**.**  The Debtor acknowledges that Trans Advantage has an Allowed Secured Claim in the amount of $396,782, and believes that Trans Advantage has no Deficiency Claim.

   **v.**  **Class 2(d) -- Western Equipment ($45,811).** The Debtor acknowledges that Western Equipment has an Allowed Secured Claim in the amount of $45,811, and that Western Equipment has a Deficiency Claim in the amount of $3,000.

   **vi.**  **Class 2(e) -- Allegiant ($23,049).** The Debtor acknowledges that Allegiant has an Allowed Secured Claim in the amount of $23,049, and believes that Allegiant has no Deficiency Claim.

The Debtor believes that there are <u>no</u> Allowed Class 3 Secured Claims.

   **h.**  **BOW Subordinated Claim ($500,000).** Pursuant to the Plan, BOW will have the BOW Subordinated Claim in the amount of $500,000.  The BOW Subordinated Claim will be paid pursuant to the provisions of Section 5.1.3 of the Plan.

   **i.**  **Priority Tax Claims ($4,685).** The Debtor estimates that approximately $4,685 in Priority Tax Claims have been asserted against the Estate. The Debtor's estimate of the amount of Priority Tax Claims derives from the Debtor's financial books and records and from the Debtor's review of Proofs of Claim filed by Creditors asserting Priority Tax Claims.  The Debtor disputes all of such Claims and believes that it owes no Priority Tax Claims.

   **j.**  **Allowed General Unsecured Claims ($2,410,790 - $2,704,720).** The Debtor estimates that approximately $2,704,720 in General Unsecured Claims have been asserted against the Debtor (including Deficiency Claims).  The Debtor disputes in excess of $294,000 of such Claims.  Substantial Disputed General Unsecured Claims include, but are not limited to, the following:

| | Creditor | Claim[8] |
|---|---|---|
| i | UFP Thornton, LLC (International Wood) | $7,020 |

---

[8] The Debtor does not dispute the entire amount of the Claims listed in this chart but, at this point, only about a total of $294,000 of such Claims.  The Debtor (and the Reorganized Debtor) reserve the right to object, in whole or in part, to such Claims and any and all other Claims asserted against the Debtor.

| | **Creditor** | **Claim[8]** |
|---|---|---|
| ii | Boyett Petroleum | $27,439 |
| iii | Pitney Bowes Inc. | $15,320 |
| iv | Stan Boyett & Son, Inc. | $41,843 |
| v | The Fundworks, LLC | $172,334 |
| vi | Gsolutionz GreatAmerica Financial Services Corporation | $51,069 |
| vii | Primary Funding Corporation | $66,890 |
| viii | Daniel R. Warman | $8,575 |
| ix | Fox Capital Group, Inc. | $218,453 |
| x | LoanMe, Inc. | $75,707 |

The Debtor anticipates that objections will be filed to a number of Disputed General Unsecured Claims.

In addition to the General Unsecured Claims asserted against the Debtor, pursuant to the Plan, BOW will have an Allowed Class 5 Deficiency Claim in the amount of $1,010,559 and an Allowed Class 5 General Unsecured Claim in the amount of $132,468. Class 2 Secured Creditors may have Deficiency Claims against the Debtor in the aggregate amount of approximately $17,971.

For the purpose of this Feasibility Analysis only, the Debtor assumes that General Unsecured Claims will be allowed in a range between approximately $2,410,790 and $2,704,720. The Debtor believes, however, that the amount of General Unsecured Claims that ultimately will be allowed by the Bankruptcy Court may be less than the $2,410,790 figure.

**k.** **Causes of Action ($0).** For the purpose of this Feasibility Analysis only, the Debtor projects that it will not obtain any net recovery from prosecuting Causes of Action. The Debtor believes that this is a very conservative projection,

and that it is likely that significant recoveries will be obtained from pursuing Avoidance Actions.

l.    **Post-Confirmation Operations**.  Attached as **Exhibit "B"** hereto is the Debtor's projection of the Reorganized Debtor's cash flow from operations during the term of the Plan ("Feasibility Projections").  The Feasibility Projections indicate that the Reorganized Debtor's operations will be profitable over the term of the Plan, and that the Reorganized Debtor will have cash flow sufficient to make all of the Distributions required by the Plan.

2.    **Funding of Distributions Required by the Plan**.  The Feasibility Analysis indicates that the Reorganized Debtor will have Cash sufficient to make all Distributions required to be made pursuant to the Plan.

a.    **Distributions Payable on or Promptly After the Effective Date**. A primary issue relative to the feasibility of the Plan is whether the Reorganized Debtor will have Cash sufficient to fund the Distributions that are required to be made on or promptly after the Effective Date of the Plan.  On or promptly after the Effective Date, the Reorganized Debtor must pay all of the Allowed Administrative Claims, Allowed Priority Non-Tax Claims, United States Trustee Fees, and the Cure Claims.  The Reorganized Debtor estimates that, on or about the Effective Date, the Reorganized Debtor will have Cash sufficient to pay such Claims.

The Debtor projects that, largely by reason of proceeds that will be obtained from the Post-Effective Date Loan, the Reorganized Debtor will have approximately $454,000 in Cash available to it on or about the Effective Date in order to pay the Distributions that will be owed on or promptly after the Effective Date.

The Debtor projects that the Reorganized Debtor will have to pay, on or promptly after the Effective Date, the following obligations:

| | | |
|---|---|---|
| i. | Allowed Administrative Claims | $ 305,468 |
| ii. | United States Trustee Fees | $   17,468 |

| | | |
|---|---|---|
| iii. | Cure Claims | $ 31,828 |
| iv. | Allowed Priority Non-Tax Claims | $ 0 |

**TOTAL:**     <u>**$ 354,764**</u>

The Feasibility Analysis indicates, therefore, that the Debtor will have Cash sufficient to fund the Distributions required to be paid to Creditors on or promptly after the Effective Date.

        **b.**      **<u>Ongoing Distributions Under the Plan</u>.** After payment of Allowed Administrative Claims, Cure Claims, United States Trustee Fees, and Allowed Priority Non-Tax Claims, the remaining material Claims to be paid pursuant to the Plan are the Allowed Class 1 Secured Claim, the Allowed Class 2 Secured Claims, the BOW Subordinated Claim, Allowed Priority Tax Claims and Allowed General Unsecured Claims (Class 5).[9]

The Debtor has been in business since 2008. The Debtor had a solid track record of profitability through the year preceding the Debtor's Chapter 11 filing, and, as a result of the Debtor's operational restructuring, cost-cutting and efforts made to enhance revenues, the Debtor's operations have been restored to profitability. The Debtor is confident that it has resolved the financial problems that led to the Debtor's Chapter 11 filing and that, through the financial and debt restructuring contemplated by the Plan, including the very significant restructuring of the Debtor's obligations to BOW, the Debtor's operations will continue to be profitable.

The Debtor has devoted considerable time and attention to the preparation of the Feasibility Projections. The Debtor believes that the material assumptions underlying the Feasibility Projections are reasonable, and that, given the care with which the Financial Projections have been prepared, the Feasibility Projections are a fair and reasonably accurate projection of the Debtor's financial performance

---

[9] At present, no order has been entered subordinating any Claims, and, accordingly, for the purpose of this Feasibility Analysis only, the Debtor projects that there will be <u>no</u> subordinated claims in the Case.

over the term of the Plan.  The Feasibility Projections indicate that the Reorganized

Debtor will be able to generate cash flow sufficient during the term of the Plan to

enable the Reorganized Debtor to make all of the Distributions required to be paid

after the Effective Date of the Plan.

        **c.**      **Projected Recoveries by Class 5 Creditors**.  The following is the

Debtor's projection of the potential recoveries by holders of Class 5 Allowed

General Unsecured Claims:

| | |
|---|---|
| Total Distribution to Class 5 Creditors | $450,000 |
| Est. Amount of Allowed General Unsecured Claims | $2,410,790 - $2,704,720 |
| **Est. Percentage Recovery by holders of Allowed General Unsecured Claims** | **16.6% - 18.7%** |

        By this Feasibility Analysis, therefore, the Debtor projects that the holders

of Allowed General Unsecured Claims will recover approximately 16.6% - 18.7%

on account of their Allowed General Unsecured Claims.  **The Debtor cautions,**

**however, that, if any of the material assumptions underlying the Feasibility**

**Analysis proves to be materially inaccurate and adverse to the interests of**

**Creditors, the Reorganized Debtor's ability to fund Distributions to holders of**

**Allowed General Unsecured Claims will be impaired.  Moreover, the recovery**

**by holders of Allowed General Unsecured Claims may prove to be less**

**favorable than that projected.  In particular, if the amount of General**

**Unsecured Claims allowed in the Case is higher than the amount projected by**

**the Debtor, the recovery by holders of Allowed General Unsecured Claims will**

**be significantly less favorable than that projected.**

    **G.**    **Liquidation Analysis.**

        Pursuant to section 1129(a)(7) of the Bankruptcy Code, a plan cannot be confirmed unless

the bankruptcy court determines that distributions under the plan to all holders of claims who have

not accepted the plan, and whose claims are classified in classes that are impaired under the plan,

are not less than those which they would receive in a liquidation case under Chapter 7. This test must be satisfied even if a plan is accepted by each impaired class of claims.  This test, which is often referred to as the "Best Interests of Creditors" test, requires the bankruptcy court to find either that (1) all holders of claims in an impaired class of claims have accepted the plan, or (2) the plan will provide to each holder of a claim in an impaired class who has not accepted the plan a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To satisfy the "Best Interests of Creditors" test, the bankruptcy court must reach a conclusion regarding the probable distribution to the holders in each impaired class of claims if the debtor were liquidated in a Chapter 7 case.  The first step in this process is to determine the "liquidation value" that would be generated from a sale of the debtor's assets by a Chapter 7 trustee. The second step requires the application of the projected liquidation proceeds in accordance with the various rights of any creditors holding liens on the property.  If such proceeds are sufficient to retire any such liens, then the excess would be made available to satisfy the claims of unsecured creditors.

Once all of the claims secured by liens on assets of a debtor's estate are deducted from the projected liquidation proceeds of the sale of the secured creditor's collateral, then the costs and expenses associated with the liquidation of the estate incurred by the Chapter 7 trustee must be paid.  These costs would include the compensation of the trustee, as well as compensation of counsel and other professionals retained by the trustee, and asset disposition expenses.

After payment of the costs and expenses associated with the Chapter 7 liquidation are paid, all unpaid administrative expenses incurred by the debtor in its Chapter 11 case (such as compensation of attorneys and accountants) and all unpaid claims arising from the operations of the debtor during the pendency of the Chapter 11 case must be paid.

After the payment of Chapter 11 administrative expenses, the remaining liquidation proceeds would be used to pay priority unsecured claims, such as tax and wage claims that are entitled to priority under the Bankruptcy Code. Thereafter, the remaining liquidation proceeds

would be made available to pay general unsecured claims.  Finally, to the extent that any proceeds remain after paying all allowed claims, such proceeds would be distributed to interest holders.

Attached hereto as **Exhibit "C"** is a liquidation analysis prepared by the Debtor that estimates the probable liquidation value of the Debtor, and applies the foregoing liquidation methodology to the estimated Claims against the Estate in a Chapter 7 liquidation in an effort to quantify what each Class of Creditors would receive in a Chapter 7 liquidation ("Liquidation Analysis").  Any Liquidation Analysis of this nature entails a significant degree of estimation and projection regarding both probable asset value and probable Allowed Claim totals.  For example, in preparing the Liquidation Analysis, the Debtor has been required to evaluate the substantial amount of Disputed Claims in the Case, and has necessarily quantified what it believes will be the Allowed Claims within each Class.  Although this quantification was based upon a thorough assessment of the information contained in the Debtor's books and records and the Debtor's review of the Disputed Claims asserted against the Debtor, as of the date of the preparation of the Liquidation Analysis, it was not possible to quantify exactly the amount of Allowed Claims given the substantial amount of Disputed Claims and the fact that no judicial determinations had been made regarding the merits of the Disputed Claims.

On the valuation side of the Liquidation Analysis, the Debtor has estimated the liquidation value of the Debtor's Assets utilizing its best estimate of the value of the Debtor's Assets in a Chapter 7 liquidation.

Pursuant to the Plan, the Debtor proposes to use profits generated from the post-confirmation operations of the Reorganized Debtor's business to fund Distributions to Creditors, including the holders of Allowed General Unsecured Claims.  The Debtor's business is relatively complex, and, to be operated effectively, requires management with extensive knowledge of and expertise in such business.  The Debtor assumes that, in a Chapter 7 liquidation scenario, the Chapter 7 trustee would <u>not</u> seek from the Bankruptcy Court an order authorizing the trustee to continue to operate the Debtor's business, but would terminate the Debtor's operations and liquidate the Debtor's Assets.  The Debtor assumes further that, in a Chapter 7 liquidation scenario, there would be little or no involvement by management of the Debtor, and that it is very

likely that the Chapter 7 trustee would have little or no knowledge of or expertise regarding the Debtor's business or the Debtor's Assets. The Debtor believes that, without the active assistance of management of the Debtor, the Chapter 7 Trustee would not be in a position to preserve effectively the value of the Debtor's Assets. The Debtor projects that the value of the Debtor's Assets would decline significantly in a Chapter 7 liquidation, and that it is very likely that a significant amount of the value of the Debtor's Assets would be lost in a Chapter 7 liquidation.

The Debtor contemplates that the Reorganized Debtor will obtain the Post-Effective Date Loan in order to facilitate the Debtor's making Distributions under the Plan. The Debtor assumes that a Chapter 7 trustee would not seek, nor be able to obtain, any such funding.

It should be noted that the Debtor has <u>not</u> used a "worst case" scenario in preparing the Liquidation Analysis. Rather, the Debtor has assumed that the Debtor's Assets will be liquidated in as orderly a fashion as possible under the circumstances in order to collect as much value as possible from the Assets.

Material assumptions underlying the Liquidation Analysis include the following.

1.    **BOW'S Resort to its Remedies.**

BOW asserts that it holds duly-perfected and unavoidable Liens encumbering all of the Debtor's Assets, except only for certain items of rolling stock and equipment (<u>i.e.</u>, the Unencumbered Assets). The Debtor believes that, in a Chapter 7 liquidation proceeding, BOW and other Secured Creditors likely would seek relief from the bankruptcy stay, and, if such relief were granted, they would proceed to enforce their remedies as Secured Creditors, including by foreclosing upon their Collateral. The Debtor believes that there would be no proceeds available for other Creditors upon the Secured Creditors' foreclosing upon its Collateral.

2.    **Reduced Value of Assets in Liquidation.**

Liquidation values for many types of assets are typically lower than going concern values for such assets. In this case, the Debtor's primary Assets are the following: cash, accounts receivable, and fixed assets, including rolling stock and equipment

a.    **Cash.** Cash is fully recoverable either in a going concern scenario

or in a liquidation scenario.

       **b.**      **Accounts Receivable.**  The Debtor believes that, in a Chapter 7 liquidation proceeding, many of the Debtor's customers would withhold payment and exercise their right of setoff due to the Debtor's failure to perform under its contracts with its customers.  The Debtor believes that a Chapter 7 trustee, or BOW if it were granted relief from stay to foreclose upon its interests in the accounts receivable, would incur significant costs attempting to collect accounts receivable and would have significant difficulty obtaining payment of accounts receivable. Accordingly, the Debtor projects that, in a Chapter 7 liquidation, the value of accounts receivable less than 90 days old would decline by approximately 55% and that BOW would obtain all of the net proceeds therefrom.

       **c.**      **Rolling Stock and Equipment.**  The Debtor estimates that the aggregate value of its rolling stock and equipment which are encumbered by Liens in favor of BOW and Class 2 Secured Creditors is approximately $2,928,000.  This estimate is based, in part, upon appraisals of certain rolling stock and equipment prepared by Sterling Appraisals & Machinery in July 2018 ("Sterling Appraisal") and by International Appraisal in October 2017 ("International Appraisal").

       Based in part upon the Sterling Appraisal and the International Appraisal, the Debtor estimates that the aggregate value of the Unencumbered Assets (i.e., unencumbered rolling stock and equipment) is approximately $753,000.

       The Debtor projects that, in a Chapter 7 liquidation, the value of the Debtor's encumbered rolling stock and equipment would decline by approximately 46%, and that the value of the Unencumbered Assets would decline by about 48%. This decline in value would be attributable, in part, to the following: (i) the cost of employing an auctioneer or other liquidator to liquidate such assets; (ii) the forced nature of the sale of such assets; (iii) a current excess of such assets for sale in the marketplace; and (iv) lack of facilities to accommodate the large number of storage vaults which would need to be liquidated.

Accordingly, the Debtor projects that, in a Chapter 7 liquidation, the proceeds from the liquidation of the encumbered rolling stock and equipment would be approximately $1,581,120 and would be paid entirely to BOW and to the Class 2 Secured Creditors in payment of their respective Liens encumbering such assets, and that the proceeds from the liquidation of the Unencumbered Assets would be approximately $391,360.

3.      **Increased Amount of Claims in Liquidation.**  As set forth hereinabove, a liquidation of the Debtor's Assets very likely will result in a significant reduction in the value of the Debtor's Assets.  In a Chapter 7 liquidation, Creditors' interests also would be impaired by the creation of a substantial amount of Claims, including substantial Administrative Claims, that otherwise would not be asserted against the Debtor.

In a Chapter 7 liquidation, holders of Allowed Claims would receive Distributions based on the liquidation of the Debtor's Assets.  The proceeds from the liquidation of the Assets available for funding Distributions to Creditors would be reduced by the commission payable to the Chapter 7 trustee and by the fees and expenses of the professionals who would be retained by the trustee and who would be required to "get up to speed" in the Chapter 7 Case, and, hence, who would be likely to incur fees in excess of the accruing fees of the Professionals now employed in the Chapter 11 Case.

In a Chapter 7 case, the trustee would be entitled to seek a sliding scale commission based upon the Cash that would be distributed by such trustee to Creditors.  The professionals and assistants who would be employed by the Chapter 7 trustee would add additional administrative expense that would be paid prior to payment of Allowed General Unsecured Claims.  The Debtor already has legal counsel who is knowledgeable about the Case and the legal issues concerning the Case and the resolution of Claims asserted against the Estate; by reason of the knowledge of the Professionals already employed in the Case, the Professionals likely can complete the legal work necessary to resolve the Case much more efficiently and economically than a new set of professionals who would be employed by a trustee.  The costs of familiarizing the trustee, the trustee's new professionals, and the

trustee's new staff with issues relating to the Case likely will increase the Administrative Claims that must be paid before payment of Allowed General Unsecured Claims.

It also must be noted that the issues related to the Claims adjudication process in the Case are fairly complex. The Debtor believes that the process of adjudicating Disputed Claims in the Case are best handled by the Debtor's existing management and by the Debtor's existing Professionals. The Debtor's management has substantial knowledge of the Debtor's business and financial affairs and the Debtor's transactions with its Creditors. The Debtor's management's substantial knowledge of the Debtor's business and financial affairs and the Debtor's transactions with its Creditors will be invaluable in the Claims adjudication process. Moreover, the Debtor's existing Professionals already have commenced evaluating the Claims asserted in the Case. The existing Professionals' knowledge of the Claims asserted in the Case will help to ensure that the Claims adjudication process will be handled in an efficient and expeditious manner. The Debtor believes that there is a significant risk that, in a Chapter 7 liquidation, with a loss of the "institutional knowledge" of the Debtor's financial affairs and the Claims asserted against the Debtor possessed by the Debtor's management and by the existing Professionals in the Case, the process of resolving Disputed Claims will be affected adversely to the interests of Creditors.

In addition to a potentially significant increase in Administrative Claims in the Case associated with the fees and expenses of the Chapter 7 trustee and the professionals and assistants who would be employed by the Chapter 7 trustee, the amount of Claims allowed in the Case may increase significantly in a Chapter 7.

In a Chapter 7 liquidation, it is very likely that the Debtor's business would not be operated by the Chapter 7 trustee. As a result, the Debtor's storage contracts with its customers may be rejected by the Chapter 7 trustee. A rejection of such contracts almost certainly would cause the Debtor's customers under such contracts to withhold payment of their obligations under such contracts, reducing substantially the value of the Debtor's accounts receivable, and to increase substantially the amount of General Unsecured Claims

asserted against the Debtor.  If the Chapter 7 trustee were to attempt to honor the storage contracts, the trustee would incur substantial expense in so doing, including rent and utilities associated with maintaining the Debtor's facilities and the cost of personnel to operate the facilities.  A significant percentage of such storage contracts are with military personnel; in the Debtor's experience, such contracts may have a term of many months, if not years, and so the ongoing cost of honoring the storage contracts could last for a considerable period of time.

In any Chapter 7 liquidation, the trustee may not be inclined to prosecute aggressively Causes of Action.  As a result, not only could there be a potential loss in value of Causes of Action, but there could be an increase in Allowed Claims because, by not pursuing aggressively Causes of Action against the holders of Disputed Claims, Disputed Claims could be allowed in a Chapter 7 liquidation that otherwise would not be allowed in the Chapter 11 Case.  Moreover, without the involvement of the Debtor's management and the Debtor's existing Professionals in the Claims adjudication process, there is a risk that a greater amount of Disputed Claims would be allowed in a Chapter 7 liquidation than would be allowed in the Chapter 11 Case.

Although there are difficulties inherent in quantifying, with any exactitude, the potential recoveries that Creditors would receive in a Chapter 7 liquidation scenario, the Debtor believes that the Liquidation Analysis provides a fair estimate of the results that would occur in a Chapter 7 liquidation.  The Liquidation Analysis indicates that, in a Chapter 7 liquidation scenario, holders of Chapter 11 Administrative Claims would not be paid in full and that holders of Allowed General Unsecured Claims would obtain no recovery (compared with a projected 16.6% - 18.7% recovery under the Plan).  Moreover, pursuant to the Plan, Distributions to satisfy Allowed Administrative Claims, Cure Claims and Allowed Priority Non-Tax Claims will be paid on or promptly after the Effective Date (projected to occur in or about June 2019).  In contrast, a Chapter 7 trustee would have no familiarity with the Debtor, the Debtor's Assets, the Claims and the Debtor's Case, and likely would seek to retain professionals who are similarly unfamiliar with these matters.  Consequently, the Debtor believes that it is likely that there would be no

Distributions to such Creditors in a Chapter 7 liquidation for a period of many months, if not years.

Based on the foregoing, the Debtor believes that the Reorganized Debtor is in the best position to produce the highest return to Creditors, and that it will be advantageous to Creditors to have the Debtor reorganize its financial affairs pursuant to the Plan, rather than liquidate its Assets in Chapter 7.

While the Debtor's conclusions regarding the results of a liquidation scenario are unavoidably speculative and depend upon a number of variables, the Debtor believes that there is a good basis for it to believe that, pursuant to the Plan, Creditors will be able to recover significantly more on account of their Claims than they would in a Chapter 7 liquidation proceeding. Accordingly, the Debtor has concluded that the Plan is the best alternative for Creditors, and will maximize recoveries by Creditors.

## XIII.

## CERTAIN UNITED STATES FEDERAL TAX CONSEQUENCES OF THE PLAN

**A.      Introduction.**

**CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITIES SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS AND/OR OTHER TAX ADVISORS.**  The following disclosure of possible tax consequences of the Plan is intended solely for the purpose of alerting Creditors to possible tax issues that the Plan may present to the Debtor.  The Debtor CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Internal Revenue Code embodies many complicated rules which make it difficult to state completely and accurately all of the tax implications of any action.

**B.      Consequences to the Debtor.**

In general, the Internal Revenue Code provides that a debtor in a bankruptcy case is not taxable on cancellation of debt ("COD") income, but must reduce certain of its tax attributes (such as its net operating loss carryforwards and its tax basis in its assets) by the amount of COD income.  COD income results when the amount of debt discharged exceeds the consideration

given in exchange therefor, and is equal to such excess amount.  In this case, it is likely that a cancellation of debt will be deemed to occur on the Effective Date of the Plan.  Any reduction in tax attributes does not occur, however, until the end of the Debtor's taxable year or, in the case of asset basis reduction, the first day of the taxable year following the taxable year in which the COD is incurred.

### C. **Withholding of Taxes**.

All Distributions to holders of Allowed Priority Unsecured Claims and Allowed General Unsecured Claims are subject to any applicable tax withholding, including employment tax withholding.  Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate.  Backup withholding generally applies if the holder (1) fails to furnish its social security number or other taxpayer identification number ("TIN"), (2) furnishes an incorrect TIN, (3) fails properly to report interest or dividends, or (4) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent that it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS AND/OR OTHER TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN.

### XIV.

### RECOMMENDATION

The Debtor recommends that all Creditors receiving a Ballot vote in favor of the Plan.  The Debtor believes that the Plan maximizes recoveries to all Creditors and, thus, is in the best interests of Creditors.  The Plan likely will produce Distributions to Creditors in excess of those

that would be available if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code, and

will minimize delays in recoveries by certain Creditors.

Dated:  April  10 , 2019

**LOVEJOY'S FAMILY MOVING, INC. dba
REPUBLIC MOVING & STORAGE**

By:_____

Joseph W.  Lovejoy

Title:  President

**APPROVED AS TO FORM.**

Dated:  April  10 ,

**WINTHROP COUCHOT
GOLUBOW HOLLANDER, LLP**

By: */s/  Robert E. Opera*

Robert E. Opera

Peter W. Lianides

General Insolvency Counsel for Debtor and Debtor-
in-Possession, Lovejoy's Family Moving, Inc., dba
Republic Moving & Storage

**EXHIBIT "A"**

**February 2019 MOR**

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
CENTRAL DISTRICT OF CALIFORNIA

| In re:<br>Lovejoy's Family Moving, Inc., dba Republic Moving & Storage<br><br>Debtor(s). | CHAPTER 11 (BUSINESS)<br><br>Case Number:         6:18-bk-16624-SC<br>Operating Report Number:    7<br>For the Month Ending:    19-Feb |
|---|---|

### I. CASH RECEIPTS AND DISBURSEMENTS
### A. (GENERAL ACCOUNT*)

1. TOTAL RECEIPTS PER ALL PRIOR GENERAL ACCOUNT REPORTS     6,654,888.31

2. LESS: TOTAL DISBURSEMENTS PER ALL PRIOR GENERAL     6,209,418.75
   ACCOUNT REPORTS

3. BEGINNING BALANCE: As of 8/6 -- 9/1/18     128,946.00     574,415.56

4. RECEIPTS DURING CURRENT PERIOD:
   Accounts Receivable - Post-filing     715,166.95
   Accounts Receivable - Pre-filing     TBD end of Month
   General Sales     141,437.93
   Other (Specify)     0.00
   **Other (Specify)

   TOTAL RECEIPTS THIS PERIOD:     856,604.88

5. BALANCE:     1,431,020.44

6. LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD
   Transfers to Other DIP Accounts (from page 2)     169,684.50
   Disbursements (from page 2)     627,631.06

   TOTAL DISBURSEMENTS THIS PERIOD:***     797,315.56

7. ENDING BALANCE:     633,704.88

8. General Account Number(s):     Bank of the West ..2859     Bank of the West ..3545 DIP

   Depository Name & Location:     8690 Centre Dr     8690 Centre Dr
       La Mesa, CA 91942     La Mesa, CA 91942

EXHIBIT A

| Date<br>mm/dd/yyyy | Check<br>Number | Payee or DIP account | Purpose | *Amount<br>Transfered | **Amount<br>Disbursed | Amount |
|---|---|---|---|---|---|---|
| 2/1/2019 | DEBIT | BANK FEE | BANK FEE | | 3.00 | 3.00 |
| 2/1/2019 | DEBIT | BANK FEE | BANK FEE | | 103.00 | 103.00 |
| 2/1/2019 | DEBIT | RAINBOW WATER | UTILITY DEBIT/BONSALL | | 191.87 | 191.87 |
| 2/1/2019 | WIRE | COMDATA | FUEL/DRIVERS | | 5,881.50 | 5,881.50 |
| 2/1/2019 | 2825 | JACOB RODRIGUEZ | PAYROLL | 112.00 | | 112.00 |
| 2/1/2019 | 2826 | IGLESIAS TRUCKING | CONTRACTOR | | 1,000.00 | 1,000.00 |
| 2/1/2019 | 2827 | GARCIA'S MOVING | CONTRACTOR | | 500.00 | 500.00 |
| 2/1/2019 | 2829 | IGNACIO RAMIREZ | CONTRACTOR | | 5,000.00 | 5,000.00 |
| 2/1/2019 | 2828 | USPS | SALES POSTCARD | | 198.16 | 198.16 |
| 2/1/2019 | 2432 | CALIFORNIA CHAMBER OF COMM | DUES/SUBS, YEARLY HR SERVICE | | 649.00 | 649.00 |
| 2/1/2019 | 2433 | HEAVY DUTY MOBILE | TRUCK REPAIRS | | 800.00 | 800.00 |
| 2/1/2019 | 2434 | BROWN EAGLE SVC | TRUCK REPAIRS | | 1,613.40 | 1,613.40 |
| 2/4/2019 | DEBIT | GSOLUTIONZ | PHONE SUPPORT | | 409.25 | 409.25 |
| 2/5/2019 | DEBIT | UBIQUITY | 401K FEE | | 155.00 | 155.00 |
| 2/6/2019 | DEBIT | COX COMMUNICATIONS | INTERNET/CHULA VISTA | | 1,922.40 | 1,922.40 |
| 2/4/2019 | WIRE | COMDATA | FUEL/DRIVERS | | 988.00 | 988.00 |
| 2/4/2019 | DEBIT | MERCH BANKCARD FEE | C/C PROCESSING FEES | | 235.48 | 235.48 |
| 2/4/2019 | DEBIT | MERCH BANKCARD DISC | C/C PROCESSING FEES | | 727.95 | 727.95 |
| 2/4/2019 | DEBIT | FLYERS ENERGY | FUEL/LOCAL | | 1,613.28 | 1,613.28 |
| 2/4/2019 | DEBIT | SILENT PASSENGER/VEHICLE TR | VEHICLE GPS SYSTEM | | 1,884.35 | 1,884.35 |
| 2/4/2019 | DEBIT | CHOICE LOCAL | WEBSITE/SEO | | 2,180.00 | 2,180.00 |
| 2/4/2019 | DEBIT | MERCH BANKCARD INTERCH FEE | C/C PROCESSING FEES | | 7,565.18 | 7,565.18 |
| 2/5/2019 | ACH | CHRIS CARLSSON | CONTRACTOR | | 1,851.90 | 1,851.90 |
| 2/5/2019 | 2830 | USPS | SALES POSTCARDS | | 353.83 | 353.83 |
| 2/5/2019 | 2831 | STACEY ROMERO | CONTRACTOR | | 440.00 | 440.00 |
| 2/5/2019 | 2832 | AMSA | AMERICAN MOVING & STORAGE | | 1,025.00 | 1,025.00 |
| 2/5/2019 | 2833 | DEPENDABLE HIGHWAY EXPRES | FREIGHT | | 73.15 | 73.15 |
| 2/5/2019 | 2834 | CMSA | CALIFORNIA MOVING & STORAGE | | 205.00 | 205.00 |
| 2/5/2019 | 2835 | GREGG EDWARD COMEY | SALES LEADS | | 1,425.00 | 1,425.00 |
| 2/5/2019 | 2836 | JAN-PRO | JANITORIAL | | 1,523.00 | 1,523.00 |
| 2/6/2019 | ACH | ACCESS ACCOUNTING | CONTRACTOR | | 2,733.20 | 2,733.20 |
| 2/6/2019 | ACH | MOVING MANAGEMENT | CONTRACTOR | | 16,676.28 | 16,676.28 |
| 2/6/2019 | WIRE | COMDATA | FUEL/DRIVERS | | 3,526.50 | 3,526.50 |
| 2/6/2019 | DEBIT | IRON MOUNTAIN | DOCUMENT SHREDDING | | 69.27 | 69.27 |
| 2/6/2019 | PAYROLL | DIRECT DEPOSITS | 2/8/18 PAYROLL | 24,594.56 | | 24,594.56 |
| 2/6/2019 | PAYROLL | TAX LIAB | 2/8/18 PAYROLL | 10,906.10 | | 10,906.10 |
| 2/6/2019 | PAYROLL | NET CKS | 2/8/18 PAYROLL | 1,171.05 | | 1,171.05 |
| 2/6/2019 | 2838 | DIRECT CONNECT | 3RD PARTY LOGISTICS | | 1,084.25 | 1,084.25 |
| 2/6/2019 | 2839 | MM MANAGER LLC | CUSTOMER REFUND/CLAIM | | 223.50 | 223.50 |
| 2/6/2019 | 2840 | CURTIS PRINTING SOLUTIONS | MILITARY FORMS | | 797.54 | 797.54 |
| 2/6/2019 | 2841 | EASTGROUP PROPERTIES | CHULA VISTA RENT | | 91,784.90 | 91,784.90 |
| 2/6/2019 | 2842 | CARLSBAD ROCK/SUPPLY | BONSALL RENT | | 5,000.00 | 5,000.00 |
| 2/6/2019 | 2843 | KC DIGITAL SOLUTIONS | PRINTER/TONER | | 427.54 | 427.54 |
| 2/6/2019 | 2995 | OTAY LANDFILL | TRASH REMOVAL | | 753.81 | 753.81 |
| 2/7/2019 | ACH | MARI DRAYTON/SALES DRAW | SALES DRAW | | 1,500.00 | 1,500.00 |
| 2/7/2019 | ACH | BRENDA RAYFIELD | CONTRACTOR | | 1,255.00 | 1,255.00 |
| 2/7/2019 | ACH/2848 | SARTAIN TRUCKING/TERRY | CONTRACTOR | | 326.89 | 326.89 |
| 2/7/2019 | ACH/2847 | HERMAN JONES | CONTRACTOR | | 3,696.54 | 3,696.54 |
| 2/7/2019 | 2849 | EP LOGISTICS | CONTRACTOR | | 2,302.02 | 2,302.02 |
| 2/7/2019 | 2850 | HE TRUCKING/HECTOR | CONTRACTOR | | 710.65 | 710.65 |
| 2/7/2019 | 2851 | IGLESIAS TRUCKING | CONTRACTOR | | 3,536.49 | 3,536.49 |
| 2/7/2019 | 2852 | KIRK WALTERS | CONTRACTOR | | 1,479.39 | 1,479.39 |
| 2/7/2019 | 2853 | MOVING MANAGEMENT | CONTRACTOR | | 39.81 | 39.81 |
| 2/7/2019 | 2854 | GARCIA'S MOVING/PETE | CONTRACTOR | | 1,073.76 | 1,073.76 |
| 2/7/2019 | 2855 | PUGA RELOCATIONS | CONTRACTOR | | 11,988.36 | 11,988.36 |
| 2/7/2019 | 2856 | QUICKLINE/ROLANDO | CONTRACTOR | | 1,683.88 | 1,683.88 |
| 2/7/2019 | 2857 | IGNACIO RAMIREZ | CONTRACTOR | | 4,084.41 | 4,084.41 |

EXHIBIT A

| Date | Type | Payee | Description | | | |
|---|---|---|---|---|---|---|
| 2/7/2019 | | CONTRACTOR | | | 9,143.26 | 9,143.26 |
| 2/7/2019 | 2859 | STRESS FREE MOVING | CONTRACTOR | | 676.18 | 676.18 |
| 2/7/2019 | 2860 | VERA RELOCATIONS | CONTRACTOR | | 1,325.56 | 1,325.56 |
| 2/7/2019 | 2435 | BANK OF THE WEST/ADEQU PRO | ADEQUATE PROTECTION PAYMENT | | 13,500.00 | 13,500.00 |
| 2/7/2019 | 2436 | HEAVY DUTY MOBILE | TRUCK REPAIRS | | 2,320.00 | 2,320.00 |
| 2/7/2019 | 2437 | JONAS SOFTWARE | MOVER SUITE SOFTWARE SUBSCRIPTION | | 6,477.85 | 6,477.85 |
| 2/7/2019 | 2844 | RUSSELL TRAILER LEASING | TRAILER LEASING | | 275.00 | 275.00 |
| 2/7/2019 | 2845 | GEORGE DALL, CPA | CPA SERVICES | | 1,500.00 | 1,500.00 |
| 2/7/2019 | 2846 | USPS | SALES POSTCARDS | | 455.96 | 455.96 |
| 2/7/2019 | ACH | AMERIGAS | FORKLIFT PROPANE/CHULA VISTA | | 1,413.00 | 1,413.00 |
| 2/7/2019 | ACH | AMERIGAS | FORKLIFT PROPANE/BONSALL | | 386.97 | 386.97 |
| 2/7/2019 | ACH | AMERIGAS | FORKLIFT PROPANE/CHULA VISTA | | 1,325.82 | 1,325.82 |
| 2/8/2019 | ACH | TRANSGUARD/DRIVER'S WC | DRIVERS INSURANCE | | 4,609.00 | 4,609.00 |
| 2/8/2019 | ACH | TRANSGUARD/DRIVER'S WC | DRIVERS INSURANCE | | 5,284.00 | 5,284.00 |
| 2/8/2019 | DEBIT | FLYERS ENERGY | FUEL/LOCAL | | 1,109.82 | 1,109.82 |
| 2/8/2019 | WIRE | COMDATA | FUEL/DRIVERS | | 3,597.00 | 3,597.00 |
| 2/8/2019 | 2861 | USPS | SALES POSTCARDS | | 378.12 | 378.12 |
| 2/8/2019 | 2862 | VERA RELOCATIONS | CONTRACTOR | | 1,800.00 | 1,800.00 |
| 2/8/2019 | 2863 | STRESS FREE MOVING | CONTRACTOR | | 1,200.00 | 1,200.00 |
| 2/8/2019 | 2864 | IGNACIO RAMIREZ | CONTRACTOR | | 3,100.00 | 3,100.00 |
| 2/8/2019 | 2865 | DMV RENEWAL | TRUCK LICENSE/REGISTRATION | | 2,352.00 | 2,352.00 |
| 2/8/2019 | TRSFR/2866 | PETTY CASH BOX | PETTY CASH BOX | | 4,000.00 | 4,000.00 |
| 2/12/2019 | DEBIT | SDGE | UTILITY DEBIT | | 224.44 | 224.44 |
| 2/12/2019 | DEBIT | GSOLUTIONZ | PHONE SUPPORT | | 278.98 | 278.98 |
| 2/13/2019 | PAYROLL | 401K | PAYROLL | 315.81 | | 315.81 |
| 2/14/2019 | DEBIT | PRINCIPAL FIN/DENTAL INS | GROUP DENTAL INS | | 1,640.09 | 1,640.09 |
| 2/11/2019 | DEBIT | FLYERS ENERGY | FUEL/LOCAL | | 341.75 | 341.75 |
| 2/11/2019 | DEBIT | GOOGLE | SALES LEADS | | 500.00 | 500.00 |
| 2/11/2019 | 2439 | VICTOR TENORIO | EXP REPORT REIMB | | 1,109.00 | 1,109.00 |
| 2/11/2019 | 2440 | ALL OFFICE SOLUTIONS | CONTRACTOR | | 450.00 | 450.00 |
| 2/6/2019 | 28300 | MIDWESTERN INSURANCE | WC INSURANCE | | 4,397.40 | 4,397.40 |
| 2/12/2019 | WIRE | COMDATA | FUEL/DRIVERS | | 6,540.50 | 6,540.50 |
| 2/12/2019 | DEBIT | C/C CHARGEBACK | CUSTOMER REFUND | | 365.00 | 365.00 |
| 2/12/2019 | 2441 | BRENDA RAYFIELD/EXP REIMB | CONTRACTOR | | 199.94 | 199.94 |
| 2/12/2019 | 2867 | STACEY ROMERO | CONTRACTOR | | 505.00 | 505.00 |
| 2/12/2019 | 2868 | USPS | SALES POSTCARDS | | 520.66 | 520.66 |
| 2/12/2019 | 2869 | CONCENTRA/US HEALTHWORKS | DRUG SCREENS | | 130.00 | 130.00 |
| 2/12/2019 | 2870 | KC DIGITAL SOLUTIONS | COPIER TONER | | 227.79 | 227.79 |
| 2/12/2019 | 2871 | MCD TIRE | TRUCK TIRES | | 653.76 | 653.76 |
| 2/12/2019 | 2872 | COMPLETE OFFICE | COPY PAPER | | 403.25 | 403.25 |
| 2/12/2019 | 2873 | C.P. RICHARD SIGNS | TRUCK DOOR SIGNS | | 573.75 | 573.75 |
| 2/13/2019 | WIRE | COMDATA | FUEL/DRIVERS | | 3,471.00 | 3,471.00 |
| 2/13/2019 | WIRE | NORTH AMERICAN VAN LINES | STATEMENT DEFICIT | | 6,452.59 | 6,452.59 |
| 2/13/2019 | PAYROLL | DIRECT DEPOSITS | PAYROLL | 24,570.56 | | 24,570.56 |
| 2/13/2019 | PAYROLL | TAX LIABILITY | PAYROLL | 10,670.17 | | 10,670.17 |
| 2/13/2019 | PAYROLL | NET CKS | PAYROLL | 1,015.85 | | 1,015.85 |
| 2/13/2019 | ACH | CHRIS CARLSSON | CONTRACTOR | | 1,781.40 | 1,781.40 |
| 2/13/2019 | ACH | ACCESS ACCOUNTING | CONTRACTOR | | 2,629.04 | 2,629.04 |
| 2/13/2019 | ACH | MOVING MANAGEMENT | CONTRACTOR | | 17,327.91 | 17,327.91 |
| 2/13/2019 | 2874 | SKII FLEETON/CUSTOMER REFUN | CUSTOMER REFUND | | 549.22 | 549.22 |
| 2/14/2019 | WIRE | COMDATA | FUEL/DRIVERS | | 2,656.00 | 2,656.00 |
| 2/14/2019 | ACH | TERRIE MILLER/SALES DRAW | SALES DRAW | | 1,000.00 | 1,000.00 |
| 2/14/2019 | ACH | JESSICA GONZALEZ/SALES DRAW | SALES DRAW | | 1,000.00 | 1,000.00 |
| 2/14/2019 | ACH | BRENDA RAYFIELD | CONTRACTOR | | 1,255.00 | 1,255.00 |
| 2/14/2019 | ACH | 10STRONG RELO/VICTOR TENORI | SALES DRAW | | 6,950.00 | 6,950.00 |
| 2/14/2019 | ACH | SARTAIN TRUCKING | CONTRACTOR | | 3,091.80 | 3,091.80 |
| 2/14/2019 | ACH | JOAQUIN TREJO | CONTRACTOR | | 716.59 | 716.59 |
| 2/14/2019 | 2876 | EP LOGISTICS | CONTRACTOR | | 1,877.90 | 1,877.90 |
| 2/14/2019 | 2877 | HE TRUCKING/HECTOR | CONTRACTOR | | 1,113.00 | 1,113.00 |
| 2/14/2019 | 2878 | IGLESIAS TRUCKING | CONTRACTOR | | 2,579.15 | 2,579.15 |
| 2/14/2019 | 2879 | KIRK WALTERS | CONTRACTOR | | 1,376.92 | 1,376.92 |

EXHIBIT A

| Date | Ref | Name | Category | Amount | Total |
|---|---|---|---|---|---|
| 2/14/2019 | DEBIT | | PAYMENT/CONTRACTOR | 48.25 | 48.25 |
| 2/14/2019 | 2881 | GARCIA'S MOVING/PETE | CONTRACTOR | 1,296.87 | 1,296.87 |
| 2/14/2019 | 2882 | PUGA RELOCATIONS | CONTRACTOR | 14,090.01 | 14,090.01 |
| 2/14/2019 | 2883 | QUICKLINE/ROLANDO | CONTRACTOR | 2,185.21 | 2,185.21 |
| 2/14/2019 | 2884 | IGNACIO RAMIREZ | CONTRACTOR | 2,267.13 | 2,267.13 |
| 2/14/2019 | 2885 | SG MOVING | CONTRACTOR | 6,941.11 | 6,941.11 |
| 2/14/2019 | 2886 | STRESS FREE MOVING | CONTRACTOR | 471.57 | 471.57 |
| 2/14/2019 | 2887 | VERA RELOCATIONS | CONTRACTOR | 1,465.50 | 1,465.50 |
| 2/14/2019 | 2446 | IGLESIAS TRUCKING | CONTRACTOR | 75.00 | 75.00 |
| 2/14/2019 | 2442 | DONALD CARLSON/SALES DRAW | SALES DRAW | 1,500.00 | 1,500.00 |
| 2/14/2019 | 2443 | DAVID SAAVEDRA/SALES DRAW | SALES DRAW | 500.00 | 500.00 |
| 2/14/2019 | 2444 | BROWN FAMILY SERVICES | TRUCK REPAIRS | 3,164.31 | 3,164.31 |
| 2/14/2019 | 2445 | HEAVY DUTY MOBILE | TRUCK REPAIRS | 2,968.00 | 2,968.00 |
| 2/14/2019 | 2875 | ROAD ONE | TRUCK TOW | 418.00 | 418.00 |
| 2/15/2019 | DEBIT | OTAY WATER | WATER BILL, SUITE 1 | 1,037.69 | 1,037.69 |
| 2/15/2019 | WIRE | COMDATA | FUEL/DRIVERS | 3,751.50 | 3,751.50 |
| 2/15/2019 | 2889 | USPS | SALES POSTCARDS | 954.31 | 954.31 |
| 2/15/2019 | 2890 | CONCENTRA/US HEALTHWORKS | DRUG SCREENS | 130.00 | 130.00 |
| 2/15/2019 | 2891 | PITNEY BOWES | POSTAGE | 62.93 | 62.93 |
| 2/15/2019 | 2888 | IGLESIAS TRUCKING | CONTRACTOR | 225.00 | 225.00 |
| 2/19/2019 | DEBIT | AQUA CHILL | OFFICE WATER COOLER | 67.40 | 67.40 |
| 2/20/2019 | DEBIT | PRUDENTIAL | OFFICER'S INS | 528.75 | 528.75 |
| 2/20/2019 | DEBIT | PRUDENTIAL | OFFICER'S INS | 528.75 | 528.75 |
| 2/20/2019 | DEBIT | PRUDENTIAL | OFFICER'S INS | 528.75 | 528.75 |
| 2/20/2019 | DEBIT | SDGE | UTILITY DEBIT | 3,411.84 | 3,411.84 |
| 2/21/2019 | DEBIT | ANALYSIS FEE | BANK FEE | 1,148.71 | 1,148.71 |
| 2/21/2019 | DEBIT | AMERICAN GEN LIF INS | OFFICER'S INS | 380.98 | 380.98 |
| 2/22/2019 | DEBIT | AMERITAS INS | OFFICER'S INS | 345.74 | 345.74 |
| 2/19/2019 | DEBIT | FLYERS ENERGY | FUEL/LOCAL | 1,556.04 | 1,556.04 |
| 2/19/2019 | WIRE | COMDATA | FUEL/DRIVERS | 4,828.50 | 4,828.50 |
| 2/18/2019 | 2447 | LONNA O'CONNOR | CUSTOMER REFUND/CLAIM | 200.00 | 200.00 |
| 2/19/2019 | 2847 | SAN DIEGO LANDFILL | TRASH REMOVAL | 618.92 | 618.92 |
| 2/19/2019 | 2448 | CONNIE MARINELLO | CUSTOMER REFUND/CLAIM | 1,616.82 | 1,616.82 |
| 2/19/2019 | 2449 | DARYL/SARAH AKIOKA | CUSTOMER REFUND/CLAIM | 400.00 | 400.00 |
| 2/19/2019 | 2892 | USPS | SALES POSTCARDS | 468.69 | 468.69 |
| 2/19/2019 | 2893 | STACEY ROMERO | CONTRACTOR | 430.00 | 430.00 |
| 2/19/2019 | 2894 | AMSA | DUES/SUSBS-INDUSTRY | 1,000.00 | 1,000.00 |
| 2/20/2019 | ACH | ACCESS ACCOUNTING | CONTRACTOR | 2,690.71 | 2,690.71 |
| 2/20/2019 | ACH | CHRIS CARLSSON | CONTRACTOR | 1,781.40 | 1,781.40 |
| 2/20/2019 | PAYROLL | NET CKS-TERMINATIONS | PAYROLL | 5,198.18 | 5,198.18 |
| 2/20/2019 | PAYROLL | NET CKS-TERMINATIONS | PAYROLL | 757.31 | 757.31 |
| 2/20/2019 | PAYROLL | DIRECT DEPOSITS | PAYROLL | 22,916.87 | 22,916.87 |
| 2/20/2019 | PAYROLL | TAX LIAB | PAYROLL | 12,343.61 | 12,343.61 |
| 2/20/2019 | PAYROLL | NET CKS-REGULAR | PAYROLL | 580.54 | 580.54 |
| 2/20/2019 | ACH | MOVING MANAGEMENT | CONTRACTOR | 16,008.37 | 16,008.37 |
| 2/20/2019 | 2896 | DMV RENEWAL | TRUCK LICENSE/REGISTRATION | 1,947.00 | 1,947.00 |
| 2/20/2019 | 2897 | ORKIN | PEST CONTROL | 201.41 | 201.41 |
| 2/20/2019 | 2898 | IRS | ADDL PR TAX | 790.47 | 790.47 |
| 2/20/2019 | 2900 | VANLINER INS | INSURANCE | 96.00 | 96.00 |
| 2/20/2019 | 2902 | DMV RENEWAL | TRUCK LICENSE/REGISTRATION | 306.00 | 306.00 |
| 2/21/2019 | ACH | ADAN HERNANDEZ | CONTRACTOR | 1,656.05 | 1,656.05 |
| 2/21/2019 | ACH | HERMAN JONES | CONTRACTOR | 1,520.79 | 1,520.79 |
| 2/21/2019 | 2904 | IGNACIO RAMIREZ | CONTRACTOR | 2,550.92 | 2,550.92 |
| 2/21/2019 | 2905 | EP LOGISTICS | CONTRACTOR | 1,385.28 | 1,385.28 |
| 2/21/2019 | 2906 | HE TRUCKING/HECTOR | CONTRACTOR | 4,806.69 | 4,806.69 |
| 2/21/2019 | 2907 | IGLESIAS TRUCKING | CONTRACTOR | 1,275.43 | 1,275.43 |
| 2/21/2019 | 2908 | KIRK WALTERS | CONTRACTOR | 1,485.20 | 1,485.20 |
| 2/21/2019 | 2909 | GARCIA'S MOVING/PETE | CONTRACTOR | 789.24 | 789.24 |
| 2/21/2019 | 2910 | PUGA RELOCATIONS | CONTRACTOR | 12,531.68 | 12,531.68 |
| 2/21/2019 | 2911 | QUICKLINE/ROLANDO | CONTRACTOR | 1,999.51 | 1,999.51 |

EXHIBIT A

| Date | Num | Payee | Description | | Amount | Amount |
|---|---|---|---|---|---|---|
| 2/21/2019 | | | | | 8,017.25 | 8,017.25 |
| 2/21/2019 | 2913 | JUST MOVING UP INC | CONTRACTOR | | 635.78 | 635.78 |
| 2/21/2019 | 2914 | SG MOVING | CONTRACTOR | | 6,029.70 | 6,029.70 |
| 2/21/2019 | 2915 | STRESS FREE MOVING | CONTRACTOR | | 1,636.12 | 1,636.12 |
| 2/21/2019 | 2916 | VERA RELOCATIONS | CONTRACTOR | | 1,255.41 | 1,255.41 |
| 2/21/2019 ACH | | BRENDA RAYFIELD | CONTRACTOR | | 1,255.00 | 1,255.00 |
| 2/21/2019 DEBIT | | ANALYSIS FEE | BANK FEE | | 260.00 | 260.00 |
| 2/21/2019 DEBIT | | REPUBLIC SERVICES | TRASH REMOVAL | | 1,751.00 | 1,751.00 |
| 2/20/2019 | 2901 | GARCIA'S MOVING/PETE | CONTRACTOR | | 400.00 | 400.00 |
| 2/21/2019 | 2451 | PHILIP SHAVER//CLAIM | CUSTOMER REFUND/CLAIM | | 2,845.00 | 2,845.00 |
| 2/21/2019 | 2452 | AVANTGEN//CLAIM | CUSTOMER REFUND/CLAIM | | 1,010.00 | 1,010.00 |
| 2/21/2019 | 2903 | USPS | SALES POSTCARDS | | 316.05 | 316.05 |
| 2/21/2019 | 2917 | IGLESIAS TRUCKING | CONTRACTOR | | 500.00 | 500.00 |
| 2/21/2019 | 2453 | HEAVY DUTY MOBILE | TRUCK REPAIRS | | 1,440.00 | 1,440.00 |
| 2/22/2019 DEBIT | | CALIFORNIA CHOICE INS | GROUP HEALTH INS | | 21,992.18 | 21,992.18 |
| 2/22/2019 | 2921 | COX CABLE | PHONE LINE | | 101.78 | 101.78 |
| 2/22/2019 | 2922 | JOHNSON CONTROLS | SECURITY | | 19.52 | 19.52 |
| 2/22/2019 | 2918 | USPS | SALES POSTCARDS | | 493.29 | 493.29 |
| 2/22/2019 | 2919 | STRESS FREE MOVING | CONTRACTOR | | 800.00 | 800.00 |
| 2/22/2019 | 2920 | VERA RELOCAITONS | CONTRACTOR | | 1,500.00 | 1,500.00 |
| 2/22/2019 WIRE | | COMDATA | FUEL/DRIVERS | | 7,036.50 | 7,036.50 |
| 2/25/2019 DEBIT | | SDGE | UTILITY DEBIT/BONSALL | | 437.73 | 437.73 |
| 2/26/2019 PAYROLL | | SALES PR 401K | PAYROLL 401K | 599.84 | | 599.84 |
| 2/26/2019 DEBIT | | SDGE | UTILITY DEBIT/SUITE 1 | | 903.38 | 903.38 |
| 2/28/2019 WIRE | | ACCESS ACCOUNTING | CONTRACTOR | | 2,909.31 | 2,909.31 |
| 2/25/2019 DEBIT | | ATT/BONSALL | INTERNET/BONSALL | | 80.03 | 80.03 |
| 2/25/2019 DEBIT | | FLYERS ENERGY | FUEL/LOCAL | | 1,420.10 | 1,420.10 |
| 2/25/2019 | 2848 | OTAY LANDFILL | TRASH REMOVAL | | 611.43 | 611.43 |
| 2/26/2019 PAYROLL | | SALES PR DIR DEP | SALES PAYROLL | 10,160.65 | | 10,160.65 |
| 2/26/2019 PAYROLL | | SALES PR TAX LIAB/INV | SALES PAYROLL | 7,203.05 | | 7,203.05 |
| 2/26/2019 PAYROLL | | SALES PR NET CKS | SALES PAYROLL | 3,420.58 | | 3,420.58 |
| 2/26/2019 WIRE | | COMDATA | FUEL/DRIVERS | | 2,926.00 | 2,926.00 |
| 2/26/2019 DEBIT | | C/C CHARGEBACK | CUSTOMER REFUND | | 250.00 | 250.00 |
| 2/26/2019 | 2456 | OTAY LANDFILL | TRASH REMOVAL | | 152.79 | 152.79 |
| 2/26/2019 | 2458 | WESTERN EQ FINANCE | ADEQUATE PROT PAYMENT | | 140.00 | 140.00 |
| 2/26/2019 | 2459 | WESTERN EQ FINANCE | ADEQUATE PROT PAYMENT | | 271.00 | 271.00 |
| 2/26/2019 | 2460 | TRANS ADVANTAGE | ADEQUATE PROT PAYMENT | | 2,347.37 | 2,347.37 |
| 2/26/2019 | 2461 | BB&T | ADEQUATE PROT PAYMENT | | 679.00 | 679.00 |
| 2/26/2019 | 2462 | BB&T | ADEQUATE PROT PAYMENT | | 580.00 | 580.00 |
| 2/26/2019 | 2463 | WELLS FARGO LEASING | ADEQUATE PROT PAYMENT | | 2,415.08 | 2,415.08 |
| 2/26/2019 | 2923 | USPS | SALES POSTCARDS | | 540.80 | 540.80 |
| 2/26/2019 | 2924 | DMV RENEWAL | TRUCK LICENSE/REGISTRATION | | 35.00 | 35.00 |
| 2/26/2019 | 2925 | STACEY ROMERO | CONTRACTOR | | 395.00 | 395.00 |
| 2/27/2019 ACH | | VICTOR TENORIO/SALES COMM | SALES COMMISSION | | 6,888.51 | 6,888.51 |
| 2/27/2019 DEBIT | | GOOGLE ADS | SALES LEADS | | 500.00 | 500.00 |
| 2/27/2019 PAYROLL | | 3/1/19 DIRECT DEPOSITS | PAYROLL | 23,564.31 | | 23,564.31 |
| 2/28/2019 PAYROLL | | 3/1/19 TAX LIABILITY | PAYROLL | 9,583.46 | | 9,583.46 |
| 2/28/2019 | 2927 | IGNACIO RAMIREZ/OTR | CONTRACTOR | | 7,787.92 | 7,787.92 |
| 2/28/2019 | 2928 | EP LOGISTICS | CONTRACTOR | | 2,384.24 | 2,384.24 |
| 2/28/2019 | 2929 | HE TRUCKING/HECTOR | CONTRACTOR | | 1,422.96 | 1,422.96 |
| 2/28/2019 | 2930 | IGLESIAS TRUCKING | CONTRACTOR | | 3,638.05 | 3,638.05 |
| 2/28/2019 | 2931 | KIRK WALTERS | CONTRACTOR | | 1,378.37 | 1,378.37 |
| 2/28/2019 | 2932 | GARCIA'S MOVING/PETE | CONTRACTOR | | 1,031.29 | 1,031.29 |
| 2/28/2019 | 2933 | PUGA RELOCATIONS | CONTRACTOR | | 12,122.68 | 12,122.68 |
| 2/28/2019 | 2934 | QUICKLINE/ROLANDO | CONTRACTOR | | 2,076.59 | 2,076.59 |
| 2/28/2019 | 2935 | IGANCIO RAMIREZ | CONTRACTOR | | 5,381.34 | 5,381.34 |
| 2/28/2019 | 2936 | SG MOVING | CONTRACTOR | | 7,917.80 | 7,917.80 |
| 2/28/2019 | 2937 | STRESS FREE MOVING | CONTRACTOR | | 167.95 | 167.95 |
| 2/28/2019 | 2938 | VERA RELOCATIONS | CONTRACTOR | | 114.81 | 114.81 |
| 2/28/2019 ACH | | HERMAN JONES | CONTRACTOR | | 1,115.97 | 1,115.97 |
| 2/28/2019 ACH | | JOAQUIN TREJO | CONTRACTOR | | 2,197.54 | 2,197.54 |
| 2/28/2019 ACH | | SARTAIN TRUCKING/TERRY | CONTRACTOR | | 1,010.34 | 1,010.34 |

EXHIBIT A

| Date | | Payee | Description | | | Amount | Amount |
|---|---|---|---|---|---|---|---|
| 2/28/2019 | | | | | | 1,255.00 | 1,255.00 |
| 2/28/2019 | 2926 | USPS | | | | 526.61 | 526.61 |
| 2/1/2019 | NETSPEND | SANDAG/SR-125 | TOLLS | | | 300.00 | 300.00 |
| 2/1/2019 | NETSPEND | LIQUID WEB | DUES/SUBS | | | 113.00 | 113.00 |
| 2/1/2019 | NETSPEND | MAILSOURCE | LEADS | | | 210.00 | 210.00 |
| 2/1/2019 | NETSPEND | EQUATE MEDIA | SALES LEADS | | | 500.00 | 500.00 |
| 2/1/2019 | NETSPEND | 123MOVERS.COM | SALES LEADS | | | 500.00 | 500.00 |
| 2/1/2019 | NETSPEND | BETTER BUSINESS BUREAU | DIRECTORY | | | 200.00 | 200.00 |
| 2/1/2019 | NETSPEND | INTUIT | DUES/SUBS | | | 35.00 | 35.00 |
| 2/1/2019 | NETSPEND | AMAZON | OFFICE | | | 55.53 | 55.53 |
| 2/1/2019 | NETSPEND | RELO SOLUTIONS | 3RD PARTY | | | 710.73 | 710.73 |
| 2/1/2019 | NETSPEND | RELO SOLUTIONS | 3RD PARTY SVCS | | | 163.58 | 163.58 |
| 2/1/2019 | NETSPEND | RELO SOLUTIONS | 3RD PARTY SVC | | | 205.27 | 205.27 |
| 2/2/2019 | NETSPEND | ADOBE | DUES/SUBS | | | 19.99 | 19.99 |
| 2/2/2019 | NETSPEND | ADOBE | DUES/SUBS | | | 52.99 | 52.99 |
| 2/2/2019 | NETSPEND | REALTOR.COM | SALESLEADS | | | 500.00 | 500.00 |
| 2/3/2019 | NETSPEND | GOOGLE | SALES LEADS | | | 500.00 | 500.00 |
| 2/3/2019 | NETSPEND | AMAZON | AXLE BEARING TOOL | | | 227.97 | 227.97 |
| 2/4/2019 | NETSPEND | MIRA MAR TRUCK CTR | PARTS | | | 333.03 | 333.03 |
| 2/4/2019 | NETSPEND | AMAZON | OFFICE | | | 29.42 | 29.42 |
| 2/4/2019 | NETSPEND | AMAZON | OFFICE | | | 21.62 | 21.62 |
| 2/4/2019 | NETSPEND | SAN DIEGO CITY | PARKING VIOLATION | | | 108.00 | 108.00 |
| 2/5/2019 | NETSPEND | BROTHER'S TOWING | TOW | | | 500.00 | 500.00 |
| 2/5/2019 | NETSPEND | TIM MKTG | SALES LEADS | | | 380.88 | 380.88 |
| 2/5/2019 | NETSPEND | MIRA MAR TRUCK CTR | TRUCK PARTS | | | 968.36 | 968.36 |
| 2/5/2019 | NETSPEND | FLEETPRIDE | TRUCK BATTERIES | | | 451.44 | 451.44 |
| 2/5/2019 | NETSPEND | MISSION JANITORIAL | JANITORIAL SUPPLIES | | | 463.53 | 463.53 |
| 2/6/2019 | NETSPEND | LOWES | WSE SUPPLIES | | | 136.13 | 136.13 |
| 2/6/2019 | NETSPEND | INTERMEDIA | EMAIL SERVER | | | 1,292.66 | 1,292.66 |
| 2/6/2019 | NETSPEND | AMAZON | CAB SHOCKS/TRK PARTS | | | 99.71 | 99.71 |
| 2/6/2019 | NETSPEND | WALMART | WSE SUPPLIES | | | 69.89 | 69.89 |
| 2/6/2019 | NETSPEND | AMERICAN BATTERY | TRUCK BATTERIES | | | 209.05 | 209.05 |
| 2/7/2019 | NETSPEND | ROAD ONE TOWING | TOW | | | 326.00 | 326.00 |
| 2/7/2019 | NETSPEND | AMAZON | OFFICE | | | 49.99 | 49.99 |
| 2/7/2019 | NETSPEND | DION INT'L | TRUCK PARTS | | | 387.85 | 387.85 |
| 2/7/2019 | NETSPEND | DOUG'S FILTER SVC | TRUCK PARTS | | | 53.39 | 53.39 |
| 2/7/2019 | NETSPEND | WENDOVER | SALES LEADS | | | 2,070.00 | 2,070.00 |
| 2/7/2019 | NETSPEND | WALMART | WSE | | | 27.12 | 27.12 |
| 2/7/2019 | NETSPEND | NETSPEND | DEBIT CARD FEE | | | 1.95 | 1.95 |
| 2/8/2019 | NETSPEND | MAILSOURCE | SALES LEADS | | | 210.00 | 210.00 |
| 2/8/2019 | NETSPEND | EQUATE MEDIA | SALES LEADS | | | 500.00 | 500.00 |
| 2/8/2019 | NETSPEND | DROPBOX | DUES/SUBS | | | 75.00 | 75.00 |
| 2/8/2019 | NETSPEND | LOWES | CRATING WOOD | | | 761.15 | 761.15 |
| 2/8/2019 | NETSPEND | AMERICAN BATTERY | TRUCK BATTERIES | | | 374.61 | 374.61 |
| 2/8/2019 | NETSPEND | SPEMCO SWITCHES | WSE SWEEPER | | | 19.25 | 19.25 |
| 2/8/2019 | NETSPEND | CARBONLESS ON DEMAND | 2 PART PAPER | | | 1,253.68 | 1,253.68 |
| 2/8/2019 | NETSPEND | ULINE | WSE | | | 183.27 | 183.27 |
| 2/9/2019 | NETSPEND | REALTOR.COM | SALES LEADS | | | 500.00 | 500.00 |
| 2/9/2019 | NETSPEND | DRI CRASH PLAN | DUES/SUBS | | | 19.98 | 19.98 |
| 2/9/2019 | NETSPEND | DRI CRASH PLAN | DUES/SUBS | | | 49.95 | 49.95 |
| 2/10/2019 | NETSPEND | AMAZON | WSE SUPPLIES | | | 164.95 | 164.95 |
| 2/10/2019 | NETSPEND | QUALITY INN | OPS/CLAIMS TRAVEL | | | 323.44 | 323.44 |
| 2/11/2019 | NETSPEND | SUPER COURT | DOCUMENTS | | | 35.67 | 35.67 |
| 2/12/2019 | NETSPEND | AMAZON | WSE SUPPLIES | | | 70.04 | 70.04 |
| 2/12/2019 | NETSPEND | ZOHO | DUES/SUBS | | | 15.00 | 15.00 |
| 2/12/2019 | NETSPEND | SANDAG/SR125 | TOLLS | | | 40.00 | 40.00 |
| 2/12/2019 | NETSPEND | EQUATE MEDIA | SALES LEADS | | | 500.00 | 500.00 |
| 2/12/2019 | NETSPEND | MINUTE KEY | KEY | | | 6.47 | 6.47 |
| 2/12/2019 | NETSPEND | BEST BUY | TONER | | | 177.25 | 177.25 |
| 2/12/2019 | NETSPEND | BEST BUY | TONER | | | 117.43 | 117.43 |
| 2/12/2019 | NETSPEND | AMAZON | WSE SUPPLIES/CRATING | | | 296.33 | 296.33 |
| 2/12/2019 | NETSPEND | VONNS | OFFICE | | | 69.73 | 69.73 |
| 2/13/2019 | NETSPEND | BETTER BUSINES BUREAU | MARKETING | | | 700.00 | 700.00 |
| 2/14/2019 | NETSPEND | VEGA CAFE | SALES MEETING | | | 89.59 | 89.59 |
| 2/14/2019 | NETSPEND | VEGA CAFE | SALES MEETING | | | 7.25 | 7.25 |
| 2/14/2019 | NETSPEND | INDUSTRIAL SUPPLY | WSE ADHESIVE | | | 369.00 | 369.00 |
| 2/14/2019 | NETSPEND | EQUATE MEDIA | SALES LEADS | | | 500.00 | 500.00 |
| 2/14/2019 | NETSPEND | NETSPEND | DEBIT CARD FEE | | | 1.95 | 1.95 |
| 2/14/2019 | NETSPEND | NETSPEND | DEBIT CARD FEE | | | 1.95 | 1.95 |
| 2/15/2019 | NETSPEND | MAILSOURCE | SALES LEADS | | | 210.00 | 210.00 |
| 2/15/2019 | NETSPEND | AMAZON | MTCE/TOOL | | | 168.93 | 168.93 |
| 2/15/2019 | NETSPEND | TMI MKTG | SALES LEADS | | | 455.40 | 455.40 |

EXHIBIT A

| Date | | Payee | Description | Amount | Amount |
|---|---|---|---|---|---|
| 2/16/2019 | NETSPEND | | SUB LEADS | 39.68 | 39.68 |
| 2/17/2019 | NETSPEND | MOVE HQ | | 967.00 | 967.00 |
| 2/18/2019 | NETSPEND | EQUATE MEDIA | SALES LEADS | 500.00 | 500.00 |
| 2/18/2019 | NETSPEND | MIRAMAR TRUCK CTR | PARTS/TSARTAIN | 1,149.66 | 1,149.66 |
| 2/18/2019 | NETSPEND | AMAZON | OFFICE | 30.00 | 30.00 |
| 2/18/2019 | NETSPEND | ROAD ONE TOWING | TOWING | 352.00 | 352.00 |
| 2/18/2019 | NETSPEND | BEST BUY | OFFICE | 162.34 | 162.34 |
| 2/19/2019 | NETSPEND | APPLE | DUES/SUBS | 2.99 | 2.99 |
| 2/19/2019 | NETSPEND | AMAZON | OFFICE | 21.26 | 21.26 |
| 2/19/2019 | NETSPEND | QUILL CORP | OFFICE SUPPLIES | 228.05 | 228.05 |
| 2/19/2019 | NETSPEND | AMAZON | OFFICE | 74.99 | 74.99 |
| 2/19/2019 | NETSPEND | INTL ASSOC OF MOVERS | ANNUAL MEMBERSHIP | 950.00 | 950.00 |
| 2/20/2019 | NETSPEND | WETMORE'S SAN MARCOS | TRUCK PARTS/SARTAIN | 192.13 | 192.13 |
| 2/20/2019 | NETSPEND | SMALL BUSINESS NETWORK | SALES/MKTG MEMBERSHIP | 295.00 | 295.00 |
| 2/20/2019 | NETSPEND | REALTOR.COM | SALES LEADS | 500.00 | 500.00 |
| 2/20/2019 | NETSPEND | ADOBE | PRO SUBS | 179.88 | 179.88 |
| 2/20/2019 | NETSPEND | AMAZON | ICE MACH MTCE/WSE | 150.38 | 150.38 |
| 2/20/2019 | NETSPEND | CMSA | MONTHLY MEETING | 130.00 | 130.00 |
| 2/20/2019 | NETSPEND | VONS | SALESMTG | 75.00 | 75.00 |
| 2/21/2019 | NETSPEND | BETTER BUSINESS BUREAU | MEMBERSHIP | 58.00 | 58.00 |
| 2/21/2019 | NETSPEND | WESTERN CTR | CTR RENTAL/BONSALL | 435.81 | 435.81 |
| 2/21/2019 | NETSPEND | BEST BUY | TONER | 117.43 | 117.43 |
| 2/21/2019 | NETSPEND | BEST BUY | TONER | 117.43 | 117.43 |
| 2/21/2019 | NETSPEND | BEST BUY | TONER | 182.23 | 182.23 |
| 2/21/2019 | NETSPEND | BEST BUY | TONER | 108.82 | 108.82 |
| 2/22/2019 | NETSPEND | MAIL SOURCE | LEADS | 210.00 | 210.00 |
| 2/22/2019 | NETSPEND | PENSKE TRUCK LEASING | TRUCK RENTAL | 281.17 | 281.17 |
| 2/22/2019 | NETSPEND | 123MOVERS.COM | SALES LEADS | 500.00 | 500.00 |
| 2/22/2019 | NETSPEND | NORTH CTY FORD PARTS | TRUCK PARTS | 254.25 | 254.25 |
| 2/22/2019 | NETSPEND | AMAZON | WSE SUPPLIES | 17.36 | 17.36 |
| 2/22/2019 | NETSPEND | OIL CHANGER | TRUCK-OIL CHANGE | 223.41 | 223.41 |
| 2/23/2019 | NETSPEND | PENSKE TRUCK LEASING | TRUCK RENTAL | 1.13 | 1.13 |
| 2/23/2019 | NETSPEND | AMAZON | WSE SUPPLIES | 21.93 | 21.93 |
| 2/23/2019 | NETSPEND | TOP MOVING LEADS | SALES LEADS | 499.00 | 499.00 |
| 2/24/2019 | NETSPEND | SANDA/SR-125 | TOLL ACCT | 300.00 | 300.00 |
| 2/24/2019 | NETSPEND | GOOGLE ADS | SALES LEADS | 500.00 | 500.00 |
| 2/24/2019 | NETSPEND | REALTOR.COM | SALES LEADS | 500.00 | 500.00 |
| 2/25/2019 | NETSPEND | PAY-4-PERFORMANCE | MKTG LEADS | 1,329.30 | 1,329.30 |
| 2/25/2019 | NETSPEND | EW TRUCK & EQUIP | PARTS/HE TRUCKING | 596.49 | 596.49 |
| 2/25/2019 | NETSPEND | AMAZON | DOOR LOCKS/FACILITY | 80.46 | 80.46 |
| 2/25/2019 | NETSPEND | AUTOZONE | PARTS | 15.14 | 15.14 |
| 2/26/2019 | NETSPEND | DNH GO DADDY.COM | GOLD COAST MVG/SITE | 387.37 | 387.37 |
| 2/26/2019 | NETSPEND | USPS | POSTAGE/GENERAL | 7.35 | 7.35 |
| 2/26/2019 | NETSPEND | UPS | O/N MAIL | 30.95 | 30.95 |
| 2/26/2019 | NETSPEND | BENNETT CRONE LUMBER | CRATING LUMBER | 804.75 | 804.75 |
| 2/27/2019 | NETSPEND | QUILL | OFFICE SUPPLIES | 110.64 | 110.64 |
| 2/27/2019 | NETSPEND | EW TRUCK & EQUIP | PARTS | 101.15 | 101.15 |
| 2/27/2019 | NETSPEND | AMAZON | WSE SUPPLIES | 25.80 | 25.80 |
| 2/27/2019 | NETSPEND | CMSA | DUES/SUBS | 615.00 | 615.00 |
| 2/27/2019 | NETSPEND | WA STATE | TOLL FINE/SARTAIN | 17.50 | 17.50 |
| 2/28/2019 | NETSPEND | CHOICE LOCAL | PRIORITY WEBSITE | 1,984.00 | 1,984.00 |
| 2/28/2019 | NETSPEND | REALTOR.COM | SALES LEADS | 500.00 | 500.00 |
| 2/28/2019 | NETSPEND | LOWES | WSE/BOLTS | 8.67 | 8.67 |
| | | | | | 0.00 |
| | | | | | 0.00 |
| | | | | | 0.00 |
| | | | | | 0.00 |
| | | | | | 0.00 |
| | | | | | 0.00 |
| | | | | | 0.00 |
| | | | | | 0.00 |
| | | | | | 0.00 |
| | | | | | 0.00 |
| | | | | | 0.00 |
| | | | | | 0.00 |
| | | | | | 0.00 |
| | | | | | 0.00 |
| | | | | | 0.00 |
| | | | | | 0.00 |
| | | | | | 0.00 |

EXHIBIT A

| | |
|---|---:|
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |

| | | | |
|---|---:|---:|---:|
| less change in netspend balance | | 1,015.75 | 1,015.75 |
| TOTAL DISBURSEMENTS THIS PERIOD: | 169,684.50 | 627,631.06 | 797,315.56 |

EXHIBIT A

GENERAL ACCOUNT
BANK RECONCILIATION

| Bank statement Date: | 2/28/2019 | Balance on Statement: | $596,729.00 |
|---|---|---|---|

Plus deposits in transit (a):

| | Deposit Date | Deposit Amount | |
|---|---|---|---|
| | 2/28/2019 | $0.00 | |
| * floating from Main to NetSpend | | 0.00 | |
| TOTAL DEPOSITS IN TRANSIT | | | 0.00 |

Less Outstanding Checks (a):

| | Check Number | Check Date | Check Amount |
|---|---|---|---|
| | 209036 | 9/5/2018 | 231.74 |
| | 209056 | 9/7/2018 | 20.26 |
| | 209082 | 9/14/2018 | 105.49 |
| | 209166 | 9/26/2018 | 300.00 |
| | 2227 | 11/15/2018 | 23.73 |
| x | 2603 | 12/13/2018 | 210.00 |
| | 2425 | 1/28/2019 | 180.00 |
| | 2431 | 1/31/2019 | 7,168.25 |
| | 2853 | 2/7/2019 | 39.81 |
| | 2844 | 2/7/2019 | 275.00 |
| | 2880 | 2/14/2019 | 48.25 |
| | 2875 | 2/14/2019 | 418.00 |
| | 2448 | 2/19/2019 | 1,616.82 |
| | 2449 | 2/19/2019 | 400.00 |
| | 2913 | 2/21/2019 | 635.78 |
| | 2451 | 2/21/2019 | 2,845.00 |
| | 2452 | 2/21/2019 | 1,010.00 |
| | 2922 | 2/22/2019 | 19.52 |
| | 2923 | 2/26/2019 | 540.80 |
| | 2927 | 2/28/2019 | 7,787.92 |
| | 2928 | 2/28/2019 | 2,384.24 |
| | 2929 | 2/28/2019 | 1,422.96 |
| | 2930 | 2/28/2019 | 3,638.05 |
| | 2931 | 2/28/2019 | 1,378.37 |
| | 2932 | 2/28/2019 | 1,031.29 |
| | 2933 | 2/28/2019 | 12,122.68 |
| | 2934 | 2/28/2019 | 2,076.59 |
| | 2935 | 2/28/2019 | 5,381.34 |
| | 2936 | 2/28/2019 | 7,917.80 |
| | 2937 | 2/28/2019 | 167.95 |
| | 2938 | 2/28/2019 | 114.81 |
| | PR TRSFR | 2/28/2019 | 9,583.46 |
| | 2926 | 2/28/2019 | 526.65 |

EXHIBIT A

Incoming net outstanding checks                    (90,812.12)

TOTAL OUTSTANDING CHECKS Balance:                              (19,189.56)

Current outstanding checks                          71,622.56

Bank Statement Adjustments:

Explanation of Adjustments-

ADJUSTED BANK BALANCE:                                        $615,918.56

\* It is acceptable to replace this form with a similar form

\*\* Please attach a detailed explanation of any bank statement adjustment

EXHIBIT A

I. CASH RECEIPTS AND DISBURSEMENTS
B. (PAYROLL ACCOUNT)

1. TOTAL RECEIPTS PER ALL PRIOR PAYROLL ACCOUNT REPORTS         836,003.97

2. LESS:  TOTAL DISBURSEMENTS PER ALL PRIOR PAYROLL         828,172.58
ACCOUNT REPORTS

3. BEGINNING BALANCE:         7,987.25

4. RECEIPTS DURING CURRENT PERIOD:         177,792.78
   (Transferred from General Account)

5. BALANCE:         169,805.53

6. LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD
   TOTAL DISBURSEMENTS THIS PERIOD:***         169,684.50

7. ENDING BALANCE:         8,108.28

8. PAYROLL Account Number(s):         Bank of The West 2875

   Depository Name & Location:         8690 Centre Dr
   La Mesa, CA   91942

Note.  Payroll account is 0 debit account so all amounts come out of the
general account.

EXHIBIT A

# TOTAL DISBURSEMENTS FROM PAYROLL ACCOUNT FOR CURRENT PERIOD

| Date mm/dd/yyyy | Check Number | Payee* see attached for payroll register | Purpose | Amount |
|---|---|---|---|---|
| 2/1/2019 | 2825 | JACOB RODRIGUEZ | PAYROLL | 112.00 |
| 2/6/2019 | PAYROLL | DIRECT DEPOSITS | 2/8/18 PAYROLL | 24,594.56 |
| 2/6/2019 | PAYROLL | TAX LIAB | 2/8/18 PAYROLL | 10906.1 |
| 2/6/2019 | PAYROLL | NET CKS | 2/8/18 PAYROLL | 1,171.05 |
| 2/13/2019 | PAYROLL | 401K | PAYROLL | 315.81 |
| 2/13/2019 | PAYROLL | DIRECT DEPOSITS | PAYROLL | 24570.56 |
| 2/13/2019 | PAYROLL | TAX LIABILITY | PAYROLL | 10,670.17 |
| 2/13/2019 | PAYROLL | NET CKS | PAYROLL | 1,015.85 |
| 2/20/2019 | PAYROLL | NET CKS-TERMINATIONS | PAYROLL | 5,198.18 |
| 2/20/2019 | PAYROLL | NET CKS-TERMINATIONS | PAYROLL | 757.31 |
| 2/20/2019 | PAYROLL | DIRECT DEPOSITS | PAYROLL | 22,916.87 |
| 2/20/2019 | PAYROLL | TAX LIAB | PAYROLL | 12,343.61 |
| 2/20/2019 | PAYROLL | NET CKS-REGULAR | PAYROLL | 580.54 |
| 2/26/2019 | PAYROLL | SALES PR 401K | PAYROLL 401K | 599.84 |
| 2/26/2019 | PAYROLL | SALES PR DIR DEP | SALES PAYROLL | 10,160.65 |
| 2/26/2019 | PAYROLL | SALES PR TAX LIAB/INV | SALES PAYROLL | 7,203.05 |
| 2/26/2019 | PAYROLL | SALES PR NET CKS | SALES PAYROLL | 3,420.58 |
| 2/27/2019 | PAYROLL | 3/1/19 DIRECT DEPOSITS | PAYROLL | 23,564.31 |
| 2/28/2019 | PAYROLL | 3/1/19 TAX LIABILITY | PAYROLL | 9,583.46 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | TOTAL DISBURSEMENTS THIS PERIOD: | 169,684.50 |
| | | | | |
| | | Direct Deposit and net checks for Dec Payroll | | |
| | | | 2/1-2/28 | 118,062 |
| | | Transferred in Jan disbursements to Feb Payroll | | 24,412 |
| | | March Payroll transferred on 2/28 | $ | (23,564) |
| | | Manual check | | -112.00 |
| | | P/R from check register | | 118,798 |
| | | Checks per payroll check register | | 118,798 |
| | | | | |
| | | | | |
| | | | | EXHIBIT A |

PAYROLL ACCOUNT

## BANK RECONCILIATION

Bank statement Date: <u>2/28/2019</u>    Balance on Statement: <u>$8,108.28</u>

Plus deposits in transit (a):

| Deposit Date | Deposit Amount |
|---|---|
| 2/28/2019 | 9,583.46 |
| | |
| | |
| | |
| | |

TOTAL DEPOSITS IN TRANSIT    | 9,583.46 |

Less Outstanding Checks (a):

| Check Number | Check Date | Check Amount |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

TOTAL OUTSTANDING CHECKS:    | 0.00 |

Bank Statement Adjustments:    _____
Explanation of Adjustments-

| |
|---|

ADJUSTED BANK BALANCE:    | $17,691.74 |

* It is acceptable to replace this form with a similar form
** Please attach a detailed explanation of any bank statement adjustment

Note.  Payroll account is 0 debit account, so all amounts come out of the
general account.

EXHIBIT A

I. CASH RECEIPTS AND DISBURSEMENTS
C. (TAX ACCOUNT)

| | |
|---|---|
| 1. TOTAL RECEIPTS PER ALL PRIOR TAX ACCOUNT REPORTS | 273,100.48 |
| 2. LESS: TOTAL DISBURSEMENTS PER ALL PRIOR TAX ACCOUNT REPORTS | 273,100.48 |
| 3. BEGINNING BALANCE: | - |
| 4. RECEIPTS DURING CURRENT PERIOD:<br>(Transferred from General Account) | 50,706.39 |
| 5. BALANCE: | 50,706.39 |
| 6. LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD<br>TOTAL DISBURSEMENTS THIS PERIOD:*** | 50,706.39 |
| 7. ENDING BALANCE: | 0.00 |

8. TAX Account Number(s):                    Pay-Net L120

Depository Name & Location:              505 South Buena Vista Rd
                                                          Corona, CA  92882

Note:  The Debtor does not actually have a tax account.   Taxes are taken from the general
account with payroll and are paid by the payroll processor.

EXHIBIT A

TOTAL DISBURSEMENTS FROM TAX ACCOUNT FOR CURRENT PERIOD

| Date mm/dd/yyyy | Check Number | Payee | Purpose | Amount |
|---|---|---|---|---|
| 2/6/2019 | Debit | TAX LIAB | 2/8/18 PAYROLL | 10,906.10 |
| 2/13/2019 | Debit | TAX LIABILITY | PAYROLL | 10,670.17 |
| 2/20/2019 | Debit | TAX LIAB | PAYROLL | 12,343.61 |
| 2/26/2019 | Debit | SALES PR TAX LIAB/INV | SALES PAYROLL | 7,203.05 |
| 2/28/2019 | Debit | 3/1/19 TAX LIABILITY | PAYROLL | 9,583.46 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

TOTAL DISBURSEMENTS THIS PERIOD:   50,706.39

EXHIBIT

TAX ACCOUNT
BANK RECONCILIATION

Bank statement Date:    ___1/31/2019___    Balance on Statement:    ___$0.00___

Plus deposits in transit (a):

|  | Deposit Date | Deposit Amount |
|---|---|---|
|  | _____ | _____ |
|  | _____ | _____ |
|  | _____ | _____ |
|  | _____ | _____ |
|  | _____ | _____ |

TOTAL DEPOSITS IN TRANSIT                                              | 0.00 |

Less Outstanding Checks (a):

| Check Number | Check Date | Check Amount |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

TOTAL OUTSTANDING CHECKS:                                              | 0.00 |

EXHIBIT A

## ENDING BALANCES FOR THE PERIOD:

(Provide a copy of monthly account statements for each of the below)

|  |  |
|---|---:|
| General Account: | 596,729.00 |
| Payroll Account: | $8,108.28 |
| Tax Account: | 0.00 |

*Other Accounts:

*Other Monies:

| **Petty Cash (from below): | 2,695.32 |
|---|---:|

## TOTAL CASH AVAILABLE:

| 607,532.60 |
|---:|

Petty Cash Transactions:

| Date | Purpose |  | Amount |
|---|---|---|---:|
| 2/1/2019 | PIZZA/OFFICE | ANDRIA | 35.64 |
| 2/1/2019 | LABOR/OI | VICTOR | 100.00 |
| 2/5/2019 | SCALE | TIM | 60.00 |
| 2/5/2019 | WSE SUPPLIES | LOWES | 40.00 |
| 2/6/2019 | CONTRIBUTION | SISTERS CONVENT | 100.00 |
| 2/6/2019 | LOT RENT | BEE INT'L | 500.00 |
| 2/7/2019 | POSTAL/BOX MAILED | ANDRIA | 99.10 |
| 2/7/2019 | IGNACIO FUEL ADV | HARRY | 60.00 |
| 2/8/2019 | Cash Receipt - RPCV-3620 | BRYAN JESMOND | (240.00) |
| 2/8/2019 | PETTY CASH BOX | Transfer To: REPUBLIC-PC | (4000.00) |
| 2/11/2019 | W/T'S | KENT | 32.00 |
| 2/11/2019 | CREW MTG/SCORE BONUSES | GREG | 80.00 |
| 2/11/2019 | CSR BONUSES | GARY | 5.00 |
| 2/11/2019 | FUEL REIMB/DELIVERIES | JACOB TROPP | 20.00 |
| 2/12/2019 | SODA RPR | SODA RPR | 100.00 |
| 2/13/2019 | REFUND/TIRE EXP | TREJO-TIRE REIMBURSEMENT | (460.00) |
| 2/14/2019 | Payables Trx Entry | KIRK WALTERS | 40.00 |
| 2/14/2019 | FUEL ADV | KIRK | 40.00 |
| 2/15/2019 | FUEL REIMB/DELIVERIES | JACOB TROPP | 60.00 |
| 2/18/2019 | COSTCO/OFFICE | ANDRIA | 160.00 |
| 2/18/2019 | FUEL REIMB | JACOB TROPP | 23.64 |
| 2/18/2019 | WSE LABOR | OPS | 200.00 |
| 2/18/2019 | LABOR | OPS | 200.00 |
| 2/19/2019 | DUMP FEE | KENT | 20.00 |
| 2/21/2019 | OFFICE | VEGA CAFE | 25.00 |
| 2/21/2019 | O/I LABOR | TIM | 125.00 |
| 2/25/2019 | FUEL/EMERG JOB | HARRY | 60.00 |
| 2/26/2019 | W/T'S | KENT | 20.00 |
| 2/26/2019 | W/T'S | TIM | 40.00 |
| 2/26/2019 | WSE LABOR | TIM | 100.00 |
| 2/26/2019 | LABOR/AUTONREITH | TIM | 100.00 |
| 2/26/2019 | DMV FEES | MICHELLE | 20.00 |
| 2/26/2019 | FUEL/TRASH REMOVAL | JOSE FLORES | 20.00 |

EXHIBIT A

| 2/26/2019 | LABOR | CM | 300.00 |
| 2/28/2019 | OFFICE SUPPLIES | ANDRIA | 60.00 |

Change in balance     (840.70)

2695.32

total Petty Cash disbursements     (1163.98)

EXHIBIT A

4f- STATUS OF PAYMENTS TO SECURED CREDITORS, LESSORS
AND OTHER PARTIES TO EXECUTORY CONTRACTS

| Creditor, Lessor, Etc. | Frequency of Payments (Mo/Qtr) | Amount of Payment | Post-Petition payments not made (Number) | Total Due |
|---|---|---|---|---|
| Lease 953Trans Advantage, Inc. | Mo | 880 | 7 | 1,754.32 |
| Lease 40234378Western Equipment Finance, Inc. | Mo | 271.00 | 3 | 40,528.92 |
| Lease 954Trans Advantage, Inc. | Mo | 1,076.00 | 6 | 8,741.62 |
| Lease 5560Western Equipment Finance, Inc. | Mo | 140.00 | 3 | 11,914.50 |
| Real Estate Lease - Chula Vista - Eastgroup Properties LP | Mo | 72873.6 | 0 | 10,132,656.20 |
| Lease Allegiant Partners Incorporated | Mo | 1,037.00 | 7 | 9,485.11 |
| Lease 3968Allegiant Partners Incorporated | Mo | 820 | 7 | 14,803.66 |
| Umbrella Ins TCU0000707 01Transguard Ins Company | Mo | 1997 | 0 | 3.00 |
| Stamp Machine Rental - Pitney Bowes Global Financial Services | Mo | 0 | 0 | 12,878.00 |
| Office EquipmentWells Fargo Financial Leasing, Inc. | Mo | 2415.08 | 1 | 14,490.48 |
| Equipment Lease SD-1Navitas Credit Corp. | Mo | 927.00 | 4 | 23,665.18 |
| Equipment Lease SD-2Navitas Credit Corp. | Mo | 1140 | 4 | 28,216.43 |
| Equipment Lease Bank of the West | Mo | 25,503.00 | 7 | 562,332.65 |
| Equipment Lease 0353Susquehnna Commercial Finance, Inc | Quart | 580.00 | 0 | 983.00 |
| Real Estate Lease - TemeculaLeed Rancho California Partnership 1 | Mo | 21,000.00 | 4 | 84,000.00 |
| G/L, Auto, etc Insurance TCU0010040 01Transguard Insurance Company | Mo | 18,806.46 | 0 | 19,106.58 |
| Equipment LeaseFord Financial Services, Inc. | Mo | 1943.93 | 3 | 80,063.07 |
| Packing Material Contract CDS Moving Equipment, Inc. | Mo | 50334.99 variabe | 0 | 0.00 |
| Van Line Agency AgreementNorth American Van Lines, Inc | N/A | N/a | 0 | |
| Phone System (auto dialer)Gsolutionsz, Inc. Great America Leasing | Mo | 1,497.13 | 0 | 20,959.82 |
| Workers Compensation Ins National Liability & Fire Insurance company | Mo | 4397.40, variable | 0 | 26,177.88 |
| Equipment Lease 379Trans Advantage, Inc. | Mo | 1,359.00 | 7 | 35,842.00 |
| Moversuite SoftwareJonas Software USA, EWS Division | Mo | 6,477.85 | 0 | |
| Health In (mo. payment reduced by offset)California Choice Benefits | Mo | 21,992.18 | 0 | 0.00 |
| Cell Phone ServiceSprint | Mo | 0 | 1 | 247.58 |
| Driver Cash Advance CreditComdata Network, Inc | Ongoing as needed | 37,715, variable. Deduct from driver | 0 | 0.00 |
| Equipment LeaseExchange Bank | Mo | 1,221.00 | 7 | 15,432.38 |
| 401K PlanADP, Inc., Retirement Services | Mo | 1,962, variable | 0 | 0.00 |
| Merchant Services Applied Merchant Systems West Coast LLC | Mo | 8528.61, variable | 0 | 0.00 |
| Pest ServicePro Pacific Pest Control | Mo | 99 | 5 | 0.00 |
| Cell PhonesVerizon Wireless | Mo | 2,117.83 | 0 | 14,344.67 |
| Merchant Processing (TSYS)Transfirst LLC | Mo | variable | 3 | 0.00 |
| Bank of the West Line of Credit | N/A | 0 | 0 | 2,700,000.00 |
| Equipment Lease 3511Trans Advantage, Inc. | Mo | 2,347.37 | 2 | 41,585.10 |
| Equipment Lease 0336Susquehnna Commercial Finance, Inc | Quart | 679 | 1 | 868 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | TOTAL DUE: | 13,901,080.15 |

EXHIBIT A

### IV. AGING OF ACCOUNTS PAYABLE AND RECEIVABLE

|  | *Accounts Payable Post-Petition | Accounts Receivable | |
|---|---|---|---|
|  |  | Pre-Petition | Post-Petition |
| 30 days or less |  |  |  |
| 31 - 60 days |  |  |  |
| 61 - 90 days |  |  |  |
| 91 - 120 days |  |  |  |
| Over 120 days |  |  |  |
| TOTAL: | 0.00 | 0.00 | 0.00 |

pre-pet higher than Dec

==TBD end of month==

### V. INSURANCE COVERAGE

|  | Name of Carrier | Amount of Coverage | Policy Expiration Date | Premium Paid Through (Date) |
|---|---|---|---|---|
| General Liability | Transguard | $2MM (w/ umb.) | 4/1/2019 | 2/28/2019 |
| Worker's Compensation | Midwestern Insurance Alliance | $1MM Statutory | 4/1/2019 | 2/28/2019 |
| Casualty | Transguard | 500K/675K | 4/1/2019 | 2/28/2019 |
| Vehicle | Transguard | $2MM (w/ umb.) | 4/1/2019 | 2/28/2019 |
| Others: |  |  |  |  |
|  |  |  |  |  |

### VI.  UNITED STATES TRUSTEE QUARTERLY FEES
### (TOTAL PAYMENTS)

| Quarterly Period Ending (Date) | Total Disbursements | Quarterly Fees | Date Paid | Amount Paid | Quarterly Fees Still Owing |
|---|---|---|---|---|---|
| 30-Sep-2018 | 2,040,389.29 | 20,403.89 | 9-Nov-2018 | 325.00 | 20,078.89 |
|  |  |  | 7-Nov-2018 | 20,404.89 | (326.00) |
| 31-Dec-2018 | 2,158,778.52 | 21,587.79 | 14-Jan-2019 | 21,261.79 | (0.00) |
| 31-Dec-2018 | 929,281.70 | 9,292.82 | 15-Mar-2019 | 9,292.82 | 0.00 |
|  |  |  |  |  | 0.00 |
|  |  |  |  |  | 0.00 |
|  |  |  |  |  | 0.00 |
|  |  |  |  |  | 0.00 |
|  |  |  |  |  | 0.00 |
|  |  |  |  |  | 0.00 |
|  |  |  |  |  | 0.00 |
|  |  |  |  |  | 0.00 |
|  |  |  |  |  | 0.00 |
|  |  |  |  |  | 0.00 |
|  |  |  |  |  | 0.00 |
|  |  |  |  |  | 0.00 |
|  |  |  |  |  | 0.00 |
|  |  | 51,284.50 |  | 51,284.50 | (0.00) |

* Post-Petition Accounts Payable SHOULD NOT include professionals' fees and expenses which have been incurred but not yet awarded by the court.  Post-Petition
Accounts Payable SHOULD include professionals' fees and expenses authorized by Court Order but which remain unpaid as of the close of the period report

EXHIBIT A

VII SCHEDULE OF COMPENSATION PAID TO INSIDERS

| Name of Insider | Date of Order Authorizing Compensation | *Authorized Gross Compensation | Gross Compensation Paid During the Month |
|---|---|---|---|
| Joseph W. Lovejoy | 8/19/2018 | 3846.15/week | $ 15,384.60 |
| Carol Lovejoy | 8/19/2018 | 1153.85/week | $ 4,615.40 |
| James Lovejoy | 8/19/2018 and 12/26/18 | 1923.10/week | $ 7,684.80 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## VIII.  SCHEDULE OF OTHER AMOUNTS PAID TO INSIDERS

| Name of Insider | Date of Order Authorizing Compensation | Description | Amount Paid During the Month |
|---|---|---|---|
| None | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

* Please indicate how compensation was identified in the order (e.g. $1,000/week, $2,500/month)

EXHIBIT A

QUESTIONNAIRE

|  | No | Yes |
|---|---|---|
| 1. Has the debtor-in-possession made any payments on its pre-petition unsecured debt, except as have been authorized by the court?  If "Yes", explain below: | x | |

_____

|  | No | Yes |
|---|---|---|
| 2. Has the debtor-in-possession during this reporting period provided compensation or remuneration to any officers, directors, principals, or other insiders without appropriate authorization?  If "Yes", explain below: | x | |

_____

3. State what progress was made during the reporting period toward filing a plan of reorganization.
1. Obtained interest from more specialized term lender and ABL lenders.  Going through and evaluating them while we are assessing if we should to go to due diligence with the ones ready to go. 2. One remaining issue left to negotiate with the senior secured lender 3. Reaching agreement also with a second secured claimant

4. Describe potential future developments which may have a significant impact on the case:
Appears military is not going to change processes in the short term, providing stability to the market place.  Military again letting Hawaii shipment get booked and volume has picked up.  TSP customer base is starting to catch up with payments after the system was down.

5. Attach copies of all Orders granting relief from the automatic stay that were entered during the reporting period.
None

|  | No | Yes |
|---|---|---|
| 6. Did you receive any exempt income this month, which is not set forth in the operating report?  If "Yes", please set forth the amounts and sources of the income below. | X | |

_____

I,    Joseph W. Lovejoy,
declare under penalty of perjury that I have fully read and understood the foregoing debtor-in-possession operating report and that the information contained herein is true and complete to the best of my knowledge.

Dated: March 22, 2019

_____
President

## BANK OF THE WEST
### BNP PARIBAS

P.O. Box 2830, Omaha, NE 68103-2830

# Account Statement

February 1, 2019 - February 28, 2019

Page **1** of **6**



>018869 2725858 0001 008230 10Z
LOVEJOYS FAMILY MOVING DBA
REPUBLIC MOVING & STORAGE N AMER
DEBTOR IN POSSESSION
2311 BOSWELL RD SUITE 5
CHULA VISTA CA 91914-3512

## At your service

 bankofthewest.com

 1-800-488-2265

 1-800-659-5495 TTY/TDD

## New online and mobile services!

Enjoy these new online debit card services: Online statements - Online and recurring payments - Balance transfers - Dispute transactions - Travel notices - PIN Change - Account alerts - Credit line increases - Replacement cards - Card activation - Lock/unlock your card

Simply log into your account at www.bankofthewest.com and go to the Services and Support page or on your mobile device on the More screen.

Remember to confirm your email during your next branch visit or call our Contact Center at 800-488-2265. Our emails keep you educated about our services, products and more.

## CLASSIC BUSINESS CHECKING ████3545

LOVEJOYS FAMILY MOVING DBA
REPUBLIC MOVING & STORAGE N AMER
DEBTOR IN POSSESSION

### ACCOUNT SUMMARY

| | |
|---|---|
| **Beginning Balance** | **$388,300.79** |
| 28 Credits | 944,279.91 |
| 1 Deposits | 401.24 |
| 94 Withdrawals | -407,165.99 |
| 145 Checks | -390,887.02 |
| **Ending Balance** | **$534,928.93** |

### EARNINGS SUMMARY

| | |
|---|---|
| Interest this statement period | $0.00 |
| Interest credited year-to-date | $0.00 |
| Interest credited prior year | $0.00 |
| Annual percentage yield earned | 0.00% |
| Average monthly balance | $414,517.29 |



**For your protection:**
Examine this statement promptly. Any discrepancy must be reported within 30 days. Consumer customers: A discrepancy regarding an electronic payment or line of credit must be reported within 60 days.

In South Dakota, Bank of the West operates under the name of Bank of the West California.



**BANK OF THE WEST**
**BNP PARIBAS**

# Account Statement

## CLASSIC BUSINESS CHECKING  xxx-xx3545 *(continued)*
### ACCOUNT DETAIL

### Credits

| Date | Amount | Description |
|------|--------|-------------|
| 02/01 | $10.00 | SERVICE CHG REBATE VALUED CUSTOMER MONTHLY SERVICE CHARGE REBATE |
| 02/01 | 18,641.13 | ELECTRONIC DEP MERCHANT BANKCD DEPOSIT 020119 498282992888 CCD |
| 02/04 | 335.00 | ELECTRONIC DEP MERCHANT BANKCD DEPOSIT 020419 498282992888 CCD |
| 02/04 | 460.00 | ELECTRONIC DEP MERCHANT BANKCD DEPOSIT 020419 498282992888 CCD |
| 02/04 | 38,689.78 | ELECTRONIC DEP MERCHANT BANKCD DEPOSIT 020419 498282992888 CCD |
| 02/04 | 150,000.00 | ACCT TRNSFR CR REFERENCE # 190204007572 ACCT TRNSF CR SENDING BANK REFERENCE # AT20190204272179 001 |
| 02/05 | 18,107.95 | ELECTRONIC DEP MERCHANT BANKCD DEPOSIT 020519 498282992888 CCD |
| 02/06 | 1,060.98 | ELECTRONIC DEP MERCHANT BANKCD DEPOSIT 020619 498282992888 CCD |
| 02/07 | 9,979.55 | ELECTRONIC DEP MERCHANT BANKCD DEPOSIT 020719 498282992888 CCD |
| 02/11 | 140.00 | ELECTRONIC DEP MERCHANT BANKCD DEPOSIT 021119 498282992888 CCD |
| 02/11 | 15,135.49 | ELECTRONIC DEP MERCHANT BANKCD DEPOSIT 021119 498282992888 CCD |
| 02/11 | 26,038.95 | ELECTRONIC DEP MERCHANT BANKCD DEPOSIT 021119 498282992888 CCD |
| 02/12 | 14,855.19 | ELECTRONIC DEP MERCHANT BANKCD DEPOSIT 021219 498282992888 CCD |
| 02/12 | 150,000.00 | ACCT TRNSFR CR REFERENCE # 190212006442 ACCT TRNSF CR SENDING BANK REFERENCE # AT20190212277007 001 |
| 02/13 | 31,113.42 | ELECTRONIC DEP MERCHANT BANKCD DEPOSIT 021319 498282992888 CCD |
| 02/14 | 31,498.95 | ELECTRONIC DEP MERCHANT BANKCD DEPOSIT 021419 498282992888 CCD |
| 02/15 | 14,271.93 | ELECTRONIC DEP MERCHANT BANKCD DEPOSIT 021519 498282992888 CCD |
| 02/19 | 20,552.48 | ELECTRONIC DEP MERCHANT BANKCD DEPOSIT 021919 498282992888 CCD |
| 02/19 | 32,674.48 | ELECTRONIC DEP MERCHANT BANKCD DEPOSIT 021919 498282992888 CCD |
| 02/20 | 10,974.28 | ELECTRONIC DEP MERCHANT BANKCD DEPOSIT 022019 498282992888 CCD |
| 02/21 | 11,851.97 | ELECTRONIC DEP MERCHANT BANKCD DEPOSIT 022119 498282992888 CCD |
| 02/22 | 7,875.60 | ELECTRONIC DEP MERCHANT BANKCD DEPOSIT 022219 498282992888 CCD |
| 02/22 | 150,000.00 | ACCT TRNSFR CR REFERENCE # 190222006519 ACCT TRNSF CR SENDING BANK REFERENCE # AT20190222283609 001 |
| 02/25 | 2,360.00 | ELECTRONIC DEP MERCHANT BANKCD DEPOSIT 022519 498282992888 CCD |
| 02/26 | 11,206.47 | ELECTRONIC DEP MERCHANT BANKCD DEPOSIT 022619 498282992888 CCD |
| 02/27 | 9,153.57 | ELECTRONIC DEP MERCHANT BANKCD DEPOSIT 022719 498282992888 CCD |
| 02/28 | 17,292.74 | ELECTRONIC DEP MERCHANT BANKCD DEPOSIT 022819 498282992888 CCD |
| 02/28 | 150,000.00 | ACCT TRNSFR CR REFERENCE # 190228011079 ACCT TRNSF CR SENDING BANK REFERENCE # AT20190228287961 |

**28 credits for a total of $944,279.91**

### Deposits

| Date | Amount |
|------|--------|
| 02/08 | $401.24 |

**1 deposit for a total of $401.24**

### Withdrawals

| Date | Amount | Description |
|------|--------|-------------|
| 02/01 | $5,881.50 | OUTGOING WIRE REFERENCE # 190201004767 WIRE DEBIT SENDING BANK REFERENCE # WT19020101533173 001 |
| 02/01 | 3.00 | EXCESS CURR FEE PREVIOUS PERIOD ACTIVITY RESULTED IN FEE FOR EXCESS CURRENCY |
| 02/01 | 10.00 | MONTHLY SVC CHG PREVIOUS PERIOD ACTIVITY RESULTED IN MONTHLY SERVICE CHARGE |
| 02/01 | 103.00 | EXCESS TRANSCTN FEE PREVIOUS PERIOD ACTIVITY RESULTED IN EXCESS TRANSACTION FEE |
| 02/01 | 191.87 | ELECTRONIC DBT RMWD 7607281178 020119 WEB |
| 02/04 | 5,000.00 | ACH SETTLEMENT LOVEJOYS2 MISC 020419 |
| 02/04 | 988.00 | OUTGOING WIRE REFERENCE # 190204006739 WIRE DEBIT SENDING BANK REFERENCE # WT19020401539750 001 |
| 02/04 | 235.48 | ELECTRONIC DBT MERCHANT BANKCD FEE 020419 498282992888 CCD |
| 02/04 | 727.95 | ELECTRONIC DBT MERCHANT BANKCD DISCOUNT 020419 498282992888 CCD |
| 02/04 | 1,613.28 | ELECTRONIC DBT Flyers Energy, L PAYMENT 020419 PPD |

033107  1159084  0000000  066757  133514  01/01

EXHIBIT 5



# Account Statement

February 1, 2019 - February 28, 2019

Page **3** of **6**

## CLASSIC BUSINESS CHECKING  xxx-xx3545 *(continued)*

### ACCOUNT DETAIL

**Withdrawals**



| Date | Amount | Description |
|------|--------|-------------|
| 02/04 | $1,884.35 | ELECTRONIC DBT VEHICLE TRACKING SALE 020419 CCD |
| 02/04 | 2,180.00 | ELECTRONIC DBT CHOICELOCAL PURCHASE 020419 REPUBLICMOVING CCD |
| 02/04 | 7,565.18 | ELECTRONIC DBT MERCHANT BANKCD INTERCHNG 020419 498282992888 CCD |
| 02/05 | 1,851.90 | ACH SETTLEMENT LOVEJOYS2 MISC 020519 |
| 02/05 | 2,000.00 | ACH SETTLEMENT LOVEJOYS2 MISC 020519 |
| 02/06 | 2,733.20 | ACH SETTLEMENT LOVEJOYS2 MISC 020619 |
| 02/06 | 3,000.00 | ACH SETTLEMENT LOVEJOYS2 MISC 020619 |
| 02/06 | 16,676.28 | ACH SETTLEMENT LOVEJOYS2 MISC 020619 |
| 02/06 | 3,526.50 | OUTGOING WIRE REFERENCE # 190206002528 WIRE DEBIT SENDING BANK REFERENCE # WT19020601544413 001 |
| 02/06 | 1,171.05 | ACCT TRNSFR DR REFERENCE # 190206006135 ACCT TRNSF DB SENDING BANK REFERENCE # AT20190206273745 001 |
| 02/06 | 10,906.10 | ACCT TRNSFR DR REFERENCE # 190206006132 ACCT TRNSF DB SENDING BANK REFERENCE # AT20190206273744 001 |
| 02/06 | 24,594.56 | ACCT TRNSFR DR REFERENCE # 190206006122 ACCT TRNSF DB SENDING BANK REFERENCE # AT20190206273743 001 |
| 02/06 | 69.27 | ELECTRONIC DBT IRON MOUNTAIN BT0205 020619 000000075037882 CCD |
| 02/07 | 326.89 | ACH SETTLEMENT LOVEJOYS2 MISC 020719 |
| 02/07 | 1,255.00 | ACH SETTLEMENT LOVEJOYS2 MISC 020719 |
| 02/07 | 1,500.00 | ACH SETTLEMENT LOVEJOYS2 MISC 020719 |
| 02/07 | 3,696.54 | ACH SETTLEMENT LOVEJOYS2 MISC 020719 |
| 02/08 | 5,000.00 | ACH SETTLEMENT LOVEJOYS2 MISC 020819 |
| 02/08 | 3,597.00 | OUTGOING WIRE REFERENCE # 190208006254 WIRE DEBIT SENDING BANK REFERENCE # WT19020801554038 001 |
| 02/08 | 1,109.82 | ELECTRONIC DBT Flyers Energy, L PAYMENT 020819 PPD |
| 02/08 | 341.75 | ELECTRONIC DBT Flyers Energy, L PAYMENT 021119 PPD |
| 02/11 | 386.97 | ELECTRONIC DBT YOUR PROPANE COM BT0207 021019 75182658 CCD |
| 02/11 | 500.00 | ELECTRONIC DBT GOOGLE ADWORDS:20 021119 US001D0CUT CCD |
| 02/11 | 1,325.82 | ELECTRONIC DBT YOUR PROPANE COM BT0207 021019 75176894 CCD |
| 02/11 | 1,413.00 | ELECTRONIC DBT YOUR PROPANE COM BT0207 021019 75176746 CCD |
| 02/11 | 4,609.00 | ELECTRONIC DBT KC TransguardIns Insurance 021119 988-1088683-020 CCD |
| 02/11 | 5,284.00 | ELECTRONIC DBT KC TransguardIns Insurance 021119 988-143125-0208 CCD |
| 02/12 | 2,000.00 | ACH SETTLEMENT LOVEJOYS2 MISC 021219 |
| 02/12 | 6,540.50 | OUTGOING WIRE REFERENCE # 190212006268 WIRE DEBIT SENDING BANK REFERENCE # WT19021201561833 001 |
| 02/12 | 365.00 | ELECTRONIC DBT MERCHANT BANKCD CHARGEBACK 021219 498282992888 CCD |
| 02/13 | 1,781.40 | ACH SETTLEMENT LOVEJOYS2 MISC 021319 |
| 02/13 | 2,629.04 | ACH SETTLEMENT LOVEJOYS2 MISC 021319 |
| 02/13 | 17,327.91 | ACH SETTLEMENT LOVEJOYS2 MISC 021319 |
| 02/13 | 3,471.00 | OUTGOING WIRE REFERENCE # 190213006627 WIRE DEBIT SENDING BANK REFERENCE # WT19021301565127 001 |
| 02/13 | 6,452.59 | OUTGOING WIRE REFERENCE # 190213003629 WIRE DEBIT SENDING BANK REFERENCE # WT19021301563440 001 |
| 02/13 | 1,015.85 | ACCT TRNSFR DR REFERENCE # 190213007983 ACCT TRNSF DB SENDING BANK REFERENCE # AT20190213278128 001 |
| 02/13 | 10,670.17 | ACCT TRNSFR DR REFERENCE # 190213007982 ACCT TRNSF DB SENDING BANK REFERENCE # AT20190213278127 001 |
| 02/13 | 24,570.56 | ACCT TRNSFR DR REFERENCE # 190213007979 ACCT TRNSF DB SENDING BANK REFERENCE # AT20190213278125 001 |
| 02/14 | 716.59 | ACH SETTLEMENT LOVEJOYS2 MISC 021419 |
| 02/14 | 1,000.00 | ACH SETTLEMENT LOVEJOYS2 MISC 021419 |
| 02/14 | 1,000.00 | ACH SETTLEMENT LOVEJOYS2 MISC 021419 |
| 02/14 | 1,255.00 | ACH SETTLEMENT LOVEJOYS2 MISC 021419 |
| 02/14 | 2,000.00 | ACH SETTLEMENT LOVEJOYS2 MISC 021419 |
| 02/14 | 3,091.80 | ACH SETTLEMENT LOVEJOYS2 MISC 021419 |
| 02/14 | 6,950.00 | ACH SETTLEMENT LOVEJOYS2 MISC 021419 |
| 02/14 | 2,656.00 | OUTGOING WIRE REFERENCE # 190214008366 WIRE DEBIT SENDING BANK REFERENCE # WT19021401570043 001 |
| 02/15 | 1,500.00 | ACH SETTLEMENT LOVEJOYS2 MISC 021519 |

18869 2725858 037294 074587 0002/0003




EXHIBIT 7



**BANK OF THE WEST**
**BNP PARIBAS**

# Account Statement

February 1, 2019 - February 28, 2019

Page **4** of **6**

## CLASSIC BUSINESS CHECKING  xxx-xx3545 *(continued)*

### ACCOUNT DETAIL

#### Withdrawals

| Date | Amount | Description |
|------|--------|-------------|
| 02/15 | $3,751.50 | OUTGOING WIRE REFERENCE # 190215010103 WIRE DEBIT SENDING BANK REFERENCE # WT19021501575561 001 |
| 02/15 | 1,037.69 | ELECTRONIC DBT OTAY WATER DISTR 6196702777 021519 WEB |
| 02/19 | 4,000.00 | ACH SETTLEMENT LOVEJOYS2 MISC 021919 |
| 02/19 | 4,828.50 | OUTGOING WIRE REFERENCE # 190219004656 WIRE DEBIT SENDING BANK REFERENCE # WT19021901577264 001 |
| 02/19 | 1,556.04 | ELECTRONIC DBT Flyers Energy, L PAYMENT 021919 PPD |
| 02/20 | 1,781.40 | ACH SETTLEMENT LOVEJOYS2 MISC 022019 |
| 02/20 | 2,690.71 | ACH SETTLEMENT LOVEJOYS2 MISC 022019 |
| 02/20 | 16,008.37 | ACH SETTLEMENT LOVEJOYS2 MISC 022019 |
| 02/20 | 580.54 | ACCT TRNSFR DR REFERENCE # 190220008296 ACCT TRNSF DB SENDING BANK REFERENCE # AT20190220281901 001 |
| 02/20 | 757.31 | ACCT TRNSFR DR REFERENCE # 190220004390 ACCT TRNSF DB SENDING BANK REFERENCE # AT20190220281447 001 |
| 02/20 | 5,198.18 | ACCT TRNSFR DR REFERENCE # 190220004333 ACCT TRNSF DB SENDING BANK REFERENCE # AT20190220281439 001 |
| 02/20 | 12,343.61 | ACCT TRNSFR DR REFERENCE # 190220008295 ACCT TRNSF DB SENDING BANK REFERENCE # AT20190220281900 001 |
| 02/20 | 22,916.87 | ACCT TRNSFR DR REFERENCE # 190220008282 ACCT TRNSF DB SENDING BANK REFERENCE # AT20190220281899 001 |
| 02/20 | 260.00 | CASH MANAGEMENT CHG -NON-ANALYZED CHARGES |
| 02/21 | 1,255.00 | ACH SETTLEMENT LOVEJOYS2 MISC 022119 |
| 02/21 | 1,520.79 | ACH SETTLEMENT LOVEJOYS2 MISC 022119 |
| 02/21 | 1,656.05 | ACH SETTLEMENT LOVEJOYS2 MISC 022119 |
| 02/21 | 4,000.00 | ACH SETTLEMENT LOVEJOYS2 MISC 022119 |
| 02/21 | 1,751.00 | ELECTRONIC DBT REPUBLICSERVICES RSIBILLPAY 022119 WEB |
| 02/22 | 7,036.50 | OUTGOING WIRE REFERENCE # 190222005629 WIRE DEBIT SENDING BANK REFERENCE # WT19022201591428 001 |
| 02/22 | 21,992.18 | ELECTRONIC DBT CHOICE ADMIN ONLIN PMNT 022219 WEB |
| 02/25 | 4,000.00 | ACH SETTLEMENT LOVEJOYS2 MISC 022519 |
| 02/25 | 80.03 | ELECTRONIC DBT ATT Payment 022419 PPD |
| 02/25 | 1,420.10 | ELECTRONIC DBT Flyers Energy, L PAYMENT 022519 PPD |
| 02/26 | 6,888.51 | ACH SETTLEMENT LOVEJOYS2 MISC 022619 |
| 02/26 | 2,926.00 | OUTGOING WIRE REFERENCE # 190226005266 WIRE DEBIT SENDING BANK REFERENCE # WT19022601599880 001 |
| 02/26 | 3,420.58 | ACCT TRNSFR DR REFERENCE # 190226005193 ACCT TRNSF DB SENDING BANK REFERENCE # AT20190226285213 001 |
| 02/26 | 7,203.05 | ACCT TRNSFR DR REFERENCE # 190226005187 ACCT TRNSF DB SENDING BANK REFERENCE # AT20190226285212 001 |
| 02/26 | 10,160.65 | ACCT TRNSFR DR REFERENCE # 190226005185 ACCT TRNSF DB SENDING BANK REFERENCE # AT20190226285207 001 |
| 02/26 | 250.00 | ELECTRONIC DBT MERCHANT BANKCD CHARGEBACK 022619 498282992888 CCD |
| 02/27 | 23,564.31 | ACCT TRNSFR DR REFERENCE # 190227009599 ACCT TRNSF DB SENDING BANK REFERENCE # AT20190227286805 001 |
| 02/27 | 500.00 | ELECTRONIC DBT GOOGLE ADWORDS:20 022719 US001DHX6O CCD |
| 02/28 | 1,010.34 | ACH SETTLEMENT LOVEJOYS2 MISC 022819 |
| 02/28 | 1,115.97 | ACH SETTLEMENT LOVEJOYS2 MISC 022819 |
| 02/28 | 1,255.00 | ACH SETTLEMENT LOVEJOYS2 MISC 022819 |
| 02/28 | 2,197.54 | ACH SETTLEMENT LOVEJOYS2 MISC 022819 |
| 02/28 | 4,000.00 | ACH SETTLEMENT LOVEJOYS2 MISC 022819 |

**94 withdrawals for a total of $407,165.99**

#### Checks Paid

| Number | Date paid | Amount | Number | Date paid | Amount | Number | Date paid | Amount |
|--------|-----------|--------|--------|-----------|--------|--------|-----------|--------|
| 0 | 02/27 | 316.05 | 2426* | 02/01 | 4,750.00 | 2433 | 02/12 | 800.00 |
| 2098* | 02/04 | 27.00 | 2428* | 02/01 | 271.00 | 2434 | 02/08 | 1,613.40 |
| 2375* | 02/11 | 1,265.00 | 2429 | 02/01 | 140.00 | 2435 | 02/08 | 13,500.00 |
| 2408* | 02/19 | 363.60 | 2430 | 02/01 | 2,347.37 | 2436 | 02/14 | 2,320.00 |
| 2417* | 02/01 | 2,158.17 | 2432* | 02/13 | 649.00 | 2437 | 02/12 | 6,477.85 |

*\* Break in check number sequence.*



bankofthewest.com          1-800-488-2265          1-800-659-5495 TTY/TDD

033107 1158084 00000000 066758 133516 02/03



# Account Statement

February 1, 2019 - February 28, 2019

Page **5** of **6**

## CLASSIC BUSINESS CHECKING **xxx-xx3545** *(continued)*

### ACCOUNT DETAIL

#### Checks Paid

| Number | Date paid | Amount | Number | Date paid | Amount | Number | Date paid | Amount |
|--------|-----------|--------|--------|-----------|--------|--------|-----------|--------|
| 2439* | 02/11 | 1,109.00 | 2833 | 02/08 | 73.15 | 2881* | 02/15 | 1,296.87 |
| 2440 | 02/12 | 450.00 | 2834 | 02/15 | 205.00 | 2882 | 02/20 | 14,090.01 |
| 2441 | 02/12 | 199.94 | 2835 | 02/20 | 1,425.00 | 2883 | 02/15 | 2,185.21 |
| 2442 | 02/20 | 1,500.00 | 2836 | 02/12 | 1,523.00 | 2884 | 02/15 | 2,267.13 |
| 2443 | 02/15 | 500.00 | 2838* | 02/11 | 1,084.25 | 2885 | 02/20 | 6,941.11 |
| 2444 | 02/19 | 3,164.31 | 2839 | 02/07 | 223.50 | 2886 | 02/15 | 471.57 |
| 2445 | 02/25 | 2,968.00 | 2840 | 02/12 | 797.54 | 2887 | 02/15 | 1,465.50 |
| 2446 | 02/15 | 75.00 | 2841 | 02/11 | 91,784.90 | 2888 | 02/15 | 225.00 |
| 2447 | 02/28 | 200.00 | 2842 | 02/19 | 5,000.00 | 2889 | 02/21 | 954.31 |
| 2453* | 02/25 | 1,440.00 | 2843 | 02/12 | 427.54 | 2890 | 02/22 | 130.00 |
| 2456* | 02/28 | 152.79 | 2844 | 02/12 | 275.00 | 2891 | 02/25 | 62.93 |
| 2458* | 02/28 | 140.00 | 2845 | 02/11 | 1,500.00 | 2892 | 02/25 | 468.69 |
| 2459 | 02/28 | 271.00 | 2846 | 02/13 | 455.96 | 2893 | 02/22 | 430.00 |
| 2460 | 02/27 | 2,347.37 | 2847 | 02/22 | 618.92 | 2894 | 02/28 | 1,000.00 |
| 2461 | 02/28 | 679.00 | 2848 | 02/28 | 611.43 | 2896* | 02/21 | 1,947.00 |
| 2462 | 02/28 | 580.00 | 2849 | 02/11 | 2,302.02 | 2897 | 02/22 | 201.41 |
| 2463 | 02/27 | 2,415.08 | 2850 | 02/08 | 710.65 | 2898 | 02/26 | 790.47 |
| 2708* | 02/20 | 1,425.00 | 2851 | 02/08 | 3,536.49 | 2900* | 02/26 | 96.00 |
| 2797* | 02/04 | 18,156.88 | 2852 | 02/12 | 1,479.39 | 2901 | 02/21 | 400.00 |
| 2805* | 02/05 | 483.00 | 2854* | 02/08 | 1,073.76 | 2902 | 02/21 | 306.00 |
| 2807* | 02/26 | 50.00 | 2855 | 02/13 | 11,988.36 | 2904* | 02/22 | 2,550.92 |
| 2808 | 02/04 | 566.09 | 2856 | 02/08 | 1,683.88 | 2905 | 02/22 | 1,385.28 |
| 2811* | 02/06 | 232.77 | 2857 | 02/08 | 4,084.41 | 2906 | 02/22 | 4,806.69 |
| 2812 | 02/01 | 2,453.02 | 2858 | 02/19 | 9,143.26 | 2907 | 02/22 | 1,275.43 |
| 2813 | 02/04 | 768.69 | 2859 | 02/08 | 676.18 | 2908 | 02/25 | 1,485.20 |
| 2814 | 02/01 | 2,582.37 | 2860 | 02/08 | 1,325.56 | 2909 | 02/22 | 789.24 |
| 2815 | 02/01 | 4,208.07 | 2861 | 02/13 | 378.12 | 2910 | 02/28 | 12,531.68 |
| 2816 | 02/04 | 1,572.29 | 2862 | 02/08 | 1,800.00 | 2911 | 02/22 | 1,999.51 |
| 2817 | 02/01 | 386.21 | 2863 | 02/08 | 1,200.00 | 2912 | 02/22 | 8,017.25 |
| 2818 | 02/04 | 14,728.19 | 2864 | 02/08 | 3,100.00 | 2914* | 02/25 | 6,029.70 |
| 2819 | 02/01 | 2,712.51 | 2865 | 02/12 | 2,352.00 | 2915 | 02/22 | 1,636.12 |
| 2820 | 02/01 | 1,681.38 | 2866 | 02/08 | 4,000.00 | 2916 | 02/22 | 1,255.41 |
| 2821 | 02/04 | 13,022.25 | 2867 | 02/20 | 505.00 | 2917 | 02/22 | 500.00 |
| 2822 | 02/01 | 2,319.49 | 2868 | 02/20 | 520.66 | 2918 | 02/27 | 493.29 |
| 2823 | 02/01 | 2,820.15 | 2869 | 02/15 | 130.00 | 2919 | 02/22 | 800.00 |
| 2825* | 02/01 | 112.00 | 2870 | 02/19 | 227.79 | 2920 | 02/22 | 1,500.00 |
| 2826 | 02/01 | 1,000.00 | 2871 | 02/14 | 653.76 | 2921 | 02/27 | 101.78 |
| 2827 | 02/04 | 500.00 | 2872 | 02/15 | 403.25 | 2924* | 02/27 | 35.00 |
| 2828 | 02/06 | 198.16 | 2873 | 02/14 | 573.75 | 2925 | 02/28 | 395.00 |
| 2829 | 02/01 | 5,000.00 | 2874 | 02/20 | 549.22 | 2995* | 02/08 | 753.81 |
| 2830 | 02/11 | 353.83 | 2876* | 02/15 | 1,877.90 | 2996 | 02/04 | 445.15 |
| 2830* | 02/11 | 4,397.40 | 2877 | 02/19 | 1,113.00 | 2997 | 02/01 | 637.00 |
| 2831 | 02/08 | 440.00 | 2878 | 02/15 | 2,579.15 | | | |
| 2832 | 02/15 | 1,025.00 | 2879 | 02/19 | 1,376.92 | | | |

**145 checks paid for a total of $390,887.02**

*\* Break in check number sequence.*

18869 2725858 037295 074589 0003/0003

  

**BANK OF THE WEST**
**BNP PARIBAS**

# Account Statement

February 1, 2019 - February 28, 2019

Page **6** of **6**

## IMPORTANT INFORMATION

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS
(For accounts that are maintained primarily for personal, family or household purposes.)

Telephone us at (800) 488-2265, or write us at Bank of the West*, Branch Service Center, P.O. Box 2573, Omaha, NE 68103-2573 as soon as you can if you think your statement or receipt is wrong or if you need more information about a transfer listed on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. We will need to know the following:

1. Tell us your name and account number (if any).

2. Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.

3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (20 business days for transactions involving new accounts) to do this, we will credit your account for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation.

*In South Dakota, Bank of the West operates under the name of Bank of the West California.

bankofthewest.com          1-800-488-2265        1-800-659-5495 ATTY/TDD

**BANK OF THE WEST**
**BNP PARIBAS**

P.O. Box 2830, Omaha, NE 68103-2830

# Account Statement

February 1, 2019 - February 28, 2019

Page **1** of **6**

ɪlɪlɪɪɪɪɪɪɪlɪllɪɪɪllɪllllllllllɪɪllɪɪllɪllɪllllɪɪɪlɪll
>015172 2725845 0001 008230 10Z
LOVEJOYS FAMILY MOVING DBA
REPUBLIC MOVING & STORAGE, N.AMER/
REPUBLIC VAN LINES
2311 BOSWELL RD 5
CHULA VISTA CA 91914-3512

## At your service

  bankofthewest.com

  1-800-488-2265

  1-800-659-5495 TTY/TDD

## New online and mobile services!

Enjoy these new online debit card services: Online statements - Online and recurring payments - Balance transfers - Dispute transactions - Travel notices - PIN Change - Account alerts - Credit line increases - Replacement cards - Card activation - Lock/unlock your card

Simply log into your account at www.bankofthewest.com and go to the Services and Support page or on your mobile device on the More screen.

Remember to confirm your email during your next branch visit or call our Contact Center at 800-488-2265. Our emails keep you educated about our services, products and more.

## ANALYZED CHECKING ████2859

LOVEJOYS FAMILY MOVING DBA
REPUBLIC MOVING & STORAGE, N.AMER/
REPUBLIC VAN LINES

### ACCOUNT SUMMARY

| | |
|---|---:|
| **Beginning Balance** | **$167,536.40** |
| 102 Credits | 511,588.87 |
| 1 Deposits | 345.12 |
| 24 Withdrawals | -617,668.58 |
| 0 Checks | 0.00 |
| **Ending Balance** | **$61,801.81** |

### EARNINGS SUMMARY

| | |
|---|---:|
| Interest this statement period | $0.00 |
| Interest credited year-to-date | $0.00 |
| Interest credited prior year | $0.00 |
| Annual percentage yield earned | 0.00% |
| Average monthly balance | $160,173.31 |

**For your protection:**
Examine this statement promptly. Any discrepancy must be reported within 30 days. Consumer customers: A discrepancy regarding an electronic payment or line of credit must be reported within 60 days.

In South Dakota, Bank of the West operates under the name of Bank of the West California.



EXHIBIT A
Member FDIC    EQUAL HOUSING LENDER



# BANK OF THE WEST
## BNP PARIBAS

## Account Statement

February 1, 2019 - February 28, 2019

Page **2** of **6**

## ANALYZED CHECKING xxx-xx2859 *(continued)*

### ACCOUNT DETAIL

### Credits

| Date | Amount | Description |
|------|--------|-------------|
| 02/01 | $1,321.46 | ELECTRONIC DEP ABC WORLD MOVERS ACH ITEM 020119CCD 10529, 10846 |
| 02/01 | 1,534.80 | ELECTRONIC DEP DOMESTICMILITARY Inv Pmnt 020119 REPUBLICMVGSTGD CCD CHECK 42400994 - MISC INVOICES |
| 02/01 | 1,719.77 | ELECTRONIC DEP FOREMOST FORWD Inv Pmnt 020119 REPUBLICMVGSTGF CCD CHECK 34401308 - INVOICES 11234, 11270 |
| 02/01 | 1,800.75 | ELECTRONIC DEP BAINBRIDGE INTER ACH 020119 REPUBLICCCD 10877 |
| 02/01 | 2,047.66 | ELECTRONIC DEP CARTWRGHTGENRAL Inv Pmnt 020119 REPUBLICMVGSTGC CCD CHECK 403237 - MISC INVOICES |
| 02/01 | 2,278.44 | ELECTRONIC DEP SUDDATH VAN LNS ACCTS PAY 020119 W01227CCD |
| 02/01 | 2,827.63 | ELECTRONIC DEP ALL AMERICAN FOR ACH 020119 REPUBLICCCD SEE EMAIL REMITTANCE |
| 02/01 | 2,843.60 | ELECTRONIC DEP RED BALL FORWARD CORP PAY 020119 232708CCD |
| 02/01 | 3,754.10 | ELECTRONIC DEP AMERITRANS ACH ITEM 020119CCD 10530 |
| 02/01 | 5,498.08 | ELECTRONIC DEP LOCKBOX DEPOSIT 0009060165 LOCKBOX NO=24554 NBR OF ITEMS: 2 |
| 02/01 | 6,176.13 | ELECTRONIC DEP PIONEER VAN LINE ACH ITEM 020119CCD 10819 |
| 02/01 | 8,184.25 | ELECTRONIC DEP CONSER OFFICE SO PAYABLES 013119PPD |
| 02/01 | 10,866.25 | ELECTRONIC DEP TIER ONE RELOCAT AUTOCHECK 020119 161300CCD |
| 02/04 | 1,105.90 | ELECTRONIC DEP DESERET FWDG REPUBLIC 020419PPD |
| 02/04 | 2,172.44 | ELECTRONIC DEP GRIDIRON FORWARD PAYMENT 020419 REPUBLICMOVING CCD |
| 02/04 | 32,871.81 | ELECTRONIC DEP LOCKBOX DEPOSIT 0009060165 LOCKBOX NO=24554 NBR OF ITEMS: 4 |
| 02/05 | 330.00 | ELECTRONIC DEP REDDY ICE CORP PAYABLES 020519PPD |
| 02/05 | 9,882.89 | ELECTRONIC DEP LOCKBOX DEPOSIT 0009060165 LOCKBOX NO=24554 NBR OF ITEMS: 3 |
| 02/05 | 18,937.44 | E-DEPOSIT 0000001 |
| 02/06 | 94.92 | ELECTRONIC DEP FOREMOST FORWD Inv Pmnt 020619 REPUBLICMVGSTGF CCD CHECK 34401314 - INVOICE 11330 |
| 02/06 | 843.65 | ELECTRONIC DEP The Suddath Comp EDI PYMNTS 020619 4000028894 CCD |
| 02/06 | 1,548.22 | ELECTRONIC DEP SUDDATH VAN LNS ACCTS PAY 020619 W01227CCD |
| 02/06 | 1,843.34 | ELECTRONIC DEP COX MOVING Inv Pmnt 020619 REPUBLICMVGSTGC CCD CHECK 3340236 - INVOICE LKNQ0308817001 |
| 02/06 | 7,947.26 | ELECTRONIC DEP CARTWRGHTGENRAL Inv Pmnt 020619 REPUBLICMVGSTGC CCD CHECK 403243 - MISC INVOICES |
| 02/07 | 3,644.18 | ELECTRONIC DEP CENTRAL VAN LINE VENDOR PAY 020719 000000000019357 CCD |
| 02/07 | 12,991.01 | ELECTRONIC DEP LOCKBOX DEPOSIT 0009060165 LOCKBOX NO=24554 NBR OF ITEMS: 1 |
| 02/07 | 1,991.24 | E-DEPOSIT 0000001 |
| 02/08 | 390.90 | ELECTRONIC DEP AMERITRANS ACH ITEM 020819CCD 10948, 11078 |
| 02/08 | 1,654.05 | ELECTRONIC DEP BAINBRIDGE INTER ACH 020819 REPUBLICCCD 11016, 11058 |
| 02/08 | 2,261.51 | ELECTRONIC DEP RED BALL FORWARD CORP PAY 020819 232708CCD |
| 02/08 | 3,037.19 | ELECTRONIC DEP LOCKBOX DEPOSIT 0009060165 LOCKBOX NO=24554 NBR OF ITEMS: 3 |
| 02/08 | 3,409.31 | ELECTRONIC DEP CARTWRGHTGENRAL Inv Pmnt 020819 REPUBLICMVGSTGC CCD CNNQ0056502 LKNQ0326520 LKNQ0315411 UMNL0008731 QE NQ0254996 |
| 02/08 | 3,638.31 | ELECTRONIC DEP SUDDATH VAN LNS ACCTS PAY 020819 W01227CCD |
| 02/08 | 6,176.82 | ELECTRONIC DEP The Suddath Comp EDI PYMNTS 020819 4000029014 CCD |
| 02/08 | 9,591.74 | ELECTRONIC DEP CONSER OFFICE SO PAYABLES 020719PPD |
| 02/08 | 13,066.78 | E-DEPOSIT 0000001 |
| 02/11 | 200.00 | ELECTRONIC DEP VSPONE SAN DIEGO EDI PYMNTS 021119 2000012479 CTX |
| 02/11 | 1,671.76 | ELECTRONIC DEP LOCKBOX DEPOSIT 0009060165 LOCKBOX NO=24554 NBR OF ITEMS: 1 |
| 02/11 | 2,240.42 | ELECTRONIC DEP NATIONAL FORWRD EFTPAYMENT 020819PPD |
| 02/11 | 2,564.75 | ELECTRONIC DEP LOCKBOX DEPOSIT 0009060165 LOCKBOX NO=24554 NBR OF ITEMS: 1 |
| 02/11 | 5,941.90 | ELECTRONIC DEP INTERSTATEVANLNS VENDORPAY 021119CCD |
| 02/11 | 8,992.46 | ELECTRONIC DEP LOCKBOX DEPOSIT 0009060165 LOCKBOX NO=24554 NBR OF ITEMS: 6 |
| 02/11 | 11,052.38 | ELECTRONIC DEP DESERET FWDG REPUBLIC 021119PPD |
| 02/11 | 5,508.08 | E-DEPOSIT 0000001 |
| 02/12 | 4,562.02 | ELECTRONIC DEP GRIDIRON FORWARD PAYMENT 021219 REPUBLICMOVING CCD |
| 02/12 | 6,459.96 | ELECTRONIC DEP LOCKBOX DEPOSIT 0009060165 LOCKBOX NO=24554 NBR OF ITEMS: 1 |


EXHIBIT A



020718 1152188 0000000 052755 105510 01/03



**Account Statement**

February 1, 2019 - February 28, 2019

## ANALYZED CHECKING  xxx-xx2859 *(continued)*

### ACCOUNT DETAIL

#### Credits

| Date | Amount | Description |
|------|--------|-------------|
| 02/13 | $584.95 | ELECTRONIC DEP CARTWRGHTGENRAL Inv Pmnt 021319 REPUBLICMVGSTGC CCD CHECK 403259 - MISC INVOICES |
| 02/13 | 2,354.81 | ELECTRONIC DEP The Suddath Comp EDI PYMNTS 021319 4000029201 CCD |
| 02/13 | 6,998.07 | ELECTRONIC DEP SUDDATH VAN LNS ACCTS PAY 021319 W01227CCD |
| 02/13 | 4,853.12 | E-DEPOSIT 0000001 |
| 02/14 | 2,965.52 | ELECTRONIC DEP LOCKBOX DEPOSIT 0009060165 LOCKBOX NO=24554 NBR OF ITEMS: 1 |
| 02/14 | 5,331.64 | ELECTRONIC DEP CENTRAL VAN LINE VENDOR PAY 021419 000000000019357 CCD |
| 02/14 | 2,046.54 | E-DEPOSIT 0000001 |
| 02/15 | 1,423.63 | ELECTRONIC DEP CONSER OFFICE SO PAYABLES 021419PPD |
| 02/15 | 2,578.84 | ELECTRONIC DEP SUDDATH VAN LNS ACCTS PAY 021519 W01227CCD |
| 02/15 | 5,955.90 | ELECTRONIC DEP The Suddath Comp EDI PYMNTS 021519 4000029313 CCD |
| 02/15 | 7,443.77 | ELECTRONIC DEP LOCKBOX DEPOSIT 0009060165 LOCKBOX NO=24554 NBR OF ITEMS: 2 |
| 02/15 | 7,653.87 | ELECTRONIC DEP RED BALL FORWARD CORP PAY 021519 232708CCD |
| 02/19 | 100.00 | ELECTRONIC DEP BAINBRIDGE INTER ACH 021919 REPUBLICCCD 11089 |
| 02/19 | 200.00 | ELECTRONIC DEP VSPONE SAN DIEGO EDI PYMNTS 021919 2000012511 CTX |
| 02/19 | 535.00 | ELECTRONIC DEP LOCKBOX DEPOSIT 0009060165 LOCKBOX NO=24554 NBR OF ITEMS: 1 |
| 02/19 | 3,234.99 | ELECTRONIC DEP GRIDIRON FORWARD PAYMENT 021919 REPUBLICMOVING CCD |
| 02/19 | 5,692.61 | ELECTRONIC DEP INTERSTATEVANLNS VENDORPAY 021919CCD |
| 02/19 | 8,001.22 | ELECTRONIC DEP DESERET FWDG REPUBLIC 021919PPD |
| 02/19 | 19,100.91 | ELECTRONIC DEP LOCKBOX DEPOSIT 0009060165 LOCKBOX NO=24554 NBR OF ITEMS: 5 |
| 02/19 | 15,936.81 | E-DEPOSIT 0000001 |
| 02/20 | 879.87 | ELECTRONIC DEP FOREMOST FORWD Inv Pmnt 022019 REPUBLICMVGSTGF CCD CHECK 34401330 - INVOICES 6907, 11346, 11722 |
| 02/20 | 2,131.73 | ELECTRONIC DEP CARTWRGHTGENRAL Inv Pmnt 022019 REPUBLICMVGSTGC CCD CHECK 403281 - MISC INVOICES |
| 02/20 | 2,576.39 | ELECTRONIC DEP JOHNSON STORAGE PAYABLES 022019 700004CCD |
| 02/20 | 2,817.76 | ELECTRONIC DEP SUDDATH VAN LNS ACCTS PAY 022019 W01227CCD |
| 02/21 | 471.83 | ELECTRONIC DEP LOCKBOX DEPOSIT 0009060165 LOCKBOX NO=24554 NBR OF ITEMS: 1 |
| 02/22 | 27.25 | ELECTRONIC DEP The Suddath Comp EDI PYMNTS 022219 4000029581 CCD |
| 02/22 | 99.11 | ELECTRONIC DEP ABC WORLD MOVERS ACH ITEM 022219CCD 8082 |
| 02/22 | 278.71 | ELECTRONIC DEP BAINBRIDGE INTER ACH 022219 REPUBLICCCD 11151 |
| 02/22 | 725.50 | ELECTRONIC DEP ALL AMERICAN FOR ACH 022219 REPUBLICCCD 11167 |
| 02/22 | 906.61 | ELECTRONIC DEP CENTRAL VAN LINE VENDOR PAY 022219 000000000019357 CCD |
| 02/22 | 1,970.73 | ELECTRONIC DEP RED BALL FORWARD CORP PAY 022219 232708CCD |
| 02/22 | 2,257.53 | ELECTRONIC DEP The Suddath Comp EDI PYMNTS 022219 4000029567 CCD |
| 02/22 | 2,463.22 | ELECTRONIC DEP LOCKBOX DEPOSIT 0009060165 LOCKBOX NO=24554 NBR OF ITEMS: 2 |
| 02/22 | 2,853.03 | ELECTRONIC DEP CARTWRGHTGENRAL Inv Pmnt 022219 REPUBLICMVGSTGC CCD CHECK 403285 - INVOICES 11766, 11795 |
| 02/22 | 3,453.42 | ELECTRONIC DEP SUDDATH VAN LNS ACCTS PAY 022219 W01227CCD |
| 02/22 | 5,396.05 | ELECTRONIC DEP AMERITRANS ACH ITEM 022219CCD 11154, 11256 |
| 02/22 | 6,711.56 | ELECTRONIC DEP CONSER OFFICE SO PAYABLES 022119PPD |
| 02/22 | 1,182.17 | E-DEPOSIT 0000001 |
| 02/25 | 111.47 | ELECTRONIC DEP INTERSTATEVANLNS VENDORPAY 022519CCD |
| 02/25 | 409.50 | ELECTRONIC DEP ABLE MOVING STOR REPUBLIC 022519CCD 11146 |
| 02/25 | 851.60 | ELECTRONIC DEP DOMESTICMILITARY Inv Pmnt 022519 REPUBLICMVGSTGD CCD CHECK 42401011 - INVOICE 6856 |
| 02/25 | 3,269.77 | ELECTRONIC DEP GRIDIRON FORWARD PAYMENT 022519 REPUBLICMOVING CCD |
| 02/25 | 6,358.13 | ELECTRONIC DEP DESERET FWDG REPUBLIC 022519PPD |
| 02/25 | 6,615.60 | ELECTRONIC DEP LOCKBOX DEPOSIT 0009060165 LOCKBOX NO=24554 NBR OF ITEMS: 3 |
| 02/25 | 11,633.64 | ELECTRONIC DEP ACCELERATED PAYMENTJNL 022519 REPPOWCCD |
| 02/25 | 43,364.58 | ELECTRONIC DEP LOCKBOX DEPOSIT 0009060165 LOCKBOX NO=24554 NBR OF ITEMS: 8 |

   



# BANK OF THE WEST
## BNP PARIBAS

# Account Statement

February 1, 2019 - February 28, 2019

Page **4** of **6**

## ANALYZED CHECKING xxx-xx2859 *(continued)*

### ACCOUNT DETAIL

#### Credits

| Date | Amount | Description |
|------|--------|-------------|
| 02/25 | $14,692.11 | E-DEPOSIT 0000001 |
| 02/26 | 5,436.13 | ELECTRONIC DEP NORTH AMERICAN V PAYMENTS 022619 A000019340 CCD |
| 02/26 | 5,437.76 | ELECTRONIC DEP LOCKBOX DEPOSIT 0009060165 LOCKBOX NO=24554 NBR OF ITEMS: 1 |
| 02/27 | 283.79 | ELECTRONIC DEP SUDDATH VAN LNS ACCTS PAY 022719 W01227CCD |
| 02/27 | 800.60 | ELECTRONIC DEP The Suddath Comp EDI PYMNTS 022719 4000029772 CCD |
| 02/27 | 2,313.53 | ELECTRONIC DEP AFS INC EXP REIMB 022719PPD |
| 02/27 | 7,431.14 | ELECTRONIC DEP The Suddath Comp EDI PYMNTS 022719 4000029755 CCD |
| 02/28 | 584.77 | ELECTRONIC DEP LOCKBOX DEPOSIT 0009060165 LOCKBOX NO=24554 NBR OF ITEMS: 1 |
| 02/28 | 655.04 | ELECTRONIC DEP ALLIED INTERNATI PAYMENTS 022819 A000019340 CCD |
| 02/28 | 21,667.48 | E-DEPOSIT 0000001 |

**102 credits for a total of $511,588.87**

#### Deposits

| Date | Amount |
|------|--------|
| 02/11 | $345.12 |

**1 deposit for a total of $345.12**

#### Withdrawals

| Date | Amount | Description |
|------|--------|-------------|
| 02/04 | $150,000.00 | ACCT TRNSFR DR REFERENCE # 190204007572 ACCT TRNSF DB SENDING BANK REFERENCE # AT20190204272179 |
| 02/04 | 409.25 | ELECTRONIC DBT GSOLUTIONZINC PURCHASE 020419 LOVEJOY'S FAMIL CCD |
| 02/05 | 155.00 | ELECTRONIC DBT UBIQUITY RETIREM ONLINE401K 020519 WEB |
| 02/06 | 1,922.40 | ELECTRONIC DBT COX COMM SAN BANK DRAFT 020619 PPD |
| 02/11 | 1,215.46 | TARGET TRANSFER TRANSFER TO CHECKING ACCT 041-742875 |
| 02/12 | 150,000.00 | ACCT TRNSFR DR REFERENCE # 190212006442 ACCT TRNSF DB SENDING BANK REFERENCE # AT20190212277007 |
| 02/12 | 224.44 | ELECTRONIC DBT SD GAS ELEC PAID SDGE 021219 WEB |
| 02/12 | 278.98 | ELECTRONIC DBT GSOLUTIONZINC PURCHASE 021219 LOVEJOY'S FAMIL CCD |
| 02/13 | 1,640.09 | ELECTRONIC DBT PLIC-SBD INSUR CLM 021319 PPD |
| 02/19 | 67.40 | ELECTRONIC DBT AQUA CHILL OF NO SALE 021919 PPD |
| 02/20 | 315.81 | TARGET TRANSFER TRANSFER TO CHECKING ACCT 041-742875 |
| 02/20 | 1,148.71 | CASH MANAGEMENT CHG -ACCOUNT ANALYSIS CHARGES |
| 02/20 | 528.75 | ELECTRONIC DBT PRUDENTIAL INS PREM 022019 PPD |
| 02/20 | 528.75 | ELECTRONIC DBT PRUDENTIAL INS PREM 022019 PPD |
| 02/20 | 528.75 | ELECTRONIC DBT PRUDENTIAL INS PREM 022019 PPD |
| 02/20 | 3,411.84 | ELECTRONIC DBT SD GAS ELEC PAID SDGE 022019 WEB |
| 02/21 | 380.98 | ELECTRONIC DBT AMERICAN GEN LIF INS PAYMT 022119 PPD |
| 02/22 | 150,000.00 | ACCT TRNSFR DR REFERENCE # 190222006519 ACCT TRNSF DB SENDING BANK REFERENCE # AT20190222283609 |
| 02/22 | 315.81 | TARGET TRANSFER TRANSFER TO CHECKING ACCT 041-742875 |
| 02/22 | 345.74 | ELECTRONIC DBT Ameritas Life In XI23DD 022219 PPD |
| 02/25 | 437.73 | ELECTRONIC DBT SD GAS ELEC PAID SDGE 022519 WEB |
| 02/26 | 903.38 | ELECTRONIC DBT SD GAS ELEC PAID SDGE 022619 WEB |
| 02/28 | 2,909.31 | OUTGOING WIRE REFERENCE # 190228009044 WIRE DEBIT SENDING BANK REFERENCE # WT19022801610198 |
| 02/28 | 150,000.00 | ACCT TRNSFR DR REFERENCE # 190228011079 ACCT TRNSF DB SENDING BANK REFERENCE # AT20190228287961 |

**24 withdrawals for a total of $617,668.58**

EXHIBIT A

020718 11583188 0000000 0527256 105513 02/03



# IMPORTANT INFORMATION

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS
(For accounts that are maintained primarily for personal, family or household purposes.)

Telephone us at (800) 488-2265, or write us at Bank of the West*, Branch Service Center, P.O. Box 2573, Omaha, NE 68103-2573 as soon as you can if you think your statement or receipt is wrong or if you need more information about a transfer listed on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. We will need to know the following:

1. Tell us your name and account number (if any).

2. Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.

3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (20 business days for transactions involving new accounts) to do this, we will credit your account for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation.



*In South Dakota, Bank of the West operates under the name of Bank of the West California.

 bankofthewest.com           1-800-488-2265           1-800-659-5495 TTY/TDD

EXHIBIT A

**BANK OF THE WEST**
**BNP PARIBAS**

This space intentionally left blank.



**BANK** OF THE **WEST**
**BNP PARIBAS**

P.O. Box 2830, Omaha, NE 68103-2830

# Account Statement

February 1, 2019 - February 28, 2019

Page **1** of **4**

ıllıʼlılnllılɔllılɔɓɓɲuꞁꞁꞁꞁllɓɓlɔꞁꞁꞁllꞁɔlɓɓlɔꞁʼlılꞁl
>012374 2725845 0001 008230 10Z
LOVEJOYS FAMILY MOVING DBA
REPUBLIC MOVING & STORAGE, N.AMER/
REPUBLIC VAN LINES
2311 BOSWELL RD 5
CHULA VISTA CA 91914-3512

## At your service

 bankofthewest.com

 1-800-488-2265

1-800-659-5495 TTY/TDD

## New online and mobile services!

Enjoy these new online debit card services: Online statements - Online and recurring payments - Balance transfers - Dispute transactions - Travel notices - PIN Change - Account alerts - Credit line increases - Replacement cards - Card activation - Lock/unlock your card

Simply log into your account at www.bankofthewest.com and go to the Services and Support page or on your mobile device on the More screen.

Remember to confirm your email during your next branch visit or call our Contact Center at 800-488-2265. Our emails keep you educated about our services, products and more.

## ANALYZED CHECKING 2875

LOVEJOYS FAMILY MOVING DBA
REPUBLIC MOVING & STORAGE, N.AMER/
REPUBLIC VAN LINES

### ACCOUNT SUMMARY

| | |
|---|---|
| **Beginning Balance** | **$0.00** |
| 3 Credits | 1,847.08 |
| 0 Deposits | 0.00 |
| 3 Withdrawals | -1,847.08 |
| 0 Checks | 0.00 |
| **Ending Balance** | **$0.00** |

### EARNINGS SUMMARY

| | |
|---|---|
| Interest this statement period | $0.00 |
| Interest credited year-to-date | $0.00 |
| Interest credited prior year | $0.00 |
| Annual percentage yield earned | 0.00% |
| Average monthly balance | $0.00 |



**For your protection:**
Examine this statement promptly. Any discrepancy must be reported within 30 days. Consumer customers: A discrepancy regarding an electronic payment or line of credit must be reported within 60 days.

In South Dakota, Bank of the West operates under the name of Bank of the West California.



Member FDIC    EXHIBIT A    EQUAL HOUSING LENDER

**BANK** OF THE **WEST**
**BNP PARIBAS**

## ANALYZED CHECKING  xxx-xx2875 *(continued)*

### ACCOUNT DETAIL

**Credits**

| Date | Amount | Description |
|------|--------|-------------|
| 02/11 | $1,215.46 | TARGET TRANSFER TRANSFER FROM CHECKING ACCT 041-742859 |
| 02/20 | 315.81 | TARGET TRANSFER TRANSFER FROM CHECKING ACCT 041-742859 |
| 02/22 | 315.81 | TARGET TRANSFER TRANSFER FROM CHECKING ACCT 041-742859 |

**3 credits for a total of $1,847.08**

**Withdrawals**

| Date | Amount | Description |
|------|--------|-------------|
| 02/11 | $1,215.46 | ELECTRONIC DBT LOVEJOY'S FAMILY 401K 021119 07C65H65 CCD |
| 02/20 | 315.81 | ELECTRONIC DBT LOVEJOY'S FAMILY 401K 022019 07C65H65 CCD |
| 02/22 | 315.81 | ELECTRONIC DBT LOVEJOY'S FAMILY 401K 022219 07C65H65 CCD |

**3 withdrawals for a total of $1,847.08**

020714 11S8188 0000000 0527747 105494 01/02



# Account Statement

February 1, 2019 - February 28, 2019

Page **3** of **4**

## IMPORTANT INFORMATION

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS
(For accounts that are maintained primarily for personal, family or household purposes.)

Telephone us at (800) 488-2265, or write us at Bank of the West*, Branch Service Center, P.O. Box 2573, Omaha, NE 68103-2573 as soon as you can if you think your statement or receipt is wrong or if you need more information about a transfer listed on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. We will need to know the following:

1. Tell us your name and account number (if any).

2. Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.

3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (20 business days for transactions involving new accounts) to do this, we will credit your account for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation.



12374 2725845 024464 048927 0002/0002



*In South Dakota, Bank of the West operates under the name of Bank of the West California.

 bankofthewest.com           1-800-488-2265           1-800-659-5495 TTY/TDD

EXHIBIT A

**BANK**OF**THE**WEST
**BNP PARIBAS**

# Account Statement

February 1, 2019 - February 28, 2019

Page 4 of 4

This space intentionally left blank.

020714 11581B8 0000000 052748 105496 02/02

# BANK OF THE WEST
## BNP PARIBAS

P.O. Box 2830, Omaha, NE 68103-2830

## Account Statement

February 1, 2019 - February 28, 2019

Page **1** of 4

>016054 2725858 0001 008230 10Z
LOVEJOYS FAMILY MOVING DBA
REPUBLIC MOVING & STORAGE N AMER
DEBTOR IN POSSESSION
2311 BOSWELL RD SUITE 5
CHULA VISTA CA 91914-3512

## At your service

 bankofthewest.com

 1-800-488-2265

 1-800-659-5495 TTY/TDD

## New online and mobile services!

Enjoy these new online debit card services: Online statements - Online and recurring payments - Balance transfers - Dispute transactions - Travel notices - PIN Change - Account alerts - Credit line increases - Replacement cards - Card activation - Lock/unlock your card

Simply log into your account at www.bankofthewest.com and go to the Services and Support page or on your mobile device on the More screen.

Remember to confirm your email during your next branch visit or call our Contact Center at 800-488-2265. Our emails keep you educated about our services, products and more.

## CLASSIC BUSINESS CHECKING ▮▮▮▮3552

LOVEJOYS FAMILY MOVING DBA
REPUBLIC MOVING & STORAGE N AMER
DEBTOR IN POSSESSION

### ACCOUNT SUMMARY

| | |
|---|---|
| **Beginning Balance** | **$20,369.44** |
| 16 Credits | 159,083.39 |
| 0 Deposits | 0.00 |
| 17 Withdrawals | -157,569.02 |
| 13 Checks | -13,775.53 |
| **Ending Balance** | **$8,108.28** |

### EARNINGS SUMMARY

| | |
|---|---|
| Interest this statement period | $0.00 |
| Interest credited year-to-date | $0.00 |
| Interest credited prior year | $0.00 |
| Annual percentage yield earned | 0.00% |
| Average monthly balance | $12,961.76 |

**For your protection:**
Examine this statement promptly. Any discrepancy must be reported within 30 days. Consumer customers: A discrepancy regarding an electronic payment or line of credit must be reported within 60 days.

In South Dakota, Bank of the West operates under the name of Bank of the West California.

EXHIBIT A
Member FDIC    EQUAL HOUSING

**BANK OF THE WEST**
**BNP PARIBAS**

## Account Statement

February 1, 2019 - February 28, 2019

Page **2** of **4**

## CLASSIC BUSINESS CHECKING xxx-xx3552 *(continued)*

### ACCOUNT DETAIL

#### Credits

| Date | Amount | Description |
|------|-------:|-------------|
| 02/01 | $10.00 | SERVICE CHG REBATE VALUED CUSTOMER MONTHLY SERVICE CHARGE REBATE |
| 02/06 | 1,171.05 | ACCT TRNSFR CR REFERENCE # 190206006135 ACCT TRNSF CR SENDING BANK REFERENCE # AT20190206273745 001 |
| 02/06 | 10,906.10 | ACCT TRNSFR CR REFERENCE # 190206006132 ACCT TRNSF CR SENDING BANK REFERENCE # AT20190206273744 001 |
| 02/06 | 24,594.56 | ACCT TRNSFR CR REFERENCE # 190206006122 ACCT TRNSF CR SENDING BANK REFERENCE # AT20190206273743 001 |
| 02/13 | 1,015.85 | ACCT TRNSFR CR REFERENCE # 190213007983 ACCT TRNSF CR SENDING BANK REFERENCE # AT20190213278128 001 |
| 02/13 | 10,670.17 | ACCT TRNSFR CR REFERENCE # 190213007982 ACCT TRNSF CR SENDING BANK REFERENCE # AT20190213278127 001 |
| 02/13 | 24,570.56 | ACCT TRNSFR CR REFERENCE # 190213007979 ACCT TRNSF CR SENDING BANK REFERENCE # AT20190213278125 001 |
| 02/20 | 580.54 | ACCT TRNSFR CR REFERENCE # 190220008296 ACCT TRNSF CR SENDING BANK REFERENCE # AT20190220281901 001 |
| 02/20 | 757.31 | ACCT TRNSFR CR REFERENCE # 190220004390 ACCT TRNSF CR SENDING BANK REFERENCE # AT20190220281447 001 |
| 02/20 | 5,198.18 | ACCT TRNSFR CR REFERENCE # 190220004333 ACCT TRNSF CR SENDING BANK REFERENCE # AT20190220281439 001 |
| 02/20 | 12,343.61 | ACCT TRNSFR CR REFERENCE # 190220008295 ACCT TRNSF CR SENDING BANK REFERENCE # AT20190220281900 001 |
| 02/20 | 22,916.87 | ACCT TRNSFR CR REFERENCE # 190220008282 ACCT TRNSF CR SENDING BANK REFERENCE # AT20190220281899 001 |
| 02/26 | 3,420.58 | ACCT TRNSFR CR REFERENCE # 190226005193 ACCT TRNSF CR SENDING BANK REFERENCE # AT20190226285213 001 |
| 02/26 | 7,203.05 | ACCT TRNSFR CR REFERENCE # 190226005187 ACCT TRNSF CR SENDING BANK REFERENCE # AT20190226285212 001 |
| 02/26 | 10,160.65 | ACCT TRNSFR CR REFERENCE # 190226005185 ACCT TRNSF CR SENDING BANK REFERENCE # AT20190226285207 001 |
| 02/27 | 23,564.31 | ACCT TRNSFR CR REFERENCE # 190227009599 ACCT TRNSF CR SENDING BANK REFERENCE # AT20190227286805 001 |

**16 credits for a total of $159,083.39**

#### Withdrawals

| Date | Amount | Description |
|------|-------:|-------------|
| 02/01 | $10.00 | MONTHLY SVC CHG PREVIOUS PERIOD ACTIVITY RESULTED IN MONTHLY SERVICE CHARGE |
| 02/01 | 113.24 | ELECTRONIC DBT LOVEJOY'S FAMILY BILLING 020119 L120 CCD |
| 02/01 | 10,490.90 | ELECTRONIC DBT LOVEJOY'S FAMILY TAX 020119 L120 CCD |
| 02/07 | 24,594.56 | ELECTRONIC DBT LOVEJOY'S FAMILY DIRDEP 020719 L120 CCD |
| 02/08 | 114.96 | ELECTRONIC DBT LOVEJOY'S FAMILY BILLING 020819 L120 CCD |
| 02/08 | 10,791.14 | ELECTRONIC DBT LOVEJOY'S FAMILY TAX 020819 L120 CCD |
| 02/14 | 24,570.56 | ELECTRONIC DBT LOVEJOY'S FAMILY DIRDEP 021419 L120 CCD |
| 02/15 | 120.01 | ELECTRONIC DBT LOVEJOY'S FAMILY BILLING 021519 L120 CCD |
| 02/15 | 10,550.16 | ELECTRONIC DBT LOVEJOY'S FAMILY TAX 021519 L120 CCD |
| 02/20 | 25.00 | CASH MANAGEMENT CHG -NON-ANALYZED CHARGES |
| 02/21 | 22,916.87 | ELECTRONIC DBT LOVEJOY'S FAMILY DIRDEP 022119 L120 CCD |
| 02/22 | 119.22 | ELECTRONIC DBT LOVEJOY'S FAMILY BILLING 022219 L120 CCD |
| 02/22 | 12,224.39 | ELECTRONIC DBT LOVEJOY'S FAMILY TAX 022219 L120 CCD |
| 02/27 | 10,160.65 | ELECTRONIC DBT LOVEJOY'S FAMILY DIRDEP 022719 L120 CCD |
| 02/28 | 88.35 | ELECTRONIC DBT LOVEJOY'S FAMILY BILLING 022819 L120 CCD |
| 02/28 | 7,114.70 | ELECTRONIC DBT LOVEJOY'S FAMILY TAX 022819 L120 CCD |
| 02/28 | 23,564.31 | ELECTRONIC DBT LOVEJOY'S FAMILY DIRDEP 022819 L120 CCD |

**17 withdrawals for a total of $157,569.02**

#### Checks Paid

| Number | Date paid | Amount | Number | Date paid | Amount | Number | Date paid | Amount |
|--------|-----------|-------:|--------|-----------|-------:|--------|-----------|-------:|
| 0 | 02/04 | 3,906.28 | 11538 | 02/11 | 616.33 | 11542 | 02/22 | 580.54 |
| 11535* | 02/04 | 915.42 | 11539 | 02/08 | 554.72 | 20192191* | 02/25 | 1,041.97 |
| 11536 | 02/04 | 567.88 | 11540 | 02/20 | 543.74 | 20192192 | 02/25 | 3,158.40 |
| 11537 | 02/01 | 420.33 | 11541 | 02/15 | 472.11 | 20192195* | 02/20 | 598.14 |

*\* Break in check number sequence.*

bankofthewest.com          1-800-488-2265          1-800-659-5495 TTY/TDD

EXHIBIT 7

**BANK OF THE WEST**
**BNP PARIBAS**

# Account Statement

February 1, 2019 - February 28, 2019

Page **3** of **4**

## CLASSIC BUSINESS CHECKING  xxx-xx3552 *(continued)*

### ACCOUNT DETAIL

**Checks Paid**

| Number | Date paid | Amount |
|--------|-----------|--------|
| 20192196 | 02/20 | 399.67 |

**13 checks paid for a total of $13,775.53**

16054 2725858 031540 063079 0002/0002

 
EXHIBIT A

**BANK OF THE WEST**
**BNP PARIBAS**

# Account Statement

February 1, 2019 - February 28, 2019

Page 4 of 4

## IMPORTANT INFORMATION

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS
(For accounts that are maintained primarily for personal, family or household purposes.)

Telephone us at (800) 488-2265, or write us at Bank of the West*, Branch Service Center, P.O. Box 2573, Omaha, NE 68103-2573 as soon as you can if you think your statement or receipt is wrong or if you need more information about a transfer listed on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. We will need to know the following:

1. Tell us your name and account number (if any).

2. Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.

3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (20 business days for transactions involving new accounts) to do this, we will credit your account for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation.

*In South Dakota, Bank of the West operates under the name of Bank of the West California.

 bankofthewest.com          1-800-488-2265          1-800-659-5495 TTY/TDD

033106  1158084  0000000  066756  133512  02/02

# Check Register

**Republic Moving & Storage**

Company (L120)

| Bank Account | Transit Number | Bank Name | | Description | | |
|---|---|---|---|---|---|---|
| 3552 | 122242843 | Bank of the West, La Mesa, CA | | Primary Account | | |

**Payroll Checks**

| Check/Voucher | | Check Type | Check Date | Payable to | Name | Net Amount | Dir Dep | Net Check |
|---|---|---|---|---|---|---|---|---|
| 11536 | ☐ | Reg | 02/01/2019 | 173 | Tropp, Jacob | 567.88 | 0.00 | 567.88 |
| 11537 | ☐ | Reg | 02/01/2019 | 175 | Rodriguez, Jacob | 420.33 | 0.00 | 420.33 |
| 11538 | ☐ | Reg | 02/08/2019 | 173 | Tropp, Jacob | 616.33 | 0.00 | 616.33 |
| 11539 | ☐ | Reg | 02/08/2019 | 175 | Rodriguez, Jacob | 554.72 | 0.00 | 554.72 |
| 11540 | ☐ | Reg | 02/15/2019 | 173 | Tropp, Jacob | 543.74 | 0.00 | 543.74 |
| 11541 | ☐ | Reg | 02/15/2019 | 176 | Martinez, Tiffany | 472.11 | 0.00 | 472.11 |
| 11542 | ☐ | Reg | 02/22/2019 | 176 | Martinez, Tiffany | 580.54 | 0.00 | 580.54 |
| 11543 | ☐ | Reg | 02/28/2019 | 155 | Carlson, Donald | 2,959.33 | 0.00 | 2,959.33 |
| 11544 | ☐ | Reg | 02/28/2019 | 174 | Saavedra, David | 461.25 | 0.00 | 461.25 |
| 15303 | ☐ | Reg | 02/01/2019 | 168 | Achenbach, Harry | 351.49 | 351.49 | 0.00 |
| 15304 | ☐ | Reg | 02/01/2019 | 98 | Lepera, Amanda | 665.27 | 665.27 | 0.00 |
| 15305 | ☐ | Reg | 02/01/2019 | 54 | Wicker, Timothy | 976.64 | 976.64 | 0.00 |
| 15306 | ☐ | Reg | 02/01/2019 | 14 | Lovejoy, James | 1,337.47 | 1,337.47 | 0.00 |
| 15307 | ☐ | Reg | 02/01/2019 | 26 | Shadoan, Gregory | 919.42 | 919.42 | 0.00 |
| 15308 | ☐ | Reg | 02/01/2019 | 164 | Bernal, Carla | 498.31 | 498.31 | 0.00 |
| 15309 | ☐ | Reg | 02/01/2019 | 106 | Evans, Sharon | 586.86 | 586.86 | 0.00 |
| 15310 | ☐ | Reg | 02/01/2019 | 63 | Galibut, Rosalinda | 562.22 | 562.22 | 0.00 |
| 15311 | ☐ | Reg | 02/01/2019 | 166 | Jenious, Auntadiasha | 496.18 | 496.18 | 0.00 |
| 15312 | ☐ | Reg | 02/01/2019 | 170 | Leasure, Sarah | 490.43 | 490.43 | 0.00 |
| 15313 | ☐ | Reg | 02/01/2019 | 114 | Leon, Flavia R. | 493.44 | 493.44 | 0.00 |
| 15314 | ☐ | Reg | 02/01/2019 | 65 | Lovejoy, Carol | 863.06 | 863.06 | 0.00 |
| 15315 | ☐ | Reg | 02/01/2019 | 163 | Payovo, Eric | 608.28 | 608.28 | 0.00 |
| 15316 | ☐ | Reg | 02/01/2019 | 60 | Ruiz, Michelle | 877.32 | 877.32 | 0.00 |
| 15317 | ☐ | Reg | 02/01/2019 | 123 | Shaffer, Amanda | 497.74 | 497.74 | 0.00 |
| 15318 | ☐ | Reg | 02/01/2019 | 131 | Skiff, Andria | 804.81 | 804.81 | 0.00 |
| 15319 | ☐ | Reg | 02/01/2019 | 8 | Garner, Lynn | 696.79 | 696.79 | 0.00 |
| 15320 | ☐ | Reg | 02/01/2019 | 12 | Lammers, Mischelle | 877.20 | 877.20 | 0.00 |
| 15321 | ☐ | Reg | 02/01/2019 | 17 | Moore, Robert | 1,090.67 | 1,090.67 | 0.00 |
| 15322 | ☐ | Reg | 02/01/2019 | 22 | Rosa, Ruth | 790.34 | 790.34 | 0.00 |
| 15323 | ☐ | Reg | 02/01/2019 | 154 | Cerone, Lacey | 630.60 | 630.60 | 0.00 |
| 15324 | ☐ | Reg | 02/01/2019 | 151 | Kordylas, Jessica | 514.01 | 514.01 | 0.00 |
| 15325 | ☐ | Reg | 02/01/2019 | 88 | Mello, Peter | 591.26 | 591.26 | 0.00 |
| 15326 | ☐ | Reg | 02/01/2019 | 118 | Ramirez Canales, Angelica | 526.00 | 526.00 | 0.00 |
| 15327 | ☐ | Reg | 02/01/2019 | 156 | Velasco, Angela | 561.62 | 561.62 | 0.00 |
| 15328 | ☐ | Reg | 02/01/2019 | 1 | Bell, Gary | 1,458.44 | 1,458.44 | 0.00 |
| 15329 | ☐ | Reg | 02/01/2019 | 9 | Gerrick, Julie | 547.56 | 547.56 | 0.00 |
| 15330 | ☐ | Reg | 02/01/2019 | 46 | Allen, Robert | 623.84 | 623.84 | 0.00 |
| 15331 | ☐ | Reg | 02/01/2019 | 18 | Packard, Terrence | 949.19 | 949.19 | 0.00 |
| 15332 | ☐ | Reg | 02/01/2019 | 15 | Lovejoy, Joseph | 2,537.50 | 2,537.50 | 0.00 |
| 15338 | ☐ | Reg | 02/08/2019 | 168 | Achenbach, Harry | 534.03 | 534.03 | 0.00 |
| 15339 | ☐ | Reg | 02/08/2019 | 98 | Lepera, Amanda | 665.27 | 665.27 | 0.00 |
| 15340 | ☐ | Reg | 02/08/2019 | 54 | Wicker, Timothy | 976.63 | 976.63 | 0.00 |
| 15341 | ☐ | Reg | 02/08/2019 | 14 | Lovejoy, James | 1,337.48 | 1,337.48 | 0.00 |
| 15342 | ☐ | Reg | 02/08/2019 | 26 | Shadoan, Gregory | 919.40 | 919.40 | 0.00 |
| 15343 | ☐ | Reg | 02/08/2019 | 164 | Bernal, Carla | 504.08 | 504.08 | 0.00 |
| 15344 | ☐ | Reg | 02/08/2019 | 106 | Evans, Sharon | 557.34 | 557.34 | 0.00 |
| 15345 | ☐ | Reg | 02/08/2019 | 63 | Galibut, Rosalinda | 568.13 | 568.13 | 0.00 |
| 15346 | ☐ | Reg | 02/08/2019 | 166 | Jenious, Auntadiasha | 499.95 | 499.95 | 0.00 |
| 15347 | ☐ | Reg | 02/08/2019 | 170 | Leasure, Sarah | 493.69 | 493.69 | 0.00 |
| 15348 | ☐ | Reg | 02/08/2019 | 114 | Leon, Flavia R. | 473.52 | 473.52 | 0.00 |
| 15349 | ☐ | Reg | 02/08/2019 | 65 | Lovejoy, Carol | 863.08 | 863.08 | 0.00 |
| 15350 | ☐ | Reg | 02/08/2019 | 163 | Payovo, Eric | 622.78 | 622.78 | 0.00 |
| 15351 | ☐ | Reg | 02/08/2019 | 60 | Ruiz, Michelle | 959.72 | 959.72 | 0.00 |
| 15352 | ☐ | Reg | 02/08/2019 | 123 | Shaffer, Amanda | 539.15 | 539.15 | 0.00 |
| 15353 | ☐ | Reg | 02/08/2019 | 131 | Skiff, Andria | 804.80 | 804.80 | 0.00 |
| 15354 | ☐ | Reg | 02/08/2019 | 8 | Garner, Lynn | 688.34 | 688.34 | 0.00 |
| 15355 | ☐ | Reg | 02/08/2019 | 12 | Lammers, Mischelle | 877.19 | 877.19 | 0.00 |
| 15356 | ☐ | Reg | 02/08/2019 | 17 | Moore, Robert | 1,090.65 | 1,090.65 | 0.00 |
| 15357 | ☐ | Reg | 02/08/2019 | 22 | Rosa, Ruth | 790.35 | 790.35 | 0.00 |
| 15358 | ☐ | Reg | 02/08/2019 | 141 | Bell, Tracey | 810.28 | 810.28 | 0.00 |
| 15359 | ☐ | Reg | 02/08/2019 | 154 | Cerone, Lacey | 659.22 | 659.22 | 0.00 |
| 15360 | ☐ | Reg | 02/08/2019 | 151 | Kordylas, Jessica | 547.02 | 547.02 | 0.00 |
| 15361 | ☐ | Reg | 02/08/2019 | 88 | Mello, Peter | 591.27 | 591.27 | 0.00 |
| 15362 | ☐ | Reg | 02/08/2019 | 118 | Ramirez Canales, Angelica | 510.85 | 510.85 | 0.00 |
| 15363 | ☐ | Reg | 02/08/2019 | 156 | Velasco, Angela | 593.81 | 593.81 | 0.00 |
| 15364 | ☐ | Reg | 02/08/2019 | 1 | Bell, Gary | 1,458.44 | 1,458.44 | 0.00 |
| 15365 | ☐ | Reg | 02/08/2019 | 9 | Gerrick, Julie | 547.53 | 547.53 | 0.00 |
| 15366 | ☐ | Reg | 02/08/2019 | 46 | Allen, Robert | 623.86 | 623.86 | 0.00 |
| 15367 | ☐ | Reg | 02/08/2019 | 18 | Packard, Terrence | 949.21 | 949.21 | 0.00 |
| 15368 | ☐ | Reg | 02/08/2019 | 15 | Lovejoy, Joseph | 2,537.49 | 2,537.49 | 0.00 |
| 15374 | ☐ | Reg | 02/15/2019 | 168 | Achenbach, Harry | 822.76 | 822.76 | 0.00 |
| 15375 | ☐ | Reg | 02/15/2019 | 98 | Lepera, Amanda | 665.27 | 665.27 | 0.00 |
| 15376 | ☐ | Reg | 02/15/2019 | 54 | Wicker, Timothy | 976.63 | 976.63 | 0.00 |
| 15377 | ☐ | Reg | 02/15/2019 | 14 | Lovejoy, James | 1,337.49 | 1,337.49 | 0.00 |
| 15378 | ☐ | Reg | 02/15/2019 | 26 | Shadoan, Gregory | 919.42 | 919.42 | 0.00 |
| 15379 | ☐ | Reg | 02/15/2019 | 164 | Bernal, Carla | 480.98 | 480.98 | 0.00 |
| 15380 | ☐ | Reg | 02/15/2019 | 106 | Evans, Sharon | 552.59 | 552.59 | 0.00 |
| 15381 | ☐ | Reg | 02/15/2019 | 63 | Galibut, Rosalinda | 557.61 | 557.61 | 0.00 |
| 15382 | ☐ | Reg | 02/15/2019 | 166 | Jenious, Auntadiasha | 493.81 | 493.81 | 0.00 |
| 15383 | ☐ | Reg | 02/15/2019 | 170 | Leasure, Sarah | 486.84 | 486.84 | 0.00 |
| 15384 | ☐ | Reg | 02/15/2019 | 114 | Leon, Flavia R. | 460.14 | 460.14 | 0.00 |
| 15385 | ☐ | Reg | 02/15/2019 | 65 | Lovejoy, Carol | 863.09 | 863.09 | 0.00 |
| 15386 | ☐ | Reg | 02/15/2019 | 163 | Payovo, Eric | 613.72 | 613.72 | 0.00 |
| 15387 | ☐ | Reg | 02/15/2019 | 60 | Ruiz, Michelle | 966.80 | 966.80 | 0.00 |
| 15388 | ☐ | Reg | 02/15/2019 | 123 | Shaffer, Amanda | 500.09 | 500.09 | 0.00 |
| 15389 | ☐ | Reg | 02/15/2019 | 131 | Skiff, Andria | 804.82 | 804.82 | 0.00 |

EXHIBIT A

| Check | | Check Type | Check Date | | Name | Net Amount | Dir Dep | Net Check |
|---|---|---|---|---|---|---|---|---|
| 15390 | ☐ | Reg | 02/15/2019 | 8 | Garner, Lynn | 688.33 | 688.33 | 0.00 |
| 15391 | ☐ | Reg | 02/15/2019 | 12 | Lammers, Mischelle | 877.20 | 877.20 | 0.00 |
| 15392 | ☐ | Reg | 02/15/2019 | 17 | Moore, Robert | 1,090.66 | 1,090.66 | 0.00 |
| 15393 | ☐ | Reg | 02/15/2019 | 22 | Rosa, Ruth | 790.36 | 790.36 | 0.00 |
| 15394 | ☐ | Reg | 02/15/2019 | 154 | Cerone, Lacey | 626.22 | 626.22 | 0.00 |
| 15395 | ☐ | Reg | 02/15/2019 | 151 | Kordylas, Jessica | 553.59 | 553.59 | 0.00 |
| 15396 | ☐ | Reg | 02/15/2019 | 88 | Mello, Peter | 591.26 | 591.26 | 0.00 |
| 15397 | ☐ | Reg | 02/15/2019 | 118 | Ramirez Canales, Angelica | 533.91 | 533.91 | 0.00 |
| 15398 | ☐ | Reg | 02/15/2019 | 175 | Rodriguez, Jacob | 528.48 | 528.48 | 0.00 |
| 15399 | ☐ | Reg | 02/15/2019 | 156 | Velasco, Angela | 584.62 | 584.62 | 0.00 |
| 15400 | ☐ | Reg | 02/15/2019 | 1 | Bell, Gary | 1,458.46 | 1,458.46 | 0.00 |
| 15401 | ☐ | Reg | 02/15/2019 | 9 | Gerrick, Julie | 547.55 | 547.55 | 0.00 |
| 15402 | ☐ | Reg | 02/15/2019 | 46 | Allen, Robert | 711.15 | 711.15 | 0.00 |
| 15403 | ☐ | Reg | 02/15/2019 | 18 | Packard, Terrence | 949.20 | 949.20 | 0.00 |
| 15404 | ☐ | Reg | 02/15/2019 | 15 | Lovejoy, Joseph | 2,537.51 | 2,537.51 | 0.00 |
| 15410 | ☐ | Reg | 02/22/2019 | 168 | Achenbach, Harry | 612.71 | 612.71 | 0.00 |
| 15411 | ☐ | Reg | 02/22/2019 | 54 | Wicker, Timothy | 976.63 | 976.63 | 0.00 |
| 15412 | ☐ | Reg | 02/22/2019 | 14 | Lovejoy, James | 1,261.46 | 1,261.46 | 0.00 |
| 15413 | ☐ | Reg | 02/22/2019 | 26 | Shadoan, Gregory | 919.41 | 919.41 | 0.00 |
| 15414 | ☐ | Reg | 02/22/2019 | 164 | Bernal, Carla | 510.26 | 510.26 | 0.00 |
| 15415 | ☐ | Reg | 02/22/2019 | 106 | Evans, Sharon | 571.50 | 571.50 | 0.00 |
| 15416 | ☐ | Reg | 02/22/2019 | 63 | Galibut, Rosalinda | 553.80 | 553.80 | 0.00 |
| 15417 | ☐ | Reg | 02/22/2019 | 170 | Leasure, Sarah | 492.38 | 492.38 | 0.00 |
| 15418 | ☐ | Reg | 02/22/2019 | 114 | Leon, Flavia R. | 460.16 | 460.16 | 0.00 |
| 15419 | ☐ | Reg | 02/22/2019 | 65 | Lovejoy, Carol | 863.08 | 863.08 | 0.00 |
| 15420 | ☐ | Reg | 02/22/2019 | 163 | Payoyo, Eric | 620.30 | 620.30 | 0.00 |
| 15421 | ☐ | Reg | 02/22/2019 | 60 | Ruiz, Michelle | 911.46 | 911.46 | 0.00 |
| 15422 | ☐ | Reg | 02/22/2019 | 123 | Shaffer, Amanda | 504.75 | 504.75 | 0.00 |
| 15423 | ☐ | Reg | 02/22/2019 | 131 | Skiff, Andria | 804.81 | 804.81 | 0.00 |
| 15424 | ☐ | Reg | 02/22/2019 | 8 | Garner, Lynn | 688.33 | 688.33 | 0.00 |
| 15425 | ☐ | Reg | 02/22/2019 | 12 | Lammers, Mischelle | 877.21 | 877.21 | 0.00 |
| 15426 | ☐ | Reg | 02/22/2019 | 17 | Moore, Robert | 1,090.66 | 1,090.66 | 0.00 |
| 15427 | ☐ | Reg | 02/22/2019 | 22 | Rosa, Ruth | 790.34 | 790.34 | 0.00 |
| 15428 | ☐ | Reg | 02/22/2019 | 154 | Cerone, Lacey | 488.72 | 488.72 | 0.00 |
| 15429 | ☐ | Reg | 02/22/2019 | 151 | Kordylas, Jessica | 533.66 | 533.66 | 0.00 |
| 15430 | ☐ | Reg | 02/22/2019 | 88 | Mello, Peter | 591.28 | 591.28 | 0.00 |
| 15431 | ☐ | Reg | 02/22/2019 | 118 | Ramirez Canales, Angelica | 545.12 | 545.12 | 0.00 |
| 15432 | ☐ | Reg | 02/22/2019 | 175 | Rodriguez, Jacob | 503.38 | 503.38 | 0.00 |
| 15433 | ☐ | Reg | 02/22/2019 | 156 | Velasco, Angela | 541.63 | 541.63 | 0.00 |
| 15434 | ☐ | Reg | 02/22/2019 | 1 | Bell, Gary | 1,458.43 | 1,458.43 | 0.00 |
| 15435 | ☐ | Reg | 02/22/2019 | 9 | Gerrick, Julie | 547.55 | 547.55 | 0.00 |
| 15436 | ☐ | Reg | 02/22/2019 | 46 | Allen, Robert | 711.16 | 711.16 | 0.00 |
| 15437 | ☐ | Reg | 02/22/2019 | 18 | Packard, Terrence | 949.20 | 949.20 | 0.00 |
| 15438 | ☐ | Reg | 02/22/2019 | 15 | Lovejoy, Joseph | 2,537.49 | 2,537.49 | 0.00 |
| 15444 | ☐ | Reg | 02/28/2019 | 141 | Bell, Tracey | 1,186.95 | 1,186.95 | 0.00 |
| 15445 | ☐ | Reg | 02/28/2019 | 154 | Cerone, Lacey | 110.40 | 110.40 | 0.00 |
| 15446 | ☐ | Reg | 02/28/2019 | 110 | Gonzalez, Jessica | 1,341.17 | 1,341.17 | 0.00 |
| 15447 | ☐ | Reg | 02/28/2019 | 81 | Gross-Drayton, Mariquita | 3,893.87 | 3,893.87 | 0.00 |
| 15448 | ☐ | Reg | 02/28/2019 | 115 | Miller, Theresa | 1,797.38 | 1,797.38 | 0.00 |
| 15449 | ☐ | Reg | 02/28/2019 | 92 | Stodolsky, Daniel | 1,063.56 | 1,063.56 | 0.00 |
| 15450 | ☐ | Reg | 02/28/2019 | 156 | Velasco, Angela | 570.94 | 570.94 | 0.00 |
| 15451 | ☐ | Reg | 02/28/2019 | 9 | Gerrick, Julie | 196.38 | 196.38 | 0.00 |
| 20192191 | | Manual | 02/22/2019 | 98 | Lepera, Amanda | 1,041.97 | 0.00 | 1,041.97 |
| 20192192 | | Manual | 02/22/2019 | 98 | Lepera, Amanda | 3,158.40 | 0.00 | 3,158.40 |
| 20192193 | | Manual | 02/22/2019 | 166 | Jenious, Auntadiasha | 569.32 | 0.00 | 569.32 |
| 20192194 | | Manual | 02/22/2019 | 166 | Jenious, Auntadiasha | 187.99 | 0.00 | 187.99 |
| 20192195 | | Manual | 02/22/2019 | 173 | Tropp, Jacob | 598.14 | 0.00 | 598.14 |
| 20192196 | | Manual | 02/22/2019 | 173 | Tropp, Jacob | 399.67 | 0.00 | 399.67 |

**Totals for Payroll Checks**                    **144 Items**                    **118,798.32**    **105,666.60**    **13,131.72**

**Third Party and Misc Checks**

| Check/Voucher | Check Type | Check Date | Payable to | Name | Net Amount | Dir Dep | Net Check |
|---|---|---|---|---|---|---|---|
| 15334 | Transfer | 02/01/2019 | Billing | Pay-Net | 113.24 | 113.24 | 0.00 |
| 15335 | Transfer | 01/31/2019 | DirDep | Pay-Net | 23,423.96 | 23,423.96 | 0.00 |

| Bank Account | Transit Number | | Bank Name | | Description | | |
|---|---|---|---|---|---|---|---|
| **3552** | **122242843** | | **Bank of the West, La Mesa, CA** | | **Primary Account** | | |

| Check/Voucher | Check Type | Check Date | Payable to | Name | Net Amount | Dir Dep | Net Check |
|---|---|---|---|---|---|---|---|

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 15337 | ☐ | Transfer | 02/01/2019 | Tax | Pay-Net | 10,490.90 | 10,490.90 | 0.00 |
| 15369 | ☐ | Transfer | 02/08/2019 | Tax | Pay-Net | 10,791.14 | 10,791.14 | 0.00 |
| 15370 | ☐ | Transfer | 02/07/2019 | DirDep | Pay-Net | 24,594.56 | 24,594.56 | 0.00 |
| 15371 | ☐ | Transfer | 02/08/2019 | Billing | Pay-Net | 114.96 | 114.96 | 0.00 |
| 15405 | ☐ | Transfer | 02/15/2019 | Tax | Pay-Net | 10,550.16 | 10,550.16 | 0.00 |
| 15406 | ☐ | Transfer | 02/15/2019 | Billing | Pay-Net | 120.01 | 120.01 | 0.00 |
| 15408 | ☐ | Transfer | 02/14/2019 | DirDep | Pay-Net | 24,570.56 | 24,570.56 | 0.00 |
| 15439 | ☐ | Transfer | 02/21/2019 | DirDep | Pay-Net | 22,916.87 | 22,916.87 | 0.00 |
| 15441 | ☐ | Transfer | 02/22/2019 | Billing | Pay-Net | 119.22 | 119.22 | 0.00 |
| 15442 | ☐ | Transfer | 02/22/2019 | Tax | Pay-Net | 12,224.39 | 12,224.39 | 0.00 |
| 15452 | ☐ | Transfer | 02/27/2019 | DirDep | Pay-Net | 10,160.65 | 10,160.65 | 0.00 |
| 15453 | ☐ | Transfer | 02/28/2019 | Tax | Pay-Net | 7,114.70 | 7,114.70 | 0.00 |
| 15454 | ☐ | Transfer | 02/28/2019 | Billing | Pay-Net | 88.35 | 88.35 | 0.00 |

**Totals for Third Party and Misc Checks**        **15 Items**                157,393.67        157,393.67

**Totals for Account        3552**

| Check Type | Count | Net Amount | Dir Dep | Net Check |
|---|---|---|---|---|
| Manual | 6 | 5,955.49 | | 5,955.49 |
| Reg | 138 | 112,842.83 | 105,666.60 | 7,176.23 |
| Transfer | 15 | 157,393.67 | 157,393.67 | 0.00 |
| **Totals** | **159** | **170,525.39** | **157,393.67** | **13,131.72** |

●        Only the Net Check amounts for payroll checks are included in these totals. The Dir Dep
         amount is already included as part of the Transfers amount.

**Account Totals**

| Account | Count | Net Amount | Dir Dep | Net Check |
|---|---|---|---|---|
| 3552 | 159 | 170,525.39 | 157,393.67 | 13,131.72 |
| **Totals** | **159** | **170,525.39** | **157,393.67** | **13,131.72** |

EXHIBIT A

## PAYROLL REGISTER

| Check Type | Count | Net Amount | Dir Dep | Net Check |
|---|---|---|---|---|
| Manual | 6 | 5,955.49 | 0.00 | 5,955.49 |
| Reg | 138 | 112,842.83 | 105,666.60 | 7,176.23 |
| Transfer | 15 | 157,393.67 | 157,393.67 | 0.00 |
| Totals | 159 | 176,525.39 | 157,393.67 | 13,131.72 |

| | | | |
|---|---|---|---|
| 1/30/2019 PAYROLL | DIRECT DEPOSITS | $(23,423.96) | 2/1/2019 |
| 1/30/2019 PAYROLL | TAX LIABILITY | $(10,604.14) | 2/1/2019 |
| 1/30/2019 PAYROLL | NET CKS | $(988.21) | 2/1/2019 |
| 2/6/2019 PAYROLL | DIRECT DEPOSITS | $(24,594.56) | 2/8/2019 |
| 2/6/2019 PAYROLL | TAX LIAB | $(10,906.10) | 2/8/2019 |
| 2/6/2019 PAYROLL | NET CKS | $(1,171.05) | 2/8/2019 |
| 2/13/2019 PAYROLL | DIRECT DEPOSITS | $(24,570.56) | 2/15/2019 |
| 2/13/2019 PAYROLL | TAX LIABILITY | $(10,670.17) | 2/15/2019 |
| 2/13/2019 PAYROLL | NET CKS | $(1,015.85) | 2/15/2019 |
| 2/20/2019 PAYROLL | NET CKS-TERMINATI | $(5,198.18) | 2/22/2019 |
| 2/20/2019 PAYROLL | NET CKS-TERMINATI | $(757.31) | 2/22/2019 |
| 2/20/2019 PAYROLL | DIRECT DEPOSITS | $(22,916.87) | 2/22/2019 |
| 2/20/2019 PAYROLL | TAX LIAB | $(12,343.61) | 2/22/2019 |
| 2/20/2019 PAYROLL | NET CKS-REGULAR | $(580.54) | 2/22/2019 |
| 2/26/2019 PAYROLL | SALES PR DIR DEP | $(10,160.65) | FEB SALES |
| 2/26/2019 PAYROLL | SALES PR TAX LIAB | $(7,203.05) | FEB SALES |
| 2/26/2019 PAYROLL | SALES PR NET CKS | $(3,420.58) | FEB SALES |
| 2/27/2019 PAYROLL | 3/1/19 DIRECT DEPO | $(23,564.31) | 3/1/2019 |

$ (170,525.39)  TRANSFERRED FOR FEB PAYROLLS

TRANSFERRED IN FEB FOR MARCH 1 PAYROLL
FOR MARCH PAYROLL

EXHIBIT A

**EXHIBIT "B"**

**PROJECTIONS**

| | | **Exhibit B** | | |
|---|---|---|---|---|
| Lovejoy's Family Moving, Inc, DBA Republic Moving & Storage | | **INCOME STATEMENT** | | |
| Case: 6:18-bk-16624-SC | 1 month ending | 1 month ending | 1 month ending | 1 month ending |
| **Income Statement - accrual basis** | **Feb-19** | **Mar-19** | **Apr-19** | **May-19** |
| Total Revenue | 878,378 | 1,082,157 | 1,072,258 | 1,344,437 |
| Commission Expenses | | | | |
| Total Commission Expenses | 374,585 | 480,992 | 479,568 | 609,002 |
| Gross Margin | 503,793 | 601,165 | 592,690 | 735,435 |
| Other Operating Expenses | | | | |
| Employee Costs | 41,892 | 49,605 | 40,153 | 43,900 |
| Outside Services | 25,615 | 33,911 | 33,381 | 40,231 |
| Travel Op's | 606 | 730 | 720 | 854 |
| Travel - Non Op's | 504 | 504 | 504 | 504 |
| Communications | 1,009 | 1,009 | 1,009 | 1,009 |
| Equipment | 685 | 685 | 685 | 685 |
| Vehicles | 61,650 | 51,957 | 53,039 | 63,071 |
| Supplies | 26,979 | 32,064 | 30,033 | 47,848 |
| Advertising | 4,000 | 5,079 | 4,988 | 6,162 |
| Facility | 5,170 | 4,663 | 5,229 | 5,600 |
| Insurance | 19,251 | 7,695 | 17,294 | 17,755 |
| Claims | 10,302 | 7,732 | 9,562 | 9,776 |
| General Expenses | 19,614 | 23,546 | 22,781 | 29,498 |
| Total Other Operating Expenses | 217,279 | 219,180 | 219,377 | 266,895 |
| General & Administrative | | | | |
| Officer Wages | 17,282 | 17,282 | 17,282 | 17,282 |
| Employee Costs | 155,148 | 186,415 | 162,691 | 214,146 |
| Outside Services | 14,485 | 15,409 | 14,485 | 15,409 |
| Travel - Non Op's | 3,597 | 4,416 | 4,347 | 5,238 |
| Communications | 13,106 | 13,497 | 13,464 | 13,890 |
| Equipment | 13,035 | 13,035 | 13,035 | 13,035 |
| Vehicles | (475) | (480) | (524) | (669) |
| Supplies | 4,286 | 5,337 | 5,280 | 6,544 |
| Advertising | 19,506 | 20,038 | 20,762 | 22,913 |
| Facility | 113,850 | 115,220 | 115,104 | 116,595 |
| Insurance | 9,008 | 9,008 | 9,008 | 9,008 |
| Claims | 86 | 90 | 96 | 122 |
| Legal and professional Expenses | 48,111 | 54,652 | 54,280 | 56,361 |
| General Expenses | 17,623 | 22,670 | 24,261 | 28,138 |
| Depreciation & Amortization | 39,299 | 39,299 | 39,299 | 39,299 |
| Total General & Administrative | 467,946 | 515,888 | 492,869 | 557,309 |
| Non Operating Income/(Expense) | | | | |
| Truck rental fees | 24,381 | 25,088 | 25,220 | 26,722 |
| Interest | (16,145) | (16,145) | (16,145) | (16,145) |
| Other Income/(Expense) | | | | |
| Total Non Operating Income/(Expense) | 8,237 | 8,943 | 9,076 | 10,577 |
| Net Income Before Taxes | (173,196) | (124,959) | (110,481) | (78,191) |
| Provision for Income Taxes | (69,279) | (49,984) | (44,192) | (31,277) |
| Federal Income Tax | - | - | - | - |
| State Income Tax | - | - | - | - |
| Other Income Taxes | 201 | 143 | 133 | 47 |
| Total Provision for Income Taxes | (69,078) | (49,841) | (44,059) | (31,230) |
| Net Income After Taxes | (104,118) | (75,119) | (66,422) | (46,962) |

Lovejoy's Family Moving, Inc,
DBA Republic Moving &
Storage

Case: 6:18-bk-16624-SC

| Income Statement – accrual basis | 1 month ending Jun-19 | 1 month ending Jul-19 | 1 month ending Aug-19 | 1 month ending Sep-19 | 1 month ending Oct-19 | 1 month ending Nov-19 | 1 month ending Dec-19 |
|---|---|---|---|---|---|---|---|
| Total Revenue | 2,210,419 | 2,029,388 | 1,631,907 | 1,293,285 | 1,099,465 | 1,185,622 | 1,073,935 |
| Commission Expenses | | | | | | | |
| Total Commission Expenses | 1,024,791 | 894,101 | 727,861 | 555,537 | 486,742 | 527,718 | 487,311 |
| Gross Margin | 1,185,628 | 1,135,287 | 904,046 | 737,748 | 612,723 | 657,904 | 586,624 |
| Other Operating Expenses | | | | | | | |
| Employee Costs | 70,776 | 65,311 | 51,507 | 52,502 | 43,986 | 44,392 | 38,259 |
| Outside Services | 62,993 | 59,687 | 48,148 | 39,935 | 34,201 | 36,733 | 32,404 |
| Travel Op's | 1,302 | 1,237 | 1,010 | 849 | 736 | 786 | 700 |
| Travel - Non Op's | 504 | 504 | 504 | 504 | 504 | 504 | 504 |
| Communications | 1,009 | 1,009 | 1,009 | 1,009 | 1,009 | 1,009 | 1,009 |
| Equipment | 685 | 685 | 685 | 685 | 685 | 685 | 685 |
| Vehicles | 48,589 | 60,429 | 49,649 | 56,153 | 41,008 | 43,180 | 49,685 |
| Supplies | 100,089 | 77,028 | 47,509 | 38,211 | 30,575 | 36,718 | 33,865 |
| Advertising | 10,062 | 9,496 | 7,518 | 6,111 | 5,129 | 5,562 | 4,821 |
| Facility | 8,237 | 9,613 | 8,588 | 6,985 | 5,852 | 5,463 | 5,437 |
| Insurance | 15,553 | 30,545 | 24,055 | 14,777 | 19,164 | 19,921 | 9,248 |
| Claims | 14,433 | 18,422 | 17,319 | 13,566 | 11,190 | 9,520 | 10,546 |
| General Expenses | 52,705 | 50,679 | 37,263 | 30,005 | 23,964 | 26,127 | 22,680 |
| Total Other Operating Expenses | 386,939 | 384,645 | 294,766 | 261,292 | 218,003 | 230,601 | 209,844 |
| General & Administrative | | | | | | | |
| Officer Wages | 17,282 | 17,282 | 17,282 | 17,282 | 17,282 | 17,282 | 17,282 |
| Employee Costs | 162,546 | 147,854 | 199,105 | 185,655 | 154,610 | 196,301 | 161,445 |
| Outside Services | 14,485 | 14,485 | 15,409 | 14,485 | 14,485 | 15,409 | 14,485 |
| Travel - Non Op's | 8,199 | 7,769 | 6,268 | 5,200 | 4,454 | 4,783 | 4,220 |
| Communications | 15,303 | 15,098 | 14,381 | 13,871 | 13,515 | 13,672 | 13,404 |
| Equipment | 12,381 | 12,381 | 12,381 | 9,965 | 9,140 | 8,769 | 8,769 |
| Vehicles | (1,085) | (828) | (755) | (539) | (459) | (431) | (588) |
| Supplies | 10,679 | 9,888 | 7,925 | 6,369 | 5,395 | 5,782 | 5,197 |
| Advertising | 27,420 | 23,570 | 22,357 | 19,748 | 18,006 | 18,512 | 21,827 |
| Facility | 121,549 | 120,829 | 120,504 | 116,531 | 117,283 | 117,834 | 116,892 |
| Insurance | 9,008 | 9,008 | 9,008 | 9,008 | 9,008 | 9,008 | 9,008 |
| Claims | 198 | 151 | 138 | 98 | 92 | 87 | 110 |
| Legal and professional Expenses | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| General Expenses | 45,088 | 37,560 | 34,003 | 26,953 | 24,392 | 24,764 | 23,648 |
| Depreciation & Amortization | 39,299 | 39,299 | 39,299 | 39,299 | 39,299 | 39,299 | 39,299 |
| Total General & Administrative | 484,351 | 456,345 | 499,305 | 465,925 | 428,502 | 473,130 | 436,996 |
| Non Operating Income/(Expense) | | | | | | | |
| Truck rental fees | 31,311 | 29,479 | 27,969 | 25,922 | 25,179 | 25,242 | 25,600 |
| Interest | (31,044) | (33,866) | (31,257) | (29,212) | (27,124) | (23,952) | (24,087) |
| Other Income/(Expense) | | | | | | | |
| Total Non Operating Income/(Expense) | 267 | (4,387) | (3,288) | (3,290) | (1,945) | 1,290 | 1,513 |
| Net Income Before Taxes | 314,604 | 289,910 | 106,686 | 7,240 | (35,728) | (44,537) | (58,702) |
| Provision for Income Taxes | 125,842 | 115,964 | 42,675 | 2,896 | (14,291) | (17,815) | (23,481) |
| Federal Income Tax | - | - | - | - | - | - | - |
| State Income Tax | - | - | - | - | - | - | - |
| Other Income Taxes | 155 | 130 | 126 | 131 | 139 | 178 | 289 |
| Total Provision for Income Taxes | 125,996 | 116,094 | 42,800 | 3,027 | (14,152) | (17,637) | (23,192) |
| Net Income After Taxes | 188,608 | 173,816 | 63,886 | 4,213 | (21,576) | (26,901) | (35,510) |

Lovejoy's Family Moving, Inc,
DBA Republic Moving &
Storage

Case: 6:18-bk-16624-SC

| Income Statement - accrual basis | 1 month ending Jan-20 | 1 month ending Feb-20 | 1 month ending Mar-20 | 1 month ending Apr-20 | 1 month ending May-20 | 12 months June-May 19-20 | 12 months June-May 20-21 |
|---|---|---|---|---|---|---|---|
| Total Revenue | 1,151,266 | 860,662 | 1,070,053 | 1,060,534 | 1,329,247 | 15,995,784 | 15,897,165 |
| Commission Expenses | | | | | | | |
| Total Commission Expenses | 485,562 | 361,913 | 470,782 | 469,753 | 612,477 | 7,104,547 | 7,044,309 |
| Gross Margin | 665,704 | 498,750 | 599,272 | 590,782 | 716,770 | 8,891,237 | 8,852,856 |
| Other Operating Expenses | | | | | | | |
| Employee Costs | 43,735 | 41,538 | 49,376 | 39,896 | 43,975 | 585,253 | 612,471 |
| Outside Services | 37,663 | 26,651 | 35,857 | 36,027 | 40,341 | 490,639 | 517,081 |
| Travel Op's | 775 | 595 | 728 | 716 | 870 | 10,303 | 10,248 |
| Travel - Non Op's | 504 | 504 | 504 | 504 | 504 | 6,049 | 6,049 |
| Communications | 1,009 | 1,009 | 1,009 | 1,009 | 1,009 | 12,114 | 12,114 |
| Equipment | 685 | 685 | 685 | 685 | 685 | 8,224 | 8,224 |
| Vehicles | 50,235 | 61,751 | 52,279 | 53,327 | 63,752 | 630,037 | 633,571 |
| Supplies | 30,462 | 25,319 | 31,656 | 29,975 | 48,021 | 529,430 | 508,427 |
| Advertising | 5,488 | 3,891 | 5,041 | 4,970 | 8,949 | 77,037 | 55,576 |
| Facility | 6,034 | 5,802 | 5,255 | 5,964 | 6,452 | 79,681 | 81,632 |
| Insurance | 22,318 | 18,565 | 18,131 | 18,821 | 16,702 | 227,800 | 218,166 |
| Claims | 9,067 | 10,057 | 7,535 | 9,475 | 9,670 | 140,801 | 140,096 |
| General Expenses | 24,232 | 17,540 | 21,759 | 21,096 | 28,345 | 356,396 | 336,834 |
| Total Other Operating Expenses | 232,208 | 213,909 | 229,816 | 222,466 | 269,275 | 3,153,765 | 3,140,490 |
| General & Administrative | | | | | | | |
| Officer Wages | 17,282 | 17,282 | 17,282 | 17,282 | 17,282 | 207,381 | 207,381 |
| Employee Costs | 186,729 | 154,028 | 146,217 | 157,845 | 228,290 | 2,080,627 | 1,986,180 |
| Outside Services | 15,214 | 15,214 | 16,138 | 15,214 | 16,138 | 181,161 | 186,269 |
| Travel - Non Op's | 4,891 | 3,649 | 4,562 | 4,479 | 5,544 | 64,017 | 65,191 |
| Communications | 15,338 | 14,750 | 15,182 | 15,143 | 15,647 | 175,307 | 158,555 |
| Equipment | 3,783 | 4,109 | 4,109 | 4,109 | 4,109 | 94,007 | 31,548 |
| Vehicles | (492) | (475) | (480) | (524) | (669) | (7,324) | (7,324) |
| Supplies | 5,654 | 4,156 | 5,250 | 5,181 | 6,591 | 78,068 | 76,955 |
| Advertising | 20,539 | 19,610 | 20,166 | 22,327 | 24,170 | 258,313 | 259,192 |
| Facility | 111,755 | 109,752 | 111,224 | 111,091 | 112,808 | 1,388,050 | 1,396,542 |
| Insurance | 8,993 | 8,993 | 8,993 | 8,993 | 8,993 | 108,020 | 107,920 |
| Claims | 93 | 89 | 90 | 96 | 123 | 1,366 | 1,368 |
| Legal and professional Expenses | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 24,000 | 24,000 |
| General Expenses | 24,051 | 17,470 | 22,774 | 24,597 | 28,726 | 334,024 | 334,405 |
| Depreciation & Amortization | 39,299 | 39,299 | 39,299 | 39,299 | 39,299 | 471,588 | 471,588 |
| Total General & Administrative | 455,130 | 409,928 | 412,808 | 427,133 | 509,051 | 5,458,606 | 5,299,770 |
| Non Operating Income/(Expense) | | | | | | | |
| Truck rental fees | 25,347 | 24,400 | 25,053 | 25,179 | 26,768 | 317,450 | 317,173 |
| Interest | (27,665) | (28,619) | (26,543) | (28,517) | (29,861) | (341,747) | (299,098) |
| Other Income/(Expense) | | | | | | | |
| Total Non Operating Income/(Expense) | (2,318) | (4,219) | (1,490) | (3,337) | (3,092) | (24,297) | 18,076 |
| Net Income Before Taxes | (23,953) | (129,306) | (44,843) | (62,154) | (64,648) | 254,569 | 430,671 |
| Provision for Income Taxes | (9,581) | (51,722) | (17,937) | (24,862) | (25,859) | 101,828 | 172,269 |
| Federal Income Tax | - | - | - | - | - | - | - |
| State Income Tax | - | - | - | - | - | - | - |
| Other Income Taxes | 221 | 201 | 144 | 134 | 126 | 1,973 | |
| Total Provision for Income Taxes | (9,360) | (51,521) | (17,793) | (24,728) | (25,733) | 103,801 | 174,256 |
| Net Income After Taxes | (14,592) | (77,785) | (27,049) | (37,426) | (38,915) | 150,768 | 256,415 |

| Lovejoy's Family Moving, Inc, DBA Republic Moving & Storage | 12 months June-May | 12 months June-May | 12 months June-May |
|---|---|---|---|
| Case: 6:18-bk-16624-SC | | | |
| **Income Statement – accrual basis** | **21-22** | **22-23** | **23-24** |
| Total Revenue | 15,976,651 | 16,056,534 | 16,136,817 |
| Commission Expenses | | | |
| Total Commission Expenses | 7,079,531 | 7,114,928 | 7,150,503 |
| Gross Margin | 8,897,120 | 8,941,606 | 8,986,314 |
| Other Operating Expenses | | | |
| Employee Costs | 624,721 | 637,215 | 649,960 |
| Outside Services | 527,423 | 537,971 | 548,731 |
| Travel Op's | 10,248 | 10,248 | 10,248 |
| Travel - Non Op's | 6,049 | 6,049 | 6,049 |
| Communications | 12,114 | 12,114 | 12,114 |
| Equipment | 8,224 | 8,224 | 8,224 |
| Vehicles | 633,571 | 633,571 | 633,571 |
| Supplies | 508,427 | 508,427 | 508,427 |
| Advertising | 55,576 | 55,576 | 55,576 |
| Facility | 81,632 | 81,632 | 81,632 |
| Insurance | 222,529 | 226,980 | 231,519 |
| Claims | 140,096 | 140,096 | 140,096 |
| General Expenses | 336,834 | 336,834 | 336,834 |
| Total Other Operating Expenses | 3,167,445 | 3,194,938 | 3,222,981 |
| General & Administrative | | | |
| Officer Wages | 211,528 | 215,759 | 220,074 |
| Employee Costs | 2,025,903 | 2,066,422 | 2,107,750 |
| Outside Services | 189,995 | 193,794 | 197,670 |
| Travel - Non Op's | 65,191 | 65,191 | 65,191 |
| Communications | 158,555 | 158,555 | 158,555 |
| Equipment | 31,548 | 31,548 | 31,548 |
| Vehicles | (7,324) | (7,324) | (7,324) |
| Supplies | 76,955 | 76,955 | 76,955 |
| Advertising | 259,192 | 259,192 | 259,192 |
| Facility | 1,431,456 | 1,467,242 | 1,503,923 |
| Insurance | 110,079 | 112,280 | 114,526 |
| Claims | 1,368 | 1,368 | 1,368 |
| Legal and professional Expenses | 24,000 | 24,000 | 24,000 |
| General Expenses | 334,405 | 334,405 | 334,405 |
| Depreciation & Amortization | 531,588 | 571,588 | 611,588 |
| Total General & Administrative | 5,297,346 | 5,305,577 | 5,311,095 |
| Non Operating Income/(Expense) | | | |
| Truck rental fees | 317,306 | 317,434 | 317,434 |
| Interest | (185,588) | (70,653) | (25,238) |
| Other Income/(Expense) | | | |
| Total Non Operating Income/(Expense) | 131,718 | 246,781 | 292,196 |
| Net Income Before Taxes | 564,049 | 687,873 | 744,434 |
| Provision for Income Taxes | 225,620 | 275,149 | 297,774 |
| Federal Income Tax | - | - | - |
| State Income Tax | - | - | - |
| Other Income Taxes | - | - | - |
| Total Provision for Income Taxes | 225,620 | 275,149 | 297,774 |
| Net Income After Taxes | 338,429 | 412,724 | 446,660 |

| Main Document | Page 164 of 180 | | 300,355 | 454,313 |
|---|---|---|---|---|

Lovejoy's Family Moving, Inc, DBA Republic Moving & Storage

| Case: 6:18-bk-16624-SC | CASH FLOW STATEMENT | | | |
|---|---|---|---|---|
| | 1 month ending | 1 month ending | 1 month ending | 1 month ending |
| | **Feb-19** | **Mar-19** | **Apr-19** | **May-19** |
| | | | | |
| **CASH FLOW FROM OPERATING ACTIVITIES** | | | | |
| NET INCOME | (104,118) | (75,119) | (66,422) | (46,962) |
| DEPRECIATION | 39,299 | 39,299 | 39,299 | 39,299 |
| TOTAL ACCOUNTS RECEIVABLE | 223,855 | 1,259 | (2,598) | (231,797) |
| OTHER CURRENT ASSETS | (17,984) | 6,980 | (74,606) | (16,996) |
| TRADE PAYABLES | (8,258) | 6,183 | (21,896) | 151,751 |
| OTHER CURRENT LIABILITIES | (113,417) | (26,735) | (43,870) | 10,718 |
| **CASH FLOW FROM OPERATING ACTIVITIES** | 19,376 | (48,132) | (170,092) | (93,987) |
| | | | | |
| **CASH FLOW FROM INVESTMENT ACTIVITY** | | | | |
| **TOTAL FIXED ASSETS** | (40,000) | (40,000) | (40,000) | - |
| | | | | |
| | | | | |
| **CASH FLOW FROM FINANCING ACTIVITY** | | | | |
| **Pre-Petition Obligations** | | | | |
| Class 1 Secured Claim | (7,200) | (7,200) | (7,200) | (1,852,750) |
| Class 1 Subordianted Claim | - | - | - | - |
| Class 2 Secured Claims | - | - | - | - |
| -Transadvantage | (5,784) | (5,813) | (5,843) | (5,873) |
| -Western Equipment Finance | (652) | (656) | (660) | (664) |
| -Exchange Bank Leasing | (163) | (164) | (165) | (167) |
| -Allegiant Partners | (291) | (294) | (297) | (300) |
| | | | | |
| General Unsecured Claims | - | - | - | - |
| US Trustee Claim | | | | (17,468) |
| Adminstrative and Cure Claims | - | - | - | (128,060) |
| Professional and Legal Claims | 46,012 | 52,789 | 30,437 | 42,033 |
| **Pre-Petition Obligations** | 31,923 | 38,662 | 16,272 | (1,963,248) |
| | | | | |
| **Post-Petition Obligations** | | | | |
| New Line of Credit | - | - | - | 975,760 |
| New term Loan | - | - | - | 1,237,740 |
| **Post-Petition Obligations** | - | - | - | 2,213,500 |
| **TOTAL CASH FLOW** | 11,299 | (49,470) | (193,820) | 156,264 |
| | | | | |
| **BEGINNING CASH** | 535,086 | 546,384 | 494,175 | 298,048 |
| **CASH FLOW** | 11,299 | (49,470) | (193,820) | 156,264 |
| **ENDING CASH** | 546,384 | 496,914 | 300,355 | 454,313 |

| | 601,624 | 1,0... | Main Document 1,095,... | Page 165 of 180 | ...7,431 | 1,088,413 | 933,952 | 972,995 | 754,238 | 743,977 | 557,949 |

Lovejoy's Family Moving, Inc, DBA Republic Moving & Storage

Case: 6:18-bk-16624-SC

**CASH FLOW STATEMENT**

| | 1 month ending | 1 month ending | 1 month ending | 1 month ending | 1 month ending | 1 month ending | 1 month ending | 1 month ending | 1 month ending | 1 month ending | 1 month ending | 1 month ending |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Jun-19** | **Jul-19** | **Aug-19** | **Sep-19** | **Oct-19** | **Nov-19** | **Dec-19** | **Jan-20** | **Feb-20** | **Mar-20** | **Apr-20** | **May-20** |
| **CASH FLOW FROM OPERATING ACTIVITIES** | | | | | | | | | | | | |
| NET INCOME | 188,608 | 173,816 | 63,886 | 4,213 | (21,576) | - | - | - | - | - | - | (40,506) |
| DEPRECIATION | 39,299 | 39,299 | 39,299 | 39,299 | 39,299 | 39,299 | 39,299 | 39,299 | 39,299 | 39,299 | 39,299 | 39,299 |
| TOTAL ACCOUNTS RECEIVABLE | (635,982) | (37,686) | 218,628 | 266,307 | 163,902 | (9,020) | 255,660 | (21,297) | 227,522 | (152,772) | (59,409) | (293,428) |
| OTHER CURRENT ASSETS | 17,636 | 18,197 | 17,932 | 48,993 | 7,034 | 7,028 | 6,875 | 7,095 | 7,017 | 6,995 | (89,043) | 8,003 |
| TRADE PAYABLES | 14,731 | (11,658) | (55,477) | (11,676) | (21,213) | (14,535) | (4,562) | 1,555 | (25,422) | 1,315 | 35,651 | 33,851 |
| OTHER CURRENT LIABILITIES | 313,289 | 82,510 | (67,284) | (127,838) | (3,921) | (40,212) | (15,312) | (52,415) | (109,666) | 27,627 | 51,437 | 23,042 |
| **CASH FLOW FROM OPERATING ACTIVITIES** | (62,419) | 264,479 | 216,984 | 219,299 | 163,525 | (17,441) | 281,959 | (25,762) | 138,749 | (77,535) | (22,066) | (229,739) |
| | | | | | | | | | | | | |
| **CASH FLOW FROM INVESTMENT ACTIVITY** | | | | | | | | | | | | |
| **TOTAL FIXED ASSETS** | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | |
| **CASH FLOW FROM FINANCING ACTIVITY** | | | | | | | | | | | | |
| **Pre-Petition Obligations** | | | | | | | | | | | | |
| Class 1 Secured Claim | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 1 Subordianted Claim | - | - | - | - | (50,000) | - | - | - | - | - | - | - |
| Class 2 Secured Claims | - | - | - | - | - | - | - | - | - | - | - | - |
|   -Transadvantage | (5,903) | (5,933) | (5,963) | (5,994) | (6,025) | (6,055) | (6,086) | (6,118) | (6,149) | (6,180) | (6,212) | (6,244) |
|   -Western Equipment Finance | (668) | (672) | (676) | (680) | (684) | (688) | (692) | (696) | (700) | (705) | (709) | (713) |
|   -Exchange Bank Leasing | (168) | (170) | (171) | (173) | (174) | (175) | (177) | (178) | (180) | (182) | (183) | (185) |
|   -Allegiant Partners | (304) | (307) | (310) | (313) | (316) | (319) | (323) | (326) | (329) | (333) | (336) | (340) |
| | | | | | | | | | | | | |
| General Unsecured Claims | - | - | - | - | - | - | - | - | - | - | - | - |
| US Trustee Claim | | | | | | | | | | | | |
| Adminstrative and Cure Claims | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional and Legal Claims | (57,571) | (57,571) | (57,571) | (57,571) | - | - | - | - | 15,689 | - | - | - |
| **Pre-Petition Obligations** | (64,614) | (64,652) | (64,691) | (64,730) | (57,199) | (7,238) | (7,278) | (7,318) | 8,330 | (7,399) | (7,440) | (7,481) |
| | | | | | | | | | | | | |
| **Post-Petition Obligations** | | | | | | | | | | | | |
| New Line of Credit | 274,230 | 234,155 | (55,446) | (174,115) | (175,257) | (47,606) | (57,644) | (66,221) | (71,549) | (33,820) | 69,103 | 111,964 |
| New term Loan | - | - | - | (18,083) | (18,343) | (18,606) | (18,874) | (19,145) | (19,420) | (19,700) | (19,983) | (20,270) |
| **Post-Petition Obligations** | 274,230 | 234,155 | (55,446) | (192,198) | (193,600) | (66,212) | (76,518) | (85,366) | (90,969) | (53,520) | 49,120 | 91,694 |
| **TOTAL CASH FLOW** | 147,197 | 433,981 | 96,847 | (37,629) | (87,274) | (90,891) | 198,163 | (118,446) | 56,110 | (138,454) | 19,614 | (145,525) |
| | | | | | | | | | | | | |
| **BEGINNING CASH** | 454,427 | 601,776 | 1,035,911 | 1,132,913 | 1,095,439 | 1,008,322 | 890,250 | 1,052,398 | 916,885 | 892,693 | 724,363 | 703,475 |
| **CASH FLOW** | 147,197 | 433,981 | 96,847 | (37,629) | (87,274) | (90,891) | 198,163 | (118,446) | 56,110 | (138,454) | 19,614 | (145,525) |
| **ENDING CASH** | 601,624 | 1,035,757 | 1,132,759 | 1,095,284 | 1,008,166 | 917,431 | 1,088,413 | 933,952 | 972,995 | 754,238 | 743,977 | 557,949 |

| | | | | |
|---|---|---|---|---|
| | | | 591,498 | 754,516 |

Lovejoy's Family Moving, Inc, DBA Republic Moving & Storage

Case: 6:18-bk-16624-SC

## CASH FLOW STATEMENT

| | 12 months ending | 12 months ending | 12 months ending | 12 months ending |
|---|---|---|---|---|
| | **May-21** | **May-22** | **May-23** | **May-24** |
| | | | | |
| **CASH FLOW FROM OPERATING ACTIVITIES** | | | | |
| NET INCOME | 256,415 | 338,429 | 412,724 | 446,660 |
| DEPRECIATION | 471,588 | 531,588 | 571,588 | 611,588 |
| TOTAL ACCOUNTS RECEIVABLE | (97,642) | (22,960) | (8,000) | (43,040) |
| OTHER CURRENT ASSETS | - | (1,769) | (26,804) | (31,841) |
| TRADE PAYABLES | (15,603) | 2,960 | (25,295) | (79,866) |
| OTHER CURRENT LIABILITIES | 18,653 | (1,486) | (21,507) | (72,707) |
| **CASH FLOW FROM OPERATING ACTIVITIES** | 633,411 | 846,763 | 902,706 | 830,795 |
| | | | | |
| **CASH FLOW FROM INVESTMENT ACTIVITY** | | | | |
| **TOTAL FIXED ASSETS** | (120,000) | (300,000) | (300,000) | (300,000) |
| | | | | |
| | | | | |
| **CASH FLOW FROM FINANCING ACTIVITY** | | | | |
| **Pre-Petition Obligations** | | | | |
| Class 1 Secured Claim | - | - | - | - |
| Class 1 Subordianted Claim | (250,000) | (200,000) | - | - |
| Class 2 Secured Claims | | | | |
| -Transadvantage | (81,668) | (89,019) | (97,030) | (105,763) |
| -Western Equipment Finance | (9,327) | (10,166) | (11,081) | (12,078) |
| -Exchange Bank Leasing | (2,415) | (2,632) | (2,869) | (3,127) |
| -Allegiant Partners | (4,441) | (4,841) | (5,276) | (5,751) |
| | | | | |
| General Unsecured Claims | (100,000) | (100,000) | (100,000) | (150,000) |
| US Trustee Claim | | | | |
| Adminstrative and Cure Claims | - | - | - | - |
| Professional and Legal Claims | - | - | - | - |
| **Pre-Petition Obligations** | (447,851) | (406,658) | (216,257) | (276,720) |
| | | | | |
| **Post-Petition Obligations** | | | | |
| New Line of Credit | 188,363 | 206,875 | 6,909 | 6,944 |
| New term Loan | (267,210) | (317,129) | (376,373) | (98,000) |
| **Post-Petition Obligations** | (78,847) | (110,254) | (369,464) | (91,057) |
| **TOTAL CASH FLOW** | (13,288) | 29,851 | 16,985 | 163,019 |
| | | | | |
| **BEGINNING CASH** | 557,949 | 544,662 | 574,513 | 591,498 |
| **CASH FLOW** | (13,288) | 29,851 | 16,985 | 163,019 |
| **ENDING CASH** | 544,662 | 574,513 | 591,498 | 754,516 |

**EXHIBIT "C"**

**LIQUIDATION CHARTS & NOTES**

**CHART I**

**ESTIMATED LIQUIDATION VALUE OF THE DEBTOR'S
ENCUMBERED ASSETS ASSUMING A LIQUIDATION UNDER CHAPTER 7**
**(February 1, 2019)**

| ASSETS | FAIR MARKET VALUE (EST.) | NOTE | LIQUIDATION VALUE |
|---|---|---|---|
| Cash | $535,000 | 1 | $535,000 |
| Accounts Receivable <90 days | $808,000 | 2 | $363,000 |
| Accounts Receivable >90 days | $291,000 | 3 | $43,000 |
| Encumbered Fixed Assets (including Rolling Stock and Equipment) | $2,928,000 | 4 | $1,581,120 |
| **TOTAL EST. LIQUIDATION VALUE OF ENCUMBERED ASSETS** | | | $2,522,120 |

## CHART II

### ESTIMATED SECURED CLAIMS IN CHAPTER 7 LIQUIDATION
**(February 1, 2019)**

| Claim | Note | Approx. Amounts |
|---|---|---|
| Class 1 Secured Creditor (BOW) | 5 | $3,363,509 |
| Class 2 Secured Claims (Aggregate of Class 2(a)-2(e) Secured Claims) | 6 | $492,937 |
| **TOTAL:** | | **$3,856,446** |

## CHART III

## ESTIMATED RECOVERY FROM LIQUIDATION OF ENCUMBERED ASSETS OF DEBTOR
### (February 1, 2019)

| | |
|---|---|
| Proceeds from Liquidation of Encumbered Assets (See Note 7) | $2,522,120 |
| Less Amount of Class 1 and Class 2 Secured Claims (See Note 8) | $3,856,446 |
| **Total Amount Available to Distribute to Unsecured Creditors from Liquidation of Encumbered Assets (See Note 9)** | **($1,334,326)** |

## CHART IV

### ESTIMATED LIQUIDATION VALUE OF DEBTOR'S UNENCUMBERED ASSETS ASSUMING A LIQUIDATION UNDER CHAPTER 7
**(February 1, 2019)**

| ASSETS | FAIR MARKET VALUE (EST) | NOTE | LIQUIDATION VALUE |
|---|---|---|---|
| Unencumbered Assets | $753,000 | 10 | $391,560 |
| Causes of Action | $0 | 11 | $0 |
| **TOTAL EST. LIQUIDATION VALUE OF UNENCUMBERED ASSETS:** | | | **$391,560** |

## CHART V

### ESTIMATED ADMINISTRATIVE AND PRIORITY
### CLAIMS IN CHAPTER 7 LIQUIDATION
#### (February 1, 2019)

| Claims | Note | Approx. Amount |
|---|---|---|
| Chapter 7 Trustee's Fees | 12 | $22,828 |
| Chapter 7 Trustee's Attorneys' Fees and Other Professional Fees | 13 | $100,000 |
| Cost of Services Necessary to Liquidate Assets During Chapter 7 | 14 | $40,000 |
| Chapter 11 Administrative Claims (unpaid) | 15 | $330,468 |
| United States Trustee Fees (unpaid) | 16 | $10,800 |
| Allowed Priority Tax Claims | 17 | $0 |
| Allowed Priority Non-Tax Claims | 18 | $0 |
| **TOTAL:** | | **$504,096** |

# CHART VI

## ESTIMATED DISTRIBUTION TO GENERAL UNSECURED CREDITORS IN CHAPTER 7 LIQUIDATION

Proceeds from Liquidation of Unencumbered Assets                                $391,560
(See Note 19)

Less Proceeds Necessary to Satisfy Chapter 7 Expenses, Chapter 11              $504,096
Administrative Claims and Priority Claims (See Note 20)

    TOTAL AVAILABLE FOR DISTRIBUTION TO                  ($112,536)
    HOLDERS OF ALLOWED GENERAL UNSECURED
    CLAIMS

    ESTIMATED AMOUNT OF ALLOWED GENERAL                $2,471,790  -
    UNSECURED CLAIMS IN CHAPTER 7 (See Note 21)    $2,704,720

    **ESTIMATED PERCENTAGE RECOVERY BY                        0%**
    **HOLDERS OF ALLOWED GENERAL UNSECURED**
    **CLAIMS IN CHAPTER 7 (See Note 22)**

## <u>NOTES TO LIQUIDATION ANALYSIS</u>

**<u>Note 1</u>.**

  <u>Cash</u>. Cash consists of cash as of February 1, 2019, and is treated as 100% recoverable on that date.

**<u>Note 2</u>.**

  <u>Accounts Receivable < 90 Days</u>.  Accounts receivable less than 90 days old are projected to be recoverable at approximately 45% of the face amount of such receivables.

**<u>Note 3</u>.**

  <u>Accounts Receivable > 90 Days</u>.  Accounts Receivables more than 90 days old are projected to be recoverable at approximately 14.7% of the face amount of such receivables.

**<u>Note 4</u>.**

  <u>Encumbered Fixed Assets (including Rolling Stock and Equipment)</u>.  The Debtor estimates that the value of the Debtor's encumbered rolling stock and equipment is approximately $2,928,000.  This estimate is based, in part, upon appraisals of certain rolling stock and equipment prepared by Sterling Appraisals & Machinery in July 2018 and by International Appraisal in October 2017.  The Debtor believes that, in a Chapter 7 liquidation, approximately $1,581,120 in value would be collected from a liquidation of the encumbered fixed assets, including rolling stock and equipment, taking into account commissions that would be incurred in the liquidation of such encumbered fixed assets (but not taking into account any other expenses associated with the liquidation of such encumbered fixed assets).

**<u>Note 5</u>.**

  <u>Claim of Class 1 Secured Creditor (BOW)</u>.  BOW asserts against the Debtor a Secured Claim in an amount not less than $3,363,509.  Based upon the Debtor's negotiations with BOW,

MAINDOCS-#237957-v6-Lovejoy-Notes_to_Liquidation_Analysis.docx

the Debtor believes that it has reached with BOW a preliminary agreement by which BOW

(i) will reduce its Secured Claim by the amount of $1,010,559 and to have such amount be

treated as an Allowed General Unsecured Claim under the Plan, and (ii) will subordinate an

additional $500,000 of its Secured Claim, in part, in order to facilitate the Reorganized Debtor's

obtaining the Post-Effective Date Loan.  The Debtor assumes, however, that, in a Chapter 7

liquidation, there would be no benefit to BOW from reducing the amount of its Secured Claim,

and that BOW would assert in a Chapter 7 liquidation the full amount of its Secured Claim.

**Note 6**.

Class 2 Secured Claims (Classes 2(a)–2(e).  The Debtor estimates that the aggregate

amount of the Allowed Secured Claims of the Class 2 Creditors is approximately $492,937.

**Note 7**.

Proceeds from Liquidation of Encumbered Assets.  The estimated amount of such

proceeds derives from Chart I.

**Note 8**.

Amount of Class 1 and Class 2 Secured Claims.  The estimated amount of such Secured

Claims derives from Chart II.

**Note 9**.

Total Amount Available to Distribute to Unsecured Creditors from Liquidation of

Encumbered Assets.  The Debtor believes that, if the Debtor's Chapter 11 Case were converted

to a Chapter 7 liquidation, BOW and the Class 2 Secured Creditors would seek, and obtain, relief

from the bankruptcy stay and then would foreclose upon their Collateral, including the

encumbered fixed assets.  Under such scenario, it is very likely that no proceeds would be

available for unsecured creditors.  The Debtor believes also that, even if the Debtor's

encumbered fixed assets, including rolling stock and equipment, were liquidated by a trustee in a

Chapter 7 liquidation, the liquidation of the Debtor's encumbered fixed assets would produce no

proceeds available for distribution to unsecured creditors, and, in fact, that there would be an

aggregate amount of approximately $1,334,326 in Deficiency Claims that would be asserted by

the Secured Creditors.

**Note 10**.

Unencumbered Assets.  The Debtor has a number of items of rolling stock that are

unencumbered.  The Debtor estimates that the aggregate value of the Unencumbered Assets is

approximately $753,000.  This estimate is based, in part, upon the Sterling Appraisal and the

International Appraisal.  The Debtor estimates that, in a Chapter 7 liquidation, approximately

52% of the value of the Unencumbered Assets would be realized, without taking into account

any commissions payable to a liquidator or other costs associated with the liquidation thereof.

**Note 11**.

Causes of Action.  The Debtor has not completed an evaluation of potential Causes of

Action, including Avoidance Actions, and, accordingly, by the Disclosure Statement, the Debtor

assumes that there will be no net recoveries from the prosecution of Causes of Action.  The

Debtor believes that this assumption is very conservative, and that, in fact, the Debtor or the

Reorganized Debtor may obtain significant recoveries from the prosecution of Causes of Action

in the Chapter 11 Case.  The Debtor believes that the value of Causes of Action may be

significantly less in a Chapter 7 liquidation than in the Chapter 11 Case because, in a Chapter 7,

a trustee would lack knowledge of potential Causes of Action and a trustee may not have funding

sufficient to prosecute Causes of Action, and, consequently, may not be in a position to prosecute effectively Causes of Action.

**Note 12.**

Chapter 7 Trustee's Fees.  Pursuant to Section 326(b) of the Bankruptcy Code, a Chapter 7 trustee would be entitled to a fee equal to the following:  25% of the first $5,000 distributed to Creditors; 10% of any amount in excess of $5,000 but not in excess of $50,000; 5% on any amount in excess of $50,000, but not in excess of $1.0 million, distributed to Creditors; and reasonable compensation not to exceed 3% of monies distributed to Creditors in excess of $1.0 million.  The Debtor projects that, in a Chapter 7 case, the Secured Creditors would obtain relief from stay and would foreclosure upon their Collateral and, consequently, that a trustee would distribute only the proceeds of the Unencumbered Assets ($391,650).  The Debtor estimates, therefore, that the Chapter 7 trustee would be entitled to a fee of approximately $22,828.

**Note 13.**

Chapter 7 Trustee's Attorneys' Fees and Other Professional Fees.  The Chapter 7 trustee would need to retain counsel and accountants to assist him to liquidate the Debtor's Assets and to administer the Debtor's Chapter 7 case.  The Debtor estimates that the fees and costs incurred by such professionals would be approximately $100,000.

**Note 14.**

Costs of Services Necessary to Liquidate Assets During Chapter 7.  The Debtor believes that, in a Chapter 7 case, the Chapter 7 trustee would be required to employ agents, including liquidators, to assist the Chapter 7 trustee in the liquidation of the Debtor's Assets and to

administer the Debtor's Chapter 7 case.  The Debtor projects that the trustee would incur the amount of $40,000 with respect to the costs of personnel and agents to assist the trustee to liquidate the Debtor's Assets during Chapter 7.

**Note 15.**

Chapter 11 Administrative Claims (Unpaid).  The Debtor estimates that, as of February 1, 2019, there were the following unpaid Chapter 11 obligations:  $125,000 in accrued but unpaid payroll and associated taxes; $115,000 owed to Winthrop Couchot; $23,000 owed to Illyssa I. Fogel & Associates; $62,588 owed to Leed Rancho for unpaid post-petition rent; and $4,880 owed to Navitas Credit Corp. for unpaid post-petition equipment lease payments.  The Debtor estimates, therefore, that approximately $330,468 would need to be paid in a Chapter 7 liquidation on account of unpaid Chapter 11 Administrative Claims.

**Note 16.**

United States Trustee Fees (Unpaid).  The Debtor estimates that, as of February 1, 2019, the Debtor owed approximately $10,800 in United States Trustee Fees.

**Note 17.**

Allowed Priority Tax Claims.  The Debtor estimates that approximately $4,685 in Priority Tax Claims have been asserted against the Debtor.  The Debtor disputes such Claims and intends to object to such Claims.  The Debtor believes that, in a Chapter 7 liquidation, a trustee may not have knowledge of the Priority Tax Claims sufficient to object effectively to such claims and may not be inclined to object to such claims, and, accordingly, that such Claims may be allowed in a Chapter 7 case.  Nevertheless, to be conservative, the Debtor projects that, in a Chapter 7 liquidation, such Claims will be disallowed.

**Note 18**.

Allowed Priority Non-Tax Claims.  The Debtor estimates that approximately $24,799 in Priority Non-Tax Claims have been asserted against the Debtor.  The Debtor disputes such Claims and intends to object to such Claims.  The Debtor believes that, in a Chapter 7 liquidation, a trustee may not have knowledge of the Priority Non-Tax Claims sufficient to object effectively to such Claims and may not be inclined to object to such Claims, and, accordingly, that such Claims may be allowed in a Chapter 7 case.  Nevertheless, to be conservative, the Debtor projects that, in a Chapter 7 liquidation, such Claims will be disallowed.

**Note 19**.

Proceeds from Liquidation of Unencumbered Assets.  The Debtor projects that, in a Chapter 7 liquidation, there would be approximately $391,650 in proceeds from the liquidation of the Unencumbered Assets.  This figure derives from Chart IV.

**Note 20**.

Proceeds Necessary to Satisfy Chapter 7 Expenses, Chapter 11 Administrative Claims and Priority Claims.  The Debtor projects that, in a Chapter 7 liquidation, there would be an aggregate amount of $504,096 in Chapter 7 expenses, Chapter 11 Administrative Claims, Priority Tax Claims and Priority Non-Tax Claims.  This figure derives from Chart V.

**Note 21**.

Estimated Amount of Allowed General Unsecured Claims.  The Debtor estimates that approximately $2,704,720 in General Unsecured Claims have been asserted against the Debtor. The Debtor disputes not less than $294,000 of such Claims.  The Debtor believes that, in a Chapter 7 liquidation, the amount of General Unsecured Claims asserted against the Debtor

MAINDOCS-#237957-v6-Lovejoy-Notes_to_Liquidation_Analysis.docx

would increase significantly, in part, because of an increase in Deficiency Claims and Rejection Claims, and that the amount of General Unsecured Claims allowed in the Chapter 7 liquidation would increase significantly, in part, because the trustee would not have knowledge of the General Unsecured Claims sufficient to object effectively to such Claims and may not have the inclination to do so.

**Note 22.**

Estimated Percentage Recovery by Holders of Allowed General Unsecured Claims in Chapter 7.  The Debtor projects that, in a Chapter 7 liquidation, holders of Chapter 11 Administrative Claims would not be paid in full and that holders of Allowed General Unsecured Claims would obtain no recovery on their Claims.